E-FILED
Tuesday, 07 June, 2005  04:26:23 PM
Clerk, U.S. District Court, ILCD

Page 1

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF ILLINOIS


BARBARA J. KENDELL,

    Plaintiff,

vs.                    Case No. 04-1140

AMERICAN INCOME LIFE OF

CHICAGO and AMERICAN INCOME

LIFE INSURANCE CO.,

    Defendants.


THE VIDEOTAPED DEPOSITION of BARBARA

ELIZABETH JOHANNSEN KENDELL, taken on behalf of the

defendants, at 9:12 a.m., on March 4, 2005.


Reported by: Darlene M. Niemeyer, CSR, RPR, CCR
Illinois CSR License No.: 084-003677
Missouri CCR License No.: 866

MILES REPORTING COMPANY
1339 North 17th Street, Suite 102
Belleville, Illinois 62226-6441
(618) 235-2633
fax # (618) 235-2641

EXHIBIT

**A**

b11e9c0c-9b81-11d9-a30a-444553540000

1    Q.    Okay.  Barb, will you please state your full

2    name and spell your last name.

3    A.    Barbara Elizabeth Johannsen, J-O-H-A-N-N-S-E-N,

4    Kendell, K-E-N-D-E-L-L.

5    Q.    And have you ever gone by any other name?

6    A.    I was married briefly before Worley and I went

7    by the name of McCarty, but I took my name back when I

8    divorced him.

9    Q.    What was Mr. McCarty's first name?

10   A.    John.

11   Q.    John.  I'm sorry.  Was he a doctor?

12   A.    No, he was a -- well, when I married him he was

13   in the Air Force.  And then he left the Air Force, and

14   we both went to Bradley University up in Peoria.

15   Q.    Okay.  How long were you married to McCarty?

16   A.    Four years, I think.

17   Q.    Where did you --

18   A.    To the best of my recollection.

19   Q.    Where did you and Mr. McCarty live?

20   A.    Peoria.

21   Q.    Did you have any children?

22   A.    No.  I realized three -- we were married three

23   years, 364 days too long.

24   Q.    Okay.  And was your divorce, that was filed in

b11e9c0c-9b81-11d9-a30a-444553540000

1  Peoria, as well?

2  A.    Yes.

3  Q.    Have you gone by any other names?

4  A.    No.

5  Q.    What is your date of birth?

6  A.    January 7th, 1943.

7  Q.    Where were you born?

8  A.    St. Louis Maternity Hospital.

9  Q.    Is that in St. Louis proper?

10  A.    Well, I'm a little young.  I don't remember, but

11  yeah, mom said, yeah (the deponent laughing).

12  Q.    Okay.

13  A.    Yeah.

14  Q.    Barb, what is your current address?

15  A.    504 West High Street, Peoria.

16  Q.    How long have you lived at this address?

17  A.    I think I moved the year 2000, 2000.

18  Q.    That's when you first started residing at that

19  address?

20  A.    As far as I remember.

21  Q.    And do you rent or own this property?

22  A.    I rent.

23  Q.    Okay.  And where did you live immediately prior

24  to that?

b11e9c0c-9b81-11d9-a30a-444553540000

1    A.    Not many.

2    Q.    -- are there with him?

3    A.    Not many.

4    Q.    Okay.  How long have you and Dr. Frazier lived

5    together?

6    A.    '95.

7    Q.    Does he assist you financially?

8    A.    No.

9    Q.    You pay for your own stuff, he pays for his own

10   stuff?

11   A.    Basically.

12   Q.    Have we talked about everyone who you have been

13   married to, just the two gentlemen?

14   A.    One gentleman.  One rat.

15                         (The deponent laughing.)

16   Q.    Okay.  Fair to say.  Anyone else besides those

17   two gentlemen --

18   A.    No.

19   Q.    -- or men?  Have you lived with anyone else?

20   A.    No.

21   Q.    Do you have any children?

22   A.    No.

23   Q.    Now, Dr. Kendell had children, correct?

24   A.    Yes.

b11e9c0c-9b81-11d9-a30a-444553540000

1    Q.    And what are their names?

2    A.    James was the oldest.  He has passed away.

3  Thomas next.  William or Billy.  And then Craig.  And

4  then he had Chris, and Chris had died when I think he

5  was five years old from leukemia, five or six.

6    Q.    And where do the surviving children live?

7    A.    Tom and Bill live in Dayton, Ohio.  And Craig

8  lives in Peoria.

9    Q.    Do you stay in touch with these guys?

10    A.    I do with Tom and Bill.

11    Q.    Do you ever go visit?

12    A.    I haven't visited Tom and Bill for years.

13    Q.    So your contact with them would be by phone?

14    A.    By phone.

15    Q.    Do you support these guys in any way?

16    A.    They made more money in one month than we made

17  in an entire year.

18    Q.    Okay.  Do you have any family in the area, in

19  the St. Louis area, local area?

20    A.    My mom and dad.

21    Q.    And where do they live?

22    A.    Belleville.

23    Q.    What are their names?

24    A.    Wayne and Marie Johannsen.

b11e9c0c-9b81-11d9-a30a-444553540000

Page 39

1    Q.    The two daily -- what years are your daily

2  planners?

3    A.    I think it was 2000 and 2001.

4    Q.    Okay.

5    A.    The grievance and all the correspondence that

6  went on between me and the OPEIU, the --

7    Q.    Okay.

8    A.    -- Local 277.  The correspondence between AIL

9  Waco and me.  Letters.  The letter of termination.  The

10  letter that I wrote Roger Smith.  I think that was his

11  first name.  A copy of the -- I forgot the form that I

12  filed with the IRS.  And then I just decided not to

13  pursue that one, that I was an employee not independent

14  contractor, and I was tired of it.  Because I was being

15  treated like an employee.  I mean, I really was.

16    Q.    Okay.  Barb, that is nonresponsive to my

17  question.

18    A.    You asked me what was in there.

19    Q.    What documents, yes.

20    A.    Okay.

21    Q.    Just the documents.

22    A.    That's the documents.

23    Q.    That's it?

24    A.    Well, I can go in and I can look if I am

1    EEOC.  Because he is the one that told me to do the

2    unemployment, continue with the unemployment, file with

3    the EEOC, continue on.  See what ruling they came to

4    and then if --

5        Q.    Wait, wait.  They?  The ruling they came to.

6    Who, the EEOC?

7        A.    The EEOC.

8        Q.    Okay.

9        A.    I mean, he wouldn't have known what they were

10   going to rule.  And I saw him, I think, four times.

11   And -- four or five times.  I don't remember which.

12   And that after I got the right to sue letter then I

13   went back to see him to see if the firm would take it.

14   He said well, yeah, but not on contingency.  And I

15   couldn't afford him.

16       Q.    What were his hourly rates?

17       A.    When I saw him prior to it was $250.00 an hour.

18   And if you were there 20 minutes, it was still 250

19   bucks an hour.  And to handle the law -- the litigation

20   would have been, I think -- I think it was $30,000.00

21   down.  And I don't remember whether it was $250.00 an

22   hour or $300.00 an hour.

23       Q.    Did he tell you why he would not take your case

24   on a contingency fee basis?

b11e9c0c-9b81-11d9-a30a-444553540000

1    A.    Yes, because he was handling another one on

2  contingency against an insurance company.  And I

3  believe the insurance company was combined, and I might

4  be wrong on that.  And the contingency had run the firm

5  into, I think he said, like, 200,000 already, and they

6  just couldn't afford to do another one.

7    Q.    Have you used Leo as an attorney before?

8    A.    No, but everybody in Peoria knows the name

9  Benassi & Benassi when it comes to suing employers.

10  They win.

11    Q.    So he specializes in employment law?

12    A.    Oh, big time.  They got major suit -- judgement

13  against Mitsubishi and Caterpillar.

14    Q.    Do you recall, did Leo say anything else about

15  your lawsuit or about your case against American

16  Income, AIL Waco or Scott Smith's agency?

17    A.    He said they really were -- I don't remember his

18  exact words.  But basically that they really, from all

19  the information that I showed him and all the

20  correspondence, the same stuff that you have got, when

21  I told him all about Terry and Scott, he said that they

22  -- well, it was something to the effect they really are

23  bums or -- it was a word like that.

24    Q.    Okay.  When you went to him, were you talking to

1    him about suing Scott Smith's agency where Terry

2    Brennan was, or did you talk to him also about AIL

3    Waco?

4        A.    Both.

5        Q.    About both?

6        A.    (Nodded head up and down.)

7        Q.    And he thought you had a claim -- a good case

8    against AIL Waco?

9        A.    Yes.

10       Q.    Okay.  Have you contacted anyone else to

11   represent you?

12       A.    Back in, I think, the beginning of December or

13   the end of November last year, I -- let's see.  I

14   talked with Kevin Sullivan.  He is a friend.  Well,

15   kind of a friend.  When I couldn't get a response out

16   of the charge that they were trying to serve on AIL

17   Chicago, and they refused service, and I didn't know

18   what to do about that.  I didn't know you could do

19   that.  I kept thinking of all of the times that we had

20   been subpoenaed to testify for clients, patients.  I

21   didn't know you could just refuse service.  And so I

22   went and I talked to Kevin.  And he said he didn't know

23   that either.  Surprise.  He said, why don't you go talk

24   to Dan O'Day, and I don't remember what his firm is.

b11e9c0c-9b81-11d9-a30a-444553540000

Page 47

1    Something and Fleming or Fleming and something.    I

2    don't remember.

3        Q.    In Peoria?

4        A.    Yeah.

5        Q.    Are Kevin and Dan both in Peoria?

6        A.    Uh-huh.

7        Q.    Okay.

8        A.    So I dropped all the stuff off, and his

9    secretary said he would take a look at it.    But I had

10   one of the deadlines for you, and I don't remember

11   which one, to meet.    And he was in some trial somewhere

12   other than Peoria and hadn't been able to get back and

13   go through the stuff.    Three weeks later I was under a

14   deadline for you.    So I had to just go down and get it.

15   And then by that time I sat there and I thought I'm

16   going to do it myself.    I'm either going to win or I'm

17   going to lose.    I don't care.

18       Q.    So Kevin Sullivan, then, you talked to him about

19   the service of subpoena issue.    You didn't talk to him

20   about the merits of your case, did you?

21       A.    No.

22       Q.    Dan O'Day, the same thing, you never got to

23   talk to him about --

24       A.    I talked to his equivalent of Robin.

b11e9c0c-9b81-11d9-a30a-444553540000

Page 48

1    Q.    A paralegal?

2    A.    Uh-huh.

3    Q.    A legal assistant?

4    A.    (Nodded head up and down.)

5    Q.    And do you recall what the legal assistant said

6    to you?

7    A.    Other than the fact that she would have him take

8    a look at it as soon as he was able to, no.

9    Q.    Back when you were talking with Leo about your

10   case, did he ever point out any weaknesses to you or

11   things that you should be concerned about if you

12   brought suit or filed a charge with the EEOC?

13   A.    No.

14   Q.    Did you talk to any other lawyers?

15   A.    I talked to Lance Hanna, and I'm not sure if he

16   is a lawyer or not.

17   Q.    Where is Lance Hanna?

18   A.    Peoria.  He used to be an attorney, but now he

19   is a president of an oil company.  So I'm not sure

20   whether he still has his law license or not.

21   Q.    What did you talk to Lance about?

22   A.    I told him I had a suit and I needed some

23   advice.

24   Q.    Advice on what?

b11e9c0c-9b81-11d9-a30a-444553540000

1    A.    And I didn't put it on the job application.

2    Q.    Okay.  For example, what did --

3    A.    If --

4    Q.    -- you leave out?

5    A.    Okay.  I was the administrator of the Muscular &

6  Arthritis Pain Clinic.  I put down everything, every

7  job description, which included everything from hiring,

8  firing, CEO, CFO, you name it, I did it, wrote the

9  contracts, hired the physicians, fired the physicians,

10  the physical therapists, everything.

11    Q.    So what did you leave off you should have

12  included?

13    A.    Now, wait a minute.  At the same time I was also

14  president of Joken, Limited, which was a real estate

15  limited partnership.  I was also the president of MKM

16  Enterprises, which was a business dealing with -- a

17  nutritional business.

18    Q.    All right.  So you left these off?

19    A.    Well, I had five or six different companies that

20  I was the acting -- I don't mean acting.  I mean

21  physically doing, as far as running the place or owning

22  it.

23    Q.    So --

24    A.    And people would see that and they would --

b11e9c0c-9b81-11d9-a30a-444553540000

Page 79

1    Q.    Do you know when this lien was filed against

2    you?

3    A.    '92.

4    Q.    Possibly '94?

5    A.    Possibly '94.

6    Q.    Are there any other liens that have been filed

7    against you?

8    A.    Not that I know of.

9    Q.    Okay.  What about a lawsuit, Laura --

10   A.    Oh, yeah.

11   Q.    -- Schierer?

12   A.    Laura Schierer.

13   Q.    I'm sorry.  How do you say the last name?

14   A.    Schierer.

15   Q.    Schierer.  What does that lawsuit involve?

16   A.    She did -- you don't really want to know.  Well,

17   yes, you do.  I will give you the short version.  She

18   did -- she had In His Image Design, and she did a lot

19   of the art work posters, advertising material, placed

20   the ads in the papers and stuff, and both for Muscular

21   & Arthritis Pain Clinic, Doctors Management, MKM

22   Enterprises.

23          And she and her husband got involved in

24   illegal drugs and went through a long problem, the

Page 80

1   longest problem.  We took over the contracts direct and

2   started paying the suppliers ourselves, because she was

3   -- we were giving her money and we were getting dunning

4   notices from, like, the Peoria Journal Star.  I don't

5   remember who else it was anymore.

6           And at that point we stopped paying her and

7   she disappeared for several months.  And then she came

8   back and wanted payment, and she didn't -- wouldn't

9   give us an accounting of the money that she had already

10  gotten.  And so we just decided that was it.  We paid

11  off all of the advertisers themselves and she brought

12  lawsuit.

13  Q.    What amount did she seek from you, from --

14  A.    I don't ever remember.

15  Q.    -- your company?  When was that lawsuit filed?

16  A.    I think that was in '94, too.  I am not sure.

17  Q.    So '94 was a bad year for you?

18  A.    Oh, '93, '94 was terrible.

19  Q.    Okay.  Were you represented by counsel in that

20  lawsuit?

21  A.    Originally, yes, but I don't remember.

22  Q.    Do you know who the lawyer was?

23  A.    I think it was Dave Couri, but I won't swear to

24  it.

Page 81

1     Q.     This lawsuit was filed in Peoria County,

2     correct?

3     A.     Yeah.

4     Q.     And what happened, was it settled?  It just went

5     away?

6     A.     She left town.  The original attorney she had

7     didn't pursue it.  Then she came back and she got

8     another attorney, and he decided to reinstitute it.  It

9     should have been included in the bankruptcy.  I don't

10     know how she ever got him to reinstitute it.  By that

11     time I was fed up and I decided to represent myself,

12     because I didn't have any money to hire an attorney.

13     And it just -- it petered out.  I don't know what ever

14     happened to it.

15     Q.     So that matter still has not been resolved, as

16     far --

17     A.     I haven't --

18     Q.     -- as you know?

19     A.     As far as I know.

20     Q.     Okay.  Also you mentioned bankruptcy.  Is it

21     right that you guys -- you filed for bankruptcy in

22     October of 1994?

23     A.     Correct.

24     Q.     Is that correct?  And it was Chapter 7

Page 82

1    bankruptcy, right?

2       A.    Yes.

3       Q.    Your attorney was Gregg Grimsley?

4       A.    Yes.

5       Q.    Is that correct?

6       A.    What is the law firm downstairs?  Heyl, Royster.

7    That's when he was with Heyl, Royster.

8       Q.    And you filed for bankruptcy, you filed

9    individually and listed the nature of your debt as

10   business?

11      A.    We just took all the business debt and

12   everything and dumped it on me and I filed.

13      Q.    What about a lawsuit, First Nation, Laura

14   Schierer and Lomas?  Lomas?  Have you ever heard of

15   that?

16      A.    Lomas & Nettleton, they were the --

17      Q.    Was there a lawsuit involving you and First

18   Nation, Laura Schierer and --

19      A.    I don't know what First Nation is.  Laura

20   Schierer is the same one we have been talking about.

21      Q.    That's what we just discussed.  Okay.

22      A.    And Lomas would be Lomas & Nettleton, and they

23   were the ones that had the mortgage on the house.

24      Q.    Okay.

b11e9c0c-9b81-11d9-a30a-444553540000

Page 83

1    A.      Then the bank had the second mortgage and the

2    SBC.

3    Q.      So, Barb, the business that you were referring

4    to in the bankruptcy proceeding, that's the MKM

5    Enterprise; is that right?

6    A.      That would have been Muscular & Arthritis Pain

7    Clinic, Doctors Management, Joken, MKM Enterprises all

8    rolled up into one.

9    Q.      Okay.  I guess the information is that the

10   debtor owned 33 percent.  Would that be you, the

11   debtor, you owned 33 percent?

12   A.      I don't remember at that point.  We -- I don't

13   remember at all --

14   Q.      Wait.  Who --

15   A.      -- who owned what.

16   Q.      Okay.  Well, who were the individuals that owned

17   the remaining percentage, regardless of what that

18   percentage is?

19   A.      It would have been my husband.

20   Q.      So you and your husband?

21   A.      Yeah.

22   Q.      That's it?  Anyone else?

23   A.      Originally -- at that point, no.  We had paid

24   off our -- took on the debt of everybody else to get

b11e9c0c-9b81-11d9-a30a-444553540000

Page 84

1    them out from under.

2    Q.    Why did you do that?

3    A.    Because of the stockholders.  We didn't want

4    anybody to be able to come back on a stockholder --

5    Q.    Okay.

6    A.    -- of one of the corporations.  So we took the

7    stock back.

8    Q.    So there were no shareholders?

9    A.    So there were no shareholders besides me and my

10   husband.

11   Q.    And MKM, did that operate a diet center?

12   A.    Yes.

13   Q.    What was the name of that business?

14   A.    Diet Center.

15   Q.    Diet Center is the name of it.

16   A.    Diet Center was the original -- it sort of

17   became like the word Kleenex.

18   Q.    Okay.  So when I just asked you MKM Enterprises,

19   that is the business that was filing for bankruptcy,

20   and you said, yeah, that includes a lot of things.  So

21   that includes the Diet Center, Muscular & Arthritis

22   Corporation?

23   A.    Yeah, that was separate.

24   Q.    That was separate?

Page 85

1    A.    Muscular & Arthritis Pain Clinic was a C

2    Corporation.

3    Q.    Okay.  And that closed in 1992, December of

4    1992; is that correct?

5    A.    Uh-huh.

6    Q.    And the Joken, Limited --

7    A.    Uh-huh.

8    Q.    -- who else was a partner in that, or who were

9    the partners?

10   A.    I was the managing general partner and

11   originally Worley and my mom and dad.

12   Q.    And that closed the same thing, December of

13   1992?

14   A.    I'm not sure exactly of the date of the final

15   IRS filing.

16   Q.    So December of --

17   A.    Somewhere around in that -- at that time frame

18   somewhere.

19   Q.    That sounds right?

20   A.    Yeah.

21   Q.    Okay.  What about Management Systems, Inc.?

22   A.    Doctors Management Systems.

23   Q.    That closed also in December of 1992?

24   A.    And then I reopened it again about five years

b11e9c0c-9b81-11d9-a30a-444553540000

Page 86

1   ago.

2      Q.    So in 2000 you reopened that?

3      A.    I think so.  About five years ago.  Six years

4   ago.  And I just held it open for a brief period of

5   time, because I was going to bankrupt it.  It hadn't

6   actually gone through bankruptcy.  I thought that was

7   going to be the easiest way of getting rid of Laura

8   Schierer, and then she just sort of disappeared.

9      Q.    So you did -- so what is going on with this

10  Doctors Management Systems?  It still exists as a

11  business, or did you bankrupt it?

12     A.    I didn't bankrupt it.

13     Q.    So it still exists?

14     A.    It still exists.

15     Q.    Is there a physical building?

16     A.    No.

17     Q.    It is just a company name?

18     A.    Just a company name.

19     Q.    Does it have any assets?

20     A.    No.

21     Q.    Any liabilities?

22     A.    Other than Laura Schierer, no.

23     Q.    Now, let me ask you, what happened in 1992 for

24  you to have all these business closings?  Do you recall

Page 93

1    A.    Yes.

2    Q.    And what happened to --

3    A.    I think.  No.  Well, I don't know.  I don't know

4    whether Lomas took it over or whether the bank took it.

5    I don't -- I don't actually know who --

6    Q.    Lomas Mortgage USA?

7    A.    They actually took it back.  Not the bank.

8    Okay.  Fine.

9    Q.    What happened then?  Did you have to move out of

10   your home?

11   A.    Oh, yeah, that's when --

12   Q.    That's when you moved?

13   A.    That's when I moved over on to Linn.

14   Q.    Okay.  What about the lawsuit Methodist Medical

15   Center of Illinois versus Worley Kendell and Barbara

16   Kendell?  Are you aware of that lawsuit?

17   A.    No.

18   Q.    It is filed in November of 1994 in Peoria

19   County.  Does that ring a bell?

20   A.    It is probably a bill that I just couldn't pay.

21   Q.    Yes, actually, you are correct.  Complaints on

22   payment of $5,978.79 for medical services rendered to

23   Barbara Kendell.  Your hospital admission date was

24   02-21-93.  That would be the time period you just, I

Page 94

1    believe, testified when you went in for psychiatric

2    care; is that right?

3        A.    I would imagine.

4        Q.    Did you not pay that bill at that time?

5        A.    Obviously, I didn't have the money to pay

6    whatever the insurance didn't cover.  I mean, I had no

7    money.

8        Q.    And so they filed suit against you?

9        A.    Sure.

10       Q.    Right.  Do you recall how this resolved?

11       A.    Discharged in bankruptcy, I would imagine.

12   There was a lot of people suing over that.

13       Q.    Another lawsuit, this is in 1993, Widmer?

14       A.    I was just thinking of that when I said there

15   was a lot.

16       Q.    The Widmer lawsuit?

17       A.    They were the ones that we had the furniture

18   from.

19       Q.    You were also named as a defendant in that

20   lawsuit, too, correct?

21       A.    Uh-huh.

22       Q.    That was in Peoria County.  Your lawyer was Dave

23   Couri; is that correct?

24       A.    I'm assuming that was David that --

Page 95

1   Q.    And Gregg Grimsley; is that correct, Dave?

2   A.    Yes.

3   Q.    Or excuse me, Gregg Grimsley?

4   A.    Yes.

5   Q.    Here, Barb, you entered into an equipment lease

6   with Widmer --

7   A.    For the equipment.

8   Q.    -- in 1991.  Does that ring a bell?

9   A.    Yes, that's when we put the addition on the

10  building and got the new equipment.

11  Q.    Do you recall what they sued you for?

12  A.    Because we couldn't pay it when the clinic

13  closed.

14  Q.    Do you recall how much you owed them?

15  A.    No.

16  Q.    If I said 23,000 and change does that sound

17  right?

18  A.    Fine.

19  Q.    Do you also recall during this lawsuit that your

20  attorney, David Couri, withdrew as Counsel because you

21  had not paid him and you owed him in excess of

22  $5,000.00 in legal fees?

23  A.    Is that the reason he gave?  Okay.

24  Q.    Was that not the truth, Barb?  What happened?

Page 96

1    A.    Dave didn't want to do any work.  Dave -- I was

2    paying Dave.  Dave screwed up.  Dave missed a filing

3    date.  We were in litigation with Schielein

4    Construction, because they had screwed up the addition

5    that they had put on.  And I don't remember which

6    filing date he -- he told me, and he also told the

7    First National Bank of Washington, and the president

8    was Don Uphoff, exactly what he was doing and

9    everything was going this way, and he was filing this

10   and filing that.  And he lied and he missed a filing

11   date.  And so then we decided we were going to sue him

12   for malpractice.  And it seems that attorneys are very

13   -- are willing to sue another attorney for malpractice

14   especially when he mismanaged the case as badly as he

15   did.

16   Q.    So basically, to sum up what you just said, you

17   fired him as your lawyer; is that correct?

18   A.    Yeah, basically.

19   Q.    Okay.  But the matter with Widmer, that matter

20   settled; is that correct?

21   A.    It went with the bankruptcy.

22   Q.    Bankruptcy?

23   A.    It is amazing how much stuff you can get rid of

24   just with a bankruptcy.

Page 97

1    Q.    You will have to help me with this name.  What

2    about Schielein?

3    A.    Schielein.

4    Q.    Schielein.

5    A.    That is what I was --

6    Q.    Schielein Construction.

7    A.    -- just telling you about.

8    Q.    Okay.  They also sued you.  Your lawyer was Dave

9    Couri; is that correct?

10   A.    And that's the one he screwed up badly on.

11   Q.    And that was filed in Peoria County in 1991?

12   A.    (Nodded head up and down.)

13   Q.    And that -- this bill was for $25,000.00 and

14   change?

15   A.    Uh-huh.

16   Q.    Is that correct?

17   A.    I'm assuming that that's correct.

18   Q.    Now, you, at some point, filed a third party

19   complaint against McMorrow seeking $15,000.00; is that

20   right?

21   A.    That's right.  He was the architect.

22   Q.    Okay.  And also filed a counterclaim; is that

23   correct?

24   A.    Against Schielein?

b11e9c0c-9b81-11d9-a30a-444553540000

Page 98

1    Q.    I believe so, yes.

2    A.    I brought the -- I brought -- yes, that is true.

3    They brought it first, and then I filed a counterclaim.

4    Q.    And do you recall --

5    A.    Dave was supposed to file first.

6    Q.    And, Barb, do you recall in McMorrow's answer

7    that he accused you of knowing how to manipulate the

8    legal system?

9    A.    No, I don't recall that.

10    Q.    Do you have any idea why this person would say

11    that about you?

12    A.    No.

13    Q.    No pleading?

14    A.    No.

15    Q.    In this matter --

16    A.    Except I know he was mad that I was suing him.

17    And he was mad that I -- he was just -- he was just

18    angry.  I can't -- he did a lousy job on the

19    architectural renderings and he cut a lot of corners.

20    Q.    Okay.

21    A.    Schielein cut more corners and we ended up with

22    a building that was not what it was supposed to be.

23    Q.    Okay.  Thank you.  And this matter settled, too,

24    correct?

b11e9c0c-9b81-11d9-a30a-444553540000

Page 99

1    A.    Yes.

2    Q.    You have another one.  Lomas Mortgage --

3    A.    That's the same one you just talked about

4    earlier.

5    Q.    Oh, the foreclosure, yes, okay.  And your home

6    was sold at public auction to you; is that right?

7    A.    No.

8    Q.    You didn't buy the house back?

9    A.    No.

10   Q.    Do you know how much the house sold for?

11   A.    No, but I would like to know.  How much?

12   Q.    I don't know, Barb.

13   A.    I thought maybe you had it.

14   Q.    What about a company by the name of DIJOY, Inc.?

15   A.    That's who MKM Enterprises bought Diet Center

16   from.

17   Q.    Okay.  And DIJOY sued you, as well?

18   A.    Uh-huh.

19   Q.    Right?  Do you know why they sued you or do you

20   remember?

21   A.    Because we didn't have the money with everything

22   else going on and collapsing around our ears to pay

23   their note.

24   Q.    Okay.  Do you remember how much they sought from

Page 100

1    you?

2    A.    No.

3    Q.    If I told you it was $102,429.82 plus interest

4    and costs, does that about right?

5    A.    That's fine.  I guess.  I don't know.  That

6    whole time period is just a nice big blur.

7    Q.    Do you recall, did you have your deposition

8    taken in that matter, the DIJOY matter?

9    A.    Yes, I did have a deposition taken.

10    Q.    What about the other lawsuits we just discussed,

11    did you have your deposition taken in any of those

12    lawsuits?

13    A.    I don't think so.  I think DIJOY was the only

14    one that I remember sitting down with an attorney, I

15    think.

16    Q.    Okay.  The next lawsuit, this was filed in 1993,

17    December of 1993, First Bank of Washington, do you

18    recall that?

19    A.    Yes, they are the ones that held the mortgage,

20    and we got the SBA loan for.

21    Q.    Okay.  And your attorneys there were Gregg

22    Grimsley?

23    A.    Uh-huh.

24    Q.    Is that right?

Page 104

1    Q.    So you -- for Gentry Group you were both an area

2    director and an agent?

3    A.    I gave up the area directorship and I became an

4    agent.

5    Q.    Were you a captured agent for Gentry Group?

6    A.    When I was an area director, yeah, I was an

7    employee.  And when I went down to regular

8    run-of-the-mill agent, no, I was not a captive.  I was

9    just prohibited from selling a competitive annuity or

10   annuity with a competitor.

11   Q.    Okay.  Where after Gentry Group?

12   A.    After Gentry Group I had my own again, Kendell

13   Insurance.  I have always had Kendell Insurance since

14   the year one.

15   Q.    How long have you had Kendell?

16   A.    1997.

17   Q.    Okay.  So then after Gentry Group you --

18   A.    Just hung out of my house and --

19   Q.    Okay.

20   A.    -- brokered through anybody or found anybody I

21   could sell something to until I went with American --

22   Triple A.

23   Q.    Okay.  When you were with the Gentry Group, were

24   you -- you said when you were an agent you were an

1    Q.    What else is missing?  What else should be

2    provided in the prior work experience that you omitted?

3    If we are going to get this truthful and accurate, what

4    should be there?

5    A.    Well, Ohio National should be down.

6    Q.    Okay.  AIL should be?

7    A.    Ohio National.

8    Q.    Ohio National.

9    A.    But when they give you a couple of places to

10   write, you hit the high points.

11   Q.    You go back to 1997 and 1994?

12   A.    Okay.  When I first started out afterwards I was

13   an agent for Ohio National.  I forgot to tell you that

14   part.

15   Q.    Why did you not put them on there then?

16   A.    I have only got two places to write.

17   Q.    I see that.  And you don't have to yell at me,

18   Barb.

19   A.    I'm sorry.  It is frustrating.

20   Q.    Oh, I'm frustrated, too.

21   A.    Kendell Insurance has been in existence since

22   1997 to today.

23   Q.    Are you still -- is that still in business?

24   A.    Yes, because I still have to file a Schedule C.

b11e9c0c-9b81-11d9-a30a-444553540000

Page 113

1    Q.    Did you have Kendell Insurance when you were

2  working for AIL?

3    A.    Yes.

4    Q.    Were you selling business for Kendell Insurance?

5    A.    As far as receipting in renewals, yes.

6    Q.    That's not the question.  Did you sell any

7  business for Kendell Insurance while you were working

8  for AIL?

9    A.    No.

10   Q.    The business is currently open.  Are you

11 currently selling any insurance?

12   A.    Other than Triple A, no.

13   Q.    So Kendell Insurance exists, but you are not

14 doing anything with it; is that right?

15   A.    I am receipting money in.

16   Q.    On renewals?

17   A.    On renewals.

18   Q.    But you are not currently selling any policies?

19   A.    No.

20   Q.    Can you please turn to the last page of your

21 application under conditions of employment, where you

22 signed, the bottom section?

23   A.    The last -- okay.

24   Q.    So Barb, when you filled this out, the very

1    Q.    Didn't you, in your own words, just categorize

2   what you did in this application as an omission?  And

3   it would necessarily be an omission of fact, wouldn't

4   it?

5    A.    I guess it would.  I never stopped to think

6   about whether that would be the definition of an

7   omission of fact.

8    Q.    Okay.  Barb, what are you making?  What is your

9   -- do you have a weekly rate, a monthly rate?  What are

10  you making at Triple A?

11   A.    Right now I'm making somewhere around 900 and --

12  actually take home pay, 930 or 960 -- it depends --

13  dollars every two weeks.

14   Q.    When did you start working with Triple A?

15   A.    My first actual date, I believe, was -- I think

16  training started, if it was on a Monday, the 6th of

17  December.

18   Q.    So, Barb, the money you make, your take home pay

19  of 960, 930 every two weeks, that is not based on

20  commissions?  Is this a salary?

21   A.    It is a salary and some commissions are figured

22  in somewhere along the line.  So far I don't know if

23  any of them have been figured in or not.  Commission

24  pay out schedule is different than the regular pay

1    say, in the last, I don't know, two or three years?

2        A.    I think so.

3        Q.    Did you produce those two us?

4        A.    Sure.

5        Q.    No, did you produce those to us?

6        A.    No.  You didn't ask for them.

7        Q.    Okay.  Well, I'm asking now.  Will you produce

8    to me a log of all of the places where you have sold --

9    or all the individuals you have sold insurance to and

10   what companies you went with?

11       A.    Is that privileged information?

12       Q.    If you have that question, you will have to ask

13   your own lawyer.

14       A.    I guess I will have to ask an attorney.  I'm not

15   sure if that is privileged or not.  I don't know.

16       Q.    Well, if it is privileged, Barb, what you can do

17   is you can redact whatever information you believe is

18   privileged and you provide me with a privileged log

19   stating exactly what was redacted.  That's what you can

20   do.  Do you agree to do that?

21       A.    Yes, I can do that.

22       Q.    Okay.  Thank you.  Now, as an employee of Triple

23   A, you receive benefits, right?

24       A.    Yes.

1    Q.    And can you tell me again what benefits do you

2    get from Triple A?

3    A.    I get a major medical through group, which is

4    Blue Cross/Blue Shield.

5    Q.    Is this the same health insurance that you had

6    when you were with AIL?

7    A.    Well, it's the same company.  I don't --

8    Q.    Okay.  But it is a group policy with Blue Cross?

9    A.    Yeah.  Each group is different.

10    Q.    Okay.

11    A.    I get dental insurance and I get eyeglass

12    insurance.  I have a 401.  I have a deferred comp.

13    Q.    I'm sorry.  What does that mean, deferred comp?

14    A.    They take so much money out of your paycheck and

15    invest it for you in a mutual fund.

16    Q.    Oh, so like a 401(k)?

17    A.    It is like a 401.

18    Q.    Okay.  What else?

19    A.    I think that's it.

20    Q.    On the group health insurance with Blue Cross,

21    are you --

22    A.    Oh, a prescription plan, too.

23    Q.    I'm sorry?

24    A.    A prescription plan, a drug plan, which is

Page 294

1    says.  And I found out there is no -- at least I could

2    not locate a state or a federal agency who really cared

3    what happens to an independent contractor.

4       Q.    Barb, you filed a grievance with the union,

5    though, didn't you?

6       A.    Yes, I filed a grievance with the union.

7       Q.    Okay.  So you filed a grievance with the union.

8    You filed a claim with the unemployment agency?

9       A.    (Nodded head up and down.)

10      Q.    You called the Department of Labor, but they

11   verbally rejected you because you are an independent

12   contractor?

13      A.    I also called a friend of mine who is the head

14   of the National Labor Relations Board.

15      Q.    Who is that?

16      A.    Will Vance.

17      Q.    Vance?

18      A.    Vance.

19      Q.    V-A-N-C-E?

20      A.    V-A-N-C-E.

21      Q.    And what did you discuss with Will Vance?

22      A.    And I told Will, I said, you know, I got fired

23   and I told him briefly.  And he said, Barb, I would

24   point you in the right direction, but I don't know as

b11e9c0c-9b81-11d9-a30a-444553540000

Page 374

1    filing I am filing against everybody, I guess.

2    Q.    And, Barb, you brought your EEOC charge of

3    discrimination only against Scott Smith's agency.  It

4    was AIL of Chicago; isn't that correct?

5    A.    That is correct.  Can I close this now?

6    Q.    Yes, please.

7    A.    Good.

8    Q.    Still on camera.  Great.  Yes, Barb.  You did

9    not name AIL Waco in your EEOC charge of

10   discrimination; is that right?

11   A.    They had never --

12   Q.    Yes or no?  That's a --

13   A.    That's right.

14   Q.    Okay.  And explain to me now why did you not

15   name AIL Waco in your charge of discrimination?

16   A.    Because they -- nobody from Waco had actually

17   physically, verbally or by letter assaulted me with

18   discrimination, to my knowledge.  It was all Scott and

19   all Terry.

20   Q.    Okay.  Then why did you decide to bring them

21   when you filed your federal lawsuit in the Central

22   District?

23   A.    Because after I filed with the EEOC and they did

24   the investigation, they said I should amend it and we

Page 375

1    should file against Waco, too.

2    Q.    Oh, someone at the EEOC told you that?

3    A.    Yes.

4    Q.    Do you remember who that was?

5    A.    Carol Milazzo who added that.

6    Q.    Okay.  Did you -- but you didn't amend your

7    charge in the EEOC phase, did you?

8    A.    She added -- she said I'm -- she said she had a

9    lot of trouble trying to figure out who was

10   responsible, where did the buck stop.  And --

11   Q.    Now, Barb, wait.  The question was you never

12   amended your charge, did you?

13   A.    She did.

14   Q.    Did you --

15   A.    She added them.

16   Q.    Okay.  Do you have -- but is there an amended

17   charge of discrimination on file with the EEOC?  Do you

18   know?

19   A.    I never did.  She chose to put them on.

20   Q.    Okay.  But my question was an amended charge.

21   Now, as far as I know there is no amended charge.  She

22   may have added them -- cc'd them to correspondence.  So

23   my question is, are you aware, was your charge ever

24   amended?  Did you sign a new charge?

b11e9c0c-9b81-11d9-a30a-444553540000

Page 376

1    A.    No.

2    Q.    Okay.

3    A.    Not to my knowledge.

4    Q.    So as far as you know, there was no amended

5    charge of discrimination?

6    A.    No.

7    Q.    Okay.  Barb, we are going to go through your

8    list of witnesses.  And all I want to know is who the

9    individual is and what you believe they know, what

10   knowledge they have.  Who is John Reeves?

11   A.    I don't know.  I think I dropped his name.  Or

12   John -- I don't remember.  John -- there was one name

13   that I put in originally and I don't remember why I had

14   his name in.  Now, this John Reeves I don't remember

15   what he -- what do I say on that?

16   Q.    You don't have it on this.  This is in your

17   amended discovery.  You had John Reeves.  Well, either

18   you -- sitting here today, do you know who John Reeves

19   is?

20   A.    No.

21   Q.    Okay.  What about Kevin Rutler?

22   A.    Rutter.

23   Q.    Rutter?

24   A.    He was also an agent.

b11e9c0c-9b81-11d9-a30a-444553540000

Page 428

1    shine, and that just...

2    Q.    Okay, Barb.  You received unemployment

3    compensation after your contract was terminated,

4    correct?

5    A.    Yeah, after I fought it all the way through,

6    correct.

7    Q.    And what happened?  Was there a final

8    determination, a review by the board that you were not

9    an employee but were an independent contractor?

10    A.    The way it was explained to me, and I did

11    contact an attorney over that.  In fact, I think it was

12    one down in the Belleville area I finally talked to and

13    I don't remember who.  I might have a note on

14    something.

15    Q.    Okay.

16    A.    Because I was really worried if that was going

17    to affect my EEOC ruling or anything.

18    Q.    But what ultimately happened, just a simple

19    answer to that one?

20    A.    They said that was only to make sure that

21    American Income didn't have to reimburse IDES for the

22    money that they had given me.  Don't ask.  That is the

23    way it was explained to me.

24    Q.    Well, what was their ultimate determination?

b11e9c0c-9b81-11d9-a30a-444553540000

Page 478

1   STATE OF ILLINOIS     )
                          )  SS
2   COUNTY OF MONTGOMERY)

3              C E R T I F I C A T E

4        I, DARLENE M. NIEMEYER, a Notary Public in

5   and for the County of Montgomery, State of Illinois, DO

6   HEREBY CERTIFY that pursuant to agreement there

7   appeared before me on the 4th of March A.D., 2005, at

8   103 W. Vandalia Street, Suite 300, Edwardsville,

9   Illinois, BARBARA ELIZABETH JOHANNSEN KENDELL, who was

10  first duly sworn by me to testify the whole truth of

11  her knowledge touching upon the matter in controversy

12  aforesaid so far as she should be examined, and her

13  examination was taken by me in shorthand and afterwards

14  transcribed (her signature having been not waived) and

15  said deposition is herewith returned.

16       IN WITNESS WHEREOF I have hereunto set my

17  hand and affixed my Notarial Seal this 21st day of

18  March A.D., 2005.

19

20

21              Notary Public and Certified
                Shorthand Reporter
22
    Illinois CSR License No.: 084-003677
23  My Notary Commission Expires: 03-03-2007

24