E-FILED
Monday, 27 June, 2005  09:10:14 AM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF ILLINOIS

BARBARA J. KENDELL,

    Plaintiff,

vs.                              Case No. 04-1140

AMERICAN INCOME LIFE OF

CHICAGO and AMERICAN INCOME

LIFE INSURANCE CO.,

    Defendants.

      THE DEPOSITION of JOSEPH COURI, M.D., taken on behalf of the defendants, at 1:02 p.m., on June 6, 2005.

    Reported by: Darlene M. Niemeyer, CSR, RPR, CCR
       Illinois CSR License No.: 084-003677
        Missouri CCR License No.: 866

       MILES REPORTING COMPANY
  1339 North 17th Street, Suite 102
    Belleville, Illinois 62226-6441
        (618) 235-2633
      fax # (618) 235-2641


EXHIBIT C

Page 30

1  mentioned, she was the one who brought it up initially
2  about the concept of the court appointed attorney.
3  Q.  Okay.  Have you told me everything that you can
4  recall regarding these discussions with Barb?
5  A.  Yes.
6  Q.  Okay.  Regarding the options that you discussed,
7  what option was chosen, do you recall?
8  A.  Well, the options were either she continues to
9  represent herself or she gets an attorney, from a legal
10 standpoint.  So we talked about the medical standpoint.
11 Now, the legal standpoint, the option is representing
12 herself or get an attorney.
13 Q.  Did Barb tell you that she tried to get an
14 attorney previously?
15 A.  She mentioned something.  Honestly, I don't
16 remember specifically what she said.
17 Q.  Then you continue in sentence number three by
18 stating, I feel it would be better for her hands if she
19 had a court appointed attorney.  How, in your medical
20 opinion, would a court appointed attorney help or be
21 better for Barb's hands?
22 A.  She told me that she was preparing quite a bit
23 of paperwork as her self-representative.  Off the
24 record.

Page 31

1       MS. HANSELL:  Okay.
2           (Discussion off the record.)
3       THE DEPONENT:  She was preparing quite a bit
4  of paperwork to represent herself in this legal matter.
5  Q.  (By Ms. Hansell) Okay.  So it is your
6  understanding that if she gets a court appointed
7  attorney that that attorney will be doing all the
8  paperwork?
9  A.  Yes.  So the reason for proceeding with this
10 logic is that she would -- having an attorney to help
11 her, it would relieve her of some of this hand work
12 that she was doing.  That was my understanding of the
13 situation.
14 Q.  Now, wouldn't it be just as helpful to her hands
15 if her live-in boyfriend or a coworker or a friend
16 could assist her with the writing that she is engaging
17 in right now?
18 A.  Well, I guess it gets us back to the concept of
19 representing herself and is she doing herself justice
20 by representing herself, or is she going to be better
21 represented by having an expert professional attorney
22 to represent her.
23 Q.  So is it fair to say, then, even setting aside
24 -- even assuming that Barb didn't have any hand

Page 32

1  problems, it is your position that she would be better
2  off with a lawyer in this lawsuit than without?
3  A.  Probably.
4  Q.  Okay.
5  A.  Yeah, yes.
6  Q.  I am sorry, but I was looking at this sentence
7  and I thought, well, if it is the writing she could get
8  assistance from someone else besides a lawyer.  I mean,
9  that could alleviate some of the pain she is suffering
10 from.
11 A.  You know, I think it is both.  It is for both
12 reasons.  That is probably something I would say to
13 just about anybody.
14 Q.  Okay.  We briefly talked about this before, but
15 in the last sentence of your letter you state that you
16 have mixed feelings about her representing herself
17 anyway.  I think you have generally discussed this,
18 telling me that you think it is better off to have a
19 lawyer in this situation regardless.
20 A.  Yes.
21 Q.  Is it fair to say that in your opinion an
22 individual is better off having a lawyer regardless of
23 the physical condition of that person?
24 A.  I would say that's a general statement that I

Page 33

1  would make.
2  Q.  Okay.  This is based on your personal opinion
3  and not your medical opinion about having a lawyer
4  represent you in a lawsuit?
5  A.  If we set aside any medical --
6  Q.  Correct.
7  A.  -- questions or concerns, that is still a --
8  probably a general philosophy that I would follow.
9  Q.  Okay.  Then can you explain this for me.  You
10 say you have mixed feelings.  Why are your feelings
11 mixed?
12 A.  Because of what I just said, mixed feelings
13 meaning that -- maybe that is not the best way to
14 phrase it.  Maybe I should have said that I have
15 concerns about her representing herself.  That might be
16 a better way to say that.
17 Q.  Okay.
18 A.  Because is she doing herself justice by acting
19 as her own representative.
20 Q.  So it is fair to say, then, that your feelings
21 were not mixed?
22 A.  I think the phrase or words would be better
23 served if I said concerns in my notes.
24 Q.  Okay.  In your medical opinion, based upon your

Page 34

1  12 years of treating Barb, do you think that Barb is
2  capable of representing herself?
3  A.  Probably better than some people.
4  Q.  What basis do you have for this opinion?
5  A.  Because she is an intelligent person and she is
6  a self-starter and a go-getter, and that's just Barb.
7  Q.  Okay.
8  A.  That's her personality, self-assured.
9  Q.  So, again, based upon your treatment of Barb
10 over the last 12 years, is it your opinion that Barb is
11 capable of understanding factual issues?
12 A.  Yes.
13 Q.  She also has a mental capacity to understand
14 legal issues?
15 A.  Yes, but she is not an attorney.
16 Q.  Correct.  Do you also believe that Barb is
17 emotionally and mentally stable enough where she can
18 represent herself in a lawsuit?
19 A.  I think she is -- I guess I felt that this has
20 been stressful for her, and maybe that's another reason
21 why -- I didn't say that in the letter specifically,
22 but that is maybe another reason.  I am sure it is an
23 added stress for her to be acting in this role, and
24 that was another reason, I guess, for saying ideally it

Page 35

1  would be best if she had legal representation, to take
2  some of that stress and pressure off herself.
3  Q.  Okay.  But back to my question.  Do you believe
4  that she is emotionally -- let's break it down.  Do you
5  think she is emotionally stable enough to represent
6  herself?
7  A.  Yes.
8  Q.  Do you think she is mentally stable enough to
9  represent herself?
10 A.  Yes.
11 Q.  Okay.  Now, is it your general practice to
12 require your patients to complete a history and a
13 physical sheet?
14 A.  Usually when we first see them.
15 Q.  Where do you maintain a completed history and
16 physical sheet?
17 A.  In her chart.
18 Q.  In the patient's file or chart?
19 A.  Yes.
20 Q.  Now, did Barb complete one for you, a history
21 and physical sheet?
22 A.  Actually, the first time I saw her, I saw her
23 when she was in the hospital.
24 Q.  Was that in 1993?

Page 36

1  A.  That is correct, yes.
2  Q.  Was that when she attempted to commit suicide?
3  A.  Well, I don't think she was really attempting to
4  kill herself.  She had concerns that -- it was a very
5  stressful time for her, and I think it was more -- as
6  she told me, it was more to get some attention from
7  other family members.  At least when she talked to me
8  at that time, as I recall, she was not serious about
9  it, but she felt she needed to kind of shake things up
10 around her.
11 Q.  Just so I am clear, is this -- the first time
12 you saw Barb, was this when she was in the hospital at
13 Methodist on, what, the eighth floor?
14     MS. KENDELL:  Uh-huh.
15 Q.  (By Ms. Hansell) Is that correct?
16 A.  I don't recall exactly what floor she was on
17 but...
18     MS. KENDELL:  The psych floor.
19     THE DEPONENT:  Okay.
20 Q.  (By Ms. Hansell) Just so I'm clear, as well, is
21 this the time period that you saw her after she had
22 overdosed on Dalmane?
23 A.  Yes.
24 Q.  What is Dalmane?

Page 37

1  A.  It is a sleeping medicine.
2  Q.  Do you recall why you treated her at that time?
3  A.  Well, I was asked to see her because of her
4  pain.
5  Q.  Okay.  So nothing to do with the overdose?
6  A.  No, no.  Just strictly for pain reasons.
7  Q.  Do you recall what pain she was suffering at
8  that time?
9  A.  Hip and back and neck were probably bothering
10 her the most at that point.
11 Q.  Do you know, at that time was Barb diagnosed
12 with having depression?
13 A.  Yes, I felt that she had a component of
14 depression, yes.  I think her other doctors did, too.
15 Q.  Let me just ask you, because I don't know.  Are
16 you qualified to diagnose someone as having depression?
17 A.  I feel I am, yes.
18 Q.  Okay.  Do you know, at this time was Barb taking
19 any type of antidepressants?
20 A.  She was on Prozac.
21 Q.  Okay.  This is in 1993?
22 A.  That is correct.
23 Q.  I'm sorry.  Back to the question on the history
24 and physical sheet, you do not have one in your file on

Page 98

1  that. It was in that September time frame when we sent
2  -- in 2000 -- when we sent her to the surgeon and
3  things seemed to settle down. I mean, it still was a
4  reoccurring thing to some degree, but not as bad as
5  what it was during that time frame.
6  Q.  How were you treating this condition, cortisone
7  shots?
8  A.  The anti-inflammatory to hopefully try and
9  shrink any inflammation that is at that joint that is
10 producing the cyst.
11 Q.  That is the Ibuprofen?
12 A.  Yes.
13 Q.  And the other drug you mentioned, which is what?
14 A.  Tolmetin.
15 Q.  Tolmetin. Do you know whether there is any --
16 whether your treatment and medications are alleviating
17 or correcting this condition?
18 A.  I don't know.
19 Q.  Is there something else that Barb could be doing
20 to alleviate or correct this condition? We already
21 discussed surgery.
22 A.  Just continue to work on her exercises and take
23 her medicine.
24 Q.  Okay. The bursitis, is that a temporary or

Page 99

1  permanent condition?
2  A.  Kind of permanent.
3  Q.  Permanent. How are you treating Barb for this
4  condition?
5  A.  Cortisone shots and Ibuprofen and Tolmetin and
6  exercises.
7  Q.  Do you believe that the treatment and
8  medications that you are prescribing alleviate or
9  correct this condition?
10 A.  It alleviates it for a while. It does not
11 necessarily correct it.
12 Q.  Is there something else that Barb could be doing
13 to alleviate or correct this condition?
14 A.  Continuing to work on her exercises.
15 Q.  Okay. Now, as far as her conditions, so far, I
16 mean, you have just kind of told me the drugs you are
17 giving for each one. The sleeping pills, which are
18 actually the antidepressants that you are giving her,
19 are you just giving those to her because simply she
20 cannot sleep? I mean, is that the --
21 A.  It has been shown that people with chronic pain,
22 particularly fibromyalgia, do not get deep sleep. By
23 improving sleep we can increase -- probably increase
24 the levels of certain brain compounds that probably

Page 100

1  play a role in pain, and actually can be beneficial on
2  a physiologic basis by increasing natural pain killing
3  properties of the body. So that is number one. Number
4  two, if you are better rested then it is just easier to
5  cope with pain. Your muscles need to rest and
6  rejuvenate.
7  Q.  Okay.
8  A.  So your body needs to rest.
9      MS. HANSELL:  Very good. I understand. I
10 have no further questions.
11     THE DEPONENT:  Okay. I waive signature.
12         (Signature waived.)
13         (The deposition concluded
14         at 3:30 p.m.)

Page 101

1  STATE OF ILLINOIS  )
                    ) SS
2  COUNTY OF MONTGOMERY)
3        C E R T I F I C A T E
4      I, DARLENE M. NIEMEYER, a Notary Public in
5  and for the County of Montgomery, State of Illinois, DO
6  HEREBY CERTIFY that pursuant to agreement between
7  Counsel there appeared before me on the 6th of June
8  A.D., 2005, at 309 U.S. Courthouse, 100 N.E. Monroe
9  Street, Peoria, Illinois, JOSEPH COURI, M.D., who was
10 first duly sworn by me to testify the whole truth of
11 his knowledge touching upon the matter in controversy
12 aforesaid so far as he should be examined, and his
13 examination was taken by me in shorthand and afterwards
14 transcribed (but not signed by the deponent, his
15 signature having been waived by agreement of counsel)
16 and said deposition is herewith returned.
17     IN WITNESS WHEREOF I have hereunto set my
18 hand and affixed my Notarial Seal this 16th day of June
19 A.D., 2005.
20
21
        Notary Public and Certified
22      Shorthand Reporter
23 Illinois CSR License No.: 084-003677
   My Notary Commission Expires: 03-03-2007
24