**E-FILED**
Friday, 08 July, 2005  04:46:22 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| BARBARA J. KENDELL, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 04-1140 |
| | ) | |
| AMERICAN INCOME LIFE OF | ) | |
| CHICAGO and AMERICAN INCOME | ) | |
| LIFE INSURANCE CO., | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANT AMERICAN INCOME LIFE INSURANCE CO.'S MOTION FOR SUMMARY JUDGMENT

Defendant American Income Life Insurance Co. ("Defendant"), by its undersigned attorneys, and pursuant to Federal Rules of Civil Procedure 56 and CDIL-LR 7.1, moves the Court to enter an Order dismissing with prejudice Plaintiff's Pro Se Complaint against this Defendant and, further, awarding this Defendant its costs and any further relief that the Court finds appropriate, and in support, states as follows:

### I. INTRODUCTION

Plaintiff's Title VII, ADEA and ADA actions against this Defendant should be dismissed with prejudice, pursuant to Federal Rule of Civil Procedure 56, because: (1) Plaintiff does not claim that this Defendant discriminated against her or terminated her Agent Contract on the basis of gender, age or disability; (2) Plaintiff was not an employee of this Defendant, but an independent contractor, therefore, she cannot maintain Title VII, ADEA and/or ADA claims against it; (3) Plaintiff waived any and all claims against this Defendant because it was <u>not</u> named as a Respondent to Plaintiff's EEOC Charge of Discrimination ("Charge"); and (4) Plaintiff did not file a Charge against this Defendant

within 300 days of the alleged unlawful employment practice committed by Defendant American Income Life of Chicago ("Smith Agency").

Based upon Plaintiff's own testimony and admissions, there are no genuine issues as to any material fact regarding any improper, illegal or discriminatory acts by this Defendant, her status as an independent contractor, her failure to name this Defendant in her Charge or her untimely filing of the Charge, therefore, this Defendant is entitled to a judgment as a matter of law with respect to all counts against it.

## II.  UNDISPUTED MATERIAL FACTS[1]

**BACKGROUND FACTS**

1.      For purposes of brevity and simplicity, Defendant incorporates, as if fully set forth herein, the Affidavits of Debbie Gamble, Defendant's Senior Vice President, and Scott Smith, sole proprietor of American Income Life of Chicago, as Exhibits 1 and 2 respectively.

2.      In or around September of 1998, Terry Brennan contracted Plaintiff to be an independent insurance agent through the Smith Agency, which is independently owned and operated by Scott Smith, located in Peoria, Illinois.  *Ex.1, p. 1; Ex. 2, p. 1.*

3.      The Smith Agency sells insurance policies on behalf of this Defendant. *Ex. 2, p. 1.*

4.      During all relevant times, Brennan was the manager of Smith's Peoria office. *Ex. 2, p. 2.*

---

[1] For purposes of summary judgment, Defendant treats Plaintiff's allegations as true, as it must, however, this Defendant does not admit or concede to any of Plaintiff's allegations and does not waive its right to later dispute, deny or challenge Plaintiff's allegations and claims.

5.    It is undisputed that both Smith and Brennan were non-employee, independent insurance agents for this Defendant. *Excerpts of Pla. Depo. are attached as Ex. 3, see p. 230-232; Ex. 1, p.21; Ex. 2, pp. 1-2.*

6.    Smith was a State General Agent and Brennan was a Master General Agent for this Defendant. *Ex. 1, p. 2; Ex. 2, pp. 1-2; see Smith's State General Agent Contract attached as Ex. 2-A and Brennan's General Agent Contract attached as Ex. 2-B.*

7.    Plaintiff admits that she does not know the type of control, if any, that this Defendant had over Brennan and Smith. *Ex. 3, p. 182.*

8.    When Plaintiff contracted to be an agent, she signed an Agent Contract—independent contractor's agreement—to sell insurance on behalf of this Defendant. *Complaint, Count IV, p. 1 of 2 (Doc. 5).*

9.    Plaintiff served as an insurance agent at the Smith Agency for 2 ½ years. *Ex. 3, pp. 56-57.*

10.    When Plaintiff started selling insurance through the Smith Agency, she believed that she was an independent contractor. *Ex. 3, p. 209.*

11.    Based upon Brennan's alleged control over her, she believes that she became an "employee." *Ex. 3, pp. 182-186, 209-212 and 241-242.*

12.    Plaintiff decided that she was an employee when Brennan told her that she had to work and could not take time off. *Ex. 3, p. 211.*

13.    Plaintiff admits that this was "Brennan's policy." *Ex. 3, p. 173.*

**PLAINTIFF ADMITS THAT THIS DEFENDANT DID NOT DISCRIMINATE AGAINST HER AND THAT HER CONTRACT WAS TERMINATED BASED UPON A LEGITIMATE, NON-DISCRIMINATORY REASON.**

14.    Plaintiff testified that "nobody from [this Defendant] had actually physically, verbally or by letter assaulted [her] with discrimination . . . ." *Ex. 3, p. 374.*

15.    According to Plaintiff, this Defendant's only alleged misconduct was failing to investigate the fact her contract was terminated. *Ex. 3, p. 373.*

16.    According to Plaintiff, the basis for termination of her Agent Contract was so that the company did not have to pay her renewals. *Ex. 3, pp. 296-297.*

**PLAINTIFF'S RELATIONSHIP TO THIS DEFENDANT.**

**Amount of control or supervision Defendant exerted over Plaintiff, including directions on scheduling and performance of work.**

17.    Plaintiff admits that this Defendant had <u>no</u> control or supervision over the work she performed, other than it received reports from Brennan and Smith. *Ex. 3, p. 182.*

18.    When Plaintiff sold policies, she did it on her own—Defendant had no control or supervision over the manner in which she sold a policy and no one from Defendant was there to make sure that she was doing it right. *Ex. 3, pp. 202-203 and, 218-220.*

19.    Regarding instructions on how to sell a policy, Defendant had a written opening script that Plaintiff was to read to prospective clients. *Ex. 3, pp. 218-220.*

20.    Plaintiff admits that she could modify the opening script as long as she stayed within the basic guidelines. *Ex. 3, p. 219.*

21.    Defendant otherwise provided her with no other instructions on how to sell an insurance policy. *Ex. 3, p. 220.*

22.    Defendant did not require her to keep daily office hours and did not impose a dress code upon her or require her to wear a uniform. *Excerpts of Plaintiff's*

*Responses to Defendant's Second Requests to Admit are attached as Exhibit 4, see, p. 4, Nos. 16-17; Ex. 3, pp. 176 and 216.*

23.     Plaintiff did not have to report to Defendant and does not recall having any contact with Defendant throughout her day. *Ex. 3, pp. 177 and 181.*

24.     Defendant never gave Plaintiff a performance review. *Ex. 3, p. 239.*

25.     Plaintiff did not have to work out of Defendant's office and it did not have established times of day that she was required to work. *Ex. 3, pp. 176 and 216-217; Ex. 1, p. 1.*

26.     Plaintiff did most of her work from the client's home. *Ex. 3, p. 218.*

27.     This Defendant did not have a mandatory work schedule that Plaintiff was required to work and it did not have a policy that required Plaintiff to make up time missed. *Ex. 3, pp. 173 and 176; Ex. 1, p. 3.*

28.     Plaintiff could set her own schedule and could sell policies whenever she wanted--she could sell policies on Saturday night or first thing Sunday morning. *Ex. 3, p. 216; Ex. 1, p. 3.*

**The kind of occupation and nature of skill required, including whether skills are obtained in the workplace.**

29.     Plaintiff was an independent insurance agent and her commission (profit or loss) solely was dependent upon her own degree of skill and effort. *Ex. 1, pp. 1 and 3; Plaintiff's Agent and Supervising Agent Contracts are attached as Group Ex. 5, see p. 1, Commissions, and p. 2, Relationship.*

30.     Plaintiff admits that she had prior insurance sales experience. *Ex. 3, p. 408.* In fact, she owned her own agency, Kendell Insurance. *Ex. 3, p. 104.*

31.     Regarding the extent of Plaintiff's training, Plaintiff rode along with Brennan for two to four days and watched him sell insurance. *Ex. 3, pp. 141-142.*

32.     Brennan went over the "spiel" that agents told clients until she had it memorized and gave her a training manual and flip chart to read. *Ex. 3, p. 142.*

33.     No one from Defendant provided training or was present during her training. *Ex. 3, p. 142.*

**Responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations.**

34.     Defendant did not pay for long distance work-related calls that Plaintiff made from her home, nor did it reimburse her for business travel time or personal expenses that she incurred while selling policies. *Ex. 4, pp. 3-4, Nos. 11-12; Ex. 1, pp. 3-4.*

35.     Defendant did not provide Plaintiff with a car and did not pay for her gasoline. *Ex. 3. pp. 215-216; Ex. 1, p. 3.*

36.     Defendant did not pay for her transportation to and from a client's home, did not pay for her license to sell insurance or any fees to maintain her license and it did not pay for her to have an office. *Ex. 3, pp. 203-205; Ex. 1, p. 3.*

37.     Plaintiff was able to use Smith Agency office supplies, such as pens, pencils and paper and office equipment such as the fax machine and telephone. *Ex. 3, pp. 204 and 220-221.*

38.     Defendant did not provide or pay for the cost of office supplies or equipment. *Ex. 3, pp. 204 and 220; Ex. 1, pp. 3-4.*

39.     Regarding secretarial services, Plaintiff always "paid something" for the service of the Smith Agency phone setter to set her appointments. *Ex. 3, p. 185.*

40.     During the last six to eight months as an agent, Plaintiff paid $40.00 per week to use the services of the Smith Agency phone setter. *Ex. 3, pp. 184 and 221.*

41.     Plaintiff does not know who received the weekly fee. *Ex. 3, p. 221.*

**The method and form of payment and benefits.**

42.     Defendant did not provide Plaintiff with paid holidays, paid vacations, paid sick leave or overtime. *Ex.4, p. 2, Nos. 1-4.*

43.     Plaintiff was not covered by Workers' Compensation. *Ex. 4, p. 3, No. 9; Ex. 1, p. 3.*

44.     Plaintiff was not paid by the hours that she worked and she did not receive a salary – Defendant paid her a commission. *Ex.4, pp. 2-3, Nos. 5-7; Ex. 3, pp. 138-139; Ex. 1, p. 3.*

45.     Defendant did not pay any Social Security taxes on commissions that it paid to Plaintiff. *Ex. 3, p. 209; Ex. 1, p. 3.*

46.     Defendant issued 1099s to Plaintiff, did not withhold any federal or state income taxes and she filed her income tax returns as a self-employed individual— independent contractor. *Ex. 4, p. 4, Nos. 14-15; Ex. 3, pp. 215 and 464-465; Ex. 1, p. 3.*

47.     Also, for tax purposes, Plaintiff treated herself as having a sole proprietorship (Kendell Insurance), listing her income on Schedule C and paid self-employment tax on form SE for Social Security. *Plaintiff's 1040 U.S. Individual Tax Returns and Illinois Form IL-1040 Individual Income Tax Returns for 1999, 2000 and 2001 are attached as Group Ex. 6.*

48.     When Plaintiff began as an agent, she bought a fax machine that she wrote off as an office expense on her tax returns. *Ex. 3, p. 466.*

7

49.    Plaintiff also reported mileage, telephone charges, from her home and cell phone, as business expenses on her tax returns. *Ex. 3, pp. 465, 471-473 and 476.*

50.    According to Plaintiff, Defendant did not provide retirement benefits to her. *Ex. 3, p. 138.*

51.    Plaintiff considers flip charts, third party articles and receipt of copies of letters that Defendant sent to the union to be of benefit to her in making sales—it improved her credibility as an agent. *Ex. 3, pp. 205-206.*

52.    Plaintiff testified that she received health insurance, major medical and group life insurance. *Ex. 3, p. 166.*

53.    Plaintiff is not aware of anything Defendant paid relating to her insurance agent position, other than it contributed towards her medical and group insurance. *Ex. 3, p. 205.*[2]

54.    Plaintiff admits that Defendant's contribution was a negotiated benefit between her union, OPEIU 277[3] and Defendant.[4] *Ex. 3, pp. 167-168.*

55.    Plaintiff's union agreement specifies that "[n]othing contained herein shall be construed to create the relationship of employer and employee between the Company [this Defendant] and the agent . . . ." *Excerpts of Plaintiff's Union Agreement are attached as Ex. 7; see p. 2.*

**Length of job commitment and/or expectations.**

---

[2] The Smith Agency and Plaintiff also contributed towards premium payments. *Ex. 3, p. 170.*
[3] Plaintiff testified that Defendant is the only union label insurance company in the country and that she joined the union, OPEIU, when she started as an insurance agent. *Ex. 3, pp. 136 and 139.*
[4] Plaintiff's union agreement provides that "[u]pon meeting specified production levels, additional commissions up to $115 per month shall be available for each . . . person who purchases health insurance or Medicare supplement insurance . . . ." *Ex.7; pp. 12-13.* It also provides that "[e]ach person who qualifies under this article shall also be furnished $10,000 of group term life insurance at no cost to the person." *Ex. 7, p. 13.*

56.     No one at Defendant told Plaintiff that she needed to sell its insurance for a specified number of years. *Ex. 3, p. 215.*

57.     And, no one discussed an expectation of how long she would act as an insurance agent. *Ex. 3, p. 215.*

58.     According to Plaintiff, Defendant "could hire or fire me anytime they wanted." *Ex. 3, p. 247.*

59.     Plaintiff's agent contract(s) with Defendant states that it could be terminated by either party upon giving 30 days notice. *Ex. 4, p. 4, No. 13; Ex. 5, Termination.*

**Other considerations.**

**•*Plaintiff's Agent Contract(s) provides that she was not an employee of this Defendant.***

60.     Plaintiff's Agent Contract(s) with this Defendant provide that she "is not an employee of the Company [this Defendant]." *Ex. 5, p. 2, Relationship.*

61.     These contracts also specify this Defendant's policy that: she has no fixed hours, is free to choose the time and manner in which services are performed and she is responsible for all expenses incurred in the production of insurance, including transportation, an office, advertisements, form letters, letterheads, circulars, etc. *Ex. 5, pp. 1-2.*

**•*Plaintiff's own conduct shows that she did not consider this Defendant to be her employer.***

62.     When Plaintiff filed a Charge of Discrimination with the EEOC, she did not file against this Defendant and never alleged that this Defendant was her employer. *Ex. 3, p. 374; Plaintiff's EEOC Charge of Discrimination is attached as Ex. 8; Excerpts*

*of Plaintiff's Responses to Defendant's First Requests to Admit are attached as Ex. 9, see p.5, Nos. 20-21.*

63.    When Plaintiff filed a claim for unemployment benefits, she did not file against this Defendant and never alleged that this Defendant was her employer. *Ex. 9, see p. 6, Nos. 27-28; Ex. 3, pp. 293-294.*

64.    When Plaintiff filed a grievance with her union, OPEIU 277, she did not file against this Defendant. *Ex. 3, p. 372; Plaintiff's union grievance is attached as Ex. 10.*

**RELATIONSHIP BETWEEN THIS DEFENDANT AND THE SMITH AGENCY.**

65.    Plaintiff summarily concludes that the best way, as a lay person, to explain the relationship between Defendant and the Smith Agency is that Defendant is the "parent company" to the Smith Agency. *Ex. 3, p. 243.*

66.    Plaintiff bases her conclusion upon the allegation that Defendant has "total control as far as setting the guidelines that the Scott Smith Agency has to meet to maintain the State General Agent Contract, just like Terry [Brennan] had certain qualifications he had to meet to maintain his Master General Agent Contract." *Ex. 3, pp. 243-244.*

67.    Plaintiff further concludes that "everything that Terry was doing that treated me like an employee and was backed up by Scott Smith, would have been unofficially looked at and condoned by [Defendant] . . . . *Ex. 3, p. 244.*

68.    Plaintiff admits, however, that she has no knowledge regarding what this Defendant knows or does not know. *Ex. 3, p. 247.*

**EEOC CHARGE OF DISCRIMINATION**

69.    Plaintiff testified that she only filed suit against this Defendant because EEOC investigator Carol Milazzo told Plaintiff that she should amend her Charge to include this Defendant. *Ex. 3, pp. 374-375.*

70.    Plaintiff admits, however, that she never amended her Charge and never signed a new Charge to include this Defendant. *Ex. 3, pp. 375-376.*

71.    Plaintiff was well aware that she was terminated on May 31, 2001, when Mr. Brennan unequivocally informed her that she was "fired." *Ex. 3, pp. 253-254, 268-269 and 271-272.*

72.    Not only is Plaintiff's knowledge of the May 31, 2001 termination date supported by her Charge, which specifically asserts that "[o]n May 31, 2001, I was wrongfully discharged," Plaintiff does not dispute that her last day worked was May 31, 2001. *Ex. 3, p. 267 and 270; see also Ex. 8.*

73.    Plaintiff only claims that the effective date of termination was July 31, 2001. *Ex. 3, pp. 267-268.*

### III. ARGUMENT

"Summary judgment is proper if the record 'show[s] that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."[5]

**A.    BY PLAINTIFF'S OWN ADMISSIONS, THIS DEFENDANT DID NOT DISCRIMINATE AGAINST HER AND HER CONTRACT TERMINATION WAS BASED UPON A LEGITIMATE, NON-DISCRIMINATORY REASON, THEREFORE, DISMISSAL OF HER TITLE VII, ADEA AND ADA CLAIMS AGAINST THIS DEFENDANT IS PROPER.**

In general, Title VII, ADEA and ADA prohibit employment discrimination based upon gender, age and disability, respectively.[6]

---

[5] *EEOC v. North Knox School Corp.*, 154 F.3d 744, 746 (7th Cir. 1998), citing *Fed.R.Civ.P. 56(c).*

Plaintiff admits that "nobody from [this Defendant] had actually physically, verbally or by letter assaulted [her] with discrimination . . . ." According to Plaintiff, this Defendant's only misconduct was failing to investigate the fact that her contract was terminated.

Based upon Plaintiff's own admissions, there is no question of material fact that this Defendant did not engage in discrimination and/or any conduct prohibited by Title VII, ADEA or ADA. As such, Plaintiff's Title VII, ADEA and ADA claims against it should be dismissed.

Plaintiff further testified that the basis for termination of her Agent Contract was so that the company did not have to pay her renewals. Termination to allegedly avoid paying an insurance agent renewals is legitimate and non-discriminatory on its face and does not violate Title VII, ADEA or ADA.[7]

Based upon Plaintiff's own admissions, her Title VII, ADEA and ADA claims against this Defendant cannot withstand summary judgment and dismissal is proper.

**B. ALTERNATIVELY, PLAINTIFF WAS AN INDEPENDENT CONTRACTOR AND NOT AND EMPLOYEE OF THIS DEFENDANT, THEREFORE, DISMISSAL OF HER TITLE VII, ADEA AND ADA CLAIMS AGAINST IT IS PROPER.**

Independent contractors are not protected by Title VII, the ADEA or the ADA.[8] The ultimate question of whether Plaintiff is an employee or an independent contractor is

---

[6] See *42 U.S.C. § 2000e et seq.; 29 U.S.C. § 623, et seq. and 42 U.S.C. § 12112(a).*

[7] See *Huff v. Uarco, Inc.*, 122 F.3d 374, 380 (7th Cir. 1997) (termination due to economic considerations is a neutral justification); *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 695 (7th Cir. 2000).

[8] *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 380 (7th Cir. 1991) (citations omitted) (independent contractors are not protected by Title VII); *EEOC*, 154 F.3d at 746 (courts exclude independent contractors from the ADEA's protection); *Aberman v. J. Abouchar & Sons, Inc.*, 160 F.3d 1148, 1150 (7th Cir. 1998) (citations omitted) (the ADA protects employees but not independent contractors).

a question of law.[9]  Plaintiff has the burden of proof on whether she was an independent contractor or employee.[10]

To make this determination, the trial court must examine five factors:  (1) the amount of control or supervision Defendant exerted over Plaintiff, including directions on scheduling and performance of work, which is the most important factor; (2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace; (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations; (4) the method and form of payment and benefits; and (5) the length of job commitment and/or expectations.[11]

### 1.    Defendant lacked control and supervision over Plaintiff, including directions on scheduling and performance of work.

"Of several factors to be considered, the employer's right to control is the most important when determining whether an individual is an employee or an independent contractor."[12]  An individual's control over his or her own work schedule is indicative of independent contractor status.[13]  However, "[i]f an employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist."[14]

Regarding the first factor, Plaintiff admits that this Defendant exerted no control or supervision over the work that she performed or the manner in which she sold a policy.

---

[9] *EEOC.*, 154 F.3d at 747 and f.n. 1, citing *Knight*, 950 F.2d at 379; see also *Aberman*, 160 F.3d at 1150.
[10] *Ost v. West Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 438 (7th Cir. 1996); see also *Knight*, 950 F.2d at 380 (citations omitted) (the plaintiff must prove the existence of an employment relationship in order to maintain a Title VII action).
[11] *Knight*, 950 F.2d at 378-380; *Aberman*, 160 F.3d at 1150.
[12] *Id.* at 378 (citations omitted).
[13] *Worth v. Tyler*, 276 F.3d 249, 263 (7th Cir. 2001), citing *Knight*, 950 F.2d at 380.
[14] *Id.* at 263 (citations omitted).

When she sold a policy, she did it on her own.  No one from Defendant made sure that she was doing it right.

Plaintiff admits that this Defendant did not control her work schedule and did not impose established times of day that she was required to work.  She could set her own hours and could sell policies whenever she wanted.  Plaintiff did not work out of this Defendant's office.  Plaintiff did most of her work from the client's home.

This Defendant did not require her to keep daily office hours, did not impose a dress code or require her to wear a uniform, she did not have to report to this Defendant and had no contact with this Defendant throughout her day.  And, this Defendant never gave her a performance review.

Although Plaintiff may argue that Defendant's opening script that she was required to read demonstrates some type of control, she admits that she could modify it as long as she stayed within the basis guidelines.  Regardless, this fact is not determinative.  As stated by the Seventh Circuit, "[c]ertainly one can 'control' the conduct of another contracting party by setting out in detail his obligations; this is nothing more than the freedom of contract."[15]  This type of control is significantly different than the discretionary control an employer daily exercises over its employees' conduct.[16]

Based upon the foregoing, the first, and most important factor, strongly shows that Plaintiff was an independent contractor and not an employee of this Defendant.

2.     **The kind of occupation and nature of skill required, including whether skills are obtained in the workplace.**

---

[15] *EEOC*, 154 F.3d at 748.
[16] *Id.*

14

"An individual's unique work skills may indicate independent contractor status."[17] However, "if the individual requires substantial training and supervision, an employee/employer status is more likely."[18]

Here, Plaintiff was an independent insurance agent and her commission (profit or loss) solely was dependent upon her own degree of skill and effort. Plaintiff admits that she had prior insurance sales experience and owned her own agency, Kendell Insurance. Arguably, therefore, she possessed her own unique sales skills to sell insurance policies and deal with insureds.

Although Plaintiff received a training manual and a flip chart to read, Plaintiff admits that this Defendant provided no training to Plaintiff. Plaintiff further admits that this Defendant provided no supervision over her.

Again, these facts suggest that Plaintiff was an independent contractor and not an employee of this Defendant.

### 3.    Plaintiff was responsible for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations.

"If an entity bears costs of operation—such as for equipment or office space—an employee/employer relationship is more likely."[19]

In the instant case, there is no dispute that this Defendant did not bear the costs of operation involved in Plaintiff's work. This Defendant did not pay for long distance work-related calls, nor did it reimburse Plaintiff for business travel time or personal expenses. Defendant did not provide Plaintiff with a car, did not pay for her gasoline or otherwise pay for her transportation to and from a client's home. Defendant did not pay

---

[17] *Id.* (Citations omitted).
[18] *Id.* (Citations omitted).
[19] *Worth*, 276 F.3d at 264 (citations omitted).

for her license to sell insurance or any fees to maintain her license and it did not pay for her to have an office.

Although Plaintiff used Smith Agency office supplies and office equipment, this Defendant did not provide or pay for the cost of those office supplies or equipment.

Regarding secretarial services, Plaintiff always "paid something" for the service of the Smith Agency phone setter to set her appointments. During the last six to eight months as an agent, Plaintiff paid $40.00 per week to use the services of the Smith Agency phone setter.

Considering the foregoing facts, the third factor also suggests that Plaintiff was an independent contractor and not an employee of this Defendant.

### 4.    The method and form of payment and benefits.

"Whether an individual is paid by time or by commission is indicative of the individual's status."[20] As noted by the Seventh Circuit in *Knight*, "[p]ay by commission implicitly depends on the agents' ability to sell which, in turn, depends on the methods used by [the agent] . . . ."[21] That Court, upholding a finding of independent contractor status, explained that "[i]t was the lack of control over the manner and means by which she sold insurance, which was not controlled by [the company] . . . , that determined her income."[22]

Here, Defendant paid a commission to Plaintiff. She was not paid by the hours that she worked and she did not receive a salary. And, as discussed, this Defendant did not exercise control or supervision over the manner and means by which she sold

---

[20] *Id.* (Citations omitted).
[21] *Knight*, 950 F.2d at 380.
[22] *Id.*

insurance—she did it on her own.  As such, Plaintiff's commissions from this Defendant depended upon her own manner and means of selling insurance.

"Also significant under this factor is 'the tax treatment of the hired party.'"[23] Defendant did not treat Plaintiff as an employee for tax purposes and did not issue her a W-2, which would be appropriate if her compensation had been salary or wages.[24] Rather, Defendant issued 1099s to Plaintiff, which are appropriate for independent contractors.[25]  Defendant did not withhold any federal or state income taxes, did not pay any Social Security taxes on commissions that it paid to Plaintiff and she filed her income tax returns as a self-employed individual—independent contractor.  For tax purposes, Plaintiff treated herself as a sole proprietorship (Kendell Insurance), listing her income on Schedule C and paid self-employment tax on form SE for Social Security.[26]

Plaintiff's tax returns also show that she assumed significant costs associated with her insurance sales, which likewise favors a finding that she was an independent contractor.[27]  Among other things, she bought a fax machine that she wrote off as an office expense and reported mileage, telephone charges, from her home and cell phone, as business expenses on her tax returns.

Regarding other benefits, Plaintiff admits that this Defendant did not provide Plaintiff with paid holidays, paid vacations, paid sick leave or overtime and she was not covered by Workers' Compensation.  Also, Plaintiff testified that Defendant did not provide retirement benefits to her.

---

[23] *EEOC*, 154 F.3d at 750 (citations omitted).
[24] See *Id.*
[25] See *Id.*
[26] See *Id.*
[27] *Aberman*, 160 F.3d at 1151 (citations omitted).

Plaintiff is not aware of anything Defendant paid relating to her insurance agent position, other than it contributed towards her medical and group insurance. Plaintiff admits, however, that Defendant's contribution was a negotiated benefit between her union, OPEIU 277 and Defendant. Plaintiff also contributed towards these payments.

Plaintiff's union agreement, which contains the requirement that Defendant has to contribute, clearly specifies that "[n]othing contained herein shall be construed to create the relationship of employer and employee between the Company [this Defendant] and the agent . . . ." This one fact which may lean in favor of employee status, therefore, does not carry much weight.

Considering all the facts discussed, this factor also favors a finding that Plaintiff was an independent contractor of this Defendant.

### 5.     The length of job commitment and/or expectations.

"Contracts of a set length often indicate independent contractor status."[28] Notably, however, in *Knight*, the Seventh Circuit did not disturb the trial court's finding that if either party can terminate the agreement upon giving 30 days' notice, it supports a finding that an individual is an independent contractor.[29]

Here, no one at Defendant told Plaintiff that she needed to sell its insurance for a specified number of years and no one discussed an expectation of how long she would act as an insurance agent. According to Plaintiff, Defendant "could hire or fire me anytime they wanted." But, Plaintiff's Agent Contracts with Defendant specifically state that they can be terminated by either party upon giving 30 days notice.

---

[28] *Worth*, 276 F.3d at 264 (citations omitted).
[29] *Knight*, 950 F.2d at 379.

Although Plaintiff's Agent Contracts were not for a set length, the fact that she could terminate her contract at any time and for any reason without penalty, work whenever she wanted and as little as she wanted, can hardly be characterized as the type of commitment consistent with that of an employer-employee relationship.[30] In addition, independent contractor status is further supported by the 30 day notice provisions in her Agent Contracts.

Based upon the foregoing, this factor also should support a finding that Plaintiff was an independent contractor for this Defendant.

6.    **Other considerations support the conclusion that Plaintiff was an independent contractor and not an employee of this Defendant.**

•*Plaintiff's Agent Contract(s) provides that she was not an employee of this Defendant.*

Plaintiff's Agent Contract(s) with this Defendant specifically provide that she "is not an employee of the Company [this Defendant]." These contracts also specify this Defendant's policy that: she has no fixed hours, is free to choose the time and manner in which services are performed and she is responsible for all expenses incurred in the production of insurance, including transportation, an office, advertisements, form letters, letterheads, circulars, etc.

•*Plaintiff's own conduct shows that she did not consider this Defendant to be her employer.*

When Plaintiff filed a Charge of Discrimination with the EEOC, she did not file against this Defendant and never alleged that this Defendant was her employer. When Plaintiff filed a claim for unemployment benefits, she did not file against this Defendant

---

[30] *Mazzei v. Rock-N-Around Trucking, Inc.*, 246 F.3d 956, 965 (7th Cir. 2001).

and never alleged that this Defendant was her employer. When Plaintiff filed a grievance with her union, OPEIU 277, she did not file against this Defendant.

These additional considerations further support the conclusion that Plaintiff was not an employee, but an independent contractor for this Defendant.

In sum, the simple fact that Plaintiff was not an employee of this Defendant renders her without the ambit of Title VII, ADEA and/or ADA protections and precludes her from brining discrimination actions alleging violations of these Acts. As such, summary judgment against Plaintiff and dismissal with prejudice of her claims against this Defendant is appropriate.

## C.    THERE IS NO EVIDENCE THAT THIS DEFENDANT IS THE PARENT COMPANY TO THE SMITH AGENCY.

"It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries."[31]

Although Plaintiff claims that this Defendant is the alleged "parent company" to the Smith Agency, her assertion is based upon the illogical allegation that Defendant has "total control as far as setting the guidelines that the Scott Smith Agency has to meet to maintain the State General Agent Contract, just like Terry [Brennan] had certain qualifications he had to meet to maintain his Master General Agent Contract."

Defendant does not dispute that it held contracts with Smith and Brennan containing guidelines that they had to meet to maintain their contracts. Rather, Defendant disputes Plaintiff's legal characterization of Defendant as a "parent company" because there is no evidence to support such mischaracterization.

---

[31] *U.S. v. Bestfoods*, 524 U.S. 51, 61, 118 S.Ct. 1876, 1884 (1998).

Plaintiff has not produced, and cannot produce, any evidence that the Smith Agency, a sole proprietorship, was a corporation that issued stock, nor can she show that this Defendant controlled the Smith Agency through ownership of stock. Simply put, the record is devoid of any such evidence, therefore, her claim is nothing more than an unfounded, illogical, conclusory allegation without supporting evidence and should be disregarded by the Court.

Further, even assuming that such facts existed, there is no evidence to suggest that an alleged corporate veil should be pierced to attach any type of liability to this Defendant. Again, the record is devoid of any such facts or evidence.

### D. PLAINTIFF'S SUIT AGAINST THIS DEFENDANT IS UNTIMELY AND SHE FAILED TO NAME THIS DEFENDANT AS A RESPONDENT

If this Court has not already found sufficient evidence to grant summary judgment in favor of this Defendant and against Plaintiff, Defendant respectfully requests that this Court reconsider Defendant's previously filed Motion to Dismiss now that discovery is complete. Defendant includes the following additional facts to support its previously asserted arguments:

### A. This Defendant is an improper party because it was not named as a Respondent on Plaintiff's Charge of Discrimination, therefore, it had no notice of the charges against it and Plaintiff waived any and all claims against it.

Plaintiff testified that she only filed suit against this Defendant because EEOC investigator Carol Milazzo told Plaintiff that she should amend her Charge to include this Defendant. Plaintiff admits, however, that she never amended her Charge and never signed a new Charge to include this Defendant.

Based upon the fact that Plaintiff did <u>not</u> file a Charge against Defendant AIL, Plaintiff has waived any claims that she might otherwise have and, therefore, dismissal of her Title VII, ADEA and ADA claims against this Defendant AIL is proper under the circumstances.

**B.    Dismissal also is proper because Plaintiff failed to file a Charge of Discrimination within 300 days of the alleged unlawful employment practice.  Plaintiff was informed of her termination on May 31, 2001, therefore, her April 25, 2002 Charge was filed after the 300 day time period expired and her Charge is untimely.**

Plaintiff was well aware that she was terminated on May 31, 2001, when Mr. Brennan unequivocally informed her that she was "fired."  Not only is Plaintiff's knowledge of the May 31, 2001 termination date supported by her Charge, which specifically asserts that "[o]n May 31, 2001, I was wrongfully discharged," Plaintiff does not dispute that her last day worked was May 31, 2001.  Plaintiff only claims that the effective date of termination was July 31, 2001, which is immaterial for limitations purposes.

As such, Plaintiff's Charge is untimely filed because 300 days from May 31, 2001 is March 27, 2002.  Plaintiff did not file her Charge until approximately one month later on April 25, 2002.  Because Plaintiff failed to file her Charge within 300 days of the alleged unlawful employment practice, her employment discrimination claims must be dismissed.

WHEREFORE, Defendant American Income Life Insurance Co. respectfully requests this Court to enter an Order granting summary judgment in its favor and against Plaintiff, dismissing with prejudice all counts against it, together with such other relief this Court deems just and reasonable under the circumstances.

DATED: July 8, 2005.

Respectfully submitted,

*/s/ Cassandra J. Hansell*
Cassandra J. Hansell, #06271228
BURROUGHS, HEPLER, BROOM
MacDONALD, HEBRANK &
TRUE, LLP
Two Mark Twain Plaza, Suite 300
Edwardsville, Illinois 62025-0510
Phone: (618) 656-0184
Fax: (618) 656-1364
Email: cjh@ilmolaw.com

*Attorneys for American Income
Life Insurance Co.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was sent to the following counsel/parties of record via First Class U.S. Mail, postage prepaid, this 8th day of July, 2005:

Barbara J. Kendell
504 W. High St.
Peoria, IL  61606

*/s/ Cassandra J. Hansell*