ORIGINAL

# THE DEPOSITION OF
# BARBARA ELIZABETH JOHANNSEN KENDELL

## TAKEN ON MARCH 4, 2005

### IN THE MATTER OF:

**BARBARA J. KENDELL**
vs.
**AMERICAN INCOME LIFE OF CHICAGO and AMERICAN INCOME LIFE INSURANCE COMPANY**

Case No.: 04-1140



*MILES REPORTING COMPANY*
*Certified in Illinois and Missouri*
*1339 North 17th Street, Suite 102*
*Belleville, Illinois 62226*
*(618) 235-2633*
*FAX (618) 235-2641*

*Reported by: Darlene Niemeyer, CSR, RPR, CCR*
*Illinois CSR License No.: 084-003677*
*Missouri CCR License No.: 866*



DEFENDANT'S EXHIBIT 3

**Page 53**

1 working and I wasn't when I was with American Income.
2 Q. Let's talk about that. Explain that to me.
3 What happened?
4 A. I needed time off and Terry wouldn't give me
5 time off.
6 Q. Wait. Hold on. What time period? Do you know
7 the year?
8 A. It was over the 4th of July weekend 2000.
9 Q. Okay.
10 A. Well, not exactly the 4th of July weekend, but
11 somewhere between those four days, somewhere in there.
12 Q. Okay.
13 A. And he wouldn't give me time off and I had the
14 movers hired and I was moving. And the day they
15 actually -- the first day they actually physically
16 boxed up what they had packed and put it into the truck
17 and the first truck went over I had other people there
18 working and I -- Sue kept me in town, so I would go
19 make a call and I would run back to see what was going
20 on, and I would go make a call. But he didn't give me
21 the next day off. And I had to have the next day off.
22 I couldn't work because I had to pay the movers.
23 Q. Okay. I understand that. But let's talk about
24 your lie. What did you tell Terry and why was it a

**Page 54**

1 lie?
2 A. It was a lie because I was supposed to be
3 working and I wasn't, so I turned in a false report.
4 Q. To Terry?
5 A. To American Income. Well, which is the same
6 thing as turning it into Terry.
7 Q. Is this where at night or in the evening or
8 after you make your runs you call a 1-800 number?
9 A. Yes.
10 Q. So you called in the 1-800 number --
11 A. With a fake report.
12 Q. So explain. What do you mean by fake report?
13 A. I said I saw four -- three or four people and
14 that, you know, two no home or whatever.
15 Q. Okay.
16 A. Because I had to pay the check. I mean, I'm not
17 going to turn my checkbook over to somebody.
18 Q. Did Terry catch you in that lie?
19 A. Yeah.
20 Q. What happened?
21 A. I tried lying my way out of it --
22 Q. So wait. You --
23 A. -- and it didn't work.
24 Q. So you tried to lie your way out of a lie?

**Page 55**

1 A. Tried to lie my way out of a lie.
2 Q. So we are dealing with a double lie here?
3 A. Yeah, yeah.
4 Q. What happened? Tell me what was said.
5 A. Oh, God, did he jump -- oh, no, I can't tell you
6 exactly what was said.
7 Q. No, you can tell me exactly what was said.
8 A. No, I can't.
9 Q. Do you remember? If you remember you can tell
10 me. You are under oath, Barb, and I'm entitled to
11 know.
12 A. You're -- I know you have done this before. You
13 are a troublemaker. You are a lying little -- I hate
14 -- oh, God, I hate using the language Terry uses. I
15 really do.
16 Q. Spell it. Spell the word.
17 A. B-I-T-C-H.
18 Q. Okay.
19 A. He called me a F'ing "B" before, and I -- I
20 mean, I --
21 Q. At this time period when you lied?
22 A. Well, yeah.
23 Q. When you were in your double lie?
24 A. Yeah.

**Page 56**

1 Q. Wait. Let's back up a minute. So how did you
2 -- the second part of the lie -- I'm confused here.
3 What did you tell him to cover up --
4 A. He said I --
5 Q. -- your first lie?
6 A. -- heard from Sue that she really didn't set
7 your appointment. I said, yes, she did, because I was
8 covering for her at that point. Because she was
9 supposed to and she hadn't. And he said, yeah, she
10 fessed up that she didn't set your appointments. So
11 now I know that you were lying. Okay. You caught me.
12 And then, okay, Terry.
13 Q. That's the extent of your second lie?
14 A. Yeah. And I said, darn it, you know, if you
15 would have given me time off, and that's when he was
16 just -- I thought he was going to -- you have to know
17 Terry. He gets red in the face. He starts sputtering.
18 He looks like he is going to come across the desk at
19 you any second. His mouth opens and it is just -- it
20 literally physically makes you cringe.
21 Q. How long did you work with Terry?
22 A. From the time that I was hired until the time
23 that I was fired.
24 Q. So, what, two-and-a-half years?

```
 1   A.   Two-and-a-half years.
 2   Q.   Why did you stay that long?
 3   A.   Several reasons. Number one, I needed the
 4   health insurance.
 5   Q.   Couldn't you get health insurance at other
 6   places?
 7   A.   With the problems that I have for the arthritis
 8   and then after the cyst developed, absolutely not.
 9   Q.   You have insurance now through Triple A, don't
10   you?
11   A.   If I would have gone to work for another company
12   that had benefits.
13   Q.   Right. They exist, don't they?
14   A.   They do exist.
15   Q.   Okay.
16   A.   But I was also going to stay there because I was
17   going to be darned if he got rid of me before my third
18   year was up, because I was also working for my
19   renewals.
20   Q.   Okay. What is another reason why you stayed and
21   endured Terry's attitude?
22   A.   Because of health insurance and renewals.
23   Q.   That's it? So two, two reasons?
24   A.   Basically. And in between I liked the job. I
                                57
```

```
 1   mean, I really -- if it wasn't for Terry, I would still
 2   be there, I think. I liked the job.
 3   Q.   Okay. But getting back to the double lie story,
 4   so what else did Terry say to you at this time?
 5   A.   I don't -- I actually don't remember. I just
 6   remember him getting really mad, ripping me up one side
 7   and down the other and saying if you ever do this
 8   again, I'm going to fire you on the spot, and just went
 9   on and on and on and on and on.
10   Q.   What did you say in response to him? In
11   response to his cussing at you, what did you say?
12   A.   That conversation I don't actually remember.
13   Most -- I remember most of my responses to him.
14   Q.   What were your responses?
15   A.   When he would blow up at me?
16   Q.   Uh-huh.
17   A.   Terry, get real. I didn't do anything that bad,
18   you know, you are treating --
19   Q.   Did you ever cuss back at him?
20   A.   Did I ever cuss back at Terry? Did I actually
21   call Terry a name? I don't think so.
22   Q.   So Terry would cuss at you and you would sit
23   there and take it and not act in kind?
24   A.   I would get mad.
                                58
```

```
 1   Q.   So what --
 2   A.   But I don't ever think I swore at him. I don't
 3   think I ever called Terry a name.
 4   Q.   To his face?
 5   A.   Oh, true. I have called him, in my own mind,
 6   many names.
 7   Q.   And to other agents have you called him names?
 8   A.   I don't think I ever called him a name to
 9   another agent.
10   Q.   What about in your calendar?
11   A.   Oh, yeah, I have written notes to myself.
12   Q.   Calling Terry names?
13   A.   Yeah.
14   Q.   Okay.
15   A.   But that's my stuff. I never would think that
16   it would ever come out. And I would think, oh,
17   bastard.
18   Q.   You produced it to me, didn't you?
19   A.   Well, yeah.
20   Q.   So, Barb, back to this, so what were -- you said
21   you remembered what you said to Terry. Tell me
22   exactly, then. You did not use cuss words. What
23   exactly did you -- how did you respond to Terry?
24   A.   I probably -- I do not remember word for word,
                                59
```

```
 1   but it was, Terry, if you would have given me a
 2   frickin' day off, I wouldn't have had to lie to you in
 3   the first place. I had --
 4   Q.   What else did you say?
 5   A.   -- to have the day off because I had to pay the
 6   bill. You could have had somebody else do it. No,
 7   Terry, I'm not turning my checkbook over to somebody
 8   else. It was just something like that.
 9   Q.   So is that the extent of this lie story?
10   A.   Oh, I have no idea. I don't remember how long
11   it went on. I honestly don't. I...
12   Q.   Do you think you told me everything you said in
13   response to Terry?
14   A.   I don't know.
15   Q.   So it is possible you could have said something
16   else?
17   A.   It is possible I could have said something else.
18   Q.   Is it also possible you could have cussed at him
19   in response?
20   A.   I don't honestly remember ever calling Terry a
21   name, not like --
22   Q.   Is your answer no, then? You are 100 percent
23   sure that you have never called him a name or you don't
24   remember, it is possible?
                                60
```

**Page 101**

1  A.  (Nodded head up and down.)
2  Q.  Barb, besides the union grievance that you filed
3  in this matter against AIL -- or, actually, it was not
4  against AIL.  Excuse me.  The union grievance you filed
5  against Terry Brennan and Scott Smith, and also the
6  EEOC charge of discrimination that you filed, have you
7  been involved in any other administrative proceedings
8  or claims?  For example -- or do you understand what
9  I'm talking about?
10 A.  I was just going to ask, what do you mean by
11 administrative?
12 Q.  For example, say, a workers' compensation claim
13 or any other Illinois Department of Human Right claims
14 or EEOC claims, unemployment compensation claims?
15 A.  No.
16 Q.  No.  So your first shot at doing all of this is
17 with Scott Smith's agency and AIL Waco?
18 A.  Yes.
19 Q.  And besides the deposition that we just talked
20 about that you took in that matter, have you ever had
21 your deposition taken before?
22 A.  I remember some deposition, I think, besides
23 DIJOY.  I want to say it was with Laura Schierer's
24 attorney, but I don't remember who it was.  And I think

**Page 102**

1  it was Laura Schierer.  I'm 99 percent sure.
2  Q.  Okay.
3  A.  But other than that, no.  I don't remember out
4  of that whole mess back there whether there was any
5  other depositions.
6  Q.  Okay.  So then it is fair to say that today is
7  your third deposition?
8  A.  I would -- yeah.
9       MS. HANSELL:  Okay.  Off the record.
10      (Whereupon a recess was taken from
11         11:03 a.m. to 11:24 a.m.)
12 Q.  (By Ms. Hansell)  Barb, we are back on the record
13 now.  You are under the same oath that you originally
14 took when we started.  Okay?
15 A.  Fine.
16 Q.  Okay.  Barb, can you go through for me and tell
17 me the employers or principals, if you were an
18 independent contractor, where you have worked since
19 AIL, since AIL to -- let's move forward to the present
20 and get up to Triple A, but fill in the blanks in
21 between AIL and Triple A.
22 A.  Okay.  I brokered through Moe, whatever his --
23 Moe Fox business, whatever that name is.
24 Q.  Okay.

**Page 103**

1  A.  And the companies with him, I think North
2  America, Blue Cross/Blue Shield.
3  Q.  That was immediately after AIL?
4  A.  Immediately -- well, yeah.  I have always been
5  able to broker through Moe since I got my license.
6  Q.  Where did you work after AIL?
7  A.  Federal, I think, was the first company that I
8  had a contract with after AIL.
9  Q.  What's the full name, Federal --
10 A.  Federal Life Insurance Company.
11 Q.  Okay.  You were an agent for them?
12 A.  Yes.
13 Q.  Were you a captured agent?
14 A.  No.
15 Q.  Okay.  After Federal Life Insurance Company,
16 where did you go?
17 A.  And I could still broker through Moe and
18 Sutherland and with Allianz and Blue Cross/Blue Shield.
19 Q.  Okay.
20 A.  Then after Federal I went with the Gentry Group
21 and was an area director for about three months, two or
22 three months, and then I decided I did not like being
23 an area director.  I just wanted to go back and be just
24 a regular agent.

**Page 104**

1  Q.  So you -- for Gentry Group you were both an area
2  director and an agent?
3  A.  I gave up the area directorship and I became an
4  agent.
5  Q.  Were you a captured agent for Gentry Group?
6  A.  When I was an area director, yeah, I was an
7  employee.  And when I went down to regular
8  run-of-the-mill agent, no, I was not a captive.  I was
9  just prohibited from selling a competitive annuity or
10 annuity with a competitor.
11 Q.  Okay.  Where after Gentry Group?
12 A.  After Gentry Group I had my own again, Kendell
13 Insurance.  I have always had Kendell Insurance since
14 the year one.
15 Q.  How long have you had Kendell?
16 A.  1997.
17 Q.  Okay.  So then after Gentry Group you --
18 A.  Just hung out of my house and --
19 Q.  Okay.
20 A.  -- brokered through anybody or found anybody I
21 could sell something to until I went with American --
22 Triple A.
23 Q.  Okay.  When you were with the Gentry Group, were
24 you -- you said when you were an agent you were an

**Page 133**

1  Q.  Do you know who made the decision to hire you?
2  A.  I don't know.
3  Q.  Do you recall what was discussed in your
4  interview with Terry Brennan?
5  A.  I remember that I was tired of doing the
6  prospecting on my own.
7  Q.  Will you explain? What do you mean by that?
8  A.  When I was working with Ohio National, you have
9  to make all the contacts. You have to go out and find
10 somebody to sell something to. And I must have read an
11 ad in the paper, because I know what would have gotten
12 me in there -- in fact, I know what got me in there.
13 So I'm assuming it was through an ad in the paper. It
14 was the fact that they had preset leads for you.
15 Q.  Preset leads meaning what?
16 A.  They tell you who to go and who to see.
17 Q.  They do the research and expend the money trying
18 to find potential clients and give them to the agents
19 to send out to try to get business from those potential
20 clients?
21 A.  Yes.
22 Q.  Is that an accurate way to describe that?
23 A.  Yeah, close.
24 Q.  How would you describe it?

**Page 134**

1  A.  They do the legwork. They -- do you want me to
2  go through the whole process that they do?
3  Q.  No. Capsule summary for me.
4  A.  They go out, they get the leads from a union,
5  they get appointments that are with the leads to set
6  the appointments for the agents, and the agents go out
7  and see the preset appointment.
8  Q.  So it is easier, then, for an agent, because you
9  don't have to waste time trying to get potential
10 clients? They are given to you?
11 A.  Right.
12 Q.  And you have to go to make the sale?
13 A.  Right.
14 Q.  All right. I understand. Thank you. Now,
15 regarding your position as an agent, did you apply with
16 AIL Chicago or Scott Smith's agency or with AIL Waco?
17 A.  As far as I know, it was AIL Waco.
18 Q.  That's who you applied with?
19 A.  That's what it was -- that's what -- that's the
20 way it was -- as far as I know, the contracts were
21 coming from Waco.
22 Q.  Okay. But setting aside the contract, though,
23 when you were applying there to be an agent before you
24 signed a contract with anyone, was it your

**Page 135**

1  understanding you were applying to work with Scott
2  Smith's agency or with AIL Waco?
3  A.  Both.
4  Q.  Okay. Who told you this or what's the basis for
5  your understanding?
6  A.  Terry told me.
7  Q.  And what did he tell you?
8  A.  That his office was a satellite office of
9  Chicago, Scott Smith's agency, AIL out of Chicago, and
10 they were the state general agents for AIL of Waco, and
11 that was the parent company.
12 Q.  So Terry told you AIL Waco was a parent company?
13 A.  Yes.
14 Q.  A parent company to Scott Smith's agency?
15 A.  Right. And then Terry's office was an offshoot
16 of Scott Smith's office.
17 Q.  Okay. Did you interview to be an independent
18 insurance agent or an employee?
19 A.  Independent contractor.
20 Q.  I may have asked you this. Did you fill out a
21 job application, do you recall?
22 A.  I don't remember.
23 Q.  Did anyone discuss the terms and conditions of
24 an agent contract with you?

**Page 136**

1  A.  I don't understand the question.
2  Q.  Before you signed the agent contract, did anyone
3  discuss the terms and conditions of the agent contract
4  with you, or did someone just hand you an agent
5  contract and say here you go, Barb, if you want to work
6  for us, sign this?
7  A.  Well, Terry said, here is the paperwork. You
8  can either belong to OPEIU and have the union dues
9  taken out of your paycheck, or they are going to be
10 taken out of your paycheck anyway, so you might as well
11 belong to OPEIU, because it is a union label company
12 and that's the one requirement that we are a union
13 label company because we use that when we go out and
14 sell our product as the only union label insurance
15 company in the country. So you might as well sign it.
16 Here, sign it.
17 Q.  Now, are you talking about your agent contract
18 or are you talking about the union agreement?
19 A.  The agent contract.
20 Q.  So, in other words, he told you about joining
21 the union before you signed your agent contract and
22 that's the only term or condition that he discussed
23 with you?
24 A.  And that I was an independent contractor, and I

**Page 137**

1  said there is times that I will have to take off,
2  because I think Curt already had cancer by that time or
3  I was in the process of figuring it out. Because I
4  remember telling Terry -- oh, I remember what it was.
5  I said, there is days that I can't work because I've
6  got really not great arthritis and I have got
7  fibromyalgia, and some days I just have trouble getting
8  the body to move. And he said that's all right. We
9  don't care, you are an independent contractor, as long
10 as you are selling and you are making money for the
11 company.
12 Q.  Did he tell you during -- or at any point in
13 time did anyone there tell you that you have no
14 personal days, no vacation days, no sick days?
15 A.  No, he said I could take time off anytime I
16 wanted.
17 Q.  Who hired you on behalf of AIL Waco to be an
18 agent?
19 A.  Terry.
20 Q.  Do you recall what he said to you when he hired
21 you?
22 A.  Just what I'm telling you now.
23 Q.  Okay. Anything else?
24 A.  That it was a good company to work for. The

**Page 138**

1  preset appointments were terrific. Their pay was
2  great. They advanced you a whole year's worth of
3  annualized premium. They didn't make you wait like
4  some companies. If somebody pays monthly you get paid
5  monthly. Well, they would take whatever the monthly
6  payment was times 12 and then give you I think it was
7  50 percent was your commission. And they would pay you
8  up front 80 percent of that the next pay period. And
9  the other 20 percent that they didn't pay out of the
10 50 percent commission went into a fund to -- as you got
11 more years into the company and charge backs were
12 charged against that fund, but as the fund grew that
13 fund would also help fund your retirement along with
14 your renewals.
15 Q.  Retirement. You had retirement benefits?
16 A.  No. When you retire you would like to have some
17 money coming in so --
18 Q.  Oh, I see what you are saying. Okay. You said
19 that Terry said to you that the pay is great?
20 A.  Uh-huh.
21 Q.  Pay, did you understand that to mean
22 commissions?
23 A.  Commission.
24 Q.  The way they work their commissions?

**Page 139**

1  A.  Yeah.
2  Q.  Because you were not paid a salary --
3  A.  No.
4  Q.  -- were you? Okay. Did you join OPEIU?
5  A.  Well, since they were going to take the money
6  out of my paycheck anyway, why not, sure.
7  Q.  So yes you did. Do you recall when you joined?
8  A.  The same time, I think.
9  Q.  Did Terry ever tell you that he had to get
10 permission from someone before he could hire you as an
11 agent?
12 A.  Oh, sure.
13 Q.  Who did he have to get permission from?
14 A.  I don't know. He says, I have to fly this past
15 the office, the home office, and we will see what
16 happens. And as far as I know, unless I hear
17 differently, you are hired, ho, ho, ho. That was
18 Terry.
19 Q.  So Terry told you that he had to ask the home
20 office whether or not you could --
21 A.  He had to --
22 Q.  -- be hired? Let me finish my question. You
23 had -- he told you that he had to check with the home
24 office before he could tell you whether or not you were

**Page 140**

1  hired? They had to -- the home office had to approve
2  the decision to hire you as an independent agent; is
3  that correct?
4  A.  He was making the decision. They had to approve
5  it and send him the forms.
6  Q.  Did you understand what that meant?
7  A.  Well, yeah, when he called me back in and had
8  the forms and I signed everything.
9  Q.  What were the forms?
10 A.  A contract.
11 Q.  Agent contract?
12 A.  The agent contract. A union agreement. I think
13 there was a union agreement. I don't remember if that
14 was part of the agent contract or not. I don't think
15 so. And there was a couple of other forms that I
16 signed. I don't remember what they were. And I asked
17 him, will I get a copy. And he said, yes. And I never
18 got a copy.
19 Q.  How old were you when Terry hired you as an
20 insurance agent?
21 A.  Oh, my gosh. I don't know. How old was I?
22 Q.  Well, let's think, Barb, back to --
23 A.  Okay. I am 62.
24 Q.  September of 1998.

**Page 141**

1  A.  Well, you have got the pen. Please?
2  Q.  Well, how old are you now?
3  A.  Sixty-two.
4  Q.  You are 62 now in 2005.
5  A.  Was I 47, 57. I can't add two and two without a
6  calculator.
7  Q.  Were you 56?
8  A.  Fifty-six. Okay.
9  Q.  Is that -- anyone else run the numbers?
10       THE VIDEOGRAPHER: Fifty-five or six.
11  Q.  (By Ms. Hansell) Okay. So you are -- does that
12  sound --
13  A.  Yes.
14  Q.  -- right, 55 or 56?
15  A.  Yeah.
16       THE VIDEOGRAPHER: Depending on when her
17  birthday is and when she was hired.
18  Q.  (By Ms. Hansell) Okay. How old were you when
19  your agent contract was terminated?
20  A.  If I was 57, 58, 59. And 58 if it was 56.
21  Q.  Okay. And did you go through any type of
22  orientation when you first became an agent for AIL?
23  A.  What do you mean by orientation?
24  Q.  Any type of training, welcome to AIL, Barb,

**Page 142**

1  anything -- any type of training to tell you or show
2  you the way in which they would like you to sell
3  insurance?
4  A.  I rode along with Terry for two or -- three or
5  four days, I think, and watched him sell.
6  Q.  So is that --
7  A.  And he went over the spiel that we had to tell
8  them until I had it memorized, but that's it.
9  Q.  So you just followed him along, saw what he did,
10  and that was the extent of your training?
11  A.  Yeah, and I watched him. And I thought if he
12  can do this, I know I can.
13  Q.  Was anyone from AIL Waco present during your
14  training?
15  A.  During that training week period, no.
16  Q.  Okay. During --
17  A.  He gave me a bunch of books.
18  Q.  I'm sorry?
19  A.  He gave me a bunch of stuff and said read it.
20  Q.  Do you remember what that stuff was?
21  A.  A manual, a training manual that you use as a
22  flip chart when you are in somebody's house. And you
23  point to each page as you are talking to them and
24  explaining something to them.

**Page 143**

1  Q.  Anything else?
2  A.  That's all I can -- there was a trainee manual
3  that he said most of the stuff on there is really old,
4  so most of it is changed. But I just don't have the
5  updated version. So I can't think of anything
6  specifically else, no.
7  Q.  At any point in time during either when you were
8  first hired, your interview, the interview process,
9  orientation, did anyone tell you how many hours you
10  were required to work?
11  A.  No.
12  Q.  Did anyone at any time ever tell you what would
13  be the basis for your -- for a contract, an agent
14  contract to be terminated?
15  A.  No.
16  Q.  Did you have an understanding of what it may
17  take or what you possibly could do as an agent in order
18  to get your agent contract terminated?
19  A.  I thought gross misrepresentation to a client,
20  and out-and-out lie, whatever a policy is going to do,
21  that it is not going to do, would be grounds for
22  dismissal. But then it is against the law to
23  misrepresent a policy, period so...
24  Q.  Anything else?

**Page 144**

1  A.  He said the only thing people -- these people
2  love working for the company. The only reason they
3  left was when -- if they weren't making money.
4  Q.  Who told you that?
5  A.  Terry.
6  Q.  Do you know what people he was talking about?
7  A.  Well, I didn't at the time, but I did as the
8  years went on, yes.
9  Q.  And who was he talking about?
10  A.  The agents.
11  Q.  Any agents in particular?
12  A.  You got some of the names. There is other ones
13  that were there from the time I was there.
14  Q.  I have some of the names meaning what?
15  A.  Some of the agents.
16  Q.  In your Rule 26 you disclosed them, agents?
17  A.  Yeah. I did as far back as I was allowed to go
18  with the EEOC, which was -- what was it, 300 days or
19  something like that, prior to termination. But there
20  was, I found out, a rapid turnover in agents.
21  Q.  Barb, at any point in time was there any
22  discussion about who you should contact in case you
23  feel you are not being treated fairly, you are having
24  problems, you are being abused?

**Page 165**

1  can, please?
2  A.  Selling AIL insurance to somebody.
3  Q.  And that means what do you have to do?
4  A.  Go out to their home, give them the spiel, which
5  is a canned speech.
6  Q.  Uh-huh.
7  A.  Get them to admit that, yes, they do need the
8  coverage, sign on the dotted line, transmit the
9  information to the office to Terry, and then he would
10 transmit it to Scott to scrub, and then it would go
11 down to Waco, and then it would --
12 Q.  Scott Scrub?
13 A.  Make sure that you hadn't make any mistakes on
14 the paperwork.
15 Q.  So you mean Scott Smith?
16 A.  Yeah.
17 Q.  Instead of Scott Scrub?
18 A.  To Scott to scrub.
19 Q.  Oh, okay. Okay. So basically your job, it
20 consists of a lot of -- a lot of driving to people's
21 homes --
22 A.  Uh-huh.
23 Q.  -- as part of the job?
24 A.  Correct.

**Page 166**

1  Q.  Okay. What was -- I was going to ask you what
2  your rate of pay was, but you said you were only paid
3  by -- on commission, correct?
4  A.  Correct.
5  Q.  Do you have any idea what that commission -- was
6  there a commission rate?
7  A.  A supervising agent had a little higher percent.
8  I think a regular agent was 50. A supervising agent
9  was 52 percent or something. Something like that.
10 Q.  Okay.
11 A.  And it depended on the product, too.
12 Q.  Okay. As an agent, did you receive anything
13 that you would consider to be a benefit?
14 A.  Yeah.
15 Q.  Okay. What were the benefits then?
16 A.  Health insurance.
17 Q.  Okay.
18 A.  Major medical.
19 Q.  And you said that was a PPO?
20 A.  It was a PPO.
21 Q.  And what else?
22 A.  Group life.
23 Q.  All right. What else?
24 A.  (Shook head from side to side.)

**Page 167**

1  Q.  Do you know the requirements that were set that
2  you had to meet prior to getting this insurance
3  coverage?
4  A.  I don't know there were any requirements other
5  than being an agent.
6  Q.  Okay. This PPO, the health insurance and the
7  life insurance policy, wasn't this union health and
8  welfare? It was part of a -- it was a term and
9  condition of the union contract, wasn't it?
10 A.  Part of it was, yes.
11 Q.  What part was and what part was not?
12 A.  You could belong -- it was a negotiated benefit
13 between OPEIU and AIL of Waco. AIL would pay part of a
14 premium according to the negotiated agreement -- I wish
15 I understood this -- with OPEIU. If you wanted to
16 belong to their, at that point, HMO, you could. And I
17 don't remember how much that would cost the individual
18 agent. Or you could opt out of being into the original
19 HMO when I first went on. And they would pay you 100
20 or $115.00 a month as long as you showed them proof of
21 insurance.
22 Q.  Okay. But this insurance -- this insurance
23 benefit, as you refer to it, this was through the
24 union?

**Page 168**

1  A.  It was negotiated through the union, but it was
2  a benefit, I believe, that was paid out of AIL.
3  Q.  AIL meaning Waco or Scott Smith's agency?
4  A.  Originally Waco.
5  Q.  Originally? Did it change at some point in
6  time?
7  A.  When they started the PPO coverage with Blue
8  Cross/Blue Shield.
9  Q.  Who was the HMO with?
10 A.  I don't know.
11 Q.  But not Blue Cross/Blue Shield?
12 A.  I don't know.
13 Q.  Okay. The PPO --
14 A.  I just know it was an HMO that was in the
15 Chicago area and none of the agents in Peoria wanted to
16 belong to that, because we weren't going to go all the
17 way up to Chicago to see a doctor.
18 Q.  Okay. The PPO, though, something changed? You
19 think Scott Smith's agency --
20 A.  Scott Smith's agency --
21 Q.  Wait. Let me finish.
22 A.  Oh.
23 Q.  Got involved with the PPO assisting and payment
24 of premiums; is that right?

**Page 169**

1  A.   That was my understanding. When they decided
2  they wanted healthcare for the Scott Smith agency that
3  was better than the negotiated or the HMO that AIL had
4  started Mike Knapic worked with Blue Cross/Blue Shield,
5  Mike was an agent for Scott Smith. In fact, he had
6  been the state general agent before him.
7  Q.   Okay. Barb, I'm sorry, but --
8  A.   And --
9  Q.   I'm sorry. This is -- what you are telling me
10 now is nonresponsive to my question.
11 A.   But I am getting to that.
12 Q.   Okay. Let's -- can you jump forward? I have a
13 lot of questions.
14 A.   Okay.
15 Q.   You need to answer the question.
16 A.   And I understand that --
17 Q.   Barb, let me finish talking. You need to let --
18 you need to answer the question I ask. I don't need
19 all the background. If I want it, I will ask for it,
20 because we don't have time. We can't be here until
21 midnight.
22 A.   Okay.
23 Q.   And the way we are going, we are never going to
24 get through this. I'm sorry. Do you -- do you

**Page 170**

1  understand that?
2  A.   I'm -- I'm trying.
3  Q.   Okay. So jump -- jump now to the important
4  part. What are you getting to?
5  A.   When they started the PPO.
6  Q.   Uh-huh.
7  A.   Well, my understanding, Waco was paying part,
8  Scott Smith's agency was paying part, and the agent was
9  paying part.
10 Q.   Okay. And when -- do you know when you obtained
11 these benefits?
12 A.   No, I don't remember the date. But you would
13 have it, whenever I cancelled.
14 Q.   Does January 20th of 1999 sound correct?
15 A.   If that's when I dropped my one through the
16 American College of Physicians, yes.
17 Q.   Okay. And, Barb, do you have any reason to
18 disagree with the fact that you had to -- an agent had
19 to have 90 days plus 6,000 net AP before they were
20 eligible for the union health and welfare coverage?
21 A.   That sounds reasonable.
22 Q.   In order to obtain these -- or this insurance
23 coverage, did you have to be a member of the union?
24 A.   I don't know.

**Page 171**

1  Q.   While you were an agent for AIL did you have a
2  supervisor?
3  A.   Yes.
4  Q.   Who was your supervisor?
5  A.   Terry.
6  Q.   Anyone else?
7  A.   He was my direct supervisor.
8  Q.   Barb, regarding the work schedule that you had
9  when you were an agent at AIL, isn't it true that on,
10 what, Monday mornings whenever you had your meetings
11 you would be handed a blank form for when you wanted
12 to work, days you wanted to work, and then you would
13 turn that back in; is that true?
14 A.   Towards the end of my employment.
15 Q.   So give me a time frame.
16 A.   I would say within about four months or so, five
17 months before I was terminated. Prior to that, no.
18 Q.   So prior to that how did you -- so the last four
19 months, five months, you were able to pick the times
20 when you wanted to work; is that right?
21 A.   Basically, yeah, unless Terry said you can't
22 have that day off.
23 Q.   Okay. But it was up to you to pick your own --
24 you made your own schedule?

**Page 172**

1  A.   Uh-huh.
2  Q.   Prior to that, what happened? How did you have
3  a schedule?
4  A.   You just assumed it was going to be Monday
5  through Friday. And then if I had to take time off to
6  take Curt over -- or Monday through Saturday morning.
7  And then if I had to take Curt over, I had to make it
8  up. It was five or six days a week that you were just
9  assumed that you were going to be working.
10 Q.   So that's your assumption?
11 A.   Terry's assumption.
12 Q.   Did Terry tell you this at some point?
13 A.   Yeah.
14 Q.   What did Terry say to you?
15 A.   That you need to get out there and work because
16 I need to keep my persistency up and my persistency is
17 falling.
18 Q.   Barb, isn't it true, too, that you also wanted
19 to get out there and work because it was commission
20 based?
21 A.   Oh, sure.
22 Q.   If you weren't making a sale, you weren't making
23 money?
24 A.   Sure.

**Page 173**

1  Q.  So you had -- didn't you want to work?
2  A.  Sure. I mean, I liked the job.
3  Q.  You know, too, if you take a day and you don't
4  sell a policy you are not going to make any money on
5  that day, are you?
6  A.  No.
7  Q.  Did you ever see anything in writing that told
8  you if you do not work a certain day that you have to
9  make that time up?
10 A.  No.
11 Q.  But you believed that was the policy?
12 A.  I believed that was Terry's policy, yes.
13 Q.  Was that Scott Smith's policy?
14 A.  I don't know.
15 Q.  Was that Waco -- AIL Waco's policy?
16 A.  I don't know.
17 Q.  And the reason why you believe it is Terry's
18 policy is because he told you that?
19 A.  Uh-huh.
20 Q.  Or did some other agent tell you that?
21 A.  No, I believe it was from Terry.
22 Q.  You believe? So you are not certain?
23 A.  It was from Terry.
24 Q.  Why are you certain now and you were not two

**Page 174**

1  seconds ago?
2  A.  Because I'm thinking, going back and trying to
3  remember conversations.
4  Q.  So what, exactly, did Terry say to you?
5  A.  That he expected -- when I had to take time off
6  to take Curt, that he expected the time made up. And
7  he didn't care if it was a double shift or working on a
8  Sunday, because if we weren't all out there working six
9  days a week his persistency was being hurt, and he had
10 to maintain his persistency --
11 Q.  That's a true --
12 A.  -- to keep --
13 Q.  -- statement, though, isn't it?
14 A.  I don't know whether his persistency was being
15 hurt or not. I don't know.
16 Q.  But the more his agents --
17 A.  I don't know what he was selling.
18 Q.  Barb, the more his agents sell, the better off
19 he does; isn't that correct?
20 A.  Yes.
21 Q.  Just like the more you sell, the better off you
22 are?
23 A.  Yeah. But if you have an agent that is out
24 there -- and I'm not digressing. If you have an agent

**Page 175**

1  out there who is selling and selling bad business that
2  is dropping right away, that agent is also hurting your
3  persistency. So I don't know whether he had agents
4  that were out there who were selling bad business. I
5  don't know what Terry himself was selling. I don't
6  know. I was -- I just know I was told that.
7  Q.  Okay. Explain to me -- you just said a minute
8  ago that Terry said if you have to work a double shift,
9  then that's what you have to do. I don't understand
10 that, because you are not clocking in and clocking out,
11 are you? Double shift, what do you mean by that?
12 A.  The union members, some of the union members
13 worked double shifts. Most of them were -- we have to
14 see at night because, obviously, they are working
15 during the day.
16 Q.  Right, right.
17 A.  But if they are a double shift worker, then we
18 could see them during the day, which meant if I had to
19 work a double shift, I saw union members who were home
20 during the day, and then I saw union members who were
21 home that night.
22 Q.  So basically you would see union members
23 whenever they were available?
24 A.  Right.

**Page 176**

1  Q.  So you personally were not working a double
2  shift?
3  A.  I was -- well --
4  Q.  That's just what Terry called it?
5  A.  That's what Terry called it.
6  Q.  Do you know, did AIL Waco have any type of a
7  mandatory work schedule that you were required to work?
8  A.  Not that I know of.
9  Q.  What about Scott Smith's agency?
10 A.  Not that I know of.
11 Q.  When you signed an agent --
12 A.  Well, wait a minute. You are asking did Scott
13 Smith agency have a mandatory schedule to work?
14 Q.  Mandatory work schedule.
15 A.  I don't know. I know we were exempt from their
16 mandatory meetings because we had to travel too far.
17 Q.  We meaning?
18 A.  Peoria.
19 Q.  Okay.
20 A.  But as far as if there was a mandatory work
21 schedule for the agents, I don't know.
22 Q.  Okay. You signed an agent contract with AIL
23 Waco, correct?
24 A.  Uh-huh.

**Page 177**

1 Q. Do you recall -- we have already talked about
2 this. When you first signed it, that was September
3 15th, 1998, correct?
4 A. Okay.
5 Q. And how long -- do you remember how long you
6 remained an agent, for how many months, before you
7 moved up to supervisory or supervising agent?
8 A. January 2000. No, I really don't.
9 Q. Okay.
10 A. It seems like that.
11 Q. Barb, did you report every day to AIL Waco?
12 A. I'm not sure where that 800 number went. I
13 think the 800 number went to Scott Smith.
14 Q. Okay. So is your answer yes or no?
15 A. No.
16 Q. Did you report to Scott Smith's agency on a
17 daily basis?
18 A. I think so, yes.
19 Q. Is your answer yes?
20 A. Yes.
21 Q. Okay. By contacting him on a daily basis, is
22 that through the 1-800 number you just referenced?
23 A. Yes, you had to call in your war report every
24 night.

**Page 178**

1 Q. And war report, again, is --
2 A. Who you saw, what you sold.
3 Q. Is that it?
4 A. Basically.
5 Q. Okay. What if someone calls in a false war
6 report? Is that bad?
7 A. (Shrugging shoulders.)
8 Q. In your opinion, is that bad?
9 A. Is that bad? I don't know.
10 Q. Can that subject an agent -- did you ever hear
11 anyone say that that would subject an agent to contract
12 termination?
13 A. No.
14 Q. Do you have any reason to believe that that
15 would cause or subject someone, an agent, to lose their
16 contract?
17 A. No, because I heard Terry do it all the time.
18 Q. And you said you did it, too?
19 A. I did it.
20 Q. How many occasions did you do that?
21 A. I know the one that I did it -- I don't know if
22 there was any other -- I honestly -- I don't know.
23 Q. So it is possible?
24 A. I know I did it when I had to move. I know I

**Page 179**

1 did that.
2 Q. Okay. Barb, since you don't know, so it is
3 possible you may have called in other false war
4 reports?
5 A. I don't think so. I don't think so. I may not
6 have gone to see the last appointment and called it in
7 as a no show, but I don't think that I -- I don't think
8 there was ever another out-and-out -- no, I don't think
9 so.
10 Q. Okay. And how -- Barb, I don't understand what
11 you just said. You may have called in -- or you may
12 have not gone to an appointment and called it in as a
13 no show. Isn't that a false war report?
14 A. That would be a false war report, but when you
15 are tired and it is 9:30 at night and you know they are
16 not going to be up and they don't want to see you
17 anyway, and you have got to drive 20 miles to get
18 there...
19 Q. Okay. So you have done that on other occasions?
20 A. I --
21 Q. Or on -- you have done that in addition to the
22 false war report we already talked about?
23 A. I can think of a couple of times that I did that
24 over the years. That's about it.

**Page 180**

1 Q. So a couple meaning two, four, less than -- ten,
2 ten times?
3 A. I would probably say less than a handful.
4 Q. A handful meaning five?
5 A. (The deponent showing her hand.)
6 Q. Okay.
7 A. More like two. I can't think of -- I'm sure I
8 am like every other agent they have ever had. I'm sure
9 I did it.
10 Q. All right. That's fair. So besides calling the
11 1-800 number -- well, first, let me ask you, did you
12 have to call the 1-800 number every day, every night?
13 A. Every night.
14 Q. Every night. Besides calling the 1-800 number,
15 did you have any other daily contact with Scott Smith's
16 agency?
17 A. No.
18 Q. What about the Peoria -- when I'm saying Scott
19 Smith's agency, I do mean Peoria office, like
20 everything that was Scott Smith's. But specifically
21 the Peoria office, did you have daily contact with
22 Terry Brennan?
23 A. Daily?
24 Q. Yes, daily?

1  A.  No.
2  Q.  How many times a week would you see Terry
3  Brennan?
4  A.  Two or three times a week.
5  Q.  Max, and the rest of the week were you out on
6  the road visiting clients?
7  A.  Yes.
8  Q.  Potential clients?
9  A.  Yeah.
10  Q.  And were you required to call this 1-800 number?
11  A.  Yes.
12  Q.  Do you know what would happen if you did not
13  call?
14  A.  They would call you up and tell you that you
15  didn't make a war report.
16  Q.  Okay. And then you give them the war report?
17  A.  Yeah.
18  Q.  Now, throughout your day, would you have any
19  contact with AIL Waco? I'm not talking a mandatory
20  report or -- just any contact with Waco?
21  A.  Not that I can remember. Seems -- because most
22  of the time we were working at night, any of the
23  questions that we may have that had to be answered were
24  usually answered the next day, and it was usually
                          181

1  through Scott's agency if there was any questions.
2  Q.  Did AIL Waco have any type of control or
3  supervision over you as an agent?
4  A.  I don't know. I don't know what control they
5  had over Scott and over Terry.
6  Q.  No, I'm asking over you specifically?
7  A.  Direct?
8  Q.  Yeah, directly over you, Barb?
9  A.  No.
10  Q.  So no control or supervision over what you were
11  doing?
12  A.  No, other than they got their reports that Terry
13  and Scott had to send to them is all I know.
14  Q.  Okay. But otherwise no control? They don't
15  tell you, Barb, you have got to do this, you have got
16  to do that?
17  A.  No.
18  Q.  Okay. What about Scott Smith's Peoria office?
19  A.  As to?
20  Q.  Control or supervision over Barb Kendell when
21  she was an agent?
22  A.  Whole control over me.
23  Q.  I'm sorry?
24  A.  A lot of control over me.
                          182

1  Q.  Who had control over you?
2  A.  Terry.
3  Q.  Okay. Explain the control Terry had over you.
4  A.  New appointments were set.
5  Q.  Okay. Let me stop you right there before you go
6  on. The appointments were set. Isn't this something
7  that you, as an agent, elected to have done? Just yes
8  or no. Did you elect to have Sue Vazquez set your
9  appointments for you?
10  A.  No. She just did it for everybody.
11  Q.  Okay. Didn't you pay -- weren't you charged for
12  this service?
13  A.  Not until the end, no.
14  Q.  Okay. How much were you charged for this
15  service?
16  A.  I don't remember. I think it was, like, $40.00
17  a month or something like that.
18  Q.  What about $40.00 a week?
19  A.  $40.00 a week?
20  Q.  Yes.
21  A.  For a long time we were supposed to be paying
22  and Terry just refused to do it. He didn't send the
23  money to Scott. Then Scott got mad and so we started
24  writing checks out.
                          183

1  Q.  Okay. Barb, stop. No more explanation. Just
2  -- so, yes, you paid 40 personally -- you personally
3  paid $40.00 a week for Sue Vazquez to set your
4  appointments for you?
5  A.  At the end, yes.
6  Q.  Okay. At the end. Okay. So the answer is yes
7  or no?
8  A.  The answer is yes.
9  Q.  Yes, at the end. What time frame are you
10  talking about?
11  A.  That, I don't remember.
12  Q.  The last year of your time with AIL?
13  A.  Oh, I would say the last six to eight months.
14  Q.  Okay. Six to eight months. Prior to that, Sue
15  would set your appointments for you and you would pay
16  nothing; is that what your testimony is?
17  A.  We would give Terry money to give to Sue to help
18  defray Terry's costs.
19  Q.  Do you recall how much money you gave to Terry?
20  A.  No. It was, as far as I remember, a --
21  Q.  Was it more or less than $40.00?
22  A.  Oh, less.
23  Q.  What, 20, 10?
24  A.  I don't know.
                          184

```
 1  Q.  Okay. So always during the time when you were
 2  an agent you always had -- you always paid something --
 3  A.  For Sue.
 4  Q.  -- for the service of Sue setting your
 5  appointments?
 6  A.  Yes.
 7  Q.  Okay. So, now, back to the control situation.
 8  You said Terry had control over you because Sue was
 9  setting your appointments. We just discussed you were
10  paying for that?
11  A.  Uh-huh.
12  Q.  That was something you elected, right?
13  A.  Yeah. Well, I didn't -- it was just something
14  that was.
15  Q.  You didn't have to do it, Barb, right?
16  A.  Theoretically you didn't have to do it.
17  Q.  Okay. That's all I want to know. Now, what
18  other control? Would you still say that Sue setting
19  your appointments for you was control that Terry had
20  over you?
21  A.  Yes.
22  Q.  You volunteered to have -- you consider that to
23  be control. You volunteered to have that done for you,
24  right?
                                185
```

```
 1  A.  But he wouldn't give you any of the appointment
 2  cards without it.
 3  Q.  You still think Sue setting your appointments is
 4  control that Terry demonstrated over you?
 5  A.  Yes.
 6  Q.  Okay. Moving on, what else did he do to
 7  demonstrate control over you?
 8  A.  He would tell Sue where to put us.
 9  Q.  And how do you know this?
10  A.  From Sue.
11  Q.  Did Terry ever tell you that?
12  A.  Yes.
13  Q.  What did Terry say?
14  A.  That he sent different agents to different areas
15  because of different reasons.
16  Q.  Isn't it true, Barb, that they would advertise
17  in a certain city and then set appointments in a
18  certain city and almost all of the agents were going to
19  that same location to meet --
20  A.  No.
21  Q.  -- with potential clients?
22  A.  Not always, no.
23  Q.  Not always, but usually wasn't that how it was
24  done?
                                186
```

```
 1  A.  Not --
 2  Q.  Yes or no? Yes or no?
 3  A.  No.
 4  Q.  No. Okay. Explain to me why -- how was that
 5  wrong, my statement?
 6  A.  Okay. A certain union is in a certain area.
 7  Q.  Right.
 8  A.  And the letter would go out and the cards come
 9  back and they get put in the file for Sue to call. But
10  she also had a file twice the size of the current file,
11  and that may be all over the whole mid part of the
12  state where we had previously been.
13  Q.  Okay.
14  A.  And people in those cards in those -- in that
15  file were people that she was not able to contact
16  before. And so periodically she would go through all
17  the different locals and all the different places plus
18  the current file, and if enough people in the current
19  file weren't answering their phones for whatever reason
20  she would send what agents she had to the current file
21  one and then call from the past file one.
22  Q.  Okay.
23  A.  And try to get enough agents to go for the past
24  file.
                                187
```

```
 1  Q.  Okay. That's fair. But it is also -- it is
 2  fair to say, though, every agent was being sent outside
 3  of Peoria, correct?
 4  A.  No.
 5  Q.  Who was not being sent out of Peoria?
 6  A.  Well, Terry was not outside of Peoria a lot.
 7  Q.  Really? Do you know -- Barb, let me ask you
 8  this since you traveled a lot and you claim you have
 9  gone long distances, how many miles would you say --
10  how many miles would you put on your car per year
11  traveling when you were an AIL agent?
12  A.  I don't remember. Oh, 25, 30,000 maybe. I
13  don't know.
14  Q.  Okay. Now, this would be reflected in your tax
15  returns, wouldn't it?
16  A.  Uh-huh.
17  Q.  Okay. Would it be shocking to you to learn that
18  Terry Brennan put approximately 60,000 miles on his car
19  traveling to visit potential agents?
20  A.  Yeah, it would.
21  Q.  That would shock you?
22  A.  Uh-huh.
23  Q.  Because Terry Brennan never left Peoria, is
24  that --
                                188
```

**Page 201**

1 job and go out and train Gordon.
2 Q. Okay. Was that it?
3 A. Well, yeah.
4 Q. That was the basis for your complaint?
5 A. Yeah.
6 Q. Okay.
7 A. That and the fact that Terry had had me go
8 overnight some stuff to -- I don't remember whether it
9 was to Scott Smith or Waco. And on his desk, when I
10 picked up where he set the stuff to overnight Fed Ex
11 and stuff, was a check that had not been given to an
12 agent who had left six months prior. And when I asked
13 Terry about it, I said, remember, you have got
14 so-and-so's check on your desk. He says, oh, yeah. I
15 said, well, Terry, you know, it's their paycheck. He
16 says, I never give the last paycheck out unless they
17 come and ask for it. And I said, do you have others?
18 He says, oh, yeah. And I thought, that's not right
19 either so...
20 Q. Barb, I just have a question, why -- how was
21 that your business, how Terry --
22 A. I asked Terry --
23 Q. Hold on. How Terry was managing the Peoria
24 office? Why --

**Page 202**

1 A. How is that my business?
2 Q. Yeah, to find out about other people's final
3 paychecks? How is that Barb Kendell's business?
4 A. Terry was asking me what he was doing wrong, why
5 agents were leaving. That's when I was telling him all
6 this stuff. Why agents were leaving and stuff and...
7 Q. So, again, you were criticizing Terry, weren't
8 you?
9 A. He asked what I thought.
10 Q. You were criticizing Terry, weren't you?
11 A. Constructive criticism.
12 Q. Answer the question. You were criticizing
13 Terry, weren't you?
14 A. Yes.
15 Q. Did he like to hear that criticism?
16 A. No.
17 Q. Barb, was your work, or the selling of insurance
18 policies, was that done under -- on your own? Or was
19 that done under direct supervision of a supervisor?
20 A. I don't understand the question.
21 Q. When you go out and sell a policy, were you
22 doing that on your own or was there someone there from
23 Scott Smith's agency watching you, making sure you were
24 doing it right?

**Page 203**

1 A. I was doing it on my own.
2 Q. On your own.
3 A. Can we change that blind back there?
4 Q. Was there someone from Waco with you when you
5 were making these sales, watching what you were doing
6 to make sure you were doing it right? Yes or no?
7 A. No.
8 Q. Did AIL Waco pay for your transportation?
9    (The videographer closing the
10    window blind.)
11    THE DEPONENT: Thanks. My transportation to
12 where?
13 Q. (By Ms. Hansell) To visit the clients?
14 A. Oh, no.
15 Q. Did Scott Smith's agency pay for your
16 transportation?
17 A. No.
18 Q. Did Waco -- AIL Waco pay for your license to
19 sell insurance?
20 A. No.
21 Q. What about Scott Smith's agency?
22 A. No.
23 Q. Did AIL Waco pay for you to have an office?
24 A. No.

**Page 204**

1 Q. What about Scott Smith's agency?
2 A. No.
3 Q. Did AIL Waco pay for your office supplies?
4 A. I'm not sure.
5 Q. What about Scott Smith's agency?
6 A. That's why I'm not sure who was paying for the
7 office supplies.
8 Q. Who supplied the office supplies to you? Was
9 that Scott Smith's agency or Waco?
10 A. I don't know.
11 Q. Okay. So if -- so you have no idea who paid for
12 the office supplies?
13 A. We were given pens. We were given paper. We
14 were given pencils. We were given all the paperwork.
15 We were using the fax -- there was the fax machine. We
16 were given the phone to use.
17 Q. Okay. Barb --
18 A. I don't know who --
19 Q. -- focus on the question.
20 A. -- paid the bill.
21 Q. Just focus on the question that I asked. Those
22 are yes or no.
23 A. I don't know who was paying.
24 Q. Okay. And you answered it. Did AIL Waco pay

```
1   for any fees that you were required to pay for being an
2   insurance agent?
3   A.    Such as?
4   Q.    Do you have an annual fee to maintain your
5   license?
6   A.    Oh, no, no. They were not doing that, no.
7   Q.    What about Scott Smith's agency?
8   A.    Nope.
9   Q.    Are you aware of anything else that AIL Waco
10  paid for relating to your insurance agent position?
11  A.    Other than the medical and the group, nope.
12  Q.    Okay. What about Scott Smith's agency?
13  A.    Other than the same thing, nope.
14  Q.    Okay. We talked about the insurance. And you
15  said Waco chips in, Scott Smith's agency chips in, and
16  this was -- did you say that was at the very end?
17  A.    In -- in to the medical?
18  Q.    Yes, where they were both chipping in?
19  A.    (Nodded head up and down.)
20  Q.    Okay. Besides that, that you mentioned, the
21  insurance, did AIL Waco provide you with anything else
22  you would consider to be a benefit?
23  A.    Sales stuff, but other than that, no.
24  Q.    What sales stuff?
                          205
```

```
1   A.    The flip charts and third party articles and
2   stuff you use to back up why this is a good idea, and
3   the letters that they would send out to the union, and
4   they would send us copies to be able to show this is
5   what your brother -- this is what your -- they sent all
6   of that kind of stuff.
7   Q.    Is that from the union or is that from AIL Waco?
8   A.    That was from Waco.
9   Q.    Waco. And you consider that to be a benefit?
10  A.    Well, yeah, it led to your credibility as being
11  there from a union label company.
12          MS. HANSELL: Okay. Let's take a break.
13          (Whereupon a recess was taken from
14          2:02 p.m. to 2:15 p.m.)
15  Q.    (By Ms. Hansell) Barb, on the commissions that
16  you made, I just want to -- oh, sorry.
17          Okay. Just so that I'm clear on this, on
18  the commissions that you made, you only received
19  commissions on policies sold, right? It was not on the
20  time you spent?
21  A.    (Nodded head up and down.)
22  Q.    Is that --
23  A.    True.
24  Q.    -- correct? Did you accumulate -- as an
                          206
```

```
1   insurance agent for AIL, did you accumulate any
2   retirement benefits?
3   A.    On the 20 percent that they didn't pay out on
4   the 80 percent -- remember when I said we were paid
5   50 percent or 52 percent.
6   Q.    Yes.
7   A.    And 80 percent of that was paid right away and
8   they held 20 percent back. That was supposed to be for
9   retirement. And what actually happened to that, I have
10  no idea.
11  Q.    And retirement meaning just extra money for you
12  to have to save towards your retirement?
13  A.    Correct.
14  Q.    But there was no retirement, any type of
15  policies or anything like that?
16  A.    If there was, I don't know about it.
17  Q.    Okay. What about retirement benefits from Scott
18  Smith's agency?
19  A.    No, it was all through Waco.
20  Q.    Okay. And, again, I just want to make sure I'm
21  really clear on this. The retirement benefits you are
22  talking about, it really was just a commission? It was
23  money paid to you? You could go out and shop and buy a
24  new wardrobe if you wanted?
                          207
```

```
1   A.    It was money that would eventually sometime in
2   the future be paid to us.
3   Q.    Okay. So it actually wasn't paid to you?
4   A.    No, it was not paid to us.
5   Q.    Okay.
6   A.    And what actually ever happened to it, I don't
7   know.
8   Q.    Does this go back to your first year renewals
9   and commissions?
10  A.    That was part of it. If you are paid -- say you
11  spent -- you sold $100.00. You get paid 50 percent, 50
12  bucks.
13  Q.    Okay.
14  A.    They are going to advance you 80 percent of the
15  50 bucks, which is what, 40, I think. Then they take
16  the other ten and they would put it in a fund
17  somewhere, heaven only knows where, that eventually,
18  when that fund got to a certain point and you had
19  reached retirement age or ten years down the line or
20  three years down the line, it was never really
21  explained to me, that money would come back to you.
22  Q.    So you are saying, then, that AIL Waco would
23  invest that, in your analogy you had a $10 amount.
24  They would invest that on your behalf; is that correct?
                          208
```

**Page 209**

1  A.  Into some type of a fund and do something with
2  it. But what I don't know.
3  Q.  And then at the age of retirement, being 65 --
4  A.  When you -- after you are vested, or after you
5  retire from the company then that money, because it is
6  still part of your first year commission, would be
7  given to you.
8  Q.  Okay. Okay. I understand now. Did AIL Waco
9  pay any Social Security taxes on commissions that they
10 paid to you?
11 A.  No.
12 Q.  What about Scott Smith's agency?
13 A.  No.
14 Q.  When you first started selling insurance on
15 behalf of AIL Waco, did you believe that you were an
16 independent contractor or an employee?
17 A.  Independent contractor.
18 Q.  At some point in time your belief changed; is
19 that correct?
20 A.  Yes.
21 Q.  You decided that you were an employee and not an
22 independent contractor; is that correct?
23 A.  Right.
24 Q.  Okay. What took -- what happened for you -- I

**Page 210**

1  want to know when and what facts, I guess, support your
2  belief that you became an employee?
3  A.  It was a gradual, and I can't specifically say a
4  particular date, but it was when I realized that
5  anytime I took a day off for any reason Terry expected
6  me to make that day up instead of as an independent
7  contractor if I want to work one day a week, I should
8  be able to work one day a week.
9  Q.  Okay. Let me ask you this. Would it be a
10 situation where you say a day where you had
11 appointments scheduled with potential clients and you
12 chose to take that off, so you missed all those
13 appointments, is that what he wanted you to make up?
14 A.  No, a day that had been scheduled ahead of time.
15 Q.  So a day, for example, let's say next week --
16 A.  I don't want to work --
17 Q.  -- you want to take Friday off of next week.
18 A.  (Nodded head up and down.)
19 Q.  Terry would say to you, Barb, sorry, no, you
20 can't take it off, but if you do take it off, you will
21 have to make that up at another time?
22 A.  (Nodded head up and down.)
23 Q.  Is that correct?
24 A.  Correct. He would either say, no, I need you in

**Page 211**

1  the field that day if it was something like that, I was
2  just taking a personal day or if I it was a doctor day
3  that I had to go to the doctor. Well, okay, make your
4  appointment in the morning I won't have Sue set the
5  first hour appointment for you, but the second hour
6  will be set. Or if I had to take Curt over to
7  Indianapolis and he would say, fine, you take that day
8  off, but you -- when are you coming back? Are you
9  coming back Sunday? Are you coming back Saturday?
10 Fine. You will work Sunday instead.
11 Q.  And did you work Sunday?
12 A.  Well, if Sue set the appointments.
13 Q.  Okay. So because of Terry telling you that you
14 had to work, you couldn't take time off, that's when
15 you decided you were an employee?
16 A.  That's when I decided that I was not an
17 independent contractor, yes.
18 Q.  Okay. You were an employee, then, correct?
19 A.  You are either one or the other, yes.
20 Q.  In your mind?
21 A.  (Nodded head up and down.)
22 Q.  Did you report this to anyone? Did you call
23 anyone and tell anyone that this was going on?
24 A.  That was one of the conversations that I had

**Page 212**

1  with Scott. And he said he expected the agents to be
2  out in the field five or six days a week. And that if
3  we couldn't do that, well, then we just didn't need to
4  work for American Income.
5  Q.  That's exactly what Scott said to you?
6  A.  Paraphrased basically, yeah.
7  Q.  Did Terry make all of his agents -- did he treat
8  everyone the same way with respect to taking a day off?
9  A.  I don't know.
10 Q.  Did you ever hear any other agents complaining
11 about the fact that Terry would not let them take a day
12 or that Terry required them to make up a day?
13 A.  I remember that Bill Butler, I think it was
14 Bill, one of the young guy agents, their grandmother or
15 mother was sick. And he took a week or two off because
16 of family problems. And I don't ever remember him ever
17 saying that Terry made him make it up, no.
18 Q.  So Terry may have made him make it up? You just
19 don't know?
20 A.  I don't -- I don't know.
21 Q.  Okay.
22 A.  I know I talked with Mike Holtz about when Terry
23 had hired him. I remember Terry telling Mike that --
24 because Mike is a farmer, that he could have planting

**Page 213**

1  season off and then combine season because he is a
2  farmer. And that he was taking some of the days off.
3  Some of them I think he said Terry had him work later
4  to make up, some not. You would have to ask Mike.
5  Q.    Okay. So you are aware of one -- Mike was out
6  of what office?
7  A.    The Quad Cities office.
8  Q.    Okay. So Mike Holtz, when he started as an
9  agent he had an agreement prior to becoming an agent
10 that he would have those seasons or those farming time
11 periods off, he would not be an agent for AIL; is that
12 correct?
13 A.    He would be a part-time agent for AIL during
14 those seasons, is my understanding.
15 Q.    Okay. Okay. So anyone else in a situation
16 similar to yours, where you want to be an agent out
17 there selling in the field on a regular basis and you
18 want to take a day and not sell agents -- or not sell
19 policies, and Terry made them make up that date?
20 A.    I think he made Sandy make up some days that she
21 was off.
22 Q.    How do you know that?
23 A.    I remember when we were sitting around the table
24 and she was complaining about it on a Monday meeting.

**Page 214**

1  Q.    Do you remember what she was saying?
2  A.    That she had to work on Sunday to make up for
3  something or other. And I don't remember. You would
4  have to ask Sandy.
5  Q.    Okay. So you are not sure then why she was
6  working on Sunday?
7  A.    I know it was something she did not want to do,
8  and Terry had said too bad.
9  Q.    Well, you don't know the circumstances
10 surrounding that?
11 A.    I don't remember.
12 Q.    Okay.
13 A.    If I would have known this was coming along I
14 would have taken notes.
15 Q.    Okay, Barb. So is there anyone else that you
16 know that Terry treated this way or similar to the way
17 he treated you with making up time?
18 A.    No, but I can -- I know the one person that you
19 ought to be talking to and asking would be the
20 appointments setter, because she would have been making
21 the appointments.
22 Q.    Okay. But I'm not taking her deposition. I'm
23 taking yours.
24 A.    I don't remember.

**Page 215**

1  Q.    Okay. That's a fair answer.
2  A.    I mean --
3  Q.    That's all I need to know. Did AIL Waco issue
4  you a W-2 or a 1099?
5  A.    A 10 -- I think it was a 1099. I don't
6  remember.
7  Q.    What about --
8  A.    I think it was a 1099.
9  Q.    Okay. What about Scott Smith's agency?
10 A.    No, it came out of Waco.
11 Q.    Did anyone at AIL Waco tell you that you need to
12 sell their insurance for a specified number of years?
13 A.    No.
14 Q.    What about Scott Smith's agency?
15 A.    What do you mean? I don't understand.
16 Q.    Expectation, Barb, I want you to work for us --
17 you need to work for us for three years, five years,
18 ten years?
19 A.    No.
20 Q.    Okay. Anyone at Waco or Scott Smith's agency
21 ever discuss their expectation of how long you would
22 act as an insurance agent?
23 A.    No.
24 Q.    Did either Waco or Scott Smith's agency provide

**Page 216**

1  you with a car?
2  A.    No.
3  Q.    Okay. Did either of those two, Waco or Scott
4  Smith's agency, did either one of them pay for your
5  gasoline?
6  A.    No.
7  Q.    Were you required to wear a uniform?
8  A.    No.
9  Q.    Do you know did AIL Waco have established times
10 of day when you were required to work? I should say
11 times and days of work?
12 A.    I don't know.
13 Q.    For example, could you sell a policy on Saturday
14 night if you wanted?
15 A.    Sure.
16 Q.    The first thing Sunday morning if you wanted to?
17 A.    Sure.
18 Q.    Okay. So is it fair to say there were no
19 established times and days when you had to sell
20 policies?
21 A.    I don't know.
22 Q.    What about Scott Smith's office?
23 A.    I don't know. I could sell a policy, like you
24 just said, on a Saturday night or a Sunday morning.

```
1   Q.   You could sell a policy whenever you wanted,
2   couldn't you?
3   A.   Yes. But whether they had established times
4   that they expected us to, I don't know.
5   Q.   Okay. Did you have to work out of the AIL Waco
6   office?
7   A.   No.
8   Q.   Were you required to work out of Scott Smith's
9   Peoria office?
10  A.   Yes.
11  Q.   You were?
12  A.   Yes.
13  Q.   Couldn't you work from home?
14  A.   No. As far as turning the paperwork in and
15  stuff, no.
16  Q.   Could you fax something in if you were not able
17  to --
18  A.   No.
19  Q.   -- attend, say, a meeting?
20  A.   No.
21  Q.   No?
22  A.   My appointments were faxed to me.
23  Q.   Okay.
24  A.   But could I fax in? No. Well, I could as long
                              217
1   as it wasn't an application or something. No, that has
2   to be the original.
3   Q.   Barb, was that the main or one of the major
4   parts of your agent position was you are out selling
5   policies?
6   A.   Yeah.
7   Q.   That's not at the Scott Smith agency in Peoria,
8   is it? You are out in a car out at a client's home?
9   A.   Oh, well, if that's what you mean, yes.
10  Q.   That's what I mean. Can you work from home or
11  say, for example, from your client's home? That's what
12  you did?
13  A.   I did most of the work -- the physical act of
14  selling in the client's home.
15  Q.   Okay. Did AIL Waco require you to sell policies
16  in a certain manner?
17  A.   I don't understand the question.
18  Q.   Did they tell you in order to sell a policy you
19  have to do X, Y and Z, that's all you do? Or did they
20  put any guidelines on how Barb Kendell is supposed to
21  sell a policy for AIL?
22  A.   They had a written script you were supposed to
23  follow.
24  Q.   Was that a general guideline for you, especially
                              218
1   in the beginning, when you didn't know what you were
2   doing, for you to look at and go off of and then as
3   Barb Kendell sells policies, she can kind of modify it
4   and --
5   A.   As long as I stayed within the basic guidelines,
6   yeah.
7   Q.   Okay. So this was a general guideline for you
8   to look at to know what you should be saying?
9   A.   Yes.
10  Q.   Was it a requirement that you had to read off of
11  that script?
12  A.   Yes. The letter itself was a mandatory read off
13  letter. We had to read that letter.
14  Q.   Did you always read off that letter?
15  A.   You bet ya.
16  Q.   You didn't paraphrase --
17  A.   Nope.
18  Q.   -- or summarize?
19  A.   Nope.
20  Q.   So in any other manner did they tell you how to
21  sell a policy?
22  A.   No.
23  Q.   Did that opening letter, that script that you
24  are talking about, is that what sold the policy?
                              219
1   A.   No. First the client has to have a need. If
2   they have no need, they are not going to buy.
3   Q.   Okay. But --
4   A.   If they have no money, they are not going to
5   buy.
6   Q.   Did AIL Waco instruct you on how to sell a
7   policy? You have a script you read. Fine. Setting
8   that aside, any other instructions from them on how to
9   sell a policy?
10  A.   No.
11  Q.   The same thing for Scott Smith's Peoria office.
12  A.   No. The only thing that Terry always told me,
13  and I'm sure he told the other agents, if Scott drives
14  along with you or anybody else from Chicago or Waco,
15  you make sure you follow the flip chart exactly as
16  presented, period.
17  Q.   Did AIL Waco provide you with office equipment
18  or secretarial services?
19  A.   Somebody provided the office equipment.
20  Q.   Do you know, was that Scott Smith?
21  A.   I don't know who --
22  Q.   Or Waco --
23  A.   I don't know.
24  Q.   Okay. Did AIL Waco provide you with access to
                              220
```

**Page 221**

```
1   telephones?
2   A.   I don't know who paid the phone bill.
3   Q.   You know you paid for --
4   A.   Yes. I know I didn't --
5   Q.   -- $40.00 per week of it, right?
6   A.   I don't know. I didn't pay the phone bill and I
7   could come in and I could use the phone anytime I
8   wanted to call anybody I wanted.
9   Q.   Okay. You didn't pay the phone bill, but you
10  did pay a $40.00 weekly fee, correct?
11  A.   For the appointment setter.
12  Q.   But didn't that also include you could use the
13  phone? Because you could call and set your own
14  appointments if you chose to; isn't that right?
15  A.   That was the theory, but Terry wouldn't give you
16  the cards to do it.
17  Q.   But if you had a potential client's number you
18  could call them, couldn't you?
19  A.   Sure.
20  Q.   And maybe you have already answered this. Do
21  you know who was charging you the $40.00 a week? Was
22  that Waco or Scott Smith?
23  A.   I don't know.
24  Q.   When you signed your agent contract, did you
```

**Page 222**

```
1   understand all the terms and conditions that were in
2   it?
3   A.   For the most part.
4   Q.   Okay. What --
5   A.   I'm not always sure -- and I don't remember what
6   the contract said. There are always some legal terms
7   that I am always saying I'm not sure exactly what that
8   means, but I think I know what it means.
9   Q.   Okay. Do you recall, were there any sections
10  that you didn't understand?
11  A.   I don't recall. I don't think. I think I just
12  about understood every one that was in the contract,
13  because I was used to reading contracts.
14  Q.   Do you recall reading a statement in the agent
15  contract that you signed stating that you were not an
16  employee of AIL?
17  A.   Yes.
18  Q.   In your own words will you explain what that
19  means to you?
20  A.   The man said I was an independent contractor and
21  I could work whenever I wanted to or not work whenever
22  I wanted to.
23  Q.   Setting aside Terry's yelling and screaming, I
24  guess, at you, isn't that what you actually did? You
```

**Page 223**

```
1   were able to go with -- it was Curt, wasn't it --
2   A.   Uh-huh.
3   Q.   -- who had cancer? You were able to go with him
4   for treatment in Indianapolis, weren't you?
5   A.   Uh-huh.
6   Q.   You were able, if you wanted to take time off,
7   to come down and see your mom and dad?
8   A.   I generally did that on one of the holiday
9   weekends.
10  Q.   Okay. But you did work essentially when you
11  wanted, didn't you, Barb?
12  A.   No, not really.
13  Q.   So it was more like a 9:00 to 5:00 job?
14  A.   No, it was more like a 2:00 to 11:00 job.
15  Q.   Whenever there were, say, potential clients in
16  the St. Louis area, didn't you volunteer for those?
17  A.   Not always, no.
18  Q.   But usually wouldn't you volunteer?
19  A.   I volunteered once.
20  Q.   Only once?
21  A.   Once to come down to the area and work.
22  Q.   Okay. Do you recall reading this statement in
23  the agent contract that you signed stating that you
24  have no fixed hours and are free to choose the time and
```

**Page 224**

```
1   manner in which services are performed?
2   A.   I don't remember that being in there, but if you
3   say it is, okay, it is probably in there.
4   Q.   Do you understand what that means?
5   A.   Yes, that I can work wherever I want to work and
6   whenever I want to work.
7   Q.   So if Terry, then, is not abiding by the terms
8   of your contract, why didn't you call someone?
9   A.   Because of fear.
10  Q.   If you called the union, were you afraid of
11  something, that something bad would happen?
12  A.   Of course.
13  Q.   What were you afraid of, Barb?
14  A.   Terry firing me.
15  Q.   And you think if you would have called Scott
16  Smith, Terry would have fired you?
17  A.   Oh, yes. They both made that quite clear.
18  Q.   And if you would have called your -- excuse me
19  -- if you would have called the union, would you have
20  filed a grievance on this?
21  A.   I was also informed that if I filed a grievance
22  I would be fired.
23  Q.   Do you know there are laws out there to protect
24  you from that, Barb?
```