**Page 229**

 1  A.  What?
 2  Q.  You agreed to abide by the terms. After your
 3  contract is terminated, a year later, you don't abide
 4  by the terms. You violated them. Explain that to me,
 5  Barb.
 6  A.  It was explained to me by several people.
 7  Q.  Now, Barb, explain to me how you can sign it
 8  saying you agree to the terms --
 9  A.  I agreed to it at that point.
10  Q.  -- but then you break those terms. So just on
11  the day you signed it you agreed to the terms, not any
12  point after that?
13  A.  I agreed to it.
14  Q.  And you later violated it then?
15  A.  And I later violated it.
16  Q.  And that's not a big deal to you?
17  A.  No.
18  Q.  Do you recall whether your agent contract that
19  you signed with AIL mentioned anything about the Scott
20  Smith agency?
21  A.  No, I don't remember. I don't think it did.
22  Q.  Did you have a separate written contract with
23  Scott Smith?
24  A.  No.

**Page 230**

 1  Q.  Or his agency?
 2  A.  No.
 3  Q.  Barb, do you have any reason to believe that
 4  Terry Brennan was an employee of AIL Waco, or do you
 5  think he was an independent contractor?
 6  A.  After reading the contract that you had a copy
 7  of, he was an independent contractor.
 8  Q.  I'm sorry? Your answer is he is --
 9  A.  I -- to the best of my understanding he was an
10  independent contractor.
11  Q.  Okay. So you don't have any reason to believe
12  that Terry was an employee of Waco, AIL Waco?
13  A.  At this point, no, I don't think he was. I may
14  not understand something, but, no, I don't -- he -- as
15  a master general agent, they, I think, are still
16  considered independent contractors.
17  Q.  Okay. What about Scott Smith? Do you think he
18  was an employee of AIL Waco?
19  A.  I'm totally confused over what Scott's
20  relationship with Waco is or was or is.
21  Q.  What do you believe right now? Sitting here
22  today, do you believe that Scott Smith, when he was --
23  when he was the SGA, did you believe or do you believe
24  now was he an employee or was he his own independent

**Page 231**

 1  contractor that ran his own business? What is your
 2  opinion? What do you believe?
 3  A.  I think he was an independent contractor that
 4  ran his own business according to the dictates of Waco.
 5  Q.  Okay. Do you have any reason to believe that he
 6  was an employee of Waco?
 7  A.  The way the hierarchy had been explained to me,
 8  he was an employee. Stated general agents were
 9  employees of Waco.
10  Q.  So now you are telling me you think Scott was an
11  employee?
12  A.  That's the way it was explained to me when Terry
13  explained it when I asked him on the hierarchy.
14  Whether it is, I don't know.
15  Q.  Okay. So according to Terry, Scott Smith and
16  all the others SGAs out there that have their own
17  agencies, they are all employees of Waco, according to
18  Terry Brennan?
19  A.  Yes.
20  Q.  And you think he is a good authority as to
21  what --
22  A.  No, I don't think so now, no.
23  Q.  Okay. So let me ask you, sitting here today,
24  what is your opinion? What does Barb Kendell think?

**Page 232**

 1  A.  I would really love to answer that question.
 2  Q.  I'm asking you. You are under oath.
 3  A.  Under oath, what I really think?
 4  Q.  Really, truly think.
 5  A.  What I really, truly think is insurance
 6  companies have come up with a great scheme to be able
 7  to screw the agent and pass the buck between them so
 8  nobody seems to be responsible for anything.
 9  Q.  Okay. And how does that --
10  A.  That's what I truly think.
11  Q.  -- answer my question? So what, is Terry -- or
12  excuse me -- is Scott -- do you believe Scott is an
13  employee or do you believe he is an independent
14  contractor of Waco?
15  A.  I think he is an independent contractor under
16  the control of Waco.
17  Q.  So, Barb, we just talked -- we just discussed
18  the whole control thing, and you think because of
19  Terry's control over you and not allowing you to take a
20  day off that you went from independent contractor to
21  employee. So what are you telling me here? He
22  is either an independent --
23  A.  That Scott had --
24  Q.  Barb --

| | | |
|---|---|---|
| 1 | Q. | What did Steve DeKlerk say? |
| 2 | A. | He was PMSing. |
| 3 | Q. | Okay. What does Barb Kendell think? |
| 4 | A. | It think it was when the numbers were out and he |
| 5 | | was under the gun to make production numbers and wasn't |
| 6 | | happy and was just taking it out on me because I was |
| 7 | | the easy target. |
| 8 | Q. | Would you say Terry relied heavily upon you? |
| 9 | A. | Yes, yeah. |
| 10 | Q. | Maybe you were his right-hand woman? |
| 11 | A. | I wanted to be, because I knew he needed help, |
| 12 | | yes. And when we were getting along, hey, if you |
| 13 | | wanted to go out and have a Coke with the guy, he is a |
| 14 | | nice -- you would like him. It was just this horrible |
| 15 | | temper that he couldn't -- I mean, it was just... |
| 16 | Q. | So, Barb, you knew him well enough, you knew the |
| 17 | | nice side, the good guy in Terry and you also knew the |
| 18 | | other side of Terry? |
| 19 | A. | (Nodded head up and down.) |
| 20 | Q. | Right? |
| 21 | A. | (Nodded head up and down.) |
| 22 | Q. | And quickly, again, capsule summary, if you |
| 23 | | will, please, how does the supervising agent position |
| 24 | | differ from the agent position? |

237

| | | |
|---|---|---|
| 1 | A. | You get paid more money and you train agents. |
| 2 | Q. | Okay. Is that -- in a nutshell, is that -- |
| 3 | A. | In a nutshell. |
| 4 | Q. | Okay. On the persistency level, the decrease, |
| 5 | | when you said you went from supervising agent back to |
| 6 | | agent, did someone tell you that it was because of the |
| 7 | | persistency level or is that just something you figured |
| 8 | | out? |
| 9 | A. | No, I was told, and I don't remember whether it |
| 10 | | was Scott or Terry, but I was told that was one way of |
| 11 | | getting the persistency level back up again. |
| 12 | Q. | Did that make sense to you when they were |
| 13 | | telling you that? |
| 14 | A. | None of it made sense, on the way they paid out, |
| 15 | | made any sense to me but... |
| 16 | Q. | Is that because you don't understand the way the |
| 17 | | system works? |
| 18 | A. | I didn't understand the way the system worked. |
| 19 | Q. | All right. When you were brought back down -- |
| 20 | | or brought back to an agent, did you complain to anyone |
| 21 | | and report this, hey, I don't want to be an agent, I |
| 22 | | still want to be a supervising agent? |
| 23 | A. | No. |
| 24 | Q. | No. It was okay with you? |

238

| | | |
|---|---|---|
| 1 | A. | It was okay with me. |
| 2 | Q. | You understood it? |
| 3 | A. | Fine with me. I can work my way back up to |
| 4 | | supervising agent again. |
| 5 | Q. | Okay. While you were an agent for AIL Waco |
| 6 | | and/or a supervising agent, did you receive any |
| 7 | | performance reviews? |
| 8 | A. | No. |
| 9 | Q. | Okay. Was it not customary for agents to get |
| 10 | | performance reviews? |
| 11 | A. | If they did, I don't know. |
| 12 | Q. | Okay. While you were acting as an agent and/or |
| 13 | | supervising agent for AIL Waco, did you ever receive |
| 14 | | any disciplinary action or reprimands? |
| 15 | A. | Not that I know of. |
| 16 | Q. | Okay. Again, was it not customary for agents to |
| 17 | | get reprimands or receive a disciplinary action? |
| 18 | A. | I don't know. |
| 19 | Q. | Okay. |
| 20 | A. | I got accommodations (sic), but I didn't get any |
| 21 | | reprimands. |
| 22 | Q. | What is that? What do you mean by that? |
| 23 | A. | If you sold so much you got a certificate for |
| 24 | | being a great salesperson. And if you sold so much |

239

| | | |
|---|---|---|
| 1 | | more, and I don't remember what it was, they made a big |
| 2 | | deal and put a brick on the wall up in the office in |
| 3 | | Chicago. |
| 4 | Q. | And you got a brick, didn't you? |
| 5 | A. | Yeah. |
| 6 | Q. | And that's an accommodation? |
| 7 | A. | Yeah. |
| 8 | Q. | Why do they call it that? |
| 9 | A. | I don't know. |
| 10 | Q. | But that's the term? |
| 11 | A. | Yeah. |
| 12 | Q. | The industry term, I guess? |
| 13 | A. | Yes. |
| 14 | Q. | Accommodation. Okay. Barb, just so we are |
| 15 | | clear on this, and you have explained to me why you |
| 16 | | believe you were an employee, and it is due to Terry |
| 17 | | Brennan not letting you take a day away from selling |
| 18 | | insurance, and that's correct, right? |
| 19 | A. | And not -- |
| 20 | Q. | You would have to make up your time? |
| 21 | A. | I make up my time and the fact that I didn't |
| 22 | | have, according to Terry, time to take off to have |
| 23 | | surgery. |
| 24 | Q. | Okay. |

240

```
1   A.   Because if you take that time off you might as
2   well quit, because I will fire you.
3   Q.   Well, if you took that time off, because what
4   did you want, two to three months off?
5   A.   I didn't want it. That's what the doctor said
6   the recovery was.
7   Q.   Okay. But if you took two to three months off,
8   it just means that Barb Kendell would go without pay
9   for two to three months --
10  A.   Yeah.
11  Q.   -- if you are not selling policies. So you
12  might as well quit. You are not --
13  A.   No.
14  Q.   No? Why is that?
15  A.   It means I am not going to get paid, but why
16  should I quit?
17  Q.   Couldn't you come back and sell insurance for
18  them after you recovered?
19  A.   Well, if I quit I lose my health insurance.
20  Q.   Okay. I see what you are saying. Now, so, in
21  your opinion you believed that you were an employee of
22  Scott Smith's agency; is that correct? Or do you
23  believe you were an employee for Terry Brennan?
24  A.   I believed I was an employee the way Terry
                            241
1   Brennan treated me. I believe that I ended up being an
2   employee for the Scott Smith agency because he
3   concurred about the way Terry was treating me.
4   Q.   Okay.
5   A.   Convoluted, isn't it.
6   Q.   Okay. So you are basing -- okay. Just so I can
7   understand this, Barb --
8   A.   Oh.
9   Q.   -- so your basis for believing that Scott
10  Smith's agency was your employer is because Scott Smith
11  agreed or said he would back Terry?
12  A.   But he was not my ultimate employer.
13  Q.   Who was that?
14  A.   My employer that I held my independent contract
15  with was Waco.
16  Q.   So you think your employer, then -- you were an
17  employee -- by virtue of Terry Brennan and what he did,
18  you believe, then, that you were not only an employee
19  of Scott Smith's agency, you were also an employee of
20  AIL Waco?
21  A.   Yes.
22  Q.   Can you explain to me why you believe you were
23  an employee of AIL Waco?
24  A.   Because every time I tried going up the food
                            242
1   chain to lodge a complaint I got shot out of the
2   saddle.
3   Q.   Did you call anyone at AIL Waco and complain
4   about Terry?
5   A.   If I would have known anybody there to call I
6   would. Well, I probably would have when it came to the
7   point that I couldn't take the time off to have the
8   surgery.
9   Q.   Okay. Hold up. You just said you don't know
10  anyone at AIL Waco, but you believe you are an employee
11  of that company?
12  A.   I don't know anybody at the parent company at
13  Triple A, but I know I am an employee of theirs.
14  Q.   Okay. Oh, that's right. You think they are a
15  parent company to Scott Smith; is that correct?
16  A.   Well, whatever their -- that's where I -- yes,
17  that's the best way, as a layperson, I know to explain
18  it.
19  Q.   Okay. As a layperson, then, I want to have -- I
20  want you to give me every single factual basis why you
21  believe that AIL Waco is the parent company to Scott
22  Smith's agency, every single fact, every reason you
23  have to believe they are a parent company. That's what
24  I want to know.
                            243
1   A.   Because they have total control as far as
2   setting the guidelines that the Scott Smith agency has
3   to meet to maintain the state general agent contract,
4   just like Terry had certain qualifications he had to
5   meet to maintain his master general agent contract.
6   Q.   Okay.
7   A.   Just like I had certain qualifications as a
8   supervising and then as an agent supervising.
9   Q.   Okay. What else?
10  A.   So the food chain goes reverse, too.
11  Q.   I understand that. So what else?
12  A.   And everything that Terry was doing that treated
13  me like an employee and was backed up by Scott Smith,
14  would have been unofficially looked at and condoned by
15  Waco, because a lot of the same complaints that I had
16  Waco already knew. Because when an agent resigns,
17  quits for whatever reason, Waco would send them a
18  letter asking how did you find your employment. And it
19  was an evaluation letter.
20       And from talking to some of the agents when
21  they left, they had let Waco know that they were being
22  treated as employees. So Waco couldn't have known what
23  was happening, could not have known what was happening,
24  and did nothing. That's why I said earlier it just
                            244
```

```
 1  looks to me like it is a good way to pass the buck so
 2  nobody has the buck stop on them.
 3  Q.   So, Barb, is that everything?
 4  A.   I'm not sure who paid exactly what bills, no, I
 5  don't know. Yeah, it is confusing.
 6  Q.   Now, so, is that it?
 7  A.   Yep, that's --
 8  Q.   That's it?
 9  A.   That's it.
10  Q.   So in a nutshell, you think legally, then, an
11  entity becomes a parent corporation based upon these
12  three things you told me. So if these three things are
13  present, you are a parent company to another company?
14  Is that your testimony?
15  A.   If you have any control over --
16  Q.   Barb, my question, is that your testimony?
17  A.   My testimony is if you have some type of control
18  over another company and they have to answer to you,
19  you are the top of the food chain.
20  Q.   Okay. So that makes you legally a parent
21  company? We are not talking employee/independent
22  contractor. I just -- I'm trying to understand what
23  you are saying here. So you are saying these are the
24  factors that support your basis for putting in a
                            245
```

```
 1  complaint that you filed with the Central District that
 2  AIL Waco is a parent company, because of this?
 3  A.   Because they have control.
 4  Q.   These three things?
 5  A.   Yes.
 6  Q.   Okay. That's all I wanted to know. Therefore,
 7  you believe you are an employee of AIL Waco?
 8  A.   Ultimately that I was an employee, yes.
 9  Q.   All right. Back to this, you said that Waco
10  knew that these individuals who filed -- and I believe
11  what you were referring to was exit interviews -- you
12  knew that they were treated as employees. That's what
13  you just talked about?
14  A.   They knew -- they -- from the reports I got from
15  when some of the guys and some of the girls would quit,
16  that they would -- they were complaining on the hours
17  that they had to work and that Terry would not give
18  them time off.
19  Q.   Okay. Did you read these --
20  A.   I have never seen one of them.
21  Q.   Okay. You are just going, then, off of what
22  someone told you they put in writing perhaps months
23  ago? You didn't read them yourself?
24  A.   No.
                            246
```

```
 1  Q.   So you do not know what Waco -- anyone at Waco
 2  knows, do you?
 3  A.   No.
 4  Q.   Okay. So, Barb -- and I believe we did discuss
 5  this, but review for me, since you think you were an
 6  employee of AIL Waco, what control did they have over
 7  you as an insurance agent?
 8  A.   They could hire or fire me anytime they wanted.
 9  Q.   That's the term of the contract, yes,
10  independent contractors contract, yes.
11  A.   Uh-huh.
12  Q.   Anything else?
13  A.   The same as an employee, they could fire me
14  anytime they wanted.
15  Q.   Anything else, Barb?
16  A.   That's about total control.
17  Q.   Okay.
18  A.   They can control your life that way.
19  Q.   Okay. Barb, tell me every reason that you
20  believe supports your claim that your agent contract
21  was wrongfully terminated?
22  A.   Because Terry fired me for not working the
23  weekend of Memorial Day weekend. And I most certainly
24  did work. When he told me he wanted me to work that
                            247
```

```
 1  weekend to make time off -- up for taking Curt over to
 2  Indianapolis, I said, fine. Because I knew Sue didn't
 3  want to work and when Sue didn't want to work none of
 4  us worked. And I figured she wants to set the
 5  appointments, I will run them. So she set two
 6  appointments. I think it was that Saturday or that
 7  Sunday. I would have to go back and look at my notes.
 8       And I went to one and they were home, and I
 9  talked to the young couple. And I went to the next
10  one. They weren't home. I went back to the first one,
11  because I happened to think of -- I don't remember what
12  it was I thought of that I wanted to tell them that I
13  hadn't told them the first time I was there. I already
14  reset an appointment, that I wanted them to think about
15  something or other before my next appointment with
16  them. And by that time they had already taken off
17  fishing. And I just happened to have their name
18  written down in my appointment schedule because I had
19  made the next appointment.
20  Q.   Anything else?
21  A.   Well, I got a little ticked off that he fired me
22  over the fact that I didn't work that weekend, and I
23  had. And he made Sue lie.
24  Q.   Okay.
                            248
```

**Page 253**

Q. Okay. What -- now, take me through this step-by-step. I may stop you. Just tell me each fact as it happened. So when did Scott come to the office?

A. I would have to go back and look at my appointment schedule, but it was, like, a week and a half later.

Q. After what you just --

A. Yeah.

Q. These three things happened?

A. Yeah.

Q. Okay. And did -- and you said Terry at this time -- the three things we just talked about, Terry at that time said, Barb, you are fired?

A. Yeah.

Q. Okay. But then were you really -- what time period was this?

A. I don't know if I was really fired, because I talked to Steve DeKlerk the day that Terry called me up and screamed you are fired.

Q. Okay. Barb, hold on. Would this be 05-31, 2001, the end of May of 2001, is that the time period when --

A. That's the time period.

Q. When he -- you guys had this fight, you just

**Page 254**

told me these three things, and that he said, Barb, you are fired?

A. Over the phone.

Q. Over the phone?

A. Over the phone.

Q. Okay. So that is 05-31, '01. Then you said, what, a week and a half later Scott Smith calls you or comes down?

A. No. Well, Scott and Bob Olsen were out of town, I guess, in Cancun or some place.

Q. Okay.

A. And I talked to Steve and he said you are not fired. You know Terry. He fires people without even meaning it. He said, go out and sell something. And I did. And I sold something. And I don't remember who and I don't remember what, but I remember selling something.

Q. So this is around the time period of 05-31, '01?

A. (Nodded head up and down.)

Q. Was it that day, you think, that you sold something?

A. I think it might have been that day.

Q. Okay.

A. Which I never got paid for. And then the next

**Page 255**

time I talked to Steve and he said I don't know whether you have been fired. I really don't know. You got to talk to Bob Olsen. He is managing the office while Scott is gone. So I talked to Bob, and he said I really don't know. They are in Cancun, or I think that's where they were or someplace, wherever.

Q. What did you tell Bob when you spoke with him?

A. I told Bob exactly what had happened. And I said, I don't know whether I'm fired or not. He said, well, why don't you just take off a little bit while we work this out. We can't work it out until Scott gets back into town. I will have him give you a call. No, he said, I will call you again and let you know what is going on. And I didn't hear from him for a week.

Q. Okay. Let me stop you right there. Do you remember when you called Bob Olsen, did you tell him the three things we just talked about, one being Terry Brennan fired you for not working on Memorial Day weekend, when, in fact, you did. Two, Terry Brennan accused you of writing an exit interview for Linda Haynes-Jackson, which you didn't even know about?

A. I didn't say exit interview.

Q. Okay.

A. I said, he accused me of writing a letter that

**Page 256**

Linda sent in to Waco that I didn't even know she had written a letter.

Q. Okay. Did you also tell him that you thought Terry just didn't like you?

A. Well, I said, you know, Terry and I just had another -- he just blew up at me again, and I'm tired of it and I just don't --

Q. So wait, Barb, just so I'm clear, so you did talk to Bob Olsen about --

A. Oh, yeah.

Q. -- these three things?

A. Oh, yeah.

Q. Anything else did you tell him that you haven't told me?

A. If there is, I don't remember what it was.

Q. Okay. Let me stop you.

A. It would be in the same vein.

Q. Okay. Let me get off the track just for a second. Do you know why -- do you think Terry really believed that you did work that Memorial Day weekend, and he just made this up as a lie, that, Barb, I don't think you worked Memorial, or do you think he really believed you didn't work when, in fact, as you said, you said you did?

**Page 265**

1  me if you have ever received it or read it? Or if you
2  received it or if you have ever read this document?
3  A.  Yep, I got this.
4  Q.  Okay. You received Defendant's Exhibit Number
5  3. Can you please tell me what it is?
6  A.  "You have been notified of your termination and
7  have adjusted our records to show the effective date of
8  07-31 of 2001."
9  Q.  And this letter is from whom?
10 A.  Tania Donaldson, assistant vice president,
11 agency administration of American Income Life Insurance
12 Company.
13 Q.  And it is to?
14 A.  Me.
15 Q.  And I'm sorry. Did you already say what date it
16 is dated?
17 A.  August the 5th.
18 Q.  Okay. You said you received this?
19 A.  Yeah.
20 Q.  You've read this document before?
21 A.  Yes.
22 Q.  And so is this the document we were just
23 discussing, the one you received from AIL Waco?
24 A.  Yes.

**Page 266**

1  Q.  Okay.
2  A.  Just --
3  Q.  Okay. But you think then -- because we were
4  talking about two different letters.
5  A.  You were talking about that one.
6  Q.  I was talking about that one, Defendant's
7  Exhibit Number 2. Were you talking about another
8  letter you received?
9  A.  No. I remember reading this from the copies
10 that I got from your office. I just don't remember
11 getting this in a mailing.
12 Q.  Okay. For purposes of the record, this, you
13 were referring to Defendant's Exhibit Number 2?
14 A.  Two.
15 Q.  Okay. All right. So then prior to the lawsuit,
16 prior to me sending documents to you in compliance with
17 Rule 26, the only letter on termination of contract
18 that you recall receiving is Defendant's Exhibit Number
19 3?
20 A.  Yes.
21 Q.  Is that correct? Okay. So there was no other
22 document that you received as far as you recall?
23 A.  As far as I remember, no, because I remember
24 sitting around for a long time wondering what was going

**Page 267**

1  on.
2  Q.  Okay. So what was your last day worked? Just
3  to refresh your memory, we were talking about 05-31-01,
4  and you said that's the day Terry said you were fired.
5  You went out and sold something that day. Bob Olsen
6  tells you take some time off, Barb?
7  A.  (Nodded head up and down.)
8  Q.  Scott Smith comes down and meets with you and --
9  A.  I don't know the exact last day. I would think
10 it would have been 05-31. I'm --
11 Q.  That was the last day worked?
12 A.  I might have seen somebody on the 1st or the
13 2nd. I don't remember. I would have to go and take a
14 look at my appointment schedule. If there is nothing
15 listed, I don't -- I mean, I don't know. I don't
16 remember.
17 Q.  Okay. Do you recall, Barb -- well, so, when was
18 the soonest point in time when you realized -- wait.
19 Strike all that.
20     So you believe that May 31, 2001 may have
21 been your last day worked?
22 A.  To me the last day that I worked would have been
23 the 31st or the 1st or the 2nd. The date of my actual
24 termination was the 31st of June -- of July.

**Page 268**

1  Q.  I'm sorry. Will you repeat that, please?
2  A.  The last date my termination was effective, so
3  theoretically I could have worked up until the date of
4  termination.
5  Q.  Okay. But you don't believe you did so?
6  A.  I -- I would have to look through my stuff.
7  Q.  Okay. Barb, I'm just going to -- I'm not going
8  to give this to you, because I have notes all over it.
9  At the end of the deposition I will go over and -- we
10 will go over this, a clean copy of this but -- well,
11 actually, hold on. I'm sorry.
12     Darlene, can I get this marked as a group
13 exhibit?
14     (Whereupon said document was
15     duly marked for purposes of
16     identification as Defendant's
17     Exhibit 4 as of this date.)
18 Q.  Barb, Darlene just handed you what has been
19 marked as Group Exhibit Number 4. Will you, please --
20 just for purposes of refreshing your recollection, will
21 you please turn to May 31 of 2001.
22 A.  Okay. I'm there.
23 Q.  Okay. Will you just, without looking at
24 anything else, look to the entry or your handwriting on

**Page 269**

1  5-31, 2001. And can you read for me what is written
2  there?
3  A.  Sue forgot to fax me. Had to call Terry. I
4  remember that. Sue forgot to fax in the morning. I
5  had to call Terry to find out where I was going. Then
6  on Saturday I've got --
7  Q.  No, no, go back to 05-31.
8  A.  Terry --
9  Q.  Is that all that is on there?
10 A.  No. I'm trying to decipher my own handwriting.
11 Q.  Okay, okay.
12 A.  Sue forgot to call me.
13 Q.  How about this, Barb, let me -- see if this is
14 right --
15 A.  Call Steve.
16 Q.  Barb, hold on. See if -- is this it? Sue
17 forgot to fax me. Had to call Terry. Called. Fired
18 me. Called Steve. Unsure of the last name. Terry is
19 an MFSOB. Me writing Linda's letter. Said I wrote
20 Linda's letter.
21 A.  Yeah.
22 Q.  Is that what you have written there?
23 A.  That's what I have down.
24 Q.  Okay. And does that refresh your recollection

**Page 270**

1  at all as to --
2  A.  The last day worked?
3  Q.  Yeah. I mean, I guess go ahead and glance if
4  you need to the next -- it appears that you were in
5  June -- the beginning of June you were in Indianapolis.
6  A.  Yeah, that was the last day worked.
7  Q.  Okay. So just so we are clear on the record,
8  05-31, 2002 -- or I should say May 31, 2001, is the
9  last day that you worked?
10 A.  The last day that I actually went --
11 Q.  Okay.
12 A.  -- and saw somebody, yes.
13 Q.  Now, will you tell me on here -- of course I'm
14 going to ask about this. What do you mean by MFSOB?
15 A.  I knew you were going to ask that.
16 Q.  What does it mean, Barb?
17 A.  Well --
18 Q.  I can guess, but I want you --
19 A.  Yeah, your guess --
20 Q.  -- to tell me.
21 A.  -- is as good as mine.
22 Q.  I want you to tell me, though. What does that
23 say? And it is about Terry Brennan. Terry is a --
24 A.  Mother something son of a bitch.

**Page 271**

1  Q.  That's what I thought (laughing).
2  A.  I didn't tell him that. It was in my mind.
3  There is a difference (the deponent laughing).
4  Q.  Okay. But it is in your calendar, your sacred
5  calendar.
6  A.  (The deponent laughing.)
7  Q.  All right, then. Okay. Now, let's go back
8  here. Sue forgot to fax me. What did she forget to
9  fax you?
10 A.  She forgot to fax my appointments.
11 Q.  Okay. For that day?
12 A.  For that day.
13 Q.  Are appointments faxed to you -- to agents on a
14 daily basis?
15 A.  Yes.
16 Q.  Okay.
17 A.  And I was told she forgot. Now, whether she
18 actually forgot or Terry told her not to, I don't know.
19 Q.  And you said had to call. Terry called and
20 fired me?
21 A.  I had --
22 Q.  I thought -- now, was this -- I'm a bit
23 confused, because he fired you over the phone, that's
24 what you said?

**Page 272**

1  A.  Oh, yeah.
2  Q.  But before this or on the phone did he tell you
3  that, Barb, you are fired for not working Memorial Day
4  weekend?
5  A.  No, no, no, that was a meeting --
6  Q.  When did that happen?
7  A.  -- that we had back on Tuesday the 29th.
8  Q.  Okay. So May 29th?
9  A.  That's when he blew up for not working Memorial
10 Day weekend.
11 Q.  And he also blew up because of the Linda
12 Haynes-Jackson exit --
13 A.  No.
14 Q.  When did that --
15 A.  The Linda Haynes-Jackson came the day --
16 Q.  On the phone?
17 A.  -- that he called me over the phone and just
18 absolutely flabbergasted me.
19 Q.  Okay. So -- but he also on the phone, before he
20 fired you, did he also mention the Memorial Day weekend
21 not working?
22 A.  Sue said that she only changed her story because
23 you were in the room and she was afraid of you. Like,
24 what am I going to do.

**Page 277**

1 A. That even might have been the house I was going
2 into. I don't know. But that's where I was.
3 Q. Okay. And so -- I'm trying to figure this out.
4 So May 31, that's the last day you worked. So what did
5 you do -- at this point in time you -- Terry tells you
6 that you are fired. Did you believe that Terry had the
7 authority to fire you?
8 A. After Scott done -- got done with me, I wasn't
9 sure which one had the authority or if either one of
10 them had the authority.
11 Q. Okay. So you are talking like a week later when
12 Scott came down and talked to you. What happened then?
13 Because at some point you were notified, Barb, the
14 contract is terminated.
15 A. When I got the termination letter.
16 Q. So you didn't know you were terminated or the
17 contract was terminated until August 5 or after
18 August 5?
19 A. No.
20 Q. Then what termination letter are you talking
21 about?
22 A. The Exhibit 3.
23 Q. Right.
24 A. I assumed I was.

**Page 278**

1 Q. Okay. So from May 31, 2001 until August --
2 well, after August 5 of 2001, because it takes a few
3 days for mailing. It is dated -- that's the date they
4 sent it to you. So from May 31 until August 5th, 6th,
5 7th, some point in time there, you had no idea if you
6 were still an agent or not an agent? You assumed you
7 were -- your contract was terminated, but you didn't
8 know?
9 A. I assumed that it was going through some type of
10 a review process and as soon as they let me know, I'd
11 know what was going on. And as soon as I got the
12 termination letter I went to unemployment.
13 Q. Okay. You are --
14 A. But I was --
15 Q. -- talking about Defendant's Exhibit Number 3,
16 as soon as you received that from Waco?
17 A. Yeah.
18 Q. Okay. But you -- again, you received no other
19 verbal or written confirmation from Scott Smith or
20 Terry confirming you were, in fact, terminated?
21 A. (Shook head from side to side.)
22 Q. Barb, why didn't you call Scott Smith and follow
23 up?
24 A. I figured they would get together and figure it

**Page 279**

1 out, and at that point I didn't care.
2 Q. You just let it go?
3 A. (Nodded head up and down.)
4 Q. Do you remember --
5 A. I was tired of the fight.
6 Q. Okay. Do you remember -- I'm going to take you
7 back to the fall of 2001. Well, actually, that would
8 be back fall of 2001. Did Terry -- I'm sorry. Fall of
9 2000. Sorry. Sorry. Fall of 2000. Do you remember
10 Scott Smith talking to you about falsely called in
11 appointment results?
12 A. Yes. That's when I told you that I called in
13 the appointment results.
14 Q. The fake -- the false war report?
15 A. The false war report.
16 Q. That. Okay. So after you called in the false
17 war report, Scott -- Terry calls Scott or somehow Scott
18 finds out. Scott then calls you, talks to you about
19 it. Is that what happened?
20 A. (Nodded head up and down.)
21 Q. Or did he come down and meet with you?
22 A. I think he came down. I'm not sure. I think he
23 came down. I don't remember whether he came down or
24 whether it was over the phone.

**Page 280**

1 Q. Okay. What about this. Is it fair to say that
2 Scott -- most likely he called you, and you told him
3 initially that you had run the appointments. Later in
4 that conversation you acknowledged that you did not run
5 the appointments. You lied to Brennan and asked the
6 phone setter to lie for you, too. And is that -- is
7 that a fair statement?
8 A. If -- if you are referring -- if you are
9 referring to the time that I called in the fake war
10 report right after the 4th of July weekend or whatever
11 the thing was, when I moved, yeah, that would -- that's
12 a fair...
13 Q. Okay. A fair statement?
14 A. Yeah.
15 Q. Okay. And, then, now, is this true --
16 A. But then I know -- okay. Go ahead. Never mind.
17 Q. And is it true that Scott had never had any
18 prior problems with you prior to this; is that true, as
19 far as you know? Or did Scott have problems with you
20 before that?
21 A. Well, yeah, I had called him up complaining
22 about Terry and he considered that a major headache.
23 Q. How do you know that?
24 A. Because he had told me he was not that happy and

**Page 293**

1 contract termination, did you report or complain to
2 anyone that you thought your contract was wrongfully
3 terminated?
4 A. Well, yeah, unemployment.
5 Q. Okay. So you filed an unemployment claim. What
6 else did you do?
7 A. I called the labor -- the Department of Labor.
8 Q. Okay.
9 A. And was informed since it was an independent
10 contract I did not come under the Department of Labor
11 in any way, shape or form.
12 Q. Did they send you a letter advising you of that?
13 A. No, they just told me over the phone.
14 Q. Okay. When was this in a time period here in
15 relation to when your contract was terminated? Was
16 this in June?
17 A. This would have been in probably August,
18 September.
19 Q. Okay.
20 A. I'm sitting there trying to figure out, there
21 has got to be some state or federal agency somewhere
22 that cares about somebody who signed an independent
23 contractor's license when they were not treated as an
24 independent contractor. I don't care what the contract

**Page 294**

1 says. And I found out there is no -- at least I could
2 not locate a state or a federal agency who really cared
3 what happens to an independent contractor.
4 Q. Barb, you filed a grievance with the union,
5 though, didn't you?
6 A. Yes, I filed a grievance with the union.
7 Q. Okay. So you filed a grievance with the union.
8 You filed a claim with the unemployment agency?
9 A. (Nodded head up and down.)
10 Q. You called the Department of Labor, but they
11 verbally rejected you because you are an independent
12 contractor?
13 A. I also called a friend of mine who is the head
14 of the National Labor Relations Board.
15 Q. Who is that?
16 A. Will Vance.
17 Q. Vance?
18 A. Vance.
19 Q. V-A-N-C-E?
20 A. V-A-N-C-E.
21 Q. And what did you discuss with Will Vance?
22 A. And I told Will, I said, you know, I got fired
23 and I told him briefly. And he said, Barb, I would
24 point you in the right direction, but I don't know as

**Page 295**

1 an independent contractor -- I had talked with him
2 several times socially over the problem I was having.
3 And he said, I just -- you know, if there was -- I
4 thought, well, you are the Head of the National Labor
5 Relations Board. You ought to know something about
6 labor.
7 Q. Wait. I'm sorry. How do you know Will?
8 A. He was my vice president when I was president of
9 the Contemporary Art Center Board.
10 Q. Okay. So he doesn't give you any advice?
11 A. He said, well, just keep trying the different
12 agencies. He mainly arbitrates Caterpillar's union
13 problems.
14 Q. Okay. Who else did you call, then?
15 A. The IRS and they said I could file that SS
16 whatever form, so I went down and got a copy and filed
17 it.
18 Q. Barb, I want to take you back to the time when
19 Terry called you and said your contract was terminated.
20 What did you say in response to him?
21 A. Terry, you're wrong. I didn't -- what letter?
22 Calm down. You are accusing me again of doing
23 something that I didn't do. This is twice now in the
24 same week. Terry, you can't do that.

**Page 296**

1 Q. And what did he say to you?
2 A. Yes, I can. I said, Terry, no, you can't. I
3 haven't done anything to be fired for.
4 Q. What did he say?
5 A. Well, that's just the way it is. I don't
6 remember how he ended it. I honestly -- I just -- I
7 don't remember how he ended it. But basically it was,
8 yep, I can do what I damn well feel like doing and I'm
9 going to do it.
10 Q. So it ended with --
11 A. And you are.
12 Q. -- you being -- with the contract being
13 terminated?
14 A. He calmed down a little. I had the feeling that
15 it was just one of the times when he would probably
16 change his mind. I was surprised it went as far as it
17 did.
18 Q. On that phone conversation did he give you any
19 other reasons why your contract was being terminated?
20 A. Other than I was a lying, trouble-making bitch
21 that had called and tattled on him several times trying
22 to get him fired, and I was a back stabbing little
23 blankety-blank, blank, blank, blank, blank.
24 Q. Barb, do you think -- I mean, why do you think

```
 1  your contract was terminated? What you have already
 2  told me?
 3  A.    I don't think they cared either way, so if
 4  that's what they wanted to do, that's fine. Why do I
 5  really think it was terminated? I think it was
 6  terminated because from enough years in the insurance
 7  business now I understand, and I'm understanding more
 8  as each year goes along, that companies will terminate
 9  agents to get out from paying renewals.
10  Q.    Is that what you --
11  A.    That simple.
12  Q.    Is that what you think the underlying reason for
13  your contract termination was renewals?
14  A.    Because this is habitual across the board with a
15  lot of companies.
16  Q.    Okay. So then you think the reason -- let me
17  ask you this, because I was trying to ask this before
18  and maybe I wasn't clear. Do you think, then, the
19  reasons Terry gave you, the Memorial Day weekend not
20  working and the Linda Haynes-Jackson exit interview he
21  accused you of writing, do you think those were false?
22  Do you think he made that up?
23  A.    I think -- I think he was justifying it in his
24  own mind because his philosophy was -- because he had
                          297
```

```
 1  told me when I first started as a supervising agent,
 2  get them working for three or four months and get rid
 3  of them.
 4  Q.    But you had been there more than three or four
 5  months.
 6  A.    Well, he tried very hard to get rid of me
 7  several times by giving me lousy appointments and
 8  stuff. He tried.
 9  Q.    And you think --
10  A.    And I just sat there and I thought, damn it, he
11  is not going to do it to me. I have seen him do it to
12  other people. He is not going to do it to me.
13  Q.    That's number three, Barb, damn it.
14  A.    I'm sorry.
15  Q.    Okay. Three in a day.
16  A.    But there is a difference. I am not saying it
17  to somebody.
18  Q.    You are talking to me, aren't you?
19  A.    Yeah, but I am not saying it at you. There is a
20  difference.
21  Q.    Okay. Moving on. So getting back to this, so
22  when you said Terry, you know, tried to fire you or get
23  rid of you before by sending you out on these long
24  leads, do you think at that time he was trying to get
                          298
```

```
 1  rid of you to get your renewals?
 2  A.    To get the company out of having to pay the
 3  renewals, yeah.
 4  Q.    You think that was it, that was his basis for
 5  sending you on those long leads?
 6  A.    Uh-huh.
 7  Q.    Okay. What type of money are we talking here on
 8  the renewals?
 9  A.    I don't remember what the renewal structure was.
10  Ten percent the first year.
11  Q.    Is it a lot of money? Are we talking ten,
12  twenty --
13  A.    If you work for a company for five, ten, fifteen
14  years, yeah, you are talking a lot of money.
15  Q.    Okay.
16  A.    Because it builds up over the years.
17  Q.    So you think over the course after -- when do
18  you first think Terry tried to get rid of you? Was it
19  after the first few months after you were there?
20  A.    After the first few months, yeah.
21  Q.    And it was, again, to get the renewals?
22  A.    Well, no, it was his -- yeah, it was just his
23  you get them to work three or four months and then you
24  put the pressure on and they leave.
                          299
```

```
 1  Q.    Oh, they leave. You don't -- because you said
 2  before that Terry told you, Barb, try to terminate them
 3  within the first few months.
 4  A.    Well, not fire them.
 5  Q.    Oh, okay.
 6  A.    Just put the pressure on.
 7  Q.    I was going to say, Barb, did you have --
 8  A.    Make your life miserable.
 9  Q.    Okay. To get them out to get the renewals?
10  A.    (Nodded head up and down.)
11  Q.    But he told you that was the reason you were
12  doing it?
13  A.    Yeah. And I told him I don't work that way. I
14  am going to build loyal people. And I would have
15  except that Terry had Sue send them on -- I had no
16  control over the appointments that they went on, let's
17  put it that way.
18  Q.    Do you think Sue was involved at all in getting
19  rid of you?
20  A.    Yes.
21  Q.    What do you think Sue had to do with it?
22  A.    Because Terry had threatened her job if she
23  didn't.
24  Q.    Okay. Now, getting back to this, I just want to
                          300
```

```
 1  adult site support. Were you -- I mean, does that ring
 2  a bell?
 3  A.    Adult what?
 4  Q.    Adult site support. Were you having -- does
 5  this ring a bell, to remind you that you were --
 6  A.    No.
 7  Q.    -- having problems with your porn web site?
 8  A.    No, it does not ring a bell (the deponent
 9  laughing.)
10  Q.    Okay. So this page, it brings back no memories?
11  You have no recollection of getting on a --
12  A.    I remember when I first got the computer being
13  curious about all the different porn that people were
14  telling me about.
15  Q.    When did you get your computer? Was it March of
16  2001?
17  A.    Oh, golly, I would have to ask Denny. It had to
18  have been by -- at March 2001.
19  Q.    So --
20  A.    If I hadn't -- I didn't have one -- well, when I
21  had a computer before it was at Muscular Arthritis and
22  the internet hadn't been invented.
23  Q.    Okay. Well, just so I know, so how, then -- you
24  don't recall anything from looking at this?
                              369
```

```
 1  A.    I was probably curious.
 2  Q.    So, then, are you at the point where you are
 3  going to testify that you did look on these web sites
 4  and --
 5  A.    If it is down here I looked at the web site.
 6  Q.    Okay. And you may have joined?
 7  A.    I would never have paid money to join a web
 8  site, no.
 9  Q.    Okay. Then explain to me -- here is my ultimate
10  question. How is this, gay porn and all these sites
11  and your order numbers, passwords, user name, how is
12  this relevant or is this relevant to your lawsuit?
13  A.    It is not relevant at all. I forgot it was in
14  the back of the book.
15  Q.    Okay. So not relevant. I was going to say --
16  A.    As far as gay, it wasn't females. I like to
17  look at naked guys.
18  Q.    Oh, so this was naked men?
19  A.    Yeah.
20  Q.    Okay.
21  A.    If I've got to look at somebody naked, it is
22  going to be a guy.
23  Q.    Okay. Since you are remembering it is men,
24  then, then you are remembering getting on and
                              370
```

```
 1  actually --
 2  A.    I remember looking and going oh, wow.
 3  Q.    Okay. So gay men --
 4  A.    But I'm not going to pay for it.
 5  Q.    Okay. Let me ask you this, then. So you
 6  previously told me that certain words, cuss words are
 7  offensive to you, but gay porn is not offensive?
 8  A.    Is gay porn offensive to me? Porn generally is
 9  not offensive to me, no. As long as I don't -- it is
10  not, no. It is something -- no, I guess not.
11  Q.    Two men or two women rubbing up against each
12  other does not offend you?
13  A.    Why would it offend me? I'm not one of them.
14  Q.    But the word fucking bitch offends you?
15  A.    Yes, when it is directed at me, yes.
16  Q.    Okay. I was just trying to understand that.
17  Because some porn, don't they usually cuss at each
18  other and use language like that? Gay men type porn,
19  don't they use the bitch word a lot?
20  A.    I don't know. I wasn't listening. I was just
21  looking at pictures.
22  Q.    Okay. But you said you watched videos before?
23  A.    Oh, well, yeah, I watched videos.
24  Q.    Don't they use bad language like that in those
                              371
```

```
 1  videos?
 2  A.    Yeah, but no worse than anything that you hear
 3  when you go to a regular movie.
 4  Q.    Okay. I'm just trying to figure out the
 5  offensiveness, your level of offensiveness.
 6  A.    When somebody is blasting me at full volume
 7  straight in my face with it.
 8  Q.    And these cuss words Terry would call you, would
 9  he say these directly -- I mean, to your face? They
10  were to your face, correct?
11  A.    (Nodded head up and down.)
12  Q.    Was anyone else present?
13  A.    A couple of times when I was in his office there
14  were people present and they could have very well heard
15  it through the door.
16  Q.    Okay. Through the door. Do you recall who
17  those individuals are?
18  A.    No, it was -- no, I don't know.
19  Q.    Okay. Barb, when you filed -- you filed -- we
20  talked about this. You filed a grievance against Terry
21  Brennan individually and against Scott Smith
22  individually with the union, correct?
23  A.    Yes.
24  Q.    Okay. Why did you not file a grievance against
                              372
```

**Page 373**

```
 1  AIL Waco?
 2  A.  I inadvertently left them off.
 3  Q.  So you think they had some misconduct -- there
 4  was some misconduct on their part, too?
 5  A.  For not investigating, yes.
 6  Q.  Investigating what?
 7  A.  The fact that I was terminated for no reason at
 8  all.
 9  Q.  So you think when they received that initial
10  notice from whomever, you said you didn't know, that
11  they should have conducted an investigation --
12  A.  Yes.
13  Q.  -- into the basis why you were terminated?
14  A.  I wouldn't have taken somebody's word for it as
15  an employer.
16  Q.  Is there -- do you know, is that stated in any
17  policy or in your union contract?
18  A.  I don't know.
19  Q.  So your position is you should have filed a
20  grievance against them, but you failed -- you
21  inadvertently left --
22  A.  I inadvertently --
23  Q.  -- them off?
24  A.  -- left them off.  I just assumed when I'm
```

**Page 374**

```
 1  filing I am filing against everybody, I guess.
 2  Q.  And, Barb, you brought your EEOC charge of
 3  discrimination only against Scott Smith's agency.  It
 4  was AIL of Chicago; isn't that correct?
 5  A.  That is correct.  Can I close this now?
 6  Q.  Yes, please.
 7  A.  Good.
 8  Q.  Still on camera.  Great.  Yes, Barb.  You did
 9  not name AIL Waco in your EEOC charge of
10  discrimination; is that right?
11  A.  They had never --
12  Q.  Yes or no?  That's a --
13  A.  That's right.
14  Q.  Okay.  And explain to me now why did you not
15  name AIL Waco in your charge of discrimination?
16  A.  Because they -- nobody from Waco had actually
17  physically, verbally or by letter assaulted me with
18  discrimination, to my knowledge.  It was all Scott and
19  all Terry.
20  Q.  Okay.  Then why did you decide to bring them
21  when you filed your federal lawsuit in the Central
22  District?
23  A.  Because after I filed with the EEOC and they did
24  the investigation, they said I should amend it and we
```

**Page 375**

```
 1  should file against Waco, too.
 2  Q.  Oh, someone at the EEOC told you that?
 3  A.  Yes.
 4  Q.  Do you remember who that was?
 5  A.  Carol Milazzo who added that.
 6  Q.  Okay.  Did you -- but you didn't amend your
 7  charge in the EEOC phase, did you?
 8  A.  She added -- she said I'm -- she said she had a
 9  lot of trouble trying to figure out who was
10  responsible, where did the buck stop.  And --
11  Q.  Now, Barb, wait.  The question was you never
12  amended your charge, did you?
13  A.  She did.
14  Q.  Did you --
15  A.  She added them.
16  Q.  Okay.  Do you have -- but is there an amended
17  charge of discrimination on file with the EEOC?  Do you
18  know?
19  A.  I never did.  She chose to put them on.
20  Q.  Okay.  But my question was an amended charge.
21  Now, as far as I know there is no amended charge.  She
22  may have added them -- cc'd them to correspondence.  So
23  my question is, are you aware, was your charge ever
24  amended?  Did you sign a new charge?
```

**Page 376**

```
 1  A.  No.
 2  Q.  Okay.
 3  A.  Not to my knowledge.
 4  Q.  So as far as you know, there was no amended
 5  charge of discrimination?
 6  A.  No.
 7  Q.  Okay.  Barb, we are going to go through your
 8  list of witnesses.  And all I want to know is who the
 9  individual is and what you believe they know, what
10  knowledge they have.  Who is John Reeves?
11  A.  I don't know.  I think I dropped his name.  Or
12  John -- I don't remember.  John -- there was one name
13  that I put in originally and I don't remember why I had
14  his name in.  Now, this John Reeves I don't remember
15  what he -- what do I say on that?
16  Q.  You don't have it on this.  This is in your
17  amended discovery.  You had John Reeves.  Well, either
18  you -- sitting here today, do you know who John Reeves
19  is?
20  A.  No.
21  Q.  Okay.  What about Kevin Rutler?
22  A.  Rutter.
23  Q.  Rutter?
24  A.  He was also an agent.
```

**Page 405**

1  A. No.
2  Q. A weekly basis?
3  A. Yes. Most of the time in Peoria the jobs come
4  out on Wednesday. You want to check the Wednesday
5  paper and you want to check the Sunday paper.
6  Q. So were you checking twice a week?
7  A. Yeah.
8  Q. Okay. Did any of these prospective employers
9  where you sent your resume and your cover letter to,
10 did any of those places make an offer of employment or
11 offer you an independent contractor position?
12 A. Well, the places I was applying to weren't
13 insurance companies.
14 Q. Okay, then. Did any of these prospective
15 employers offer you a job?
16 A. Not that I can remember, no.
17 Q. Okay.
18 A. Most of the time I wouldn't ever get an answer
19 back to the resume I would send in.
20 Q. Did you go to any interviews?
21 A. I went to an interview at one of the charities.
22 I don't remember if it was Neighborhood House or not.
23 Q. What happened with that interview?
24 A. I didn't get the job.

**Page 406**

1  Q. Okay. Did they send you a letter denying you
2  the opportunity to work for them?
3  A. Yeah, but I don't remember -- there was a couple
4  of doctors offices, and I don't remember where I got
5  the interviews.
6  Q. Oh, so you had more interviews than that?
7  A. Yes.
8  Q. And you didn't get those positions either?
9  A. No.
10 Q. Did they send you a rejection letter in writing?
11 A. I don't remember getting a rejection letter.
12 Q. Was it, do you think, a phone call?
13 A. I think they were phone calls.
14 Q. So all of them, the charity and the doctors
15 offices, were phone calls?
16 A. I don't know. I know a couple of them I didn't
17 get any answer from.
18 Q. Okay. Did anyone ever tell you why you were not
19 getting the job?
20 A. Did any of the people that I talked with and
21 applied for? No.
22 Q. Okay.
23 A. Did other people tell me why that are in the
24 business of job hunting? Yeah.

**Page 407**

1  Q. What did they -- why did they say?
2  A. They said age, age and places with benefits. If
3  it is a small enough place, they don't want somebody
4  that has any age on them because they probably have
5  something like arthritis.
6  Q. Who was telling you this? A headhunter?
7  A. Yeah.
8  Q. Someone trying to place you?
9  A. Yeah.
10 Q. Okay.
11 A. I mean, there is discrimination out there.
12 Q. But the whole job, finding a job, that had
13 nothing to do with Terry Brennan, did it?
14 A. (Shook head from side to side.)
15 Q. Yes or no, Barb?
16 A. Finding a new job did have to do with Terry. If
17 he hadn't of fired me, I would have been still working
18 for American.
19 Q. Well, the fact that this headhunter told you
20 that you couldn't get a job because of age, I mean,
21 that has nothing to do with Terry Brennan?
22 A. Well, Terry said the same thing.
23 Q. Well, what the headhunter said to you, that has
24 nothing to do with Terry Brennan, does it?

**Page 408**

1  A. No.
2  Q. Okay. That's all -- that was my question. Now,
3  Barb, how many places, I'm just curious, would you say
4  you applied to in the time period where after AIL
5  contract terminated until you -- I'm going to say --
6  well, once you started Kendell did you stop applying or
7  did you continue to apply for work?
8  A. I think I continued for a few months
9  periodically, if something really looked like it was a
10 job that I thought I really would be a good fit for.
11 Q. Okay. How many places did you apply to during
12 this time period, would you say? Give me your best
13 estimate.
14 A. I have no idea. I honest to God -- I don't
15 know. I don't know whether it was 10 or 15 or 20. I
16 don't know.
17 Q. Okay.
18 A. I just don't know.
19 Q. Besides AIL Waco, have you ever been discharged
20 from a job or had an agent contract terminated?
21 A. I had a contract changed from a career agent to
22 a broker agent contract when I went with American
23 Income by Ohio National.
24 Q. Okay. My question was limited, very limited.

**461**

Q. Okay. Because there was a -- there is a section on this at the top on the right side for health, and you checked excellent condition, excellent health.

A. Well, I learned how to live with that.

Q. Let me ask you this. Is this -- your statement that you are in excellent health, is this Barb Kendell where you make things look good on a resume or an application? Or did you honestly believe that you were in excellent health?

A. I actually believed I was in excellent health. I was under medication. I was under control.

Q. Okay. It is arguable that someone may say, well, Barb, with your condition it is not excellent, you may be in good or fair condition?

A. For me it was excellent, if I'm able to work and to do all the stuff that I was doing at that point.

Q. Okay. That's fair. Will you please look at the very bottom of the page under where you have employment section, you have MKM Enterprises.

A. Uh-huh, okay.

Q. Okay. And as far as the salary goes, you wrote in the blank there 20 KY. Is that 20,000 per year?

A. About, yeah.

Q. Okay. Now, maybe this is my confusion, but

**462**

explain to me if I'm wrong. Didn't you tell Triple A that you made $75,000.00 on their application?

A. Yes.

Q. So which one is right? Did you make 20 or 75?

A. Well, this is a long time later. And this would have been with Gentry. And I lied on that because of the commission structure. If I still would have been a street broker I would have had 69,000 or something like that.

Q. So you lied on what?

A. On the 75.

Q. Oh, so the 75 to Triple A is inaccurate?

A. Yes, it is inaccurate. That would have been if it was a street brokerage, because I sold an annuity for $750,000.00.

Q. So what is that -- I'm sorry. I am still confused. What is the correct answer, then? Say on Triple A, what is the correct answer? Instead of $75,000.00 it should be what?

A. Whatever the amount of money I made for last year, and all of the forms aren't in.

Q. Okay. We are nearing the end.

A. Thank God.

MS. HANSELL: We can go off the record for a

**463**

moment, please.

(Whereupon a recess was taken from 8:25 p.m. to 8:28 p.m.)

(Whereupon a document was duly marked for purposes of identification as Defendant's Exhibits 23, 24 and 25 as of this date.)

MS. HANSELL: We can go back on.

Q. (By Ms. Hansell) Okay, Barb, will you please focus your attention on Defendant's Exhibit Number 23.

A. Okay. Got you.

Q. Okay. And will you please identify what this group exhibit is?

A. My income tax records.

Q. Okay. And on the first page you have a 1099 from American Income Life --

A. American Income, '99.

Q. And page two is a payment summary and then we get into your 1999 U.S. individual income tax returns; is that correct?

A. Yes.

Q. Okay. Going back to the first page, it shows in the year 1999, that you made how much money for -- or

**464**

from American Income Life Insurance?

A. $13,264.00.

Q. Okay. Will you do me a favor? Will you please show me where in your tax records you reported this as income?

A. Well, it had to be reported somewhere.

Q. So that figure $13,264.00.

A. Let's see. It would have been on a Schedule C. I think this is the C. Sole proprietorship. It would have been in the $14,278.00.

Q. Barb, I'm sorry. Where are you, what page?

A. On schedule C after the 940, the last page. Then where it says profit and loss from business, sole proprietorship. That's where you would put it.

Q. So you are saying the amount reflecting the amount you made from AIL is the $14,000.00?

A. Would have been, yeah.

Q. What other number went into this figure?

A. Renewals.

Q. That explains why it is more than 13?

A. Why it is different, yeah.

Q. Okay. On this very page -- well, actually, I'm confused, though, because business name for the 14,000, you have listed on line C as Kendell Insurance. You

```
                                      465
 1  don't have AIL on this schedule.
 2  A.   Because my business is not AIL.  I file Schedule
 3  C under Kendell Insurance, because there has to be a
 4  catchall.  You can file it under your own name if you
 5  want to.  I've always used Kendell Insurance.
 6  Q.   So -- well, here is where I am confused, though.
 7  So there is nowhere really on this form that shows that
 8  13,000 of this amount of money was actually not made
 9  from Kendell, it was made from AIL, but you just chose
10  to lump what you made from perhaps Kendell and AIL and
11  lumped it together in this amount here?
12  A.   Correct.
13  Q.   That's most likely what it was, right?
14  A.   Yes, that's how you would do it.
15  Q.   Okay.  And, now, would you please explain to me
16  on -- what is that line?  Part two, line ten, it says
17  car and truck expense.  And you have listed $8,283.00.
18  A.   Uh-huh.
19  Q.   What is that expense for?
20  A.   Mileage.
21  Q.   That is your mileage?
22  A.   That's my mileage.
23  Q.   So looking at that, Barb, how many miles do
24  you know that you --
```

```
                                      466
 1  A.   I don't remember what the mileage was at that
 2  point.
 3  Q.   Okay.  What about can you explain to me what is
 4  number 18, or line 18, office expense.  You have
 5  $1,315.00.
 6  A.   That was for expense for -- I don't know -- a
 7  fax machine maybe.  I had to buy a fax machine when I
 8  went to work for Terry.  I didn't have one.
 9  Q.   You can write that off --
10  A.   Yeah.
11  Q.   -- as an office expense?
12  A.   Oh, sure.  When -- when you are an independent
13  contractor like that and you are getting paid on a
14  1099, all your expenses are written off to defray.
15  Q.   Barb, let me ask you this question.  If you
16  truly believe that you were an employee, have you gone
17  back and redone all your taxes --
18  A.   No.
19  Q.   -- from when you were working as an agent for
20  American Income Life?
21  A.   No.
22  Q.   And why not?
23  A.   Because I would still have had the same
24  expenses.
```

```
                                      467
 1  Q.   But isn't it different for independent
 2  contractors and employees filing?
 3  A.   Not when you are paid on a 1099 like that, no,
 4  not in insurance.
 5  Q.   So you are saying if you are an insurance agent
 6  and you are an employee you fill out the same
 7  information?
 8  A.   Unless you get a W-2.  Then the W-2 would go on
 9  the 1040 itself.  And any other 1099s would go on the
10  Schedule C.  You are always going to get 1099s.
11  Q.   Okay.  But you are saying so, therefore, because
12  you got a 1099 it would not affect whether you were an
13  employee or an independent contractor, it does not
14  affect at all the taxes that you file with the
15  government?
16  A.   That's the way I understand it, yes.
17  Q.   Okay.  Will you please turn to the section that
18  is federal statements.  It is in the same group
19  exhibit, Number 23.  And it looks -- Barb, just to
20  help, it looks like this.
21  A.   I can't see that far.  Okay.  Got you.
22  Q.   Okay.  Will you just explain to me what American
23  Bankers Insurance Company in the amount of $1,333.00
24  and --
```

```
                                      468
 1  A.   I'm not looking at that page.  Wait a minute.
 2  Q.   I'm sorry.
 3  A.   Got you.
 4  Q.   Okay.  And it also shows Central States
 5  Indemnity for 750.  What were those amounts for?
 6  A.   I don't remember.
 7  Q.   Were those policies that you sold?
 8  A.   They may have been.
 9  Q.   Would those have been policies that you sold
10  while you were -- after -- well, from, what, Kendell
11  Insurance?  Is this for 1999?
12  A.   '99.
13  Q.   Weren't you --
14  A.   They may have been renewals.
15  Q.   May have been -- do you have any idea, any proof
16  to back up the fact they were renewals and not policies
17  sold?
18  A.   I know that I did not sell anybody else's
19  policies while I worked for American Income.
20  Q.   Okay.  Do you have any proof to support that?
21  In other words, do you have any proof to show that, in
22  fact, what is listed here is American Bankers Insurance
23  Company and Central States Indemnity, that these were
24  renewals?
```

**Page 469**

1  A.  No. I'm not even sure if they were. I am
2  trying to remember what they were.
3  Q.  What else possibly could it be if they were not
4  renewals? It would have to be a policy sold, wouldn't
5  it?
6  A.  No. I had my car broken into. It could have
7  been a payment from a theft.
8  Q.  That would be listed on federal statement?
9  A.  I don't know. It could have been from when I
10 had filed unemployment before and I got a credit card
11 thing where they pay your credit card while you are
12 unemployed. I mean, I just don't know.
13 Q.  Okay.
14 A.  I don't know.
15 Q.  I understand that. Will you turn two pages back
16 and it shows this is your auto work sheet. Will you
17 please tell me the mileage you claim to be attributed
18 to business?
19 A.  26,400 miles.
20 Q.  Are those all miles that you put on your car for
21 working for American Income?
22 A.  Yes.
23 Q.  Now, Barb, if you would again turn several pages
24 back --

**Page 470**

1  A.  Which is not as much as Terry's, is it.
2  Q.  No, it's not. Could you turn to salaries and
3  wages report --
4  A.  Where is that?
5  Q.  -- please. Several pages back.
6  A.  Is it past EIC? Self-employment.
7  Q.  What I'm looking for is the one that has entries
8  for H&R Block and Ohio National Life.
9  A.  Okay. Got you.
10 Q.  Okay. Do you know what -- what are these
11 amounts for?
12 A.  That would have been wages that I got for H&R.
13 Q.  Okay. I understand that. What about Ohio
14 National?
15 A.  That would have been renewals.
16 Q.  And how are you so certain it is a renewal?
17 A.  Huh?
18 Q.  How are you certain it is --
19 A.  Because I'm still getting renewals from them.
20 Q.  And you are certain you did not sell any
21 policies for them?
22 A.  Not while I was working -- I'm positive. I did
23 not sell --
24 Q.  Okay.

**Page 471**

1  A.  -- one while I was working for American Income.
2  I wouldn't do that.
3  Q.  You would breach the contract after the fact?
4  A.  Yes.
5  Q.  But not during when you were working there?
6  A.  No.
7  Q.  Okay. Next will you please look at Exhibit
8  Number 24 and just identify these documents for me.
9  A.  Tax forms for 2000.
10 Q.  Does that look like a true and accurate copy of
11 the taxes --
12 A.  I guess.
13 Q.  -- that you filed in the year 2000?
14 A.  Yep.
15 Q.  Okay. Going back to the last exhibit, 23, is
16 that a true and accurate copy of the taxes that you
17 filed in 1999?
18 A.  As far as I know, yes.
19 Q.  Okay. Barb, will you please, first of all, tell
20 me how many miles you reported were due to business for
21 the tax year of 2000?
22 A.  57,900. I was getting close to Terry.
23 Q.  Okay. What page are you on, because I'm looking
24 at one on --

**Page 472**

1  A.  Page two, cost of goods solds -- cost of goods
2  sold under Schedule C, profit and loss.
3  Q.  Okay. Well, I'm looking at profit or loss from
4  business and it is for car and truck expense, and it is
5  $18,818.00. Does that include gas or is that only
6  mileage?
7  A.  That's mileage.
8  Q.  That's mileage. Okay. So tell me where am I
9  looking to see the mileage? The page before or page
10 after?
11 A.  Page two of Schedule C. The one you were just
12 on, just one back behind that.
13 Q.  Self-employment tax?
14 A.  This one right here that says profit and loss --
15 Q.  Yes.
16 A.  -- from business.
17 Q.  Uh-huh.
18 A.  And it has got the $18,818.00 on it, okay, go to
19 the very next page.
20 Q.  Okay. Where? I'm sorry?
21 A.  And down on question 44.
22 Q.  Oh, business. Number of miles you drove. Okay.
23 So this year you report 57,900 miles?
24 A.  Correct.

**Page 473**

1  Q. And is this the most successful year you had at
2  AIL?
3  A. Yes.
4  Q. $45,500.00?
5  A. Yes.
6  Q. Now, in part five on this very page we are
7  looking at, you have telephone written down as other
8  expense?
9  A. Yes.
10 Q. Business expense, and you indicate that it was
11 $2,844.00; is that correct?
12 A. Is that rain? Yes.
13 Q. Okay. What was this telephone expense you were
14 claiming?
15 A. Cell phone. It would have been the cell phone
16 and the long distance charges on my home phone.
17 Q. Well, why would you have long distance charges
18 on your home phone?
19 A. Because we are selling all over. At that point
20 they still were charging us long distance to call
21 Danville or --
22 Q. So this was before you had Sue -- paying $40.00
23 a week for sue to call?
24 A. No, no, no, no. You have to call your -- your

**Page 474**

1  clients. You have to do policy service. You have to
2  call your clients.
3  Q. Okay.
4  A. You have got to call them up and ask them on
5  your cell phone I'm at the corner of the red barn and
6  the white house, where are you.
7  Q. Okay. Barb, if you turn to the self-employment
8  tax section of Exhibit Number 24, it says net earnings
9  from self-employment. In that you entered $14,045.00.
10 A. Uh-huh.
11 Q. What is that amount from?
12 A. I don't know. You would have to ask Jan what
13 that computer puts there. It is all computerized.
14 Q. Yeah, but is this -- the self-employment, is
15 this relating to --
16 A. It is relating to the 49 -- the 45,000 that I
17 made.
18 Q. Somehow, but you are not sure what the amount
19 is?
20 A. I don't remember. I don't know. It is half of
21 -- when you are paying your own it's...
22 Q. Okay.
23 A. I don't remember. It gives you the
24 multiplication there from line whatever, the line

**Page 475**

1  whatever, and what to multiply by.
2  Q. Okay, Barb, will you please take a look at the
3  next exhibit, Defendant's Exhibit Number 25, and please
4  tell me what this is.
5  A. 2001.
6  Q. Okay. Do you believe this to be a true and
7  accurate copy of the tax return you filed?
8  A. If you got it from Jan, yes.
9  Q. Yes. Okay. Look at the first -- actually,
10 let's see here. It shows that in the year 2001 you
11 earned how much in compensation from AIL?
12 A. $8,759.44.
13 Q. Okay. And on the first page it shows that year
14 you received how much in unemployment compensation? It
15 is line 19.
16 A. $4,095.
17 Q. Do you believe that to be a true and accurate
18 amount of the amount of unemployment insurance you
19 received?
20 A. I'm assuming it would have been, yes.
21 Q. Okay. Again, this is just a question because I
22 don't understand. AIL, you -- the 1099 shows that you
23 made $8,759.44. So on the page for profit or loss from
24 business for the year 2001 how did you come up with

**Page 476**

1  $8,864.00?
2  A. Wait a minute. This is upside down. 8,864
3  versus 800 -- 8,759.
4  Q. Yes.
5  A. Charge backs somewhere along the line.
6  Q. Okay. So that -- and it shows your car expense
7  to be what?
8  A. Oh, $5,434.00.
9  Q. Do you believe that is true and accurate?
10 A. Yes.
11 Q. Okay. Barb, on the third to last page is that
12 your signature?
13 A. What there is on this copy, yes.
14 Q. Yes. Okay. All right.
15 A. Are we done?
16 Q. I have no further questions, Barb. Oh, I do
17 have one last thing. You have a choice whether you
18 want to waive signature, or you can read the entire
19 transcript for accuracy to check Darlene. And you are
20 able to make corrections, say, on misspellings. You
21 cannot change the substance of your testimony. But,
22 say, for example --
23 A. If I misspoke?
24 Q. No, not the substance of your testimony. But,

```
STATE OF ILLINOIS   )
                    )  SS
COUNTY OF MONTGOMERY)
```

C E R T I F I C A T E

I, DARLENE M. NIEMEYER, a Notary Public in and for the County of Montgomery, State of Illinois, DO HEREBY CERTIFY that pursuant to agreement there appeared before me on the 4th of March A.D., 2005, at 103 W. Vandalia Street, Suite 300, Edwardsville, Illinois, BARBARA ELIZABETH JOHANNSEN KENDELL, who was first duly sworn by me to testify the whole truth of her knowledge touching upon the matter in controversy aforesaid so far as she should be examined, and her examination was taken by me in shorthand and afterwards transcribed (her signature having been not waived) and said deposition is herewith returned.

IN WITNESS WHEREOF I have hereunto set my hand and affixed my Notarial Seal this 21st day of March A.D., 2005.

*OFFICIAL SEAL*
**DARLENE M. NIEMEYER**
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 3-3-2007

*Darlene Niemeyer*
———————————————
Notary Public and Certified
Shorthand Reporter

Illinois CSR License No.: 084-003677
My Notary Commission Expires: 03-03-2007