ORIGINAL

# THE DEPOSITION OF
# BARBARA ELIZABETH JOHANNSEN KENDELL

## TAKEN ON MARCH 4, 2005

### IN THE MATTER OF:

### BARBARA J. KENDELL
### vs.
### AMERICAN INCOME LIFE OF CHICAGO and AMERICAN INCOME LIFE INSURANCE COMPANY

### Case No.: 04-1140

*MILES REPORTING COMPANY*
*Certified in Illinois and Missouri*
*1339 North 17th Street, Suite 102*
*Belleville, Illinois 62226*
*(618) 235-2633*
*FAX (618) 235-2641*

Reported by: Darlene Niemeyer, CSR, RPR, CCR
Illinois CSR License No.: 084-003677
Missouri CCR License No.: 866



DEFENDANT'S EXHIBIT A

| | |
|---|---|
| 1 not discussed? | 1 I don't know, three years ago. Two years ago. They |
| 2   A.   I don't think so. | 2 smashed the window on the driver's side. From that |
| 3   Q.   Did you ever work another job while you were | 3 time on -- I never even thought of those being in that |
| 4 working as an agent for AIL? | 4 little divider between the seats when I went and looked |
| 5   A.   I don't think so. I don't remember doing Block | 5 and stuff. And, no, I haven't found stuff. I remember |
| 6 the first year at AIL. I may have. I don't think so. | 6 writing other things down. But what has happened to |
| 7 I know I didn't work any other job at the same time. | 7 them over the years, I don't know. |
| 8   Q.   Okay. So the only job possibly you may have | 8   Q.   So besides conversations with Terry, do you |
| 9 worked concurrently -- | 9 remember notes that you would have taken when speaking |
| 10   A.   Would have been part-time work with -- | 10 with anyone else -- |
| 11   Q.   Let me finish my question, please. The only job | 11   A.   No. |
| 12 you may have worked concurrently with -- while you were | 12   Q.   -- that sticks out in your mind or events that |
| 13 contracted with AIL would have been H&R Block? | 13 took place? |
| 14   A.   Yeah. | 14   A.   No. |
| 15   Q.   That's correct? | 15   Q.   So the only thing right now that you can |
| 16   A.   Yes. | 16 remember that were contained in those notes were the |
| 17   Q.   Okay. Did you receive any type of benefits from | 17 fact that Terry called you and got upset? |
| 18 H&R Block? | 18   A.   Yeah. |
| 19   A.   I don't remember getting any, no, because it was | 19   Q.   Okay. Do you remember when you applied to be a |
| 20 seasonal. | 20 contractor for AIL, did you submit a resume or did you |
| 21   Q.   Seasonal. Have you ever filed a lawsuit against | 21 just fill out a job application? |
| 22 any other employers, or if you were an independent | 22   A.   I don't remember. I remember going in to |
| 23 contractor, a principal? | 23 Terry's office. |
| 24   A.   No. Other than the ones we have talked about. | 24   Q.   Was that the first time you had ever met Terry? |
| 129 | 131 |
| 1   Q.   Which reminds me, besides AIL and Scott Smith's | 1   A.   Yes. |
| 2 agency, who else have you sued? | 2   Q.   Well, how did you hear about a job at AIL? |
| 3   A.   Oh, from the litigation back when Muscular & | 3   A.   I don't remember. |
| 4 Arthritis, when I -- can't get it out -- when I sued | 4   Q.   Or a position there? |
| 5 Schielein. But as far as an employer, no. | 5   A.   It must have been in the paper because that was |
| 6   Q.   Right. Okay. Besides the calendar, the 2000 | 6 before I had a computer at home. |
| 7 and the 2001 calendar that you produced to us, do you | 7   Q.   Do you recall filling out a job application for |
| 8 keep any other kind of a journal or a diary? | 8 AIL? Not a job -- an application to be a contractor |
| 9   A.   No. | 9 for AIL? |
| 10   Q.   Besides what is in the 2000 and 2001 calendar | 10   A.   Other than signing the contract, I don't |
| 11 that you produced to us, did you jot down any notes | 11 remember one, no. The one thing I do remember taking |
| 12 anywhere about your AIL contract termination? | 12 in was when I was featured in the Peoria Woman |
| 13   A.   Yes. And I don't know where they are. I cannot | 13 Magazine. I remember taking that in to Terry. |
| 14 locate them. If I ever find anything, I will give you | 14   Q.   Did Terry interview you? |
| 15 whatever I do find. | 15   A.   Yes. |
| 16   Q.   Do you know what those notes stated? | 16   Q.   Did anyone else interview you? |
| 17   A.   No. All I remember was writing down several | 17   A.   No. |
| 18 conversations. | 18   Q.   During your interview process, did you speak or |
| 19   Q.   Conversations. For example, do you recall -- | 19 meet with anyone from AIL Waco? |
| 20   A.   When Terry called me on the phone and would just | 20   A.   No. |
| 21 go off on a tangent. And I remember being in the car | 21   Q.   Is it fair to say that no one from AIL Waco was |
| 22 and writing notes down on just a slip of paper. And I | 22 involved in -- only if you know -- in the decision to |
| 23 had them in the car for a long time. I shouldn't have | 23 hire you as an independent contractor? |
| 24 left them there. And somebody broke into the car, oh, | 24   A.   I don't know. |
| 130 | 132 |

```
 1  telephones?
 2  A.   I don't know who paid the phone bill.
 3  Q.   You know you paid for --
 4  A.   Yes.  I know I didn't --
 5  Q.   -- $40.00 per week of it, right?
 6  A.   I don't know.  I didn't pay the phone bill and I
 7  could come in and I could use the phone anytime I
 8  wanted to call anybody I wanted.
 9  Q.   Okay.  You didn't pay the phone bill, but you
10  did pay a $40.00 weekly fee, correct?
11  A.   For the appointment setter.
12  Q.   But didn't that also include you could use the
13  phone?  Because you could call and set your own
14  appointments if you chose to; isn't that right?
15  A.   That was the theory, but Terry wouldn't give you
16  the cards to do it.
17  Q.   But if you had a potential client's number you
18  could call them, couldn't you?
19  A.   Sure.
20  Q.   And maybe you have already answered this.  Do
21  you know who was charging you the $40.00 a week?  Was
22  that Waco or Scott Smith?
23  A.   I don't know.
24  Q.   When you signed your agent contract, did you
                              221

 1  understand all the terms and conditions that were in
 2  it?
 3  A.   For the most part.
 4  Q.   Okay.  What --
 5  A.   I'm not always sure -- and I don't remember what
 6  the contract said.  There are always some legal terms
 7  that I am always saying I'm not sure exactly what that
 8  means, but I think I know what it means.
 9  Q.   Okay.  Do you recall, were there any sections
10  that you didn't understand?
11  A.   I don't recall.  I don't think.  I think I just
12  about understood every one that was in the contract,
13  because I was used to reading contracts.
14  Q.   Do you recall reading a statement in the agent
15  contract that you signed stating that you were not an
16  employee of AIL?
17  A.   Yes.
18  Q.   In your own words will you explain what that
19  means to you?
20  A.   The man said I was an independent contractor and
21  I could work whenever I wanted to or not work whenever
22  I wanted to.
23  Q.   Setting aside Terry's yelling and screaming, I
24  guess, at you, isn't that what you actually did?  You
                              222

 1  were able to go with -- it was Curt, wasn't it --
 2  A.   Uh-huh.
 3  Q.   -- who had cancer?  You were able to go with him
 4  for treatment in Indianapolis, weren't you?
 5  A.   Uh-huh.
 6  Q.   You were able, if you wanted to take time off,
 7  to come down and see your mom and dad?
 8  A.   I generally did that on one of the holiday
 9  weekends.
10  Q.   Okay.  But you did work essentially when you
11  wanted, didn't you, Barb?
12  A.   No, not really.
13  Q.   So it was more like a 9:00 to 5:00 job?
14  A.   No, it was more like a 2:00 to 11:00 job.
15  Q.   Whenever there were, say, potential clients in
16  the St. Louis area, didn't you volunteer for those?
17  A.   Not always, no.
18  Q.   But usually wouldn't you volunteer?
19  A.   I volunteered once.
20  Q.   Only once?
21  A.   Once to come down to the area and work.
22  Q.   Okay.  Do you recall reading this statement in
23  the agent contract that you signed stating that you
24  have no fixed hours and are free to choose the time and
                              223

 1  manner in which services are performed?
 2  A.   I don't remember that being in there, but if you
 3  say it is, okay, it is probably in there.
 4  Q.   Do you understand what that means?
 5  A.   Yes, that I can work wherever I want to work and
 6  whenever I want to work.
 7  Q.   So if Terry, then, is not abiding by the terms
 8  of your contract, why didn't you call someone?
 9  A.   Because of fear.
10  Q.   If you called the union, were you afraid of
11  something, that something bad would happen?
12  A.   Of course.
13  Q.   What were you afraid of, Barb?
14  A.   Terry firing me.
15  Q.   And you think if you would have called Scott
16  Smith, Terry would have fired you?
17  A.   Oh, yes.  They both made that quite clear.
18  Q.   And if you would have called your -- excuse me
19  -- if you would have called the union, would you have
20  filed a grievance on this?
21  A.   I was also informed that if I filed a grievance
22  I would be fired.
23  Q.   Do you know there are laws out there to protect
24  you from that, Barb?
                              224
```

**Page 225**

1  A.  I do now.
2  Q.  And so basically you -- did you know that this
3  phrase or this clause was in your contract?
4  A.  I don't remember exactly reading it, but if it
5  was there I probably read it.
6  Q.  Okay. I'm just wondering why if this is in
7  writing, in black and white, in your contract, why you
8  didn't either call Scott Smith, call Steve DeKlerk,
9  because you said that he --
10 A.  But I did.
11 Q.  You called Steve DeKlerk on this?
12 A.  I called Scott. That was another part on the
13 first time when I called Scott, and I was told that is
14 just the way it is. I'm always going to back Terry.
15 It doesn't matter what the complaint is. It doesn't
16 matter whether he was following the contract.
17 Q.  Okay, Barb, just so I'm clear, so on this
18 contract issue you called someone and complained about
19 it?
20 A.  Yes.
21 Q.  Who?
22 A.  Scott.
23 Q.  Was this the first time you said you called?
24 A.  The first time when I called up about Gordon and

**Page 226**

1  I called up about the contract and I called up about
2  whatever else I called up about.
3  Q.  Terry's lying to all these applicants?
4  A.  (Nodded head up and down.)
5  Q.  Okay. At the time and his response is, sorry,
6  Barb, I'm going to follow Terry or back Terry?
7  A.  I will get with Terry, but I will always
8  publicly back him.
9  Q.  Okay. Why did you then not call the union and
10 file a grievance?
11 A.  I figured why.
12 Q.  So you gave up then?
13 A.  I was afraid. I didn't want to lose my job. I
14 liked the job. I didn't like Terry, but I liked the
15 job.
16 Q.  Do you recall reading a statement in the agent
17 contract that you signed stating that you will never
18 directly or indirectly attempt to induce AIL policy
19 holders to terminate policies or in any other way
20 injure the business or reputation of AIL?
21 A.  Yes.
22 Q.  Okay. Do you know what this little paragraph
23 means? What does it mean to you, Barb?
24 A.  It is a restrictive covenant.

**Page 227**

1  Q.  What does it mean to you, Barb?
2  A.  Not to compete. It is a noncompete clause.
3  Q.  Okay. Explain that in layman's terms and say to
4  the Jury what does that mean to you?
5  A.  That means I will never do business with anybody
6  who I saw from American Income leads, sold policies for
7  American Income to, and I would never to a client of
8  American Income in any way bad-mouth them.
9  Q.  And did you abide by this policy provision?
10 A.  For the first year, yes. After that, no.
11 Q.  Why no?
12 A.  Because I had it explained to me that it was an
13 unenforceable contract clause.
14 Q.  Did you fight -- file a declaratory judgement
15 action with the court and have that ruled upon?
16 A.  No.
17 Q.  You just took that on your own and went ahead
18 and violated it?
19 A.  I violated it because my attorney told me that
20 -- the same attorney that helped me draw up my
21 physician contracts, where my noncompete clause had to
22 be for a finite period of time, with a definite mileage
23 ratio or whatever. It had to be for -- you cannot stop
24 somebody from making an income by noncompete forever.

**Page 228**

1  Q.  So, Barb, first of all, what's the name of this
2  attorney?
3  A.  That was Gregg.
4  Q.  Gregg?
5  A.  Grimsley.
6  Q.  Grimsley. And so, Barb, you decided to blue
7  line through the contract terms yourself? Rather than
8  going to a judge and having it done the legal way, Barb
9  Kendell blue lines her own provisions into this clause;
10 is --
11 A.  Yes.
12 Q.  -- that correct?
13 A.  That's correct.
14 Q.  Okay. By signing the agent contract you
15 indicated that you agreed to the terms and conditions
16 that were contained in the written contract; is that
17 correct?
18 A.  Would you restate that?
19 Q.  By signing the agent contract you indicated that
20 you agreed to the terms and conditions that were
21 contained in the written contract; is that correct?
22 A.  Correct.
23 Q.  So, again, Barb, would you consider this to be
24 perhaps a false statement by Barb Kendell?

**Page 277**

1  A.   That even might have been the house I was going
2  into. I don't know. But that's where I was.
3  Q.   Okay. And so -- I'm trying to figure this out.
4  So May 31, that's the last day you worked. So what did
5  you do -- at this point in time you -- Terry tells you
6  that you are fired. Did you believe that Terry had the
7  authority to fire you?
8  A.   After Scott done -- got done with me, I wasn't
9  sure which one had the authority or if either one of
10 them had the authority.
11 Q.   Okay. So you are talking like a week later when
12 Scott came down and talked to you. What happened then?
13 Because at some point you were notified, Barb, the
14 contract is terminated.
15 A.   When I got the termination letter.
16 Q.   So you didn't know you were terminated or the
17 contract was terminated until August 5 or after
18 August 5?
19 A.   No.
20 Q.   Then what termination letter are you talking
21 about?
22 A.   The Exhibit 3.
23 Q.   Right.
24 A.   I assumed I was.

**Page 278**

1  Q.   Okay. So from May 31, 2001 until August --
2  well, after August 5 of 2001, because it takes a few
3  days for mailing. It is dated -- that's the date they
4  sent it to you. So from May 31 until August 5th, 6th,
5  7th, some point in time there, you had no idea if you
6  were still an agent or not an agent? You assumed you
7  were -- your contract was terminated, but you didn't
8  know?
9  A.   I assumed that it was going through some type of
10 a review process and as soon as they let me know, I'd
11 know what was going on. And as soon as I got the
12 termination letter I went to unemployment.
13 Q.   Okay. You are --
14 A.   But I was --
15 Q.   -- talking about Defendant's Exhibit Number 3,
16 as soon as you received that from Waco?
17 A.   Yeah.
18 Q.   Okay. But you -- again, you received no other
19 verbal or written confirmation from Scott Smith or
20 Terry confirming you were, in fact, terminated?
21 A.   (Shook head from side to side.)
22 Q.   Barb, why didn't you call Scott Smith and follow
23 up?
24 A.   I figured they would get together and figure it

**Page 279**

1  out, and at that point I didn't care.
2  Q.   You just let it go?
3  A.   (Nodded head up and down.)
4  Q.   Do you remember --
5  A.   I was tired of the fight.
6  Q.   Okay. Do you remember -- I'm going to take you
7  back to the fall of 2001. Well, actually, that would
8  be back fall of 2001. Did Terry -- I'm sorry. Fall of
9  2000. Sorry. Sorry. Fall of 2000. Do you remember
10 Scott Smith talking to you about falsely called in
11 appointment results?
12 A.   Yes. That's when I told you that I called in
13 the appointment results.
14 Q.   The fake -- the false war report?
15 A.   The false war report.
16 Q.   That. Okay. So after you called in the false
17 war report, Scott -- Terry calls Scott or somehow Scott
18 finds out. Scott then calls you, talks to you about
19 it. Is that what happened?
20 A.   (Nodded head up and down.)
21 Q.   Or did he come down and meet with you?
22 A.   I think he came down. I'm not sure. I think he
23 came down. I don't remember whether he came down or
24 whether it was over the phone.

**Page 280**

1  Q.   Okay. What about this. Is it fair to say that
2  Scott -- most likely he called you, and you told him
3  initially that you had run the appointments. Later in
4  that conversation you acknowledged that you did not run
5  the appointments. You lied to Brennan and asked the
6  phone setter to lie for you, too. And is that -- is
7  that a fair statement?
8  A.   If -- if you are referring -- if you are
9  referring to the time that I called in the fake war
10 report right after the 4th of July weekend or whatever
11 the thing was, when I moved, yeah, that would -- that's
12 a fair...
13 Q.   Okay. A fair statement?
14 A.   Yeah.
15 Q.   Okay. And, then, now, is this true --
16 A.   But then I know -- okay. Go ahead. Never mind.
17 Q.   And is it true that Scott had never had any
18 prior problems with you prior to this; is that true, as
19 far as you know? Or did Scott have problems with you
20 before that?
21 A.   Well, yeah, I had called him up complaining
22 about Terry and he considered that a major headache.
23 Q.   How do you know that?
24 A.   Because he had told me he was not that happy and

```
 1  quick. Maybe not. I'm going to represent to you that
 2  these are various copies of your agent contracts.
 3  A.  Okay.
 4  Q.  Hold on. We have agent contract, supervising
 5  agent contract. I may -- I hope I'm not giving you
 6  multiple copies. I may be.
 7          MS. HANSELL: Okay. Can we get these marked
 8  as each stapled group as an exhibit, please.
 9          (Whereupon said document was duly
10           marked for purposes of
11           identification as Defendant's
12           Exhibits 15 through 20 as of this
13           date.)
14  Q.  (By Ms. Hansell) Okay. Barb, can you please
15  identify document Number 15?
16  A.  Just a second.
17  Q.  What is this document, Barb?
18  A.  It looks like it is the contract that I signed
19  in September of '98 when Terry hired me.
20  Q.  Okay. So is this, do you think, a true and
21  accurate copy of the agent contract that you initially
22  signed when you first became an agent with AIL?
23  A.  It has been such a long time since I have seen
24  it, I think so. This is what I would have requested
                            449
```

```
 1  when I requested my copies and I never got it.
 2  Q.  Okay, Barb, focus on my questions.
 3  A.  I think it is.
 4  Q.  Okay. Don't volunteer anything else. Just try
 5  to focus.
 6  A.  From what I remember --
 7  Q.  Okay.
 8  A.  -- this would be it.
 9  Q.  That's a good answer. Great. And did you sign
10  this? Do you recall, did you sign this document on
11  09-15, 1998?
12  A.  Not that I specifically signed it on that date,
13  but I remember signing it, yes.
14  Q.  Is that what the date reads on this document?
15  A.  That's what the date reads.
16  Q.  Okay. Do you recall, did you later sign another
17  contract on 09-25 of 1998?
18  A.  (Shook head from side to side.)
19  Q.  Okay. Let's take a look at the next exhibit.
20  Will you please identify this document for me? Okay,
21  Barb, I'll tell you what, I'm going to represent to you
22  that this is another copy of your agent contract?
23  A.  I'm sure I signed it.
24  Q.  Okay. Wait. Listen to me, please. I'm going
                            450
```

```
 1  to represent to you this is a copy of your agent
 2  contract with American Income life Insurance Company.
 3  A.  Okay.
 4  Q.  Will you please tell me, on the second page, is
 5  that your signature on the second page of this
 6  document?
 7  A.  Yes.
 8  Q.  Did you write the date, 09-25-98, is that your
 9  writing?
10  A.  Yes.
11  Q.  Okay. Do you know why, just curious, why did
12  you sign another contract ten days later?
13  A.  I have no idea.
14  Q.  Okay. You have no independent recollection why
15  you did that?
16  A.  Terry put something in front of me and said
17  sign.
18  Q.  Okay. And that's what you did?
19  A.  That's what I did.
20  Q.  Okay. Is that your handwriting on the top, the
21  first page of the document in the corner, right-hand
22  corner?
23  A.  No.
24  Q.  Okay. Let's look at the next exhibit, Barb.
                            451
```

```
 1  What number is that?
 2  A.  It's 17.
 3  Q.  Okay, 17. I'm going to represent to you that
 4  this is a copy of a supervising agent contract with
 5  AIL. Barb, is this, on page two, the signature that
 6  you believe was forged?
 7  A.  That's not my signature.
 8  Q.  So the answer is yes or no?
 9  A.  It's -- yes, it is not my signature.
10  Q.  Okay. Did you write the date on this contract?
11  A.  No.
12  Q.  Can you tell me what the date -- what is written
13  in the blank?
14  A.  10-06-99.
15  Q.  Okay. Now, let me ask you this. This is for --
16  this is when you became a supervising agent; is that
17  right? Is that the right time period?
18  A.  I think I became a supervising agent in January,
19  but I'm not going to swear to it.
20  Q.  Okay.
21  A.  I mean, I don't know. I don't remember.
22  Q.  So perhaps this is a second or a third time you
23  were supposed to sign a contract; is that possible?
24  A.  No, because this is '98, and I think it was
                            452
```

```
STATE OF ILLINOIS    )
                     ) SS
COUNTY OF MONTGOMERY)
```

### CERTIFICATE

I, DARLENE M. NIEMEYER, a Notary Public in and for the County of Montgomery, State of Illinois, DO HEREBY CERTIFY that pursuant to agreement there appeared before me on the 4th of March A.D., 2005, at 103 W. Vandalia Street, Suite 300, Edwardsville, Illinois, BARBARA ELIZABETH JOHANNSEN KENDELL, who was first duly sworn by me to testify the whole truth of her knowledge touching upon the matter in controversy aforesaid so far as she should be examined, and her examination was taken by me in shorthand and afterwards transcribed (her signature having been not waived) and said deposition is herewith returned.

IN WITNESS WHEREOF I have hereunto set my hand and affixed my Notarial Seal this 21st day of March A.D., 2005.

*OFFICIAL SEAL*
*DARLENE M. NIEMEYER*
*NOTARY PUBLIC, STATE OF ILLINOIS*
*MY COMMISSION EXPIRES 3-3-2007*

*Darlene Niemeyer*
Notary Public and Certified
Shorthand Reporter

Illinois CSR License No.: 084-003677
My Notary Commission Expires: 03-03-2007