

E-FILED
Monday, 26 September 2005 10:10:25 AM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

BARBARA J. KENDELL,                )
     Plaintiff,                      )
                   )
vs.                                )    Case No. 04-1140
                   )    Chief Judge: Joe Billy McDade
AMERICAN INCOME LIFE OF            )    Magistrate Judge: John A. Gorman
CHICAGO and AMERICAN INCOME        ) .
LIFE INSURANCE CO.,                )
                   )
     Defendants.                     )

## RESPONSE TO DEFENDANT AMERICAN INCOME LIFE INSURANCE CO.'S MOTION FOR PARTIAL SUMMERY JUDGEMENT

       I, Barbara J. Kendell. Plaintiff pursuant to Federal Rules of Civil Procedure 56 and CDIL-L R 7.1 moves the Court to enter an Order denying Partial Summery Judgment on the issue of liability on the Defendant's Counterclaims against me.

### 1. Introduction

       Defendant is not entitled to a summery judgment on its counterclaim for breach of contract against me because of testimony given during my deposition. I admitted that I violated a unenforceable provision of the Agent Contract wherein I agreed not to use information obtained from Defendant's records and not to solicit Defendant's clients in the event of termination of the Contract.

### II. Undisputed Facts

       When I signed the contract, I knew that this Termination Section was an indefensible clause by the way it was written. *See Exhibit A E and F.* Under Exhibit F, you will note that the non compete portion offers no remuneration for the restraint of me being able to pursue my vocation without and restrictions. I only signed the Contract after reading the clause that I shall term the Non Compete Clause Defendant's **Exhibit 2-B** page two Termination Clause second paragraph found in **Motion for Summery Judgment**. I had, in the past, with the help of my then attorney Gregg Grimsley, written several non compete contractual clauses as Administrator of the Muscular and Arthritis Pain Clinic, Inc.when the clinic was attempting to hiring and hiring Independent Contractors as well as employee Physicians. The non compete clauses had to be for a

finite period of time and for a described geographical finite location. The clause had to be reasonable and could not interfere with the contracted person's right to earn a living at their job training level. *See Plaintiff's Exhibit B and Exhibit F second page under rights and duties upon termination of the Digest of Illinois Insurance Law.*

I deny that I induced anyone to terminate his or her contracts with American Income Life Insurance Company. I never held a gun to anyone's head nor threatened them in any way.

Upon termination of my contract, I called Greg Grimsley, read him the Termination Clause, and asked him if I was right in my interpretation of the clause that AIL had signed was unenforceable due to the way it was written. See Plaintiff's exhibit A from Plaintiff's Deposition. He said that I had learned that part of writing contracts well and yes, it was unenforceable but to be on the safe side I might want to wait a year before contacting anyone. I cannot get an affidavit from Gregg Grimsley for he has passed away and this conversation was over the phone. Meanwhile, several AIL clients had contacted me at home for they all had my home phone number wanting me as their agent to get them other types of insurance products. I have a right to earn a living by selling insurance products that I am licensed to sell. When the year was up, I contacted the clients and asked to do an insurance review to see if their needs were still the same. Upon doing reviews several times, I found that their needs had changed. Either the client needed more coverage that they had or mostly a different type of life insurance policy other than the whole life was more beneficial to them. AIL does not have a Universal Life Insurance Policy nor do they offer Medicare Supplemental policies. Nor do they offer annuities. When I explained the flexibility of a Universal Life Policy (U/L) verses a traditional Whole Life Policy usually the Client made the decision to take out the Universal Policy. When the client asked if they should keep the AIL policy I explained the options to them. With a traditional whole life policy one can drop the coverage and take the cash value in the form of a check, use the cash value to buy reduced death benefit paid up coverage, use the cash value to buy an extended term policy at full face value, or do what is called a 1035 Exchange which sends the cash value to the new insurance company so it can be incorporated into the new policy or the client can elect to do nothing and let the insurance company pay the premiums out of the cash value until the cash value is eaten up and the policy lapses. I believe several kept the AIL policy as well as taking out the new U/L from Federal Life Insurance Company (Mutual) ("Federal Life"). The ones that wanted to replace their AIL policy and use the cash value in the new policy I did above board and legally by doing a 1035 Exchange even though there would have been no tax consequences to the policy holder if they had just stopped paying and had requested their cash value, if any, be paid to them by check. By doing a 1035 Exchange this gives AIL the chance to send an agent into the home to try to conserve the business. This is an honorable thing to do on my part for it is doing what's best for the client by giving them a chance to hear something I might not have thought of as to why the AIL policy is the better policy for them . I even have changed my two AIL policies to a Universal Life Policy with another company and the form's were sent to AIL by doing a 1035 exchange, yet no one from AIL seems to be upset over that. Not once did an agent of AIL call to set an appointment to try to conserve my business.

### III. Legal Argument

**While I admit that I sold Life Policies that *AIL* did not offer I deny that I breached a provision of that contract for it was not an enforceable or legal clause in the first place.** *See Exhibit's a and B. See Exhibit C.*

Under IL. State Law's, a restrictive covenant is unenforceable if its sole purpose is to restrict competition. *See Plaintiff's Exhibit D. Jones v. Hummanscale Corp. (2005), Cal.APP.4th*. *Plaintiff relies on Business and Professional Code section 16600, which declares that "every contract by which anyone is restrained from engaging in lawful profession, trade, or business of any kind is to that extent void." D'Sa v.Playhut, Inc (2000) 85 App 4th 927,933.* This is the sole reason for this particular clause anyone can see that, because of its broad nature and that it has no ending in time or distance. See Exhibit D *Gordon v. Landau (1958) 49 Cal.2d 690 found "valid and enforceable" a defendants agreement "not to use plaintiffs' confidential lists to solicit customers for himself for a period of **one year** following termination of his employment."* I never induced anyone to drop their AIL coverage. It was always their choice. A person should have the right to do with their own money what is best for them. I have never said nor have I done anything to injure the reputation of AIL other than this lawsuit. I have gone into homes that have AIL policies from internet lead sources that I have never attempted to replace because for that particular clients need the policy they owned was the right one for them at that time. An ethical and a good agent always places the clients needs before their own. It is our fiduciary responsibility to do what is always best for the client. I believe this with every fiber of my being.

I did not have a working knowledge of what the client's policies were or how much they were not for nor the premium amount all I had to work with was when I went into a home I did a Financial Needs Analysis and based upon this information I suggested what type of policy would word the best for their needs. I only sell on a needs basis to this day. Some of the leads were internet leads, if I had a name or thought I remembered a name of an AIL policy holder I looked up the address over the internet or through a phone book, some were mortgage leads from Federal Life *see Defendant Exhibit B-F and B-G I was not the AIL Agent nor the AIL MGA.* Some of the clients called me, some I do not remember how we contacted it may have been referrals from other clients. I also followed up letters I mailed out with phone calls. I object to the attorney's for AIL saying that I did replace policies and maliciously induced Policyholders to breach their life insurance contracts with the Defendant. I have no malice in mind only the best for my client. I will review their policies again and do another needs analysis to see if their needs are still being met and if so fine if not recommend a change. It is not my fault if AIL does not offer a broader range and different types of coverage's for the client's. Should a client, policyholder, have to have an unsuitable policy just because that is the only type of policy the company sells? There is nothing unique in AIL's Traditional Whole Life or Term Life Policies. There was nothing reasonably necessary to protect business from competition "which would be commonly regarded as improper or unfair" as brought up in Scheffel & Co., P.C. v. Fessler, 356 Ill.App.3d 308,827 N.E. 2d 1,69%th Dist. 2005) AIL has "run of the mill policy's." AIL markets through Labor Unions.

Anyone can market through Labor Unions. AIL doesn't have exclusive rights to these people. They are solicited many times in the period of a year and I could have found them in many ways. Several insurance companies i.e. Labor Unions Insurance Center; do market through the same unions as AIL. I market through several of the same unions with AAA Life Sales Agency. AAA marketed through these unions before I ever became an agent for them. No one company has a proprietary interest in one union over another.

### IV. Tortious Interference with Contractual Relation Counterclaim

1. It was not a wholly valid contract; 2. I acknowledge the existence of a non-valid contractual clause; 3. It was not my intention maliciously or otherwise to breach a valid contract; 4. Nor did I breach a contract by wrongful conduct.

I did not act "intentionally and without just cause." I offered better products for a better price and induced no one to drop his or her coverage with AIL.

### V. Conclusion

For the foregoing reasons, I, Barbara J. Kendell, Plaintiff respectfully requests that this Court denies this Defendants Motion for Partial Summary Judgment on the issue of liability.

DATED: September __ , 2005                    Respectfully submitted


                                              Barbara J. Kendell
                                              Plaintiff
                                              504 W. High Street
                                              Peoria, Illinois 61606-1923
                                              Phone: 309-673-7112
                                              E-mail: Jabby21@Juno.com

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was mailed to the following counsel/parties of record via First Class U.S. Mail, postage prepaid this ____ Day of September, 2005:

                                              Cassandra Hansell
                                              Burroughs, Hepler, Broom, MacDonald etc.
                                              103 W. Vandalia Street, Suite 300
                                              P.O.Box 510
                                              Edwardsville, Illinois 62025

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

BARBARA J. KENDELL,                    )
    Plaintiff,                         )
                     )
vs.                                     )   Case No. 04-1140
                     )   Chief Judge:  Joe Billy McDade
AMERICAN INCOME LIFE OF                 )   Magistrate Judge:  John A. Gorman
CHICAGO and AMERICAN INCOME             )
LIFE INSURANCE CO.,                     )
                     )
    Defendants.                        )

        I, Barbara J. Kendell, attest to the statement that is titled Response To Defendant American Income Life Insurance Co.'s Motion For Partial Summery Judgment that it is the truth and correct statements to the best of my knowledge and that I have complied with the Courts instructions.  I swear this upon my oath that this is the truth.

BY: _Barbara Kendell_
    Barbara J. Kendell

DATE _Sept 23, 2005_

    SUBSCRIBED AND SWORN TO BEFORE ME This __23rd__ day of

_September_ 2005

_Teresa M. Fandel_
Notary Public

"OFFICIAL SEAL"
TERESA M. FANDEL
Notary Public, State Of Illinois
My Commission Expires 08/01/09

22
10 2

```
 1              IN THE UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF ILLINOIS

 3                                         COPY

 4      BARBARA J. KENDELL,                -

 5           Plaintiff,

 6      vs.                    Case No. 04-1140

 7      AMERICAN INCOME LIFE OF

 8      CHICAGO and AMERICAN INCOME

 9      LIFE INSURANCE CO.,

10           Defendants.

11

12

13

14              THE VIDEOTAPED DEPOSITION of BARBARA

15      ELIZABETH JOHANNSEN KENDELL, taken on behalf of the

16      defendants, at 9:12 a.m., on March 4, 2005.

17

18

19

20           Reported by: Darlene M. Niemeyer, CSR, RPR, CCR
                  Illinois CSR License No.: 084-003677
21                Missouri CCR License No.: 866

22                  MILES REPORTING COMPANY
                 1339 North 17th Street, Suite 102
23               Belleville, Illinois 62226-6441
                        (618) 235-2633
24                   fax # (618) 235-2641
```

Plaintiff's
Exhibit A.

ORIGINAL

# THE DEPOSITION OF
# BARBARA ELIZABETH JOHANNSEN KENDELL

## TAKEN ON MARCH 4, 2005

## IN THE MATTER OF:

## BARBARA J. KENDELL
## vs.
## AMERICAN INCOME LIFE OF
## CHICAGO and AMERICAN INCOME
## LIFE INSURANCE COMPANY

## Case No.: 04-1140

*MILES REPORTING COMPANY*
*Certified in Illinois and Missouri*
*1339 North 17th Street, Suite 102*
*Belleville, Illinois 62226*
*(618) 235-2633*
*FAX (618) 235-2641*

*Reported by: Darlene Niemeyer, CSR, RPR, CCR*
*Illinois CSR License No.: 084-003677*
*Missouri CCR License No.: 866*

I do now.

Q. And so basically you -- did you know that this phrase or this clause was in your contract?

A. I don't remember exactly reading it, but if it was there I probably read it.

5 Q. Okay. I'm just wondering why if this is in writing, in black and white, in your contract, why you didn't either call Scott Smith, call Steve DeKlerk, because you said that he --

10 A. But I did.

Q. You called Steve DeKlerk on this?

A. I called Scott. That was another part on the first time when I called Scott, and I was told that is just the way it is. I'm always going to back Terry. It doesn't matter what the complaint is. It doesn't matter whether he was following the contract.

Q. Okay, Barb, just so I'm clear, so on this contract issue you called someone and complained about it?

20 A. Yes.

Q. Who?

A. Scott.

Q. Was this the first time you said you called?

A. The first time when I called up about Gordon and

225

1 I called up about the contract and I called up about

2 whatever else I called up about.

3 Q. Terry's lying to all these applicants?

4 A. (Nodded head up and down.)

5 Q. Okay. At the time and his response is, sorry,

6 Barb, I'm going to follow Terry or back Terry?

7 A. I will get with Terry, but I will always

8 publicly back him.

9 Q. Okay. Why did you then not call the union and

10 file a grievance?

11 A. I figured why.

12 Q. So you gave up then?

13 A. I was afraid. I didn't want to lose my job. I

14 liked the job. I didn't like Terry, but I liked the

15 job.

16 Q. Do you recall reading a statement in the agent

17 contract that you signed stating that you will never

18 directly or indirectly attempt to induce AIL policy

19 holders to terminate policies or in any other way

20 injure the business or reputation of AIL?

21 A. Yes.

22 Q. Okay. Do you know what this little paragraph

23 means? What does it mean to you, Barb?

24 A. It is a restrictive covenant.

226

1 Q. What does it mean to you, Barb?

2 A. Not to compete. It is a noncompete clause.

3 Q. Okay. Explain that in layman's terms and say to

4 the Jury what does that mean to you?

5 A. That means I will never do business with anybody

6 who I saw from American Income leads, sold policies for

7 American Income to, and I would never to a client of

8 American Income in any way bad-mouth them.

9 Q. And did you abide by this policy provision?

10 A. For the first year, yes. After that, no.

11 Q. Why no?

12 A. Because I had it explained to me that it was an

13 unenforceable contract clause.

14 Q. Did you fight -- file a declaratory judgement

15 action with the court and have that ruled upon?

16 A. No.

17 Q. You just took that on your own and went ahead

18 and violated it?

19 A. I violated it because my attorney told me that

20 -- the same attorney that helped me draw up my

21 physician contracts, where my noncompete clause had to

22 be for a finite period of time, with a definite mileage

23 ratio or whatever. It had to be for -- you cannot stop

24 somebody from making an income by noncompete forever.

227

1 Q. So, Barb, first of all, what's the name of this

2 attorney?

3 A. That was Gregg.

4 Q. Gregg?

5 A. Grimsley.

6 Q. Grimsley. And so, Barb, you decided to blue

7 line through the contract terms yourself? Rather than

8 going to a judge and having it done the legal way, Barb

9 Kendell blue lines her own provisions into this clause;

10 is --

11 A. Yes.

12 Q. -- that correct?

13 A. That's correct.

14 Q. Okay. By signing the agent contract you

15 indicated that you agreed to the terms and conditions

16 that were contained in the written contract; is that

17 correct?

18 A. Would you restate that?

19 Q. By signing the agent contract you indicated that

20 you agreed to the terms and conditions that were

21 contained in the written contract; is that correct?

22 A. Correct.

23 Q. So, again, Barb, would you consider this to be

24 perhaps a false statement by Barb Kendell?

228

A.    What?

Q.    You agreed to abide by the terms.  After your
contract is terminated, a year later, you don't abide
by the terms.  You violated them.  Explain that to me,
Barb.

A.    It was explained to me by several people.

Q.    Now, Barb, explain to me how you can sign it
saying you agree to the terms --

A.    I agreed to it at that point.

Q.    -- but then you break those terms.  So just on
the day you signed it you agreed to the terms, not any
point after that?

A.    I agreed to it.

Q.    And you later violated it then?

A.    And I later violated it.

Q.    And that's not a big deal to you?

A.    No.

Q.    Do you recall whether your agent contract that
you signed with AIL mentioned anything about the Scott
Smith agency?

A.    No, I don't remember.  I don't think it did.

Q.    Did you have a separate written contract with
Scott Smith?

A.    No.

# DCBA Brief Online
Journal of the DuPage County Bar Association

DCBA Home Page
*Brief* Home Page
*Brief* Display Rates
Article Index
Index Search

**Articles for October 2002**

Contested Adoption Cases with Underlying Criminal Convictions: The Child's Right to Waive Appeal

Negotiating Cell Tower Leases from the Property Owner's Perspective

Physician Non-Compete Agreements in Illinois: Diagnosis – Critical Condition; Prognosis – Uncertain

Tenancy By The Entirety

The Economics Of Physician And Attorney Non-competition Agreements

Some Thoughts on Good Legal Writing

© 1996 - 2003
DuPage County
Bar Association
All Rights Reserved.

## Physician Non-Compete Agreements in Illinois: Diagnosis – Critical Condition; Prognosis – Uncertain

By David J. Fish and Charles Corrigan

Illinois appellate courts hand down dozens of opinions each year on the enforceability of employee restrictive covenants. For some industries, such as printing, the majority of opinions suggest the lack of protectible business interest in the company's customers, and thus, the unenforceability of the covenant not to compete.[1] For some professions, such as the practice of law, the courts have held that public policy concerns dictate that no restrictive covenant be enforceable.[2]

Many physicians in Illinois have, for years, agreed to non-competition agreements in their employment contracts. These non-compete agreements generally require that for a certain period of time after a physician leaves a practice, he or she will not compete by practicing within a certain geographic distance from the previous practice. Until recently, doctors were on the other end of the scale from lawyers and such restrictions in the medical profession were routinely enforced if properly drafted.[3] However, the enforceability of non-compete agreements for members of the medical profession is now uncertain, and doctors, medical practices, and the lawyers advising them must wait for the Illinois Supreme Court to tell us where on the spectrum they now lie.

### *Carter-Shields v. Alton Health Institute* and its progeny

Pending before the Illinois Supreme Court and awaiting a decision is *Carter-Shields v. Alton Health Institute.*[4] The plaintiff, Carter-Shields, is a physician who entered into an employment contract with Alton Health Institute ("AHI"). The employment contract contained a non-competition agreement requiring that for a period of two years from the date the contract was terminated, the plaintiff physician would not compete within a twenty-mile radius. The plaintiff physician subsequently terminated her relationship with AHI and initiated litigation by filing a declaratory judgment action against AHI seeking to have her employment contract declared invalid. AHI counterclaimed for injunctive relief, seeking to enforce the restrictive covenant. The trial court found the non-compete provision enforceable and enjoined Carter-Shields from violating it.[5]

The Illinois Appellate Court for the Fifth District reversed the trial court. First, the Appellate Court found that the corporate practice of medicine doctrine barred AHI from entering into an employment agreement with Carter-Shields. The court then stated that covenants not to compete are disfavored by the law because they are restraints of trade. The court refused to enforce the non-competition clause because it found that Carter-Shields essentially started a new business for AHI and that AHI did not have a near-permanent relationship with the patients. Accordingly, the court found that "the covenant in question restricts competition rather than protects any legitimate business interest of AHI...."[6]

However, the *Carter-Shields* court then took the analysis one step further. It

Plaintiffs
Exhibit B

cited the ethical rules of the American Medical Association's Council on Ethical and Judicial Affairs, which disfavor agreements between physicians that restrict the right of a physician to practice medicine for a specified period of time or in a specified area upon termination of employment or a partnership or a corporate agreement, because such restrictive agreements are not in the public interest. Relying by analogy on *Dowd & Dowd, Ltd. v. Gleason*,7 a case where the Illinois Supreme Court refused to enforce a non-competition clause for attorneys on the basis that Illinois Rule of Professional Conduct 5.6 prohibits partnership or employment agreements restricting a lawyer's right to practice law, the *Carter-Shields* court refused to enforce the non-compete on behalf of a physician. The court commented:

> The same public-policy arguments that prohibit lawyers from making such contracts are applicable to physicians. An agreement restricting the right of partners or associates to practice after leaving a firm limits not only their professional autonomy but also the freedom of clients to choose a lawyer. Similarly, an agreement restricting the right of a physician to practice medicine after leaving a health care provider such as AHI limits not only the physician's professional autonomy but also the patients' freedom to choose a doctor. The 20-mile restriction, even with the modification added by the trial court, would deprive at least some patients of an ongoing relationship with the physician of their choice.8

In making this statement, the Appellate Court did not follow the body of Illinois precedent enforcing physician non-compete agreements. Instead, it relied heavily on the AMA's rules. Interestingly, in 2000 the AMA published an Annotated Model Physician Employment Agreement that summarized, in chart form, several states' laws relating to covenants not to compete among physicians and practices. For Illinois, the AMA Annotated Agreement identified and summarized two Illinois cases upholding non-compete agreements. This suggests that at about the same time that the AMA interpreted Illinois law as allowing non-competition agreements among doctors, an Illinois court interpreted AMA guidelines as restricting them.

In *Prairie Eye Center, Ltd. v. Butler*,9 the Illinois Appellate Court for the Fourth District disagreed with *Carter-Shields*. The court distinguished the Illinois Supreme Court Rule prohibiting lawyer non-competition agreements from the AMA rule relating to physician competition, pointing out that the AMA's rule was merely advisory. On the other hand, the Illinois Supreme Court's rule is mandatory, has the force of law, and is indicative of public policy in the area of attorney conduct. The Fourth District noted that the AMA's rules are not codified and therefore do not establish public policy. While the court stated that there may be "no real difference in the concerns of clients in keeping or choosing lawyers of their own choice and patients in keeping or choosing doctors of their own choice," it felt constrained to follow the precedent prior to *Carter-Shields* that enforced non-compete clauses among physicians.

At least some trial courts around the state have chosen to follow the reasoning of *Carter-Shields*. For instance, Judge Duncan of the Circuit Court of DuPage County recently followed *Carter-Shields* in *Marwaha v. Woodridge Clinic, S.C.*, a case involving a non-compete agreement among physicians. Judge Duncan recognized that "[t]he same public policy arguments that prohibit lawyers from making [covenants not to compete], are applicable to physicians."10 Accordingly, based partially on the reasoning of *Carter-Shields*, he refused to enforce a doctor's covenant not to compete in granting a motion for summary judgment.

These conflicting decisions of the Illinois Appellate Court place doctors in a time of uncertainty in the law. Until the Illinois Supreme Court resolves this conflict, lawyers in Illinois will have to advise their clients that they cannot predict what will happen to their cases if they seek to enforce or defeat a doctor's non-competition agreement.

It is anticipated that the Illinois Supreme Court will provide guidance for physicians and courts to follow in this important area of the law. In the meantime, lawyers are advised to temper their advice to clients with great caution.

1 *See, e.g., Reinhardt Printing Co. v. Feld*, 142 Ill. App. 3d 9, 490 N.E.2d 1302 (1st Dist. 1986).

2 *See, e.g., Down & Dowd v. Gleason*, 181 Ill.2d 460, 693 N.E.2d 358 (1998).

3 *See, e.g., Canfield v. Spear*, 44 Ill. 2d 49, 254 N.E.2d 433 (1969) (enjoining a former associate physician from competing); *Cockerill v. Wilson*, 51 Ill. 2d 179, 281 N.E.2d 648 (1972) (upholding non-compete restriction for veterinarians); *Gillespie v. Carbondale & Marion Eye Centers, Ltd.*, 251 Ill.App.3d 625, 622 N.E.2d 1267 (5th Dist. 1993) ("Restrictive covenants between medical doctors are not detrimental to the public interest because the restricted doctor can be just as useful to the public in another location outside the restricted area; and the physician can always resume his practice in the restricted zone once the time duration of the covenant not to compete has expired...").

4 317 Ill. App. 3d 260, 739 N.E.2d 569 (5th Dist. 2000).

5 *Id.* at 264.

6 *Id.* at 269.

7 181 Ill. 2d 460, 693 N.E.2d 358 (1998).

8 *Carter-Shields*, 317 Ill. App. 3d at 270.

9 329 Ill. App. 3d 293, 768 N.E.2d 414 (4th Dist. 2002).

10 Report of Proceedings, July 2, 2002, J. Duncan, p.17 (01 MR 1020).

***David J. Fish*** *practices with The Collins Law Firm in Naperville and is a summa cum laude graduate of Northern Illinois University College of Law. David is the Vice Chairman of the DCBA Business Law and Practice Committee.*

***Chuck Corrigan*** *is a partner in The Collins Law Firm in Naperville. He received his B.S. in Economics from George-town University and his J.D. from the John Marshall Law School in Chicago. He concentrates his practice in business law and business litigation. He is a former chair of the DCBA Labor & Employment Law committee.*


Top of Page

[ Home | Site Map | Discuss | Links | Writing ]

# Covenants Not To Compete: A Primer

This essay arose from a discussion regarding non-competes on the bboard of a prominent open source tech firm (hereafter referred to as TechFirm). TechFirm's software, TechWare, is used by a number of Internet companies.

In most respects TechFirm is an enlightened company--the managers give their employees great individual responsibility and freedom. They have a strong commitment to education, and to highest levels of professional standards. Best of all, their software is open source.

However, TechFirm also requires employees to sign a two year non-compete agreement (which the company posted online). The non-compete agreement struck me as inconsistent with the company's overall philosophy. and during the discussions, I suggested several reasons why I thought that non-competes worked against both the long-term interests of both TechFirm and TechFirm's employees. However, at the time, I didn't know much about employment law with respect to non-competes, and decided to do a little research. This essay summarizes the results of that research. I also indulge in a bit of advocacy at the end.

Let me emphasize that I'm not an attorney, and the laws regarding non-competes vary from state to state. Caveat emptor.

## Why do employers require non-competes?

Like many employers, TechFirm invests a great deal in their employees. TechFirm pays large salaries, provides full health insurance, and often subsidize a number of other amenities for employees: expense accounts, Aeron chairs, corporate retreats. Furthermore, in addition to formal training classes, TechFirm absorbs the costs of on the job learning, as a new employee fumbles around learning Oracle, the Techware api, CVS, and the other tools in the Techware toolkit. Perhaps most importantly, TechFirm lends its reputation and goodwill to its employees, giving them the opportunity to build valuable relationships with customers and vendors.

If an employee leaves, TechFirm loses much of that investment.[1] Worse, former employees could potentially take the relationships they've developed with TechFirm's customers, employees, and vendors (at TechFirm's expense) to TechFirm's competitors, or start a competing business. TechFirm' CEO expresses this concern in his explanation of TechFirm's non-compete clause:

> "These agreements also prohibit employees from starting or working for businesses that directly compete with TechFirm. You might at first think that this is an outrageous restriction on your freedom. On the other hand, put yourself in an investor's shoes. Do you want to put money into a services company where they can use your money to build a good name for themselves,

Plaintiff's
Exhibit
C

then a big group splits off to form a new, virtually identical business? Now recall that you, in virtue of your employee stock options, are actually an investor in TechFirm as well. So you really want to make sure that investors get what they pay for."

# What is a "covenant not to compete"?

To discourage former employees from competing with them, TechFirm currently requires all new employees to sign an employee agreement that includes this "covenant not to compete" clause (2):

> (a) Non-Compete Agreement. Employee acknowledges and agrees with the Compa that the Company would be irreparably damaged if Employee were to provide Employee accordingly covenants and agrees that for a period commencing the employed by the Company, Employee will not directly or indirectly own, ope employed by or assist in any way any entity which is competitive with the with" or "competitive with" the Company if its core business is the provision of [TechWare-like software].

"Covenants not to compete" such as this one are one of several "restrictive covenants" that employers use to protect themselves from competition by former employees. They fall into into four general categories:

> "(1.) "non-compete agreements," barring a "unique" former employee from working for competitors;
>
> (2) confidentiality agreements, barring a former employee's use of the former employer's sensitive information and trade secrets;
>
> (3) non-solicitation agreements," preventing a former employee from soliciting a former employer's customers; and
>
> (4) non-recruitment agreements, precluding a former employee from hiring employees of the former employer."

(Hartje, Paley, Ritter, 1999)

# What body of law governs non-compete agreements?

Non-compete agreements and other restrictive covenants are governed by state law. As a result, the enforcement of non-compete agreements varies from state to state. Some states are more firm-friendly than others--the courts and precedents in those states tend support the enforcement of non-compete agreements. However, even firm-friendly courts will strike down agreements that they believe unreasonably restrict the employee's ability to practice his/her profession.

# What determines whether a non-compete agreement can

## be enforced?

Most state laws are based on English Common law precedents. Under common law, employers don't have the right to protect themselves from competition, only from "unfair competition" by former employees who, by virtue of their employment at the firm, have gained some unfair advantage.

In general, the courts use the following three criteria to determine whether a non-compete agreement is valid:

1. Does the employer have a "legitimate interest" that must be protected?

2. Is the requested protection narrowly tailored to only address that legitimate interest?

3. Is the requested protection an unreasonable burden upon the employee?

If a non-compete agreement fails to meet any one of the criteria above, the courts will generally refuse to enforce it.

## What constitutes a legitimate interest?

The court's definition of a "legitimate interest" varies from state to state, but most states have ruled that "...[as] a general rule, an employer has no protectable interest in its clients." (Instrumentalist Co. v. Band, 1985, quoted from Balough, 1998).

However, courts have recognized a legitimate interest under the following conditions:

1. Where the former employee acquired confidential information through his employment [such as trade secrets and customer lists] and subsequently attempted to use it for his own benefit, and
2. Where the employer has a near permanent relationship with its customers and but for his association with the employer, the employee would not have contact with the customers.

(Balough, 1998)

The factors to consider whether an employer has a "near permanent relationship" with its customers include:

1. The length of time required to develop the clients;
2. The amount of money invested to acquire clients;
3. The degree of difficulty in acquiring clients;
4. The extent of personal contact by the employee;
5. The extent of the employer's knowledge of its clients;
6. The duration of the customer's association with the employer; and
7. The continuity of the employer-customer relationship."

(Balough, 1998)

The courts will also occasionally enforce a non-compete agreement when the employee has "unique or extraordinary" skills they gained as a result of their employment. What determines whether an employee's services are unique or extraordinary? As a rule, "...apart from a few performing artists, employees services are rarely found to be unique. Thus, regardless of how successful, skilled or valuable a salesperson or executive is, in the business world, a covenant not to compete will generally not be valid unless the prohibition is limited to protection only of the employer's trade secrets or other confidential information...." (Frank and Branch, 2000)

# What constitutes an unreasonable burden on an employee?

In general, courts will enforce agreements that meet the following criteria:

## Reasonable Geographic Scope

The geographic restriction must be related to the area where the employee was doing business.

> "....With respect to the geographic scope of non-competition covenants, courts generally look to whether the restricted area is coextensive with the area in which the employer is doing business and have upheld as reasonable even those covenants containing no geographical limitation where the employer was doing business nationwide and the purpose of the restriction was to protect the employer from losing customers to a former employee who, by virtue of his prior relationship, gained special knowledge and familiarity with the customer's requirements...." .(Arpac v. Murry, 1992 quoted from Balough, 1998)

What about Internet firms? Since Internet firms compete nation wide, would a national geographic scope be considered reasonable? The answer is a qualified yes.

> "...A nationwide covenant not to compete may be reasonable where the employer is an Internet-related business, since the Internet is not limited by state boundaries. (National Business Services v. Wright, 1998 quoted from Zak, 2000)

However, the time restrictions and customer/competitor scope of the agreement will also have an influence on whether the geographical restriction is considered reasonable.

## Reasonable Time Restrictions

According to (Balough, 1998),

> "One measure of the reasonableness is the amount of time needed to acquire and maintain clients. Courts have found a restriction of two years to be reasonable where it took the employer "a great deal of time" to acquire and maintain clients. Millard Maintenance Service Co. v. Bernero, 207 Ill. App. 3d 736, 750, 566 N. E. 2d 379 (1990). A term of five years was reasonable "[b] ecause of the nature of the industry and the time involved in the manufacture

and marketing of the machinery" where the former employer. s customers had a five year relationship with the manufacturer. Arpac at 79"

For Internet firms, given the rate at which the Internet industry changes, the courts have demonstrated a willingness to strike down non-competes of even one year duration. For example, here's court's reasoning in the EarthWeb v. Schlack case:

> "EarthWeb, an online publisher of IT materials, sought to enforce a twelve-month non-compete covenant against its former Vice President in charge of publishing content. At the time of his departure, the former officer informed EarthWeb that he was joining ITworld.com, one of EarthWeb's start-up competitors.
>
> Although EarthWeb's covenant not to compete was limited in scope to companies which "directly compete" with EarthWeb by providing IT information or software online to IT professionals and developers, the court refused to enforce the covenant. The court found that the twelve-month period was too long given the dynamic nature of the industry and its lack of geographic borders. The court reasoned that, when "measured against the IT industry in the Internet environment, a one-year hiatus from the work force is several generations, if not an eternity." (Regan and Burton, 1999)

In another case (Sprint, v. DeAngelo), a Kansas federal court similarly held that a three-year covenant not to compete involving an employee responsible for Internet telecommunications was unreasonable because of the "explosion of technology". (Sprint v. DeAngelo, 1998 quoted from Zak, 2000)

### Adequate consideration.

If the employee enters into a restrictive covenant in exchange for a significant raise or promotion, or the employer compensates the former employee for the non-compete period, the court is much more likely to enforce the restriction. (Hartje and Paley, 2000)

### Narrowly defined class of off-limits customers and competitors.

Courts are more likely to enforce restrictions limited to those customers with whom the former employee dealt during his/her employment. The courts are also more likely to support agreements that name specific competitors, rather than any potential competitor.

## What about California?

California is unusual in that, since 1872, when it implemented the Field Code 3, it has banned covenants not to compete. Only two other states, Colorado and North Dakota, also ban covenants not to compete. (Hyde, 1998)

The relevant portion of the California Business & Professions Code § 16600 provides that, in the absence of a statutory exception, "....'every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void.' This statutory declaration is supported by the judicially recognized right of an employee to

use the skills and general knowledge gained during employment to compete with the former employer...."(quoted from Rutter, 2000).

The only non-compete agreements upheld by California courts are those signed when a business owner sells his/her business to someone else and agrees not to compete with the new owner.

What if someone signs a non-compete agreement in say, Boston, but then goes to work for a competing company in California? Will California courts enforce the out-of-state agreement?

The answer, most likely, will be no--even if the employee continues to live in Boston! According to (Brobeck, et al. 2000):

> "A California company had hired a Maryland resident who had previously worked for a Maryland company. The employee's employment agreement with the Maryland company prohibited her from working for a competing company during her term of employment and for one year following her termination. The California company hired the employee in California, although she continued to reside in Maryland. After the Maryland company sued the California company and the employee in Maryland court, the California company and the employee sued in California seeking a declaratory judgment that California law, rather than Maryland law, governed. The court had to decide "which state has a material greater interest in the determination of the issue and which state's interests would be more seriously impaired if its policy were subordinated to the policy of the other state." The Court of Appeal observed the following:

>> In this day and age-with the advent of computer
>> technology and the concomitant ability of many types
>> of employees in many industries to work from their
>> homes, or to "telecommute" to work from anywhere a
>> telephone link reaches-an employee need not reside
>> in the same city, county, or state in which the
>> employer can be said to physically reside. California
>> employers in such sectors of the economy have a
>> strong and legitimate interest in having broad freedom
>> to choose from a much larger, indeed a "national,"
>> applicant pool in order to maximize the quality of the
>> product or services they provide, as well as the reach
>> of their "market." California has a correlative interest
>> in protecting its employers and their employees from
>> anti-competitive conduct by out-of-state employers .
>> . .-including litigation based on a covenant not to
>> compete to which the California employer is not a
>> party-who would interfere with or restrict these
>> freedoms."

(Brobeck, et al. 2000)

# What happens if the court finds that the employer has written an overreaching contract?

In some jurisdictions, "[i]f a court deems a covenant not to compete unreasonable, the entire document usually fails. Courts try not to get into the business or rewriting contracts. If an employer draws up a anticompetitive agreement that is unduly restrictive, he has little right to complain if the court invalidates the entire document." (Slaughter, 1993)

The court may also apply other penalties. In Texas, for example, if the court finds the non-compete agreement overbroad:

1. "The court may not award the employer damages for a breach of the covenant before its reformation, and any relief granted is limited to injunctive relief. Tex. Bus. & Com. Code § 15.51(c).

2. If the employee can prove the employer knew at the time the agreement was executed that the restrictions were not reasonable and necessary, and the employer sought to enforce a covenant to a greater extent than necessary to protect its goodwill and business interest, the court may award the employee attorney?s fees and costs incurred in defending an action to enforce a covenant. Tex. Bus. & Com. Code § 15.51(c); and

3. While the Texas statute specifically employs the courts to reform an overbroad covenant, that is not true in all states. Thus, if the court finds the covenant overbroad as written, it may simply hold it completely invalid and unenforceable." (Strock, Collins, Holley 2000)

That said, depending on the jurisdiction, the courts will also sometimes allow companies to rewrite the overbroad portions of the contract.

## Implications for TechFirm

The evidence is mixed on whether the nation-wide scope of TechFirm's agreement is enforceable. The National Business Services vs. Wright precedent tends suggests that the national scope of TechFirm's agreement would be enforced.

On the other hand, "...a New York court rejected an employer's effort to enforce worldwide non-compete agreements against four former executives of a global banking firm..." (Bankers Trust v. Ray, 1999, quoted from Hartje, et al. 1999)

However, the courts in the Bankers Trust v. Ray case suggested that such an agreement might have been enforceable had the employer opted for a shorter term. This suggests that if the duration, and off-limit customers/competitors are defined narrowly, then nationwide geographic scopes may be allowed.

This leads to the biggest problem with TechFirm's non-compete: the duration. Former employees may not work for any firm doing web development for two years after leaving. Given the Earthweb vs. Schlack and Bankers Trust Corp v. Ray precedents, the two-year duration would likely be struck down as unreasonable.

Other problems:

1. The clause doesn't distinguish between employees who leave voluntarily and employees who are fired or down-sized. Courts look much more favorably on non-competes if they only apply to employees who leave voluntarily.

2. There's no "due consideration", aside from the promise of employment.

3. The clause appears to attempt to limit competition, not just "unfair competition". The non-compete restricts the employee not just from customers they've developed a relationship with at TechFirm, at TechFirm's expense, but with any potential customer, including those with whom the employee may have never had a relationship.

4. Courts will not likely agree that TechFirm's employees to have unique or extraordinary skills. After all, TechFirm's software is taught widely in a number of universities (MIT, Caltech, Berkeley, Stanford, Carnegie Mellon).

5. TechFirm employees probably have access to few trade secrets that courts would consider a "protectable interest." Given the free, open source nature of TechFirm's software, it's difficult to see how an employee could give an unfair advantage to a competitor that the competitor didn't already have. It seems unlikely that the courts would apply the "inevitable disclosure" doctrine (the idea that employees can't help but disclose trade secrets when working for a competitor) that has been used to prevent some employees from working for a competitor, even in the absence of a non-compete agreement.

Moreover, at least one of TechFirm's current upper managers was wooed from another technology firm. It seems likely that TechFirm will want to woo other high quality employees away from other competitors in the future, some of whom may have their own non-compete agreements. TechFirm may find it difficult to win future disputes in court, if TechFirm's own non-compete clause is as restrictive (or more restrictive) as their rivals.

If TechFirm does take a former employee to court, an overly broad restriction will likely hurt TechFirm's reputation within the programmer labor pool. Earthweb probably found that they had greater difficulty attracting high quality employees following their highly publicized case against Schlack and ITworld.com. Given, the problems above, I doubt that, in most jurisdictions, the non-compete agreement would be enforced as written.

## What could TechFirm do to make the clause more enforceable?

TechFirm could take a number of steps to increase the likelihood that the agreement will be enforced:

1. Reduce the duration of the non-compete period from 2 years to 6 months. Given the rapid pace of development in the internet industry, 6 months is the longest time that a court is likely to accept.

2. Word the clause so that it only takes effect if the employee leaves the job voluntarily.

3. Limit the prohibited competition to the companies that TechFirm believes to be most important, e.g. Microsoft, Oracle.

4. Restrict non-solicitation to only those customers that have had business dealings with the employer.

5. Limit the non-compete clause to employees in a management position.

6. Offer to continue to pay 80% of the employee's salary for 6 months after leaving, provided that they refrain from working for a direct competitor.

7. Instead of a national/global geographic scope, limit the non-compete region to 100 mile radius of the employee's former location. Although TechFirm's market is global in nature, most of the risk would seem to come from the potential loss of customer's in the employee's immediate area.

However, even if TechFirm does all of the above, the clause would still not likely be enforceable in California. Given the size of the Internet market in California, trying to enforce the clause will likely be like trying to swat gnats with a tennis racket--you may squash a few, but most will escape through the big gaping holes.

## Non-competes stunted Route 128's growth

Here's the advocacy part I warned you about.

To be fair, non-competes alone did not stunt Route 128's growth-- rather, Route 128's restrictive culture (of which non-competes are just a part) stunted the regions growth relative to the Silicon Valley. To support this contention, I'll draw heavily on the research by AnnaLee Saxenian (professor in the Department of City and Regional Planning at the University of California at Berkeley) in her book, *Regional Advantage: Culture and Competition in Silicon Valley and Route 128. (4)*.

In the following extended quote, Allan Hyde (economist at Rutgers University) summarizes Saxenian's arguments. All emphasis in the following quotes are mine.

"...Saxenian seeks to explain why Silicon Valley decisively passed Route 128 in the 1980's. Each region was a well-known center of the computer industry by the early 1970's. Each had strong ties to local universities, grew strong on defense contracting, but diversified into civilian production. Each employed workforces of roughly equal size in 1975. Yet between 1975 and 1990, California generated three times as many jobs as Massachusetts; in that year Silicon Valley-based producers exported electronics products worth more than twice as much as Route 128's. What accounts for the difference? In Saxenian's words:

Silicon Valley has a regional network-based industrial system that promotes collective learning and flexible adjustment among specialist producers of a complex of related technologies. The region's dense social networks and open labor markets encourage experimentation and entrepreneurship. Companies compete intensely while at the same time learning from one another about changing markets and technologies through informal communication and collaborative practices; and loosely linked team structures encourage horizontal

communication among firm divisions and with outside suppliers and customers. The functional boundaries within firms are porous in a network system, as are the boundaries between firms themselves and between firms and local institutions such as trade associations and universities.

The Route 128 region, in contrast, is dominated by a small number of relatively integrated corporations. Its industrial system is based on independent firms that internalize a wide range of productive activities.*Practices of secrecy and corporate loyalty govern relations between firms and their customers, suppliers, and competitors, reinforcing a regional culture that encourages stability and self-reliance.* Corporate hierarchies ensure that authority remains centralized and information tends to flow vertically. The boundaries between and within firms and between firms and local institutions thus remain far more distinct in this independent firm-based system. (5)

Although Silicon Valley has many more firms, and many more small firms, these firms are linked by informal ties. High labor mobility among firms is central to the formation of these ties, dwarfing other sources (such as Stanford University School of Engineering). "During the 1970s, average annual employee turnover exceeded 35 percent in local electronics firms and was as high as 59 percent in small firms. It was rare for a technical professional in Silicon Valley to have a career in a single company. An anthropologist studying the career paths of the region's computer professionals concluded that job tenures in Silicon Valley averaged two years."(6) *Because professionals know and have worked with peers at other firms, there is a great deal of informal know-how sharing across firm boundaries.(7) Saxenian's book includes a number of specific comparisons in which small, nimble Silicon Valley firms, working with subcontractors and customers, were able to steal a march on the few large firms dominating Route 128."* (Hyde, 1997)

For a specific comparison between Silicon Valley and Route 128 companies, see Saxenian's essay The Limits of Autarky: Regional Networks and Industrial Adaptation in Silicon Valley and Route 128 Here's a few relevant quotes, on the differences between HP and DEC:

"Variations in corporate performance always have multiple causes, but the firms' organizational structures and their relationships to their respective regions help explain these differences. DEC maintained clear boundaries between itself and other companies or institutions in the region. This was, in part, a result of extensive vertical integration: the firm designed and manufactured internally virtually all software and hardware components for its computers internally. *Moreover, DEC's corporate culture rewarded secrecy and corporate loyalty; departed employees were typically treated like pariahs and cut off from the corporate "family" (Rifkin & Harrar, 1990).* As a result, the technical and social networks that mattered were all internal, and there were few opportunities for collaboration, learning, and exchange with other local firms.

HP was both less dominant in Silicon Valley and more open to the surrounding economy. DEC dominated the Route 128 region in a way that no firm did in Silicon Valley. With more than 30,000 Massachusetts employees in 1990, DEC accounted for almost 20 percent of regional high-technology employment,

whereas HP's 20,000 Silicon Valley employees were only 8 percent of the regional total. HP benefitted from a long history of participation in the region's rich associational life and fluid labor markets. Continuous and open exchange about everything from the latest start ups to technical breakthroughs allowed local engineers to stay at the leading edge of new computing technologies and market trends (Vedoe, 1990). HP's decentralized divisional structure also offered an ideal training ground for general managers. *Former HP executive were responsible for starting more than 18 firms in Silicon Valley between 1974 and 1984, including such notable successes such as Rolm, Tandem, and Pyramid Technology (Mitchell, 1989)... aside from Data General, it is difficult to identify successful spin-offs from DEC."* (Saxenian, 1995)

Of course, it's unlikely that any theory of regional development can ever be definitively confirmed. Whether one region grows faster than another probably depends a good deal on lucky virtuous circles--maybe if William Shockley had been born in Boston instead of Palo Alto, Saxenian would be singing the virtues of DEC's closed organizational structure instead of HP's openness.

## Conclusion

During the discussion on Techfirm's bboards, several people indicated that TechFirm adopted the non-compete clause as part of a standard boilerplate contract. The legal precedents above suggest that, as written, TechFirm's non-compete agreement would not be enforceable in most jurisdictions. TechFirm could greatly improve the legal effectiveness (and palatability) of the non-compete clause by reducing the length of the restriction to six months.

On the other hand, Saxenian's research suggests that restrictive corporate cultures impede economic growth. As a vestigial manifestation of a restrictive culture, it may be in TechFirm's best interests to drop this bit of boilerplate altogether. 8

## Footnote

1. To some degree, due to the open source nature of their software, TechFirm continues to derive some benefit from former employees. For example, one employee is a key leader of a project to an important platform that TechFirm doesn't currently support. Another former employee wrote answered a lot of newbie questions on TechFirms bboards, and wrote a number of tutorials that probably saved thousands of man hours of wasted time.

2. Not all TechFirm offices require non-competes. According to a TechFirm employee in Munich, German law requires a company to continue pay an employee's salary for the duration of the non-compete clause. So TechFirm-Germany's offices don't include the non-compete clause.

3. The Field Code is a body of civil law influenced by the Napoleonic Codes, and Louisiana Civil Law. It was named after David Dudley Field, the principal author and advocate of the Code. See THE CALIFORNIA CIVIL CODE By ARVO VAN ALSTYNE Professor of Law, University of California at Los Angeles 6 West's Annotated California Codes 1-43 (1954))] Accessed on November 24, 2000 from http://www.acusd.edu/lrc/civil_code.html

(Note: footnotes 4 - 7 are taken directly from (Hyde, 1997) at
http://andromeda.rutgers.edu/~hyde/caucus1.html#N_4_)

4. AnnaLee Saxenian, Regional Advantage: Culture and Competition in Silicon Valley and
Route 128 (1994). See also Paul Milgrom & John Roberts, The Economics of Modern
Manufacturing: Technology, Strategy, and Organization, 80 Am.Econ.Rev. 511 (1990).

5.AnnaLee Saxenian, supra n.4, at 3-4.

6. Saxenian at 34-35, quoting American Electronics Association, Technical Employment
Projections (1981)(statement of Pat Hill Hubbard). "[I]nter-firm worker mobility is a
permanent feature of the labor market for semiconductor engineers, rather than an
occasional symptom of job shopping during periods of rapid employment growth....Job
changing is likely to be especialy frequent in Silicon Valley. Within this industrial complex,
small specialized semiconductor producers typically depend upon the external labor market
(as opposed to the internal labor market of the firm) to meet their demands for skilled and
experienced workers...." David P. Angel, The Labor Market for Engineers in the U.S.
Semiconductor Industry, 65 Econ. Geog. 99, 103 (1989). In this nationwide survey of
semiconductor engineers, half the job changes reported were moves in which both the old
and new employers were located within Silicon Valley. 65 Econ. Geog. at 106.

7. There is increasing recognition in the economics literature that, in the real world, firms
share significant information and knowledge across firm boundaries, and that willingness to
do so can play a significant role in economic growth. The most important study is Eric von
Hippel, The Sources of Invention 76-92 (1988), on "informal know-how training",
engineers asking their counterparts at rival firms questions, that will be answered unless the
answer is both secret and crucial to the firm. For a historic study, see Robert C. Allen,
Collective Invention, 4 J.Econ.Behav.& Org. 1 (1983)(19th Century British iron and steel),
which von Hippel suggests (at 84) may more accurately depict "informal know-how
trading" than genuine "collective invention." See also Charles F. Sabel, Learning by
Monitoring: The Institutions of Economic Development, in Handbook of Economic
Sociology (Neil Smelser & Richard Swedberg eds. 1994); Walter W. Powell, Inter-
Organizational Collaboration in the Biotechnology Industry, 152 J.Inst.& Theoret. Econ.
(1996), and the interesting comment by Henry Hansmann, What Determines Firm
Boundaries in Biotech?, 152 J.Inst.& Theoret.Econ. (1996).

8. I bet you didn't see that conclusion coming...:>

# Bibliography

1. American Bar Association, Section on Labor and Employment Law (BNA)
   Covenants Not to Compete: A State-by-State Survey, Second Edition, (1996).

2. Arpac Corp. v. Murray, 226 Ill. App. 3d 65, 76, 589 N.E.2d 640 (1st Dist., Second
   Div. 1992)

3. Balough, R.C. (1998) Covenants Not To Compete or Trade Secret: Which Is Better
   When A Key Employee Walks Out the Door? Presented to the Intellectual Property
   Law Association of Chicago's Trade Secrets Seminar on December 1, 1998. Accessed
   on November 24, 200 from: http://www.balough.com/writings/covenant.asp

4.  Bankers Trust Corp. v. Ray, (NYLJ October 5, 1999 p. 26,

5.  BDO Seidman v. Hirshberg, 690 N.Y.S.2d 854 (Ct.App. 1999)

6.  Brobeck, Phleger, & Harrison, LLP (2000) Labor and Employment Update, July 2000
    Accessed on November 24, 2000 from
    http://www.brobeck.com/articles/labor/lab0700cc.asp

7.  Earthweb, Inc. v. Schlack, 71 F.Supp.2d299 (S.D.N.Y. 1999)

8.  Frank, J.S. Branch, K.H., (2000) Phillips Nizer Benjamin Krim & Ballon,LLP New
    York, New York U.S.A. Enforcement of Covenants Not to Compete And Other
    Restrictive Covenants In the United States Accessed on November 24, 2000 from:
    http://www.phillipsnizer.com/artnew43.htm

9.  Hartje, J. Paley, M.D. Ritter, P. (1999) Kronish Lieb Weiner & Hellman, LLP.
    October/November/December 1999 Interlawer Accessed on November 24, 200 from:
    http://www.klwh.com/domino/html/Kronish/Krev.nsf/9e2fff546f21ce618625664b00621f0c/
    OpenDocument

10. Hyde, A. (1997) Professor of Law and Sidney Reitman Scholar Employee identity
    caucuses in Silicon Valley: can they transcend the boundaries of the firm? Labor Law
    Journal, August 1997, p. 491-97 Accessed on November 24, 2000 from:
    http://andromeda.rutgers.edu/~hyde/caucus1.html

11. Hyde, A. (1998) Professor of Law and Sidney Reitman Scholar Rutgers School of
    Law The wealth of shared information: Silicon Valley's high-velocity labor market,
    endogenous economic growth, and the law of trade secrets. September 1998 Accessed
    on November 24, 2000 from: http://andromeda.rutgers.edu/~hyde/WEALTH.htm

12. Instrumentalist Co. v. Band, Inc., 134 Ill. App. 3d 884, 892, 480 N. E. 2d 1273 (1st
    Dist., Fifth Div. 1985).

13. Mitchell, J. (9 Jan 1989). HP sets the tone for business in the valley. San Jose
    Mercury News.

14. National Business Services, Inc. v. Wright, 2 F.Supp.2d 701 (E.D. Pa. 1998)

15. Rifkin, G. & Harrar, G. (1990). The ultimate entrepreneur: The story of Ken Olsen
    and Digital Equipment Corporation. Rocklin, CA: Prima Publishing.

16. Rutter, D.M. Four Things Dotcoms Should Do When There Isn't Enough Time to Do
    Anything Wednesday, September 27, 2000 Electronic Commerce and Law Volume 5,
    Number 37 Accessed on November 24, 2000 from:
    http://subscript.bna.com/SAMPLES/eip.nsf/b3e99e4adbdfc8cc85256480004f6e47/c3ec340d
    OpenDocument

17. Saxenian, AnnaLee (1994) Regional Advantage: Culture and Competition in Silicon
    Valley and Route 128. Harvard University Press, 1994.

18. Saxenian, AnnaLee (1995) The Limits of Autarky: Regional Networks and Industrial Adaptation in Silicon Valley and Route 128. Seminar on the History of Science and Technology at Stanford University on May 25, 1995. Accessed on November 27, 2000 from: http://acomp.stanford.edu/siliconhistory/Saxenian/limits.html

19. Slaughter, J. (2000) Anti-Competitive Pacts: When Are They Reasonable" The Business Weekly of the Greensboro News & Record December, 1993 Accessed on November 24, 2000 from: http://floydandjacobs.com/covenants.htm

20. Sprint Corp. v. DeAngelo, 12 F.Supp.2d 1188 (D.Kans. 1998).

21. Strock, W.C. Collins, J.M. Holley, M.W. (2000) Strategies for Retaining Key Employees and Termination Non-Performer In Key Positions While Protecting Trade Secrets and Confidential Information Southern Methodist University Law Review Association?s 8th Annual Corporate Counsel Symposium Octover 27, 2000 Accessed on November 24, 2000 from: http://www.hayboo.com/briefing/10_27_00Strock.htm

22. Vedoe, C. (1990). Manager Workstation Marketing, Sun Microsystems, personal communication of AnnaLee Saxenian.

23. Zak, C.A.(2000) Reed, Smith, Shaw and McClay, LLP. How to Negotiate A Job Offer: Covenants Not To Compete. January 31, 2000 Accessed on November 24, 2000 from http://www.geekeducation.com/joboffer/non-competes.html.

---

Send questions about the site to:
*Chris Rasch<crasch@openknowledge.org>*
Last modified: Wed Dec 13 17:44:53 MST 2000

Add a comment/View Comments

Cases & Codes

> slip Cal.App.4th

>                >         >
2005/g034387

Powered
By

# Jones v. Humanscale Corp. (2005) , Cal.App.4th

[No. G034387. Fourth Dist., Div. Three. Jun. 17, 2005.]

KEVIN JONES, Plaintiff and Respondent, v. HUMANSCALE CORPORATION, Defendant and Appellant.

(Superior Court of Orange County, No. 03CC05245, Kirk H. Nakamura, Judge.)

(Opinion by Rylaarsdam, Acting P. J., with Moore, J., and Fybel, J., concurring.)

## COUNSEL

Declues & Burkett, Glenn S. Goldby and Gregory A. Wille for Defendant and Appellant.

Ferruzzo & Worthe, David N. Shaver and Colleen M. McCarthy for Plaintiff and Respondent. {Slip Opn. Page 2}

## OPINION

### RYLAARSDAM, ACTING P. J.-

Defendant Humanscale Corporation appeals from an order denying its petition to confirm an arbitration award and granting plaintiff Kevin Jones's counter petition to vacate the award. (Code Civ. Proc., § 1294, subds. (b) & (c).) The trial court concluded the award violated California's public policy against covenants not to compete and also erroneously obligated plaintiff to pay part of the expenses of arbitration. The first ground contradicts the doctrine of arbitral finality and the latter merely supports a correction of the award. We also reject plaintiff's alternative claims that the parties' contract is illegal, the arbitrator exceeded his authority by deciding plaintiff's claim for unpaid wages, and the arbitration clause is unconscionable. We reverse the order with directions to correct

Plaintiff's Exhibit D

the invalid division of the arbitration expenses and, as so corrected, confirm the award.

## FACTS

Defendant, which manufactures and sells ergonomic office products, is incorporated in New York and has sales and manufacturing facilities in New Jersey. In late 2000, plaintiff began working as a regional manager for a company affiliated with defendant. At that time he executed a written contract containing noncompetition and arbitration clauses and a choice of law provision applying New York law.

In February 2002, the parties entered into a written agreement that appointed plaintiff as a sales consultant for defendant. The agreement declares it "shall be construed in accordance with the law of the State of New Jersey," and "[a]ny dispute involving the performance, interpretation of [*sic*] breach of this agreement or the relationship created hereby, including . . . disputes involving . . . discrimination and other rights and protections afforded by . . . law shall be submitted to binding arbitration in {Slip Opn. Page 3} New Jersey before . . . the American Arbitration Association . . . in accordance with the rules of that Association."

Paragraph 9 barred plaintiff "for a period of two years after termination of this Agreement" from selling "Humanscale products or any other products competitive with" its products "to any potential purchaser including, . . . [¶] . . . [c]ustomer locations or accounts previously called upon or developed by" either plaintiff or defendant or which defendant "assigned to" plaintiff. In addition, paragraph 9 declared, "If any provisions of this paragraph are deemed unenforceable by any court or arbitrator, that court or arbitrator shall have the right to modify the affected provisions so as to render them enforceable." Paragraph 10 prohibited plaintiff from disclosing defendant's trade secrets, including customers' names and addresses.

Defendant terminated plaintiff's employment on July 7, 2002. Several months later, defendant filed a formal demand for arbitration with the American Arbitration Association in New Jersey, citing plaintiff's alleged violation of the agreement's noncompetition and nondisclosure of trade secrets provisions.

In April 2003, plaintiff filed the present action in California, alleging causes of action for failure to timely pay wages, declaratory relief, and unfair competition. Shortly thereafter, defendant filed suit in New Jersey to enforce the arbitration clause contained in the agreement. In the California action, plaintiff moved to stay the arbitration, while defendant responded with a request to stay the action pending completion of the arbitration. After a New Jersey court issued an order directing the parties to proceed with the arbitration, the California court granted defendant's motion to stay. We summarily denied plaintiff's petition challenging that order.

Plaintiff then filed a motion with the arbitrator to dismiss the arbitration, in part asserting that "under New Jersey choice of law analysis," paragraph 9's {Slip Opn. Page 4} interpretation is governed by California law, which renders "covenants not to compete . . . void as a matter of . . . public policy." The arbitrator denied the motion. While acknowledging "California has adopted a fundamental policy protecting the freedom of employees to pursue their trade or profession," the arbitrator found "[e]very state, including New Jersey, is concerned about its employees," and "California courts have enforced covenants that impose only incidental or partial restraints." Citing the "limited nature" of defendant's proposed injunction, which sought to bar plaintiff from "'solicit[ing] or sell[ing] competing products to those Humanscale customers to who[m] he was assigned or had contact,'" the arbitrator concluded "California's interest . . . [was not] materially greater than that of New Jersey

['s]." In a letter sent shortly before the hearing began, the arbitrator informed the parties that, "[a]fter reading your various submissions and the supporting authority concerning the arbitrability of [plaintiff's] wage claim, I have concluded that the claim is arbitrable and that the claim should be determined as part of the pending arbitration."

The arbitration was conducted in New Jersey in January 2004. Subsequently, the arbitrator issued his award "in full settlement of all claims and counterclaims submitted . . . ." First, it declared plaintiff could not, "until July 7, 2004," either "sell[]or offer[]to sell" defendant's products "or any product directly in competition with such products to . . . any customer" he "called on . . . during the term of his agreement" or who was "previously called on by [defendant] and specifically assigned" to plaintiff, nor could he "disclos[e]. . . any confidential information or trade secrets provided to [him] by [defendant] . . . ." Second, the award ordered plaintiff to pay defendant over $17,500 "as damages for the sale of products in violation of the agreement between the parties," and also found plaintiff had been paid "all wages and bonuses to which [he] is entitled." Finally, it declared "[t]he administrative fees . . . {Slip Opn. Page 5} and . . . compensation of the arbitrator[] . . . shall be borne equally by the parties," and directed plaintiff to pay defendant as his share "the sum of $12,194.00."

Defendant filed a petition in this action to confirm the arbitrator's award. Plaintiff opposed the petition and alternately requested the court to vacate the award. He claimed the award was based on an illegal contract that violates California's policy against covenants not to compete, improperly ruled on his wage claim, and violated California law by requiring him to pay part of the arbitration's expenses.

The trial judge denied defendant's petition and granted plaintiff's request. He declared: "[T]he arbitrator's award is not legal on its face, and it violates the public policy in California as expressed in Business and Professions Code section 16600 . . . as well as awards costs and fees against the employee . . . . [¶] In my review of the arbitrator's award[,] it appears that the arbitrator applied New Jersey law when it appears to the court that California law . . . should apply under a choice of law analysis."

## DISCUSSION

### Introduction

California public policy supports the use of private arbitration to resolve disputes. (Code Civ. Proc., § 1280 et seq.; *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9.) To promote this alternative means of dispute resolution, the law minimizes judicial intervention in the proceedings, in part, by the doctrine of arbitral finality. (*Moncharsh v. Heily & Blase, supra,* 3 Cal.4th at pp. 8-10.) Thus, "the general rule [is] that 'an arbitrator's decision cannot be reviewed for errors of fact or law.' [Citation.]" (*Aguilar v. Lerner* (2004) 32 Cal.4th 974, 981-982.) "[B]oth because it vindicates the intentions of the parties that the award be final, and because an arbitrator is {Slip Opn. Page 6} not ordinarily constrained to decide according to the rule of law, it is the general rule that, 'The merits of the controversy between the parties are not subject to judicial review.' [Citations.] More specifically, courts will not review the validity of the arbitrator's reasoning. [Citations.] Further, a court may not review the sufficiency of the evidence supporting an arbitrator's award. [Citations.]" (*Moncharsh v. Heily & Blase, supra,* 3 Cal.4th at p. 11.)

There are limited grounds whereby a court may vacate or correct an arbitration award. (Code Civ. Proc., §§ 1286.2 & 1286.6.) The only statutory basis on which plaintiff relies is that "[t]he arbitrator

[] exceeded [his] powers and the award cannot be corrected without affecting the merits of the decision upon the controversy submitted." (Code Civ. Proc., § 1286.2, subd, (a)(4).) An appellate court reviews a determination of whether an arbitrator has exceeded his or her powers de novo, but displays substantial deference towards the arbitrator's determination of his or her contractual authority. (*Jordan v. Department of Motor Vehicles* (2002) 100 Cal.App.4th 431, 443-444; see also *O'Flaherty v. Belgum* (2004) 115 Cal.App.4th 1044, 1056.) All reasonable inferences must be drawn in support of the award. (*Ajida Technologies, Inc. v. Roos Instruments, Inc.* (2001) 87 Cal.App.4th 534, 541.)

The trial court gave two reasons for vacating the arbitration award; it enforced a covenant not to compete that violated California law, and it erroneously obligated plaintiff to pay part of the arbitration fees and expenses. On appeal, plaintiff relies on these and several additional grounds to affirm the order.

### *The Enforceability of the Covenant Not to Compete*

Plaintiff argued, and the trial court agreed, that the arbitrator erred by both applying New Jersey law to determine the enforceability of paragraph 9 and upholding {Slip Opn. Page 7} the covenant not to compete. In addition, plaintiff contends the arbitrator exceeded his powers by "award[ing] Humanscale monetary damages arising from an alleged violation of the . . . covenant not to compete" and by "unlawfully reform[ing] [the covenant] . . . to make it enforceable."

Plaintiff relies on Business and Professions Code section 16600, which declares that "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Cases recognize "'[section 16600] represents a strong public policy of this state [citations].' [Citation.]" (*D'Sa v. Playhut, Inc.* (2000) 85 Cal.App.4th 927, 933. And in *Application Group, Inc. v. Hunter Group, Inc.* (1998) 61 Cal.App.4th 881), the court affirmed a declaratory relief judgment in favor of a California corporation which had challenged the validity of a covenant not to compete in Maryland corporation's agreement. It held, "California has a materially greater interest than does Maryland in the application of its law to the parties' dispute, and . . . California's interests would be more seriously impaired if its policy were subordinated to the policy of Maryland." (*Id.* at p. 902.)

However, notwithstanding Business and Profession Code section 16600, none of the cases on which plaintiff relies, including *Application Group*, involved judicial review of an arbitrator's findings as to the enforceability of a covenant not to compete in a contract containing a choice of law provision applying the law of another state. The agreement here authorized arbitration of "[a]ny dispute involving the performance, interpretation of [*sic*] breach of this agreement or the relationship created hereby, including . . . disputes involving . . . discrimination and other rights and protections afforded by . . . law . . . ." Paragraph 9 also expressly authorized an arbitrator to modify any part of the noncompetition covenant found unenforceable. The language is broad {Slip Opn. Page 8} enough to include both the question of what state's law applied to paragraph 9 and the validity of the noncompetition clause, both of which the arbitrator decided.

This is a classic case of the trial court declining to confirm an arbitration award because it disagrees with the merits of the decision. Generally, when faced with a petition to confirm or vacate an arbitration award, a court may not review the merits of the parties' controversy or claims that the arbitrator's decision is either legally or factually erroneous. (*Moncharsh v. Heily & Blase, supra,* 3 Cal.4th at p. 11.) "'[A]rbitrators do not exceed their powers merely [by] assign[ing] an erroneous reason for their decision.' [Citations.]" (*Id.* at p. 28.) Nor can an award be vacated because the

arbitrator "reached an erroneous decision." (*Ibid.*) In this case, the trial court did exactly what the Supreme Court in *Moncharsh* said it could not do: review the merits of the arbitrator's findings concerning the applicable law and the interpretation and enforceability of the contract's noncompetition clause. "Obviously, the 'merits' include all the contested issues of law and fact submitted to the arbitrator for decision. The arbitrator's resolution of these issues is what the parties bargained for in the arbitration agreement." (*Ibid.*)

Plaintiff relies on an exception recognized in *Moncharsh* for "limited and exceptional circumstances justifying judicial review of an arbitrator's decision," where a contract contains an illegal provision and "granting finality to an arbitrator's decision would be inconsistent with the protection of a party's statutory rights. [Citation.]" (*Moncharsh v. Heily & Blase, supra,* 3 Cal.4th at p. 32.) In *Moncharsh,* the Supreme Court declined to apply the exception to a fee-splitting provision in an attorney's employment contract with his former law firm that the attorney claimed violated the Rules of Professional Conduct. The court described the matter as "essentially an ordinary {Slip Opn. Page 9} fee dispute." (*Id.* at p. 33.) And, the cases have limited this exception to situations where private arbitration itself would impede a statutory right.

Two Supreme Court decisions applied the exception in circumstances where the court concluded legislative enactments expressly or impliedly created an impediment to the resolution of an issue by private contractual arbitration. (*Aguilar v. Lerner, supra,* 32 Cal.4th at pp. 982-983 [in dispute between attorney and former client, enforcement of retainer agreement's private arbitration clause would violate client's rights under mandatory fee arbitration act (Bus. & Prof. Code, § 6200 et seq.) and thus "exceed the arbitrator's powers"]; *Board of Education v. Round Valley Teachers Assn.* (1996) 13 Cal.4th 269, 275-277 [Education Code section is "an 'explicit legislative expression of public policy' that issues involving the reelection of probationary teachers not be subject to arbitration," thereby barring arbitrator's enforcement of collective bargaining agreement's procedures that limited school district's dismissal of probationary teachers].)

Intermediate appellate decisions have also applied the exception in similar limited circumstances. (*Jordan v. Department of Motor Vehicles, supra,* 100 Cal.App.4th at pp. 438, 444, 450-451 [exception applied to vacate $88 million attorney fee award in statutorily authorized arbitration that limited award to maximum of $18 million]; *City of Palo Alto v. Service Employees Internat. Union* (1999) 77 Cal.App.4th 327, 338-340 [vacating arbitrator's award reinstating employee because it violated court order issued under Code Civ. Proc., § 527.8 enjoining employee's return to workplace]; *Alternative Systems, Inc. v. Carey* (1998) 67 Cal.App.4th 1034, 1044 [same as *Aguilar v. Lerner, supra,* 32 Cal.4th 974].)

But the issue here is different. The agreement authorized the arbitrator to determine both the applicable law and the enforceability of the covenant not to compete. (*Marsch v. Williams* (1994) 23 Cal.App.4th 238, 244 ["Even where application of a {Slip Opn. Page 10} particular law or body of law is required by the parties' arbitration agreement, an arbitrator's failure to apply such a law is not in excess of an arbitrator's powers"].) As discussed more fully below, if a party challenges the validity of a contractual provision other than the arbitration clause itself, the issue of the clause's legality is subject to arbitration. (*Moncharsh v. Heily & Blase, supra,* 3 Cal.4th at p. 30.)

Furthermore, the arbitrator's findings and decision on the enforceability of the covenant not to compete were not palpably erroneous under California law. Contrary to plaintiff's assertion, a former employee's right to pursue his or her lawful occupation is not without limitation. *Gordon v. Landau* (1958) 49 Cal.2d 690 found "valid and enforceable" a defendant's agreement "not to use plaintiffs' confidential lists to solicit customers for himself for a period of one year following termination of his

employment." (*Id.* at p. 694; see also *John F. Matull & Associates, Inc. v. Cloutier* (1987) 194 Cal.App.3d 1049, 1054 [while Business and Professions Code section 16600 "invalidates agreements which penalize a former employee for obtaining employment with a competitor, it does not necessarily affect an agreement delimiting how that employee can compete"]; *Loral Corp. v. Moyes* (1985) 174 Cal.App.3d 268, 276 ["Section 16600 does not invalidate an employee's agreement not to disclose his former employer's confidential customer lists or other trade secrets or not to solicit those customers"].) While a court lacks the power to save an invalid covenant not to compete by reforming the agreement except "where the parties have made a mistake" (*Kolani v. Gluska* (1998) 64 Cal.App.4th 402, 407), when interpreting the provision, it "must . . . construe [it] to be lawful if possible. (Civ. Code, §§ 1643, 3541.)" (*Loral Corp. v. Moyes, supra,* 174 Cal.App.3d at pp. 278-279.)

Consequently, the trial court erred in vacating the award because it disagreed with the arbitrator's findings on the applicable law and the enforceability of the noncompetition clause. {Slip Opn. Page 11}

*Plaintiff's Obligation to Pay a Portion of the Arbitration Fees and Expenses*

The arbitrator directed that the parties each pay one-half of the arbitration fees. While this portion of the award violated California law, the court erred by vacating the entire award on this ground.

In *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, the Supreme Court considered two separate issues concerning the enforceability of predispute mandatory arbitration clauses in employment contracts: unconscionability and the minimum requirements necessary to permit arbitration of unwaivable statutory rights. (*Id.* at pp. 90-91.) On the second question, the court found parties could agree to arbitrate these matters if "the arbitration . . . meet[s] certain minimum requirements" deemed essential for the "employee to vindicate his or her statutory rights." (*Id.* at pp. 90, 91.) One requirement is that "the arbitration agreement or arbitration process cannot generally require the employee to bear any type of expense that the employee would not be required to bear if he or she were free to bring the action in court." (*Id.* at pp. 110-111.) *Armendariz* involved employee claims under the Fair Employment and Housing Act (Gov. Code, § 12900 et seq.), but the same rule applies "to the enforcement of rights under any statute enacted 'for a public reason.'" (*Mercuro v. Superior Court* (2002) 96 Cal.App.4th 167, 180, fn. omitted; see also *Little v. Auto Stiegler, Inc.* (2003) 29 Cal.4th 1064, 1077, 1081 [*Armendariz*'s holding applied to common law causes of action for wrongful termination in violation of public policy].)

California recognizes the prompt payment of wages as a fundamental policy which involves a broad public interest. (Lab. Code, §§ 201, 203, 218.5; *Smith v. Rae-Venter Law Group* (2002) 29 Cal.4th 345, 360.) Because the arbitration dealt with plaintiff's wage claim, it covered an unwaivable statutory issue affecting public policy {Slip Opn. Page 12} and needed to comply with *Armendariz*'s minimum requirements. The portion of the award directing plaintiff to pay one-half of the arbitration's costs did not.

The question then is whether the trial court properly vacated the entire award rather than merely correcting it. A court may "correct the award and confirm it as corrected if the court determines that: [¶] . . . [¶] . . . The arbitrators exceeded their powers but the award may be corrected without affecting the merits of the decision upon the controversy submitted . . . ." (Code Civ. Proc., § 1286.6, subd. (b); see *DiMarco v. Chaney* (1995) 31 Cal.App.4th 1809, 1815 [although arbitrator exceeded powers by failing to award prevailing party attorney fees and costs, "error was subject to correction" under § 1286.6].) A correction of the award's division of the arbitration fees and expenses will not

affect the arbitrator's findings on the merits of the substantive issues.

A court has the power to correct an arbitration award when "[a] petition or response requesting that the award be vacated has been duly served and filed and; [¶] . . . All petitioners and respondents are before the court . . . ." (Code Civ. Proc., § 1286.8, subd. (b)(1).) Here, these requirements were met. Thus, the court had authority to correct the arbitration award and should have exercised its power to do so rather than vacating the entire award because of the erroneous division of the arbitration fees and expenses.

*Plaintiff's Additional Grounds*

### *Illegality of the Parties' Agreement*

Citing *Loving & Evans v. Blick* (1949) 33 Cal.2d 603, plaintiff argues the trial court's vacation of the arbitration award should be upheld because the agreement "contains an illegal covenant not to compete." This contention misstates the law. {Slip Opn. Page 13}

"If a contract includes an arbitration agreement, and grounds exist to revoke the entire contract, such grounds would also vitiate the arbitration agreement. Thus, if an otherwise enforceable arbitration agreement is contained in an illegal contract, a party may avoid arbitration altogether. [Citations.] [¶] By contrast, when--as here--the alleged illegality goes to only a portion of the contract (that does not include the arbitration agreement), the entire controversy, including the issue of illegality, remains arbitrable. [Citations.]" (*Moncharsh v. Heily & Blase, supra,* 3 Cal.4th at pp. 29-30, fn. omitted.)

The agreement appointed plaintiff to work as an independent sales consultant for defendant. Plaintiff makes no claim the agreement, as a whole, is unlawful. He merely points to the agreement's allegedly invalid covenant not to compete. Thus, this case concerns a question of partial illegality that was subject to determination by the arbitrator. *Loving & Evans v. Blick, supra,* 33 Cal.2d 603 is inapposite because it involved an arbitration agreement contained in an illegal construction contract executed by an unlicensed contractor. The arbitrator here had authority to decide whether paragraph 9's covenant was enforceable.

### *The Arbitrability of Plaintiff's Wage Claim*

Plaintiff contends the arbitrator "unilaterally decided to rule on the wage claim" only days before the hearing and, since neither he nor defendant had sought such a determination in that proceeding, the arbitrator exceeded his powers. The limited record before us does not support plaintiff's summary of the proceedings.

Defendant's original demand for arbitration concerned plaintiff's alleged violation of the covenant not to compete and nondisclosure of trade secrets provisions. During prearbitration discovery, defendant asked plaintiff to provide "[a]ll documents {Slip Opn. Page 14} which . . . relate to and/or . . . quantify the amount of wages, commissions, bonuses or other remuneration allegedly owed" to him. At his deposition, plaintiff was questioned about the amount of wages and benefits owed to him when he was terminated; he testified "[i]t was right around $16,000." Before the arbitration, the arbitrator concluded he would also consider plaintiff's wage claim. In a January 2004 letter, the arbitrator informed the parties that, "[a]fter reading your various submissions and the supporting authority concerning the arbitrability of [plaintiff's] wage claim, I have concluded that the claim is arbitrable and that the claim should be determined as part of the pending arbitration." In his award, the arbitrator found defendant had paid plaintiff "all wages and bonuses to which [he] is

entitled."

"Code of Civil Procedure section 1283.4 provides the arbitrator's written award shall determine all submitted questions 'necessary in order to determine the controversy.' . . . [I]t is for the arbitrators to determine what issues are 'necessary' to the ultimate decision. . . . 'Likewise, any doubts as to the meaning or extent of an arbitration agreement are for the arbitrators and not the court to resolve.' [Citations.] [¶] Although section 1286.2 permits the court to vacate an award that exceeds the arbitrator's powers, the deference due an arbitrator's decision on the merits of the controversy requires a court to refrain from substituting its judgment for the arbitrator's in determining the contractual scope of those powers. [Citations.]" (*Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 372, fn. omitted; see also *Ajida Technologies, Inc. v. Roos Instruments, Inc., supra,* 87 Cal.App.4th at p. 542.)

The parties have provided only a partial record of the arbitration proceeding. It reflects that, at some point, the issue of whether the arbitrator should decide plaintiff's wage claim was raised and argued. The arbitration clause is broad enough to cover unpaid commissions, bonuses, or other employment benefits owed but {Slip Opn. Page 15} not paid to plaintiff when defendant terminated him. Defendant sought damages from plaintiff, and any compensation it owed to him would necessarily constitute an offset against its potential recovery. Given these facts and the deference courts must show to an arbitrator's determination concerning the scope of the issues before him, plaintiff has failed to show the arbitrator exceeded his powers by ruling on the wage claim.

### *Unconscionability*

In the trial court, plaintiff argued the arbitration clause was unconscionable. Plaintiff reasserts this claim on appeal as a basis to affirm the order vacating the arbitration award.

"A written agreement to submit to arbitration an existing controversy or a controversy thereafter arising is valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract." (Code Civ. Proc., § 1281.) Thus, "pursuant to 'general contract law principles,' California courts may invalidate arbitration agreements when they contain provisions that are 'unconscionable or contrary to public policy.' [Citation.]" (*Fitz v. NCR Corp.* (2004) 118 Cal.App.4th 702, 711.)

As noted above, *Armendariz v. Foundation Health Psychcare Services, Inc., supra,* 24 Cal.4th 83 applied the doctrine of contractual unconscionability to an employment contract's predispute mandatory arbitration clause. (*Id.* at pp. 113-121.) *Little v. Auto Stiegler, Inc., supra,* 29 Cal.4th 1064 summarized the law of unconscionability: "[T]he doctrine has "'both a 'procedural' and a 'substantive' element," the former focusing on "'oppression'" or "'surprise'" due to unequal bargaining power, the latter on "'overly harsh'" or "'one-sided'" results.' [Citation.] The procedural element of an unconscionable contract generally takes the form of a contract {Slip Opn. Page 16} of adhesion, "'which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.'" [Citation.] '[I]n the case of preemployment arbitration contracts, the economic pressure exerted by employers on all but the most sought-after employees may be particularly acute, for the arbitration agreement stands between the employee and necessary employment, and few employees are in a position to refuse a job because of an arbitration requirement.' [Citation.] . . . [¶] Substantively unconscionable terms may take various forms, but may generally be described as unfairly one-sided." (*Id.* at p. 1071.)

There must be both procedural and substantive unconscionability before a court may refuse to

enforce a contract on this ground. Procedural unconscionability may exist here. Defendant prepared and submitted the agreement containing the arbitration clause to plaintiff and required him to sign it as a condition of his continued employment, thus rendering the agreement a contract of adhesion. (*Little v. Auto Stiegler, Inc., supra,* 29 Cal.4th at p. 1071; *Fitz v. NCR Corp., supra,* 118 Cal.App.4th at p. 713.)

But plaintiff failed to establish substantive unconscionable. To do so, one generally must show the lack of a "'modicum of bilaterality' in an arbitration agreement." (*Armendariz v. Foundation Health Psychcare Services, Inc., supra,* 24 Cal.4th at p. 117.) "Given the disadvantages that may exist . . ., it is unfairly one-sided for an employer with superior bargaining power to impose arbitration on the employee as plaintiff but not to accept such limitations when it seeks to prosecute a claim against the employee, without at least some reasonable justification for such one-sidedness based on 'business realities.' As has been recognized, '"unconscionability turns not only on a 'one-sided' result, but also on an absence of 'justification' for it."' [Citation.]" (*Id.* at pp. 117-118.)

The arbitration clause satisfies the requirement of mutuality. It applies to "any dispute involving the performance, interpretation of [*sic*] breach of this agreement {Slip Opn. Page 17} or the relationship created hereby, including without limitation, disputes involving . . . laws against discrimination and other rights and protections afforded by . . . law . . . ." The provision binds both parties. Nothing in it gives one party greater rights or protections than those provided to the other.

Noting again the arbitrator's order requiring both parties to equally bear the arbitration fees and expenses, plaintiff contends the arbitration clause is substantively unconscionable. (*Martinez v. Master Protection Corp.* (2004) 118 Cal.App.4th 107, 115-117.) This argument lacks merit under the circumstances of this case. "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." (Civ. Code, § 1670.5, subd. (a).)

In *Armendariz,* the Supreme Court applied Civil Code section 1670.5 to an employment agreement's arbitration clause. "The basic principles of severability that emerge from Civil Code section 1599 and the case law of illegal contracts appear fully applicable to the doctrine of unconscionability. Courts are to look to the various purposes of the contract. If the central purpose of the contract is tainted with illegality, then the contract as a whole cannot be enforced. If the illegality is collateral to the main purpose of the contract, and the illegal provision can be extirpated from the contract by means of severance or restriction, then such severance and restriction are appropriate. That Civil Code section 1670.5 follows this basic model is suggested by the Legislative Committee comment . . ., which talks in terms of contracts not being enforced if 'permeated' by unconscionability, and of clauses being severed if 'so tainted or . . . contrary to the essential purpose of the agreement.' [Citation.]" (*Armendariz v.* {Slip Opn. Page 18} *Foundation Health Psychcare Services, Inc., supra,* 24 Cal.4th at p. 124; see also *Fitz v. NCR Corp., supra,* 118 Cal.App.4th at pp. 714-715.)

The arbitration clause did not expressly require the parties to split arbitration fees and expenses. That arose from the arbitrator's award. Given Civil Code section 1670.5, subdivision (a), which *Armendariz* held authorizes a court to excise an invalid contractual provision collateral to the agreement's main purpose, plus Code of Civil Procedure section 1286.6, which allows a court to correct an arbitration award before confirming it, along with California's policy favoring the use of arbitration, the arbitration clause is not substantively unconscionable.

## DISPOSITION

The order vacating the arbitration award is reversed. The matter is remanded to the superior court with directions to correct the award by amending it to direct defendant to pay all of the fees and expenses of arbitration and, as so corrected, enter an order confirming the award. The parties shall bear their own costs on appeal.

Moore, J., and Fybel, J., concurred.


Do Another California Case Law Search

**Citation Search** | Select ▼ | get it

**Party Name Search** | search

**Full-Text Search** | search

*Copyright © 1993-2005 AccessLaw*

: Our free service locates Bankruptcy, Criminal, DUI, Immigration, Personal Injury, Taxation, or Trademark lawyers in your area who can help you with your legal issues. From LawQuote.com

: ABA Members save up to 20% on select IBM xSeries® Storage servers through 9/30/05. Also, discounts from $64 to $799* on Lenovo ThinkPad® T Series notebooks.

: ONE integrated system to manage your whole office. Provides time billing, accounting and practice management. Download a FREE demo.

: Enter data once, use everywhere! Integrated calendar, cases, contacts, conflicts, time/billing, accounting. Full front/back office.

: **Over 32,000 Legal Forms** Stop Reinventing the Wheel each time you draft a legal document. Save Time and Money! Visit USlegalforms.com Today!

: Easy-to-use and intuitive - experience great practice management software that works the way you do. Free Trial.

: Proxilaw takes care of your document preparation and filing chores. Incorporation, living trusts, LLCs, divorce & more.

: Reliable billing and practice management software for solo to mid-sized firms. Recommended by 94% of firms that use them.

: WSU alumni make up over 25% of the Orange County Bar, and provide an enormous resource for our students and graduates.

: The perfect marriage of the front office and back office. Finally, everything together.

: Need an attorney? Our free service connects you to a nationwide network of lawyers who can help you with your case.

: cases and statutes--$12





## Non-Compete Contracts

Non-compete agreements are becoming an increasingly popular way for employers to try to limit employees and former employees from working for a competitor, or from divulging trade secrets or other proprietary data.

Contrary to common misperceptions, courts will uphold non-compete clauses if they comply with acceptable standards. Enforcement against an employee can be both by damages and by an injunction that prohibits the employee from engaging in conduct that violates a non-compete clause.

An employer also can be held liable for hiring an employee who violates a non-compete agreement with a previous employer. In some cases, employers can recover damages from both the former employees and their new employers who collaborate with them in the transgressions.

However, some states impose substantial restrictions on the enforceability of non-compete clauses. In California, for example, they may not be enforceable at all. In New York, their enforceability is quite limited.

Most non-compete agreements are entered into with little, if any, negotiation between the employer and the employee. They usually are signed at the outset of an employment relationship where the employee may have very little bargaining power and when the employee is generally not too concerned about limitations on future employability when beginning a new job.

But when an employee decides to leave a job, the non-compete agreement may be a significant impediment to future employment or may prevent employees from becoming self-employed.

Although the laws differ from state to state, general principles apply to non-compete contracts in most jurisdictions. Here are some considerations to keep in mind:

- **Rule of Reasonableness**: In order to be valid, a non-compete agreement must be reasonable. Courts recognize that employers have a legitimate interest in protecting the time, investment, and other resources they have invested in employees, but that interest must be balanced against an employee's job mobility in a free enterprise system. Courts generally will scrutinize non-compete agreements carefully to make sure that they are geared to protect the reasonable business interests of an employer without unduly limiting an employee's other work opportunities. Therefore, these arrangements must usually be tailored narrowly to restrict truly competitive activities without forbidding an employee from working in the same industry or profession in a way that is not competitive.
- **Independent Consideration**: In many states, a non-compete agreement is valid if entered into at any time after an employment relationship begins. But in some states, courts will not enforce non-compete agreements unless the employee gets what is termed

Exhibit E

"independent consideration" — in other words, if they get something in exchange for signing the agreement. If this principle applies in your state, a non-compete agreement will be valid only if it is signed at the time employment commences, or at a later date if the employer gives you some additional benefits such as increase in salary, promotion, or other items of value.

- **Duration**: In order to assure that these contracts are not too stifling, courts will generally require that they only last for a limited amount of time. The duration depends upon a number of circumstances, including how long it will take to train another employee to take over the position being vacated. Generally, non-compete agreements one or two years in length will be valid, and longer time periods may be suspect. Courts generally will permit longer non-compete periods in connection with a sale of a business when a new buyer insists that the old owner refrain from competing for a prescribed period of time. In these situations, courts reason that the parties should be permitted to negotiate whatever time frame they want since the exchange is less coercive than it is in an employer-employee relationship.

- **Distance**: In addition to duration, a non-compete agreement often must have reasonable geographic limits. In today's global economy, the distance factor is less significant than it has been in the past. But if an employer has a particular market area, courts may refuse to enforce non-compete agreements that extend beyond that. For instance, a cosmetology business that draws most of its customers from a radius of 10 or 15 miles probably couldn't limit a former employee from working in the cosmetology business outside of that market area.

- **Blue Pencil Rule**: Many courts follow the "blue pencil" rule, which means if an agreement is too restrictive, the courts can modify it and then enforce it. But in some states, the "blue pencil" rule is prohibited, and courts must either uphold non-compete agreements as drafted or invalidate them entirely.

- **New Employer Liability**: In many states, employers who lose an employee to a competitor in violation of a non-compete agreement can sue the new employer, as well as the old employee. In these states, employers are reluctant to hire away employees who have non-compete agreements. The best approach for employees in these states is to let their prospective new employer know about the non-compete so that the employer is not later "surprised" with a lawsuit by the old employer. The new employer may decide that the non-compete agreement is invalid, or may be willing to assist the employee, including payment of legal expenses, in the event of a lawsuit by the former employer.

An employer should keep these principles in mind when hiring employees – both in terms of looking out for agreements that employees may have signed at their old jobs and with regard to negotiating non-compete agreements for their new jobs. Such clauses can be a very effective way to protect valid business interests, but they should be drafted with the assistance of legal counsel in order to provide assurances that the language used will be enforceable.

*Marshall Tanick is a partner with Mansfield Tanick & Cohen, a Minneapolis law firm that provides legal services to individuals, families, businesses and organizations nationwide.*

⯈ **Employment Law For Employers Message Board** for more help



**LexisNexis Martindale-Hubbell www.lawyers.com is the most complete, trusted source for identifying qualified legal counsel.**
Disclaimer: The information provided on www.lawyers.com is not intended to be legal advice, but merely conveys general information related to legal issues commonly encountered. Your access to and use of this website is subject to additional terms and conditions.

©2005 Martindale-Hubbell, a division of Reed Elsevier Inc. All rights reserved. Www.lawyers.com is a secure site that respects your privacy.

# DIGEST OF INSURANCE LAW

## ILLINOIS

Courtesy of
**Pretzel & Stouffer, Chartered**
Chicago, Illinois

---

### CIVIL JUDICIAL SYSTEM

#### Courts of Original Jurisdiction

Under Judicial Article, Illinois Constitution, effective Circuit Court in each county is sole court of general jurisdiction. In Cook County, the civil division of the Circuit Court is divided into two departments, County Department which includes law, chancery, domestic relations, probate, county and juvenile divisions, and Municipal Department which has jurisdiction over all civil law cases where amount claimed is $50,000 or less. Court-sponsored arbitration now required for civil cases with recovery of less than $30,000.

Supreme Court has discretionary original jurisdiction in cases relating to revenue, prohibition, mandamus and habeas corpus.

#### Appellate Courts

Appellate Court has jurisdiction of appeals from Circuit Courts with exception of certain classes of cases which are appealed directly to Supreme Court, such as those involving revenue, constitutional questions, habeas corpus, and convictions in capital cases. There are five geographic districts of Appellate Court.

Judgments of Appellate Court are reviewable by Supreme Court only upon certificate of importance by Appellate Court, leave to appeal granted at its discretion by Supreme Court, or as matter of right when constitutional questions arise for first time in Appellate Court.

### LAW

Abbreviations

F. Supp. — Federal Supplement.
F. Supp. 2d — Federal Supplement, Second Series.
F.2d — Federal Reporter, Second Series.
F.3d — Federal Reporter, Third Series.
ILCS — Illinois Compiled Statutes.
Ill. — Illinois Reports.
Ill. 2d — Illinois Reports, Second Series.
Ill. App. — Illinois Appellate Reports.
Ill. App. 2d — Illinois Appellate Reports, Second Series.
Ill. App. 3d — Illinois Appellate Reports, Third Series.
Ill. Rev. Stat. — Illinois Revised Statutes.
N.E.2d — North Eastern Reporter, Second Series.

### ACCIDENT AND HEALTH INSURANCE

**Disability.** In order to recover, plaintiff must plead and prove that he became totally disabled as literally defined by policy provisions. *Sibley v. Travelers*, 275 Ill. App. 323 (1934). "Total permanent disability" means inability to follow any gainful occupation, so that grocer who no longer can maintain business as before, but who can earn livelihood in less strenuous manner is barred from recovering benefits. *Lincoln v. Prudential*, 345 Ill. App. 547, 104 N.E.2d 347 (1952). Loss of use of a member is a loss of the member under a policy covering loss of members. *Galindo v. Guarantee Trust Life*, 91 Ill. App. 3d 61, 414 N.E.2d 265 (1980). But where work subsequently done is injurious to health or endangers life, recovery not barred. *Walker v. Equitable*, 123 F. Supp. 306 (E.D. Ill. 1954).

Person who is no longer able to do his accustomed work and such work as he has only been trained to do, and upon which he must depend for living is "totally disabled" within accident and health policy. *Snelson v. Pennsylvania Life*, 65 Ill. App. 2d 416, 212 N.E.2d 873 (1965). Total and permanent disability to be proved by competent medical testimony. *Kirkpatrick v. United Federation*, 52 Ill. App. 2d 457, 202 N.E.2d 136 (1964). Ability to drive car short distance does not negate total disability. *Wood v. Prudential*, 271 Ill. App. 103 (1933).

**Disease** induced by accident. Where disease is caused by accidental means, death from that disease is covered by policy insuring against death by accidental means. Such policy has been held to cover death from typhoid fever resulting from drinking water which was accidentally polluted because of defective valve. *Christ v. Pacific Mutual*, 312 Ill. 525, 144 N.E. 161 (1924). Infection contracted after surgery held not accidental where surgery itself was performed without mishap. *Body v. United Ins.*, 72 Ill. App. 3d 594, 391 N.E.2d 19 (1979).

**Excepted Risks.** Burden is on insurer to show that certain risk is excepted from policy. *Adman Products v. Federal Ins.*, 187 Ill. App. 3d 322, 543 N.E.2d 219 (1989).

**Notice and Proof of Loss.** Where policy requires written notice, oral notice to agent insufficient, unless requirement waived; proof of loss condition precedent to recovery on policy. *Feder v. Midland*, 316 Ill. 552, 147 N.E. 468 (1925). Denial of liability by insurer on grounds unrelated to proof of loss constitutes waiver of policy requirement with regard to furnishing proof of loss. *Tibbs v. Great Central*, 57 Ill. App. 3d 866, 373 N.E.2d 492 (1978). Notice of accident does not necessarily constitute proof of claim for uninsured motorist coverage. *Rooney v. State Farm*, 119 Ill. App. 3d 112, 456 N.E.2d 160 (1983).

**Renewal.** Renewal of policy by payment of premiums from year to year constitutes in effect new policy of insurance. *Eipert v. State Farm*, 189 Ill. App. 3d 630, 545 N.E.2d 497 (1989).

### ACCIDENTAL MEANS

**Accidental means** is synonymous with accidental result, and is defined as something which happens fortuitously without intention or design and which is unexpected, unusual and unforeseen. *Wahls v. Aetna Life*, 122 Ill. App. 3d 309, 461 N.E.2d 466 (1983). Thus, where insured had conspired to burn down a house to collect on insurance, and the gasoline which insured was using accidentally ignited, resulting in his death, such death was deemed to be accidental. *Taylor v. John Hancock*, 11 Ill. 2d 227, 142 N.E.2d 5 (1957). The test of foreseeability in the interpretation of insurance policies differs from that in tort or criminal law. *Marsh v. Metropolitan Life*, 70 Ill. App. 3d 790, 388 N.E.2d 1121 (1979).

Illinois has adopted a liberal attitude in interpreting accidental death provisions when resolving litigation for the recovery of insurance proceeds. *Wahls v. Aetna Life*, 122 Ill. App. 3d 309, 461 N.E.2d 466 (1983). Question of whether insured's death was accidental for jury to determine. *Scholle v. Continental Natl. Am. Group*, 44 Ill. App. 3d 716, 358 N.E.2d 893 (1976). The burden is upon the beneficiary seeking to recover accidental death benefits to prove that cause of death is accidental within terms of the policy. *Robinson v. Metropolitan Life*, 74 Ill. App. 3d 698, 393 N.E.2d 738 (1979). Once plaintiff shows a prima facie case the burden of proving an exception such as suicide is upon the insurer. *O'Mara v. Metropolitan Ins. Co.*, 1989 WL 121289 (N.D. Ill. 1989). Where a policy excludes coverage for death caused while the insured was committing or attempting to commit an assault or felony, defendant insurer has the burden of going forward with evidence that the death resulted from such cause. *Prater v. J.C. Penney Life*, 155 Ill. App. 3d 696, 508 N.E.2d 305 (1987). The fact that an actual cause of death is medically undetermined does not preclude a jury from finding that, for purposes of the insurance contract, the death was accidental. *Wahls v. Aetna Life*, 122 Ill. App. 3d 309, 461 N.E.2d 466 (1983).

When a person voluntarily engages in a fight or initiates an assault, his resulting injury or death is not accidental if it is the natural and probable result of his conduct. However, this general rule is inapplicable where the insured is coming to the aid of another. *McCall v. National Life*, 95 Ill. App. 3d 737, 420 N.E.2d 685 (1981).

Alcoholic's death from consumption of lethal quantity of alcohol found accidental. *Russell v. Metropolitan Life*, 108 Ill. App. 3d 417, 439 N.E.2d 89 (1982).

Where evidence showed that although insured traveled at 100 m.p.h. in his vehicle attempting to round curve in road, his death was held to be accidental. *Rodgers v. Reserve Life*, 8 Ill. App. 2d 542, 132 N.E.2d 692 (1956).

### ADJUSTERS

Person must obtain public insurance adjuster license before engaging in business of adjusting insurance claims or obtaining contract for public adjusting services. This does not apply to person admitted to practice of law in state, licensed agent adjusting loss or damage under policy within his control or to marine surveyor or average adjuster. Fiduciary relationship recognized between insurer and claims adjuster, where insurer reposed trust in adjuster and gave him authority to pay claims. *Federal Ins. v. Parello*, 767 F. Supp. 157 (N.D. Ill. 1990).

### ADVERTISEMENTS

Statute provides penalty for making false statement regarding terms of policy. 215 ILCS §5/149. No private right of action exists for violation of this section. *Anderson v. Humana*, 820 F. Supp. 368 (N.D. Ill. 1993). Failure to volunteer information absent a duty to do so does not constitute fraud. *In re Marriage of Travlos*, 218 Ill. App. 3d 1030, 578 N.E.2d 1267 (1991).

 Copyright © 2005 by A.M. Best Company, Inc.
All rights reserved. No part of this report may be reproduced, stored in a retrieval system or transmitted in any form or by any means; electronic, mechanical, photocopying, recording or otherwise.

*Ex filed F*

## AGE

See "AUTOMOBILES"; "LIABILITY INSURANCE"; "NEGLIGENCE."

## AGENTS AND BROKERS

Authority of Agent. Insurance broker differs from insurance agent in that broker represents insurance buying public and is not permanently employed or attached to any one carrier. *Zannini v. Reliance Ins. Co.*, 147 Ill. 2d 437, 590 N.E.2d 457 (1992). Broker is construed as agent for insured and his acts and representations, if within his scope of authority, are binding on insured. *Krause v. Pekin Life Ins. Co.*, 194 Ill. App. 3d 798, 551 N.E.2d 395 (1990). Broker also owes fiduciary duties to the client-insured. *Lake County Grading Co v. Great Lakes Agency*, 226 Ill. App. 3d 697, 589 N.E.2d 1128 (1992). However, statute limits broker's liability to cases of misappropriation of funds. 735 ILCS §5/2-2201.

Fraud of Agent. Where there is fraud or collusion between applicant and agent, knowledge of facts by agent cannot be considered knowledge of company because if engaged in defrauding his principal, he will not be presumed to have communicated information. *Tesluk v. Metropolitan Life*, 130 Ill. App. 2d 290, 264 N.E.2d 566 (1970). An insurer is responsible for the acts of an agent within the scope of his apparent authority. *Allied American Ins. Co. v. Ayala*, 247 Ill. App. 3d 538, 616 N.E.2d 1349 (1993). Broker cannot be liable under Consumer Fraud Act unless broker has personal knowledge of false or misleading character of information conveyed to insured. 815 ILCS §505/10b (3). Also, broker will not be liable if insurer denies claim for reasons unrelated to broker's error. *Apollo Label v. Schultz*, 206 Ill. App. 3d 8, 563 N.E.2d 1044 (1990).

Knowledge of Agent. Knowledge of and notice to agent can be imputed to insurer. *Massachusetts Mut. v. Leberis*, 595 F. Supp. 157 (N.D. Ill. 1984); *Mitchell Buick v. National Dealer*, 138 Ill. App. 3d 574, 485 N.E.2d 1281 (1985).

Reformation. Mutual mistake of agent and insured regarding policy terms can be basis for reformation of policy. *Schons v. Monarch Ins. Co.*, 214 Ill. App. 3d 601, 574 N.E.2d 83 (1991). Preliminary contract of insurance included coverage for jewelry and agent's failure to give insurer the schedule of personal property did not void coverage. *Zannini v. Reliance*, 147 Ill. 2d 437, 590 N.E.2d 457 (1992).

Rights and Duties Upon Termination of Employment. After termination of agency relationship, former agent may negotiate for his own interest and may act adversely to his former principal. *Prudential v. Sempetrean*, 171 Ill. App. 3d 810, 525 N.E.2d 1016 (1988). In absence of restrictive covenant in employment contract, improper taking of customer list or trade secret or fraud, former agent may compete in business with former employer and solicit former customers, without breach of any implied obligation so long as there was no demonstrable business activity on his part prior to termination of employment. *Prudential v. Van Matre*, 158 Ill. App. 3d 298, 511 N.E.2d 740 (1987).

Definition. By legislation, "Insurance Agents" and "Insurance Brokers" became collectively referred to as either "Insurance Producers," "Limited Insurance Representatives" or "Temporary Insurance Producers." "Insurance Producers" sell, solicit, or negotiate insurance. 215 ILCS §5/500-10. "Limited Insurance Representative," now known as "Limited Lines Producer," may only solicit policies sold in connection with transportation by common carriers, industrial life. Accident and health insurance, and insurance issued by municipal companies as defined under Insurance Code. 215 ILCS §5/500-100.

Unless exempt, after application and examination "Insurance Producer" is licensed. 215 ILCS §5/500-45. "Limited Insurance Representative" is also licensed by application. 215 ILCS §5/500-100.

Despite the statutory reclassification, when determining their respective legal duties, the courts still recognize the prior distinction between "insurance agents" and "insurance brokers." *Economy Fire & Cas. v. Bassett*, 170 Ill. App. 3d 765, 525 N.E.2d 539 (1988). Broker's duties are to the insured, while agent's duties are to the insurer.

Two year statute of limitations applies for civil actions brought against insurance producers relating to procurement or renewal of insurance. 735 ILCS §5/13-214.4.

## ARBITRATION

Uniform Arbitration Act in Illinois. 710 ILCS §5/1 *et seq.* Mandatory arbitration program authorized by statute took effect throughout Illinois in January, 1990. It now applies to cases where court determines the damages do not exceed $30,000, 735 ILCS §5/2 1001A *et seq.*; Ill. Sup. Ct. Rules 86-95. A party who participates in good faith at arbitration may have results vacated by paying a $200 fee. Case then proceeds to trial. A party who does not participate in good faith at arbitration will be barred from rejecting the result. *Morales v. Mongolis*, 293 Ill. App. 3d 660, 688 N.E.2d 1196 (1997). However, where failure to appear is due to reasonable extenuating circumstances, party is not barred from rejecting award. *Johnson v. Saenz*, 311 Ill. App. 3d 693, 725 N.E.2d 774 (2000).

Courts in Illinois will enforce a valid arbitration agreement even if some of the parties to litigation did not sign an arbitration agreement. *Board of Mgrs. of Courtyards v. IKO Chicago*, 183 Ill. 2d 66, 697 N.E.2d 727 (1998).

## ATTORNEYS

Rules of Professional Conduct for attorneys promulgated by Illinois Supreme Court, effective August 1, 1990. Attorney discipline regulated by Illinois Supreme Court, through Attorney Registration & Disciplinary Commission.

## AUTOMOBILES

See Tabular Section Following Law Digests.
See "NEGLIGENCE."

Age. Drivers may be licensed at eighteen. 625 ILCS §5/6-103. But, for special conditions and lower ages, *see* §5/6-107. Instruction permit for minors, §5/6-107.1. Instruction permits and temporary licenses for persons 18 years of age or older, §5/6-105.

Agency. Owner of automobile who permits another to operate it is not liable for negligence of latter, unless driver is servant or agent of owner. *Darner v. Colby*, 375 Ill. 558, 31 N.E.2d 950 (1941). Employer will not be held liable for negligent driving of employee unless employee was acting within scope of his employment. *Hengels v. Gilski*, 127 Ill. App. 3d 894, 469 N.E.2d 708 (1984).

Mandatory Insurance. Illinois motorists must carry minimum amounts of liability insurance for bodily injury or death and destruction of property. Violators will be fined. Motorists must carry proof of insurance that must be displayed at request of police officer. 625 ILCS §5/7-6d; 625 ILCS §5/7-602.

Family Purpose Doctrine. "Family purpose" doctrine is not in force in Illinois. *White v. Seitz*, 342 Ill. 266, 174 N.E. 371 (1931).

Guest Cases. Wilful and wanton conduct of driver required to establish liability to non-paying guests. 625 ILCS §5/10-201.

Intoxication. *See* 625 ILCS §5/11-500.

Imputed Negligence/Joint Enterprise. Where driver of automobile and passenger are engaged in joint enterprise, negligence of driver imputable to passenger. *Grubb v. Illinois*, 366 Ill. 330, 8 N.E.2d 934 (1937). No imputation of negligence of driver-husband to passenger-wife even in joint enterprise. *Smith v. Bishop*, 32 Ill. 2d 380, 205 N.E.2d 461 (1965). Passenger has duty to take action to preserve own safety when driver is known to be incompetent or unsafe. *Moreno v. Mercier*, 275 Ill. App. 3d 884, 656 N.E.2d 1114 (1995).

Last Clear Chance. Doctrine abolished in Illinois. See "NEGLIGENCE."

No-Fault. No-fault insurance does not exist in Illinois.

Ownership/Title. Certificate of title required with limited exceptions. 625 ILCS §5/3-101, 102. Certificate is prima facie evidence of facts contained on it. *Id.* 5/3-107 (c). Offenses involving certificates punishable as misdemeanors. *Id.* 5/3-703.

Seat Belts. Each driver and front seat passenger of motor vehicle operated on street or highway in this state shall wear properly adjusted and fastened safety seat belt. There are very few exceptions to this requirement. 625 ILCS §5/12-603.1. Evidence of failure to wear seat belt is not admissible in a civil action with respect to either liability or damages. *Clarkson v. Wright*, 108 Ill. 2d 129, 483 N.E.2d 268 (1985). However, such evidence is admissible to rebut a products liability, defective design allegation to show overall design was reasonable. *DePaepe v. General Motors*, 33 F.3d 737 (7th Cir. 1994); or to show contributory negligence and assumption of risk. *Walsh v. Emergency One*, 26 F.3d 1417 (7th Cir. 1994).

Service of Process on Non-Resident Motorists. Service of process on non-resident motorist may be made by serving Secretary of State, and mailing to defendant by registered mail notice of service and copy of process. 625 ILCS §5/10-301. Strict compliance with statute required. Service of process also may be had on any non-resident who commits tortious act within State. 735 ILCS §5/2-209.

Speed Limit. Statute prohibits driving at speed greater than 1) is reasonable and proper, or 2) maximum speed limits except where otherwise prescribed by regulation or ordinance; highway on Interstate system - outside urban district of over 50,000 people, 65 mph, for class 1 vehicles, pursuant to Federal statutes, otherwise 55 mph; urban district: 30 mph; alleys: 15 mph. 625 ILCS §5/11-601. No person shall drive at such slow speed as to impede reasonable movement of traffic, except when reduced speed is necessary for safe operation of vehicle. 625 ILCS §5/11-606. Emergency vehicles are excepted from speed limits but they must exercise due regard for safety of others. 625 ILCS §5/11-205.

Theft—Liability of Owner. Leaving car without removing ignition key makes owner liable for damages proximately caused by theft. *Ney v. Yellow Cab*, 2 Ill. 2d 74, 117 N.E.2d 74 (1954). However, owner not liable for damage caused by thief if car was parked on private property. *Lorang v. Heinz*, 108 Ill. App. 2d 451, 248 N.E.2d 785 (1969).

## AVIATION

Due to statutory repeal, engaging in aviation (other than riding as fare paying passenger on regularly scheduled route of commercial air line) is no longer recognized excepted risk.

Illinois Aeronautics Act governs. Proceedings initiated with Illinois Dept. of Transportation, Div. of Aeronautics, 620 ILCS §5/55.

## BROKERS

See "AGENTS AND BROKERS."

## BURGLARY INSURANCE

Exterior. Insurance coverage denied to proprietor of service station who sought to recover losses sustained after burglary. *Gray v. Great Central Ins.*, 4 Ill. App. 3d 1084, 283 N.E.2d 261 (1972). Vandals gained access to store by punching hole through wall separating restroom and storage area. Issue was the interpretation of the word "exterior" in policy which defined "burglary" as "a felonious extraction of insured property from within the business premises by a person making felonious entry therein by actual force and violence as evidenced by visible marks made by tools, explosives, electricity or chemicals upon, or physical damage to, the *exterior* of the business premises at the place of such entry." *Id.* Damage to only inside walls was not "exterior" of the station and rightfully denied. *Id.*

Unattended Vehicle. Insurance coverage denied to corporation engaged in buying, selling and transporting jewelry. *Zurich Midwest, Inc. v. St. Paul*, 159 Ill. App. 3d 961,

 Copyright © 2005 by A.M. Best Company, Inc.
All rights reserved. No part of this report may be reproduced, stored in a retrieval system or transmitted in any form or by any means; electronic, mechanical, photocopying, recording or otherwise.