E-FILED

Monday, 26 September, 2005  10:16:25 AM
Clerk, U.S. District Court, ILCD

**FILED**

SEP 2 3 2005

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

BARBARA J. KENDELL,                )
    Plaintiff,                          )
                               )
vs.                                )    Case No. 04-1140
                               )    Chief Judge:  Joe Billy McDade
AMERICAN INCOME LIFE OF            )    Magistrate Judge:  John A. Gorman
CHICAGO and AMERICAN INCOME        )
LIFE INSURANCE CO.,                )
                               )
    Defendants.                        )

## RESPONSE TO DEFENDANT AMERICAN INCOME LIFE INSURANCE CO.'S MOTION FOR SUMMERY JUDGEMENT

I, Barbara J. Kendell, Plaintiff pursuant to Federal Rules of Civil Procedure 56 and CDIL-LR 7.1 moves to request of the Court to deny an Order dismissing with prejudice Plaintiff's Pro Se Complaint against Defendant AIL and  not awarding this Defendant its costs and any further relief that they are requesting of this Court in this Motion

### I. INTRODUCTION

Plaintiffs Title VII, ADEA and ADA actions against this defendant should *not* be dismissed with prejudice, pursuant to Federal Rule of Civil Procedure 56, because:  (1) Plaintiff *does* claim that this Defendant discriminated against her or terminated her Agent Contract on the basis of gender, age, or disability;(2) Plaintiff *was* an employee of this Defendant, *not* an independent contractor as called for by the Contract, therefore I can claim Title VII,ADEA and/or ADA claims against it;(3) Plaintiff did *not* waive any and all claims against this Defendant because it was not named as a Respondant to Plaintiff's EEOC Charge of Discrimination ("Charge); and (4) Plaintiff *did* file a charge against the Defendant within 300 days of the alleged unlawful employment practice committed by Defendant American Income Life of Chicago (AIL of Chicago Scott Smith Agency).

The Defendant is *not* entitled to a judgment as a matter of law with respects to all counts against it.  Under the Amendments to the Constitution Article VII, it says, "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by jury shall be otherwise re-examined in any Court of the United States, than according to the rules of common law."

### II. UNDISPUTED MATERIAL FACTS

## BACKGROUND FACTS

1.       Terry Brennan fired me using two "trumped up charge's of: 1. My not working on the Memorial Day weekend in the year 2001 *see Exhibit 1 Affidavit of Sue Vazquez Appointment Setter For AIL* and, 2. That I had written a letter for Linda Haynes-Jackson to AIL in Waco in answer to their form letter to her asking, "how did you find your employment while you were working for us." The letter was derogatory to Terry. I did not even know that she had written the letter. When he called me on my cell phone, to fire me, on my way to an appointment to sell insurance he was screaming and swearing at me. One of the phrases he used among many more was that I was a lying back stabbing bitch. I did not know what letter he was talking about and I told him so. *See Exhibit 3 Affidavit of Linda Haynes-Jackson.* During this same conversation, he said that Sue had changed her statement that I had worked on Memorial Day Weekend to I had not worked. He said I have you now and he screamed you are fired. In the past, Terry had told me that I was too old for another company to hire me so I should just do what he told me to do. He also discriminated against me when he refused to honor my Doctor Couri's driving restriction and had Sue Vazquez send me as far as she had leads for agents to run. *See exhibit 1.* Terry also discriminated against me when he refused to let me have time off for back surgery. *See exhibit 4 Testimony given by me under oath at Deposition. See Exhibit 5, Affidavit of Donna Stethem, Custodian of Records for Robert Grubb M.D. Terry* said if I tried to take time off, he would fire me. Terry also discriminated against me by having me train agents who were not my responsibility to train because they were coded to Terry. *See Exhibit 2 Linda Haynes- Jackson.* Since Terry discriminated against me, according to Scott Smith's Contract with American Income Life Insurance Company, he is responsible, according to his contract, under Obligations of State General Agent © To be responsible for the acts and obligations of Agents and General Agents. Terry would fall under this category. Under (j) To take no action or make any statement that is injurious or harmful to the Company, its business or its reputation. Terry's contract states the same (b) and (h) see Plaintiff's Exhibit 13 Terrance Brennan and Scott Smith contracts,

2.While it is true when Terry hired me in or around September of 1998 as an Independent Contractor, it soon became apparent that I had to work when he told me to work. S*ee Exhibits 1 Affidavit Sue Vazquez 2, Affidavit Sandra Wood and 3 Affidavit of Linda Haynes- Jackson.* He told us when we had to work. Terry supplied all of the office equipment i.e. Computer, telephone, copy machine, pens, pencils, and AIL paid for all of this according to Terry, including the rent on the office. In other words AIL owned all of the equipment. AIL also supplies all of the materials that were used to present a sale including all printed materials. I, upon termination on July 30, 2001 filed for unemployment as an employee of AIL. After a through investigation and testimony by current AIL employees I.D.E.S. found in my favor, decided that I was an employee not an Independent Contractor and granted me unemployment payments. *See Exhibit 6 State Of Illinois Department of Employment Security, Appeals Division, Referee's Decision Appeal Docket No. L 48679. See Exhibit 7 Testimony given by me at my Deposition Taken March 4, 2005 under Oath pages 2004 to 214. See Exhibit 8 EEOC Letter Dated*

*2/27/2004 Written by John P Rowe, District Director with the attached Notice of Right to Sue, followed by the Original Charge of Discrimination dated by me on 4/20/2001.*
Please also see *Exhibit 12 U.S. EEOC Determination Letter* stating what charges I could bring in the lawsuit against American Life Insurance Company. Please note in the EEOC letter the Charging Party: Barbara J. Kendell and the Respondent: American Income Life of Chicago/American Income Life Insurance Co.

3. The Original EEOC Charge *See exhibit 8 page 3 was drafted just the way the EEOC told me to do because at that point they were not sure where American Income Life Insurance Co. fit into the picture but during the investigation American Income Life Insurance Company was added as a Respondent.*

4. I did file the Charge with the EEOC within the 300 days after Termination. The time between Terry telling me I was fired, *See Plaintiffs Exhibit 9 Defendants Deposition Exhibit 4 (Group) Please see May 31, 2001* and the American Income Life Termination Letter dated August 5, 2001 terminating me with the effective date of July 31, 2001 *See Plaintiff Exhibit 10 Defendant's Exhibit B-a from Defendant's Exhibit B Affidavit of Debby Gramble from Defendant's Motion For Partial Summary Judgment,* I did work as and Agent of American Income Life *See Exhibit 9. On* June 10th: I called AIL *clients on June 11th I spoke with Bob Olsen and he said* that he wasn't sure if Terry had the right to fire me and that Scott Smith was coming to Peoria. .I met with Scott Smith see note on June 12th. Scott did not fire me on that day. On June 14, 2001, I filed a Grievance by writing a letter to Becky Turner. *See Plaintiff's Exhibit 11. 11a* Letter to Becky Turner dated June 14, 2001 *11b* and Letter addressed to Mr. Smith who was the CEO of American Income Life in Waco Texas dated June 15, 2001. American Income Life Insurance now knew that I filed with my Union OPEIU Local 277 because I sent Mr. Smith a copy of the Becky Turner letter. Waco received the letter on June 20, 2001 *see Exhibit 9* June 20th. Since I had to file within 300 days of termination and I was terminated as of July 31, 2001 and I filed with the EEOC on 4 20, 2002 I was within the guideline statute.

WHEREFORE: Plaintiff respectfully requests this Court to enter an Order denying the Defendant's request in its entirety.

DATED: September 23, 2005          Respectfully submitted,

Barbara J. Kendell
Plaintiff
504 W. High Street
Peoria, IL. 61606-1923
309-673-7112

## CERTIFICATE OF SERVIC

The undersigned hereby certifies that a copy of the foregoing was sent to the

following counsel/parties of record via First Class U.S. Mail, postage prepaid this 23rd day of September, 2005

        Cassandra Hansell
        Burroughs, Hepler,Broom,MacDonald,
        Herbrank & True, LLP
        Two Mark Twain Plaza, Suite 300
        Edwardsville, IL. 62025

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

BARBARA J. KENDELL, )
    Plaintiff, )
  )
vs. ) Case No. 04-1140
  ) Chief Judge:  Joe Billy McDade
AMERICAN INCOME LIFE OF ) Magistrate Judge:  John A. Gorman
CHICAGO and AMERICAN INCOME )
LIFE INSURANCE CO., )
  )
    Defendants. )

## AFFIFAVIT OF BARBARA J. KENDELL

Barbara J. Kendell personally appeared before the undersigned Notary Public and after being duly sworn, states and deposes as follows:

1. I am over the age of 21, and am competent to testify.

2. I have personal knowledge of the information contained in this Affidavit.

3. I am the Plaintiff

4. All of the statements that I have made in my RESPONSE TO DEFENDANT AMERICAN INCOME LIFE INSURANCE CO.'S MOTION FOR SUMMERY JUDGEMENT are True and Correct to the best of my knowledge.

5. All of the Exhibits or either original sworn to statements or True and Accurate copies of exhisting records.

Further Affiant sayeth not.

_Barbara J. Kendell_ _Sept. 23, 2005_
Barbara J. Kendell

**SUBSCRIBED AND SWORN** to before me this 23 day of September, 2005.

_Teresa M Fandel_
Notary Public
My Commission Expires: 08-01-09

"OFFICIAL SEAL"
TERESA M. FANDEL
Notary Public, State Of Illinois
My Commission Expires 08/01/09

### Affidavit Sue Vazquez

I Sue Vazquez being of sound mind want to say that what I am about to say is the truth to the best of my memory. I went to work for Terry Brennan sometime in late 1997 or early 1998. He hired me as the appointment setter for his office. Terry was OK in the beginning but he changed and started yelling a lot. Barbara Kendall was hired sometime at the end of 1998 if I remember right. Terry was nice to Barb in the beginning, sometimes he would have me cherry pick appointments for an agent. He began to change in his attitude to her around the time she was allowed to have agents coded to her. Terry expected her to do whatever he told her to do right or wrong. I think that he began to see that the agents liked her better because she took time to train them and show them how to do their paper work. When he was mad at her he would call her names like bitch. I remember when she had something wrong with her leg and was going to therapy Terry would say maybe she would quit. Barb brought in a doctors note restricting her driving and Terry said to me that he didn't believe there was anything wrong with her leg and that her doctors would just lie for her because her husband had been a doctor. Terry told me to send her the farthest out I could set the appointments for and for me to give her the shitest and longest drives that I had cards for no matter how old the cards were. He was hoping that this would make her quit because he was afraid that she was after his job. Her boy friend Curt has cancer and she drove him to Indianapolis to go to the VA. Before her leg they would go over maybe twice a month. After her leg began to hurt she would take two days to go over because she would stay over so she could rest her leg before having to drive back to Peoria. Terry had me set extra appointments for her and made her work weekends to make up the number of appointments he expected agents to run. He had me set four to five appointments a day or night and he expected the agents to work six days a week. If I had the lead cards he would have Barb working a double shift like instead of starting as 4 in the afternoon and set every hour he would have me start her at 10 in the morning or whatever so she would have six , seven or more in one day to make up for days she missed. He didn't care if she was a two hour deive away with the first appointment scheduled at 9AM and the next one scheduled at two and the next one at four and then every hour with the last one being at nine PM. He would have me set appointments for her on Sundays. He paid bonuses to his favorite male agents for working on Sundays like Bill Butler but I know that he never paid the women agents anything for working on a Sunday. He would laugh and tell me that the guys had to be paid to get them out there but the girls would just go because they didn't want to cross him.

Exhibit #1
Plaintiff

When Barb's leg got worse she went to a back doctor who wrote a letter saying that she needed surgery. She also went home and saw another doctor who said the same thing. On our regular meeting day I think it was on Monday's she brought the letter to the meeting and gave it to Terry after the meeting. I was in the office going over the new leads when she came in. She told him that when she had the surgery that she would need two to three months off. Terry hit the ceiling and got mad and said she might as well quit because if she tried to take that much time off he would fire her. He told her she was too old to get another job in insurance that was as easy as this one and she better think about it long and hard, He said he could put the word out so no one would hire her. He said that he never took more than a week off for a vacation and that no one could have more time than that. The next day I found the letters wadded up on the floor when I went in to get supplies.

Terry at one time or another yelled at everyone but he seemed to be meaner to the women. He would yell at me and fire me or I would quit but in a few days he would hire me back because I was the best appointment setter he ever had and he knew it. He always said if an agent quit he would just find someone else. The agent turn over was a lot and the only one who stayed was Barb. She always told me that she would out last Terry so she would get her renewals. She knew that he was trying to force her out before her three years were up.

Terry paid for a motel room for two of the male agents and gave them eating money so they would work over the weekend in Quincy but when he had the female agents go to Beneld or Danville two or three days in a row he never offered to put them up overnight. There were times I set the last appointment at 9PM on a Friday night and then sent Barb back to East St. Louis, or Danville the next morning with a 9AM appointment. I knew that it would be midnight or later before she got home on Friday night, Terry had me set appointments for her in the East Saint Louis area. He also had me send Sandy Wood there but not the mail agents because he knew the leads weren't good ones. They were SEIU leads and I knew that they were not good leads when I made the appointments by the way they answered my questions but Terry made me do it. He would threaten my job if I didn't do what he wanted.

Terry wouldn't give Barb any time off when she was moving. It was around the Fourth of July I think in 2000. I felt sorry for her because of her leg and the way Terry was treating her so I used Peoria leads that Terry had reserved for himself and set them for her so she could drive back home in between appointments to see how the packers were doing. I gave her a fake schedule the day after the forth because that was the day of the move and she needed to be at the old apartment, the new apartment to supervise the unloading and placing of the furniture and pay the movers when they were done. Some how Terry found out that she called a fake report in and he told Scott after he had yelled at both of us. Scott came down and told me that my job was safe but he almost fired Barb. He didn't care that Barb was moving. He said Terry was right and made Barb apologies to Terry and Scott said if she ever did that again he would fire her,

The tension between Barb and Terry got worse, I called Steve DeKlerk several times and told him about Terry and Steve always said to calm down that Terry just had trouble with people skills

Terry made me set appointments for Barb over the Memorial Day weekend in 2001 to make up for time she had been in Indianapolis with Curt. I only set half of the appointments that he wanted set so to cover myself when Terry got the call report I lied to him and told him that I had set all of the appointments that he told me to set and that she just didn't run them. I thought that I could get away with it but Terry talked to Barb and she showed him the schedule and gave him the names of the couple she saw. Terry called me back into the office and asked me again if I set all of the appointments and I said Barb was right that she did run the Appointments that I set. I had set only two instead of five. Barb demanded an apology from me and Terry and then left and went into her office. After she left Terry yelled at me something terrible about he finially had the fucking bitch, why did you back her up? I could have fired her if you had just kept lying. This went on for several minutes. He finally stopped and said I'll still get her. I left the office. Terry called me later and told me that I had to change my story and back him up because he was going to find a reason to get rid of her. And he said if I didn't back him up he would fire me and he ment it. Several days later he fired her over a supposed letter that he thought she had written to Waco telling them what a bad manager he was. He made me back up his story to Scott. After Barb was fired she went to unemployment and filed for unemployment. She asked me if I would testify for her that she was treated badly as well as an employee and I said yes. Unemployment asked me questions I answered them truthfully and I believe that I was under oath. I told the investigator how she was made to work and how she was treated. She won and got unemployment. Then she told me that she had filed charges with the EEOC and would I talk to the investigator and I said yes again, it took a long time but she finally won that one too. Now I am telling this again because it is the right thing to do and I am sorry that I ever lied for Terry. And I am not lying for him ever again.

*Sue Vazquez*

**Sue Vazquez**

9-22-05

**Date**

State of Illinois
County of Peoria
Signed before me this 22nd day of September **Notary**
by Sue Vazquez.

OFFICIAL SEAL
**DEBRA L. HOUSER**
NOTARY PUBLIC - STATE OF ILLINOIS
My Commission Expires April 17, 2007

9/21/05

To Whom It May Concern;

I worked for American Income Life in 1999 thru 2000 under manager Terry Brennan. He was very discriminatory to females in his capacity as manager. He continually threatened to fire me if I did not work every evening and Saturday, even though we were suppose to be contracted agents.
He tried to be very threatening and intimidating to the female agents but had an open and friendly rapport with all male agents.

It was very obvious he had an issue with agent Barbara Kendell. He did not hesitate to raise his voice to her and be extremely demeaning thru threats of termination and cursing. At the weekly meetings, he would not hide the fact that he wanted her to quit by making snide derogatory statements.

He showed his preference to the male agents by offering them bonuses to work on Sunday's and to pay for their motel rooms if they needed or wanted to stay in a particular area out of town.

Terry was definitely discriminatory against Barbara Kendell.


Cordially,

*Sandra Wood*
Sandra Wood


September 22, 2005
Peoria County
State of Illinois

Jean Kieser, Notary

**OFFICIAL SEAL**
**JEAN KIESER**
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:03/10/08

Exhibit #2

Plaintiff Exhibit # 3

To Whom it may concern,

I answered an ad in the newspaper for the sales position with American Income in early 2001. At the interview Terry seemed interested in me being there for employment. After I started that all changed. Terry was very abrupt and trained me 2-3 days out with several no shows so I only saw 2-3 presentations and he said I was on my own. Also he had me sign a paper that said I was an independant contractor, then preceded to tell me when I had to work and how many hours. My boys were younger and if I needed a day off. I had to make it up. I was befriended by Barb Kendall another agent and I asked her if I could ride with her a couple of times and she said sure. So for the next week to 10 days I got trained by Barb. I was very thankful for her help. We had Monday meetings that were unorganized and nothing much was ever accomplished. With Terry being a bully to him every other week firing our telemarketer, I decided it wasn't a good place to work. Definately not for me.

A week or 2 later I got a letter from American Income. Kind of a

surprise. It was, as best as I
can describe, an exit interview
form letter or job evaluation
questioner. I answered the
letter truthfully. I thought
someone from upper "company"
might want to know how
their office in Peoria was
being ran. As I remember
I put on the form about Barb
training me and Terry being
rude and a bully. I was
very glad to get out of there.

Linda Taynes Jackson

"OFFICIAL SEAL"
Barbara Crow
Notary Public, State of Illinois
My Commission Expires 3/10/2008

Barbara W. Crow
9-22-05

1    IN THE UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF ILLINOIS

3    CCPY

4    BARBARA J. KENDELL,

5        Plaintiff,

6    vs.                    Case No. 04-1140

7    AMERICAN INCOME LIFE OF

8    CHICAGO and AMERICAN INCOME

9    LIFE INSURANCE CO.,

10        Defendants.

11

12

13

14        THE VIDEOTAPED DEPOSITION of **BARBARA**

15    **ELIZABETH JOHANNSEN KENDELL**, taken on behalf of the

16    defendants, at 9:12 a.m., on March 4, 2005.

17

18

19

20    Reported by: Darlene M. Niemeyer, CSR, RPR, CCR
             Illinois CSR License No.: 084-003677
21             Missouri CCR License No.: 866

22             **MILES REPORTING COMPANY**
            **1339 North 17th Street, Suite 102**
23            **Belleville, Illinois 62226-6441**
                **(618) 235-2633**
24              **fax # (618) 235-2641**    *Exhibit 4*

1

1    months.  I just -- it was excruciating.  It was just --
2    so I didn't do anything that I didn't absolutely have
3    to do.
4    Q.    During that four to six --
5    A.    I do remember coming down and seeing mother and
6    dad on one other trip and that was the first time mom
7    saw me after it started in.  And she just had a fit
8    when I'm walking and I'm literally kind of dragging the
9    left leg.
10   Q.    Okay.  So during this four to six month time
11   period when you said your --
12   A.    Seven months.
13   Q.    -- back pain was at the worst, you did come down
14   to visit mom and dad?
15   A.    Well, I came down because I had to go see a
16   neurosurgeon over in St. Louis.
17   Q.    Okay.  So you came down to St. Louis for a
18   neurosurgeon.  Did you go to any -- or take any trips
19   to Indianapolis during this four to six or seven
20   whatever month --
21   A.    Yes, I did.
22   Q.    -- period?
23   A.    Yes, I did.
24   Q.    How many trips did you take?

```
 1 │ way Terry is, he is that type of an intimidating human
 2 │ being?
 3 │   A.    Yeah.
 4 │   Q.    Okay.  What else?
 5 │   A.    I don't know whether the fact that I -- I wanted
 6 │ to take time off to have the surgery, if that had
 7 │ anything to do with it or not.  I don't know.  Because
 8 │ eventually the way it was going, I was going to have
 9 │ to.   That was before the cyst ruptured, thank God.  I
10 │ didn't know how much longer I could put up with the
11 │ pain.  And I don't know.  I have no idea.  I don't -- I
12 │ can't see inside Terry's mind.  I just -- I tried for a
13 │ long time to figure him out.
14 │   Q.    Okay.  So this whole -- the time off for
15 │ surgery, it may or may not be a reason why he tried to
16 │ impose fear and intimidation on you?  You don't know?
17 │   A.    (Shook head from side to side.)
18 │   Q.    Do you think prior to this incident where you
19 │ said you needed time off for surgery, was he exhibiting
20 │ or trying to impose fear and intimidation on you prior
21 │ to this?
22 │   A.    Yes, but when I showed him the driving
23 │ restriction and then he threw it on the desk and he
24 │ said, that's just -- that's a lie.  Your doctor would
```

310

```
 1    lie for you.  And I said, well, no, my doctor -- maybe
 2    your doctor would lie for you, Terry, but my doctor is
 3    not going to lie for me.  And this is just the way it
 4    is and --
 5    Q.    Okay.  So, Barb, how would you explain it, then?
 6    Was he trying to impose fear and intimidation on you
 7    prior to this incident where you said, Terry, I need
 8    time off for surgery?
 9    A.    (Nodded head up and down.)
10    Q.    He did?
11    A.    Yeah.
12    Q.    Yes.  You are saying it is different?
13    A.    It got more so.
14    Q.    More intimidation, more fear --
15    A.    Yeah, yeah.
16    Q.    -- on you?  What did he -- what did he say to
17    you that caused you to fear and feel intimidation --
18    and feel intimidated?
19    A.    When I brought the first neurosurgeon report in
20    and I said this is the neurosurgeon report and I am
21    going to go down and get a second opinion.  But it
22    looks like I'm going to need two or three months off.
23    Q.    Okay.  Do you recall when you gave Terry that
24    report?  Well, whose -- what doctor was that?  What
```

311

```
 1   report --

 2   A.    That would have been Dr. Tracy's.

 3   Q.    -- did you give first?  Okay.  Dr. Tracy.  What

 4   did Dr. Tracy's report say, do you recall?

 5   A.    I don't remember all of the medical terminology.

 6   Basically I had a -- or I still have it.  A cyst

 7   between L4-L5 pressing on the sciatic nerve causing all

 8   kinds of really bad problems with the left leg,

 9   including partial, whatever, radicular pain, numbness,

10   tingling.  It won't work.  I'm dragging it when I'm

11   trying to walk.  That to get to it -- he would have to

12   do a laminectomy to get to the cyst.  And then do a

13   final -- a spinal fusion to stabilize between L4-L5.

14   Q.    Okay.  Let me stop you for one second, please.

15              MS. HANSELL:  Could you mark that.

16              THE DEPONENT:  Juxta facet cyst, I think.  I

17   think.

18                         (Whereupon a document was duly

19                         marked for purposes of

20                         identification as Defendant's

21                         Exhibit 5 as of this date.)

22   Q.    (By Ms. Hansell) Okay.  Barb, we --

23   A.    Wait a minute.

24   Q.    You have just been handed what has been marked
```

```
 1   as Defendant's Exhibit Number 5.  Is this the medical
 2   report from Dr. Tracy that you were just referring to?
 3   A.    Yes.
 4   Q.    Okay.  So it is your position that you gave this
 5   -- I mean, is this a true and accurate copy --
 6   A.    Yes.
 7   Q.    -- of the letter that you claim to have given to
 8   Terry Brennan?
 9   A.    Yes.
10   Q.    And on what date did you give this to Terry
11   Brennan?
12   A.    I don't remember.  It would have been right
13   after.  I don't remember.
14   Q.    Right after --
15   A.    Right after the -- right after I got a copy of
16   the letter.  I don't remember.
17   Q.    Okay.  So you have -- okay.
18   A.    I mean, I just don't remember.
19             THE VIDEOGRAPHER:  Excuse me.  I need you to
20   -- you are covering your microphone up where you have
21   it, you know what I mean.  Put it above the second
22   button.  There you go.  Thanks.
23             THE DEPONENT:  And I told Terry, I said,
24   well, I have got another appointment.  I'm going to be
```

```
 1    taking time off to go down to see doctor -- oh,
 2    whatever the guy's name is down here.  I'm so tired.  I
 3    can't think of his name.
 4    Q.    (By Ms. Hansell) Dr. Grubb?
 5    A.    Yeah.  And we will see what he says.
 6    Q.    Okay.  Barb, is it possible that on September
 7    13th, 2000 you discussed surgery with Terry Brennan and
 8    that is when --
 9    A.    That is quite possible.
10    Q.    And that's when he accused you of lying?
11    A.    That was the second time.  The first time he
12    accused me of lying was when I gave him Dr. Couri's
13    little note on the driving restriction.
14    Q.    When did you give him that?
15    A.    I don't remember.
16    Q.    Do you think the Couri driving restriction, does
17    that go -- that's what we were talking about, the time
18    off for surgery, the fear and intimidation?
19    A.    As far as I remember, Couri's note was prior to
20    this because it was just when I was doing the physical
21    therapy, because the driving was bothering me a lot.
22    And I was doing physical therapy, I think, three times
23    a week, pool therapy and heat massage.
24              And that was prior to -- well, anyway, the
```

1   pain just kept getting worse and worse and worse

2   instead of better and it should have been getting

3   better.  And that's when I said I think there is

4   something wrong.  I want to pursue this further.  It is

5   more than just arthritis.  And he put me on a driving

6   restriction.  I went to see -- it all happened around

7   the same time.

8   Q.   Okay.  But to get back to my question, and

9   again, try to listen to what I am saying so we can get

10   through this quickly.  The fear and intimidation

11   element of your claim, you said you were waiting for

12   the next phone call from Terry.  Does the Dr. Couri --

13   the driving restriction from Dr. Couri, does that fall

14   into this category, or is this not a part of the fear

15   and intimidation category?

16   A.   That was the first time that he ever said that a

17   doctor would lie for me.

18   Q.   Okay.  But did you consider that statement,

19   Terry's statement to be trying to impose or instill

20   fear in you or intimidation?

21   A.   No.

22   Q.   No.  Okay.

23   A.   I --

24   Q.   So hold on.  Let me make sure I'm clear.  So the

```
 1    driving restriction note from the doctor that you gave
 2    to Brennan, that does not come under fear and
 3    intimidation?
 4    A.    No.
 5    Q.    But we are going to look at the September 12th
 6    of 2000 letter, Defendant's Exhibit Number 5, the
 7    letter from Dr. Tracy.  That comes into the fear and
 8    intimidation with Terry Brennan; am I right?
 9    A.    Yes.
10    Q.    Okay.  And let me ask you this.  So your cyst in
11    your back, is that what you claim to have as a
12    disability?
13    A.    The disability when Terry hired me was the
14    fibromyalgia.
15    Q.    Okay.  And is that what you claim to have --
16    A.    I have had that since in the '60s.
17    Q.    Okay.  But I'm just trying to figure out what is
18    your --
19    A.    And I told Terry that there were days that I
20    would not be able to work, and I couldn't predict them
21    ahead of time.
22    Q.    Right.  So, Barb, what I'm trying to figure out,
23    just in general, what is your disability, though?  So
24    is it fibromyalgia?
```

1   A.    Fibromyalgia.

2   Q.    Okay.  Do you think that your cyst is a

3   disability?

4   A.    The cyst, when it was at its worse, was a

5   disability, yes.

6   Q.    Okay.  But it is no longer a disability?

7   A.    It is, from time to time, unable to do -- yeah,

8   I can't do what I want to do.

9   Q.    Okay.  I've got to get down from -- or figure

10  out from you what time period, and I know we discussed

11  there was a four or a five-month period where you claim

12  that it was at its worse.

13  A.    (Nodded head up and down.)

14  Q.    Is that when you considered it to be -- the

15  cyst, you considered the cyst to be a disability?

16  A.    Yeah.

17  Q.    And did we narrow down the date, the four to

18  five-month time period?  Was it in '99, 2000, 2001?

19  A.    It was in 2000.

20  Q.    Okay.  Now, can we narrow it down to the months,

21  an approximation, estimate of months when you

22  considered it to be a disability?

23  A.    October, July, August, September, and it just

24  gradually got worse.

```
 1    Q.    At what point -- it started in the summer of
 2    2000?
 3    A.    I don't remember when.  I know it was several
 4    months before I had the neurosurgeon take a look,
 5    because I kept thinking it would go away.  I kept
 6    thinking it would get better.  It just kept getting
 7    worse.
 8    Q.    Okay.  So to answer my question, though, is it
 9    fair to say from, say, summer of 2000 until the fall of
10    2000 it was at its worst?
11    A.    Summer of 2000 until the late winter of 2001.
12    Q.    Okay.  And from that point --
13    A.    Maybe early spring.
14    Q.    And then, Barb, so did you ever have the
15    surgery?
16    A.    No.
17    Q.    Okay.  Why did you not have surgery?
18    A.    Well, number one, Terry told me he would fire me
19    if I did.  And I had planned on having it over the
20    Christmas holiday.
21    Q.    Okay.
22    A.    Because I figured I don't like working in
23    January anyway.
24    Q.    Okay.
```

1    to be marked as exhibit -- Defendant's Exhibit Number

2    12.

3                        (Whereupon a document was duly

4                        marked for purposes of

5                        identification as Defendant's

6                        Exhibit 12 as of this date.)

7    Q.    (By Ms. Hansell) I am going to represent that's

8    a copy of your complaint.  Would you please just take a

9    quick glance at it and tell me if this appears to be a

10   true and accurate copy of the complaint that you filed

11   in the Central District of Illinois?

12   A.    Yeah, I think so.  It sure looks like it.

13   Q.    Okay.  Barb, on the -- well, the last page

14   before you have your attachments, I just want to

15   confirm, is that your signature on that page?

16   A.    I don't know.  Where is it?  How far back is it?

17   Q.    Okay.  One, two, three, four, five, six, seven,

18   eight -- on the ninth page if you count from the first

19   page of the complaint on, at the top it says page

20   seven.  Is that your signature?

21   A.    Is that it?

22   Q.    Yes.

23   A.    Yes, page seven.

24   Q.    Is that your signature?

1    A.    Yes.

2    Q.    Okay.  Is that -- the handwriting on here, this

3    is your handwriting; is that correct?

4    A.    Yeah.

5    Q.    Okay.  I have another quick question for you.

6    It is on the typed -- single spaced typewritten

7    information that you provided in response to part four,

8    roman numeral four.

9    A.    Is it after this or before this?

10    Q.    It is before that.  It is in the -- okay.  It is

11    on page one of two, the typewritten section.  Okay.  If

12    you would look at the first, second, the third

13    paragraph in the middle, it states, I went to two

14    neurosurgeons for --

15    A.    Wait, wait, wait.  Okay.  Got you.

16    Q.    Okay.  I went to two neurosurgeons for

17    consultation.  Both said I had a large cyst between L4

18    and L5 in the spine and I should have surgery.  I said

19    that I would probably have the surgery in December of

20    2000.  I took the reports to Terry and he made copies

21    to send to Scott Smith.

22          Okay.  Barb, do you recall when you gave

23    these reports to Terry?

24    A.    Other than it was after the -- right after the

1    reports came out.  Exactly what day, no, I don't

2    remember.

3        Q.    You don't recall.  Now, did you attach these --

4    first of all, what reports are you referring to?

5        A.    This one and the one from Dr. Grubb.

6        Q.    Okay.  Now, you attached those reports to your

7    grievance; is that correct?

8        A.    Yes.

9        Q.    Okay.  Is that the first -- is that the first

10   time that you gave these to Terry, these --

11       A.    Oh, no.

12       Q.    -- medical reports?  Okay.  You had given these

13   medical reports to Terry prior to the grievance filing?

14       A.    I had given them in September after this report

15   came out, and I gave the one from Dr. Grubb, that was

16   like three weeks later.

17       Q.    Okay.  So you think shortly after the time when

18   you saw these doctors you gave copies of their reports

19   to Terry?

20       A.    Yes.

21       Q.    You said Terry made copies and sent them to

22   Scott.  Did you see Terry make copies of these

23   documents?

24       A.    Yes.  No, wait a minute.  No, I didn't see him

437

STATE OF MISSOURI      }

                              } SS

CITY OF ST. LOUIS        }

**AFFIDAVIT**

      Comes now <u>Donna Stethem,</u> having been duly sworn, and hereby attests as follows:

1. I am of sound mind, capable of making this Affidavit, and personally acquainted with the facts herein stated.

2. I am the custodian of records at the Office of *Robert Grubb MD*, Washington University School of Medicine, 660 S. Euclid, St. Louis, MO 63110. Attached hereto are medical records from the office of *Robert Grubb MD* regarding patient *Barbara J. Kendell*.

3. These records attached hereto are true and accurate copies of their original counterparts. Said originals have been kept and maintained at the office of *Robert Grubb MD* in the regular course of business by one of its employees or representatives, with knowledge of the act, event, opinion, or diagnosis recorded in the records to make said records.

      The records attached hereto were made at or near the time of the act, event, condition, opinion, or diagnosis, and were made by an individual with personal knowledge of the act, event, condition, opinion, or diagnosis recorded therein.

                                      _____

                                      **Custodian of Records**

      In witness whereof, I have hereunto subscribed my name and affixed my official seal this __25__ day of __February__, 2005.

                        *Connie M Kindhart*

                      **Notary Public**

" NOTARY SEAL "
Connie M. Kindhart, Notary Public
St. Louis City, State of Missouri
My Commission Expires 10/11/2005

*Exhibit 5*

# DEPARTMENT OF NEUROLOGICAL SURGERY
## Washington University Medical Center

PATIENT NAME: Kendell, Barbara J.
DOB: 7-1-34

DATE OF SERVICE: 12-18-00
SEEN BY: Robert L. Grubb, Jr., M.D.
PRIMARY M.D.: Robert Meister, M.D.

## OFFICE FOLLOW-UP VISIT

The patient has been much improved over the past several weeks. Some days she has virtually no pain in her leg and other days she has some pain which is not severe. She is taking one Vicodin tablet a day intermittently and Motrin intermittently. She is having very little lower back pain. Most of her lower back pain is in her left buttock. The pain continues in her left posterolateral hip, posterolateral thigh, and lateral lower leg when present.

### PHYSICAL EXAMINATION:
Examination today showed good bending of her back, which was not painful. There was no focal motor or sensory deficit in her legs and feet. She stood well on her heels and toes. Knee jerks were 2+. Ankle jerks were trace.

### RECOMMENDATIONS/DISCUSSION:
The situation was again discussed at length with the patient. I told her she should stop taking Vicodin altogether and see how she does without taking Vicodin. At this time she feels she is not having enough pain to consider surgery. She is to call if she becomes worse.

ROBERT L. GRUBB, JR., M.D.

RLG:sjs

cc:     Patrick Tracey, M.D. > faxed  1/17/01
        Robert Meister, M.D. > faxed  1/16/01

**DEPARTMENT OF NEUROSURGERY**
**WASHINGTON UNIVERSITY SCHOOL OF MEDICINE**
**660 S. EUCLID AVE., CAMPUS BOX 8057**
**ST. LOUIS, MO 63110**
**314-362-3567**

**KENDELL, BARBARA J.**

**DOB: 1-7-43**
**PHONE: 309-673-7112**

**REQUESTING PHYSICIAN: PATRICK TRACEY, M.D.**

**CONSULTING PHYSICIAN: ROBERT L. GRUBB, JR., M.D.**

**OFFICE CONSULTATION NOTE**
**DATE OF VISIT: 9-20-00**

**HISTORY OF PRESENT ILLNESS:**
57-year-old right-handed female who had a 5-month history of intermittent aching and at times sharp pain and at other times burning type pain in her left posterolateral hip, posterolateral thigh, and lateral lower leg. At times the pain occurred when standing and walking. She also had intermittent tingling and numbness in the same distribution. At times when lying or sitting she would have tingling in the same distribution in her left leg, but her leg did not hurt when lying flat or standing. Coughing and sneezing did not increase her pain. She underwent a course of physical therapy, which did not help. She was taking up to four Vicodin tablets a day for pain. She was also taking Motrin and Flexeril intermittently for pain. She had no weakness in her leg. She had mild low back pain. She had no pain in her right leg.

**REVIEW OF X-RAYS:**
An MR scan of the lumbosacral spine showed a synovial cyst at L4-5 on the left measuring approximately 1 cm in diameter causing mass effect on the left posterolateral aspect of the dural sac. Lumbosacral spine films with flexion/extension views showed degenerative disc disease at L4-5 and L5-S1 and 2 mm anterior subluxation of L4 on L5 which did not change with flexion and extension. There was extensive osteoarthritic posterior facet changes at L4-L5. An MR scan of the pelvis showed extensive calcification and ossification within the subcutaneous tissue of the buttocks, but was otherwise unremarkable. An MR scan of the lumbosacral spine done in 1998 had shown facet degeneration at L3-4, L4-5, and L5-S1, but no evidence of spinal stenosis, herniated disc, or a synovial cyst.

**PAST MEDICAL HISTORY:**
Positive for appendectomy, tonsillectomy, bone graft to left little finger, uterine suspension procedure, surgery on right eye for strabismus, and excision of multiple subcutaneous calcium deposits. She had a history of asthma, osteoarthritis, fibromyalgia, and hypothyroidism. She had no history of cardiac disease, diabetes mellitus, or hypertension.

**ALLERGIES:** Darvon, Sulfa, Penicillin.

**MEDICATIONS:** Synthroid 0.05 mg daily, Trazodone 50 mg po q hs, Dyazide prn, Flexeril prn, Motrin prn, and Vicodin prn.

**OCCUPATION:** She worked in insurance sales.

**HABITS:** She did not smoke.

**REVIEW OF SYSTEMS:** Otherwise unremarkable (see attached sheet).

**GENERAL PHYSICAL EXAMINATION:**
Showed height 5'7" and weight 180 pounds. She could flex her back to 90°. This caused pain in her left posterolateral thigh and lateral lower leg. Extension and left lateral bending of her back caused tingling in her left posterolateral thigh and lower leg. Right lateral bending was not painful. Straight leg raising at 40° on the left produced pain in her left posterolateral thigh. Straight leg raising was negative on the right. Rotation of her hips was not painful. There were no bruits over the neck. Carotid, superficial temporal, radial, and dorsalis pedis pulses were palpable bilaterally. Neurologic examination showed she was awake and alert with clear speech. Cranial nerves II through XII were grossly intact. Optic discs were flat. There was no focal motor or sensory deficit. The

**Barbara Kendell**
**Consultation Note**
**Page 2**

deep tendon reflexes were 2+ and symmetric, except for trace ankle jerks. Toes were downgoing. There were no cerebellar signs.

**ASSESSMENT & PLAN:**
The MR scan was reviewed. The situation was discussed with the patient. The patient has a large synovial cyst at L4-5 on the left. A surgical procedure to remove the cyst was discussed. I told her I did not think a fusion of L4-5 was indicated at this time. I explained to her, however, that with a synovial cyst and severe degeneration of the facet joints, she is at increased risk of further anterior subluxation of L4 on L5 requiring a fusion in the future with or without surgery to remove the synovial cyst at this time. The risks of surgery to remove the synovial cyst including paralysis, loss of sensation, bowel, bladder, and sexual function, hemorrhage, infection, CSF leak requiring secondary surgery, spinal instability requiring secondary surgery and fusion, possibility of recurrence of synovial cyst in future, and lack of guarantee of good results were discussed. The patient told me she wanted to proceed with surgery, but cannot have it done until November or December because of her job. She told me she would call my office to schedule surgery when she decides to proceed.

ROBERT L. GRUBB, JR., M.D.

RLG:sjs

CC:    Robert Meister, M.D.    Faxd
9-29-00



**A S S O C I A T E D**
**U N I V E R S I T Y**
**NEUROSURGEONS, S.C.**

UIC - College of Medicine at Peoria
Department of Neurosurgery
Clinical Faculty:
D.H. Dinh, M.D.
P.W. Elwood, M.D.
W.C. Hanigan, M.D.
J.P. Henderson, M.D.
J.R. Lister, M.D.
W.C. Olivero, M.D.
P.T. Tracy, M.D.

**Please Send Correspondence to:**
**719 N. Kumpf Blvd. - Suite 100**
**Peoria, IL 61605**
**(309) 676-0766**

September 15, 2000

JOSEPH COURI MD
MIDSTATE RHEUMATOLOGY ASSOC
120 NE GLEN OAK AVE #408
PEORIA IL   61603

RE: BARB J. KENDELL

Dear Joe:

Mrs. Kendell returned today, with flexion/extension x-rays of her lumbosacral spine. To my review, she has grade I L4-5 spondylolisthesis, and also has about 2 or 3 mm of additional subluxation of the flexion views, as compared to the extension views. The neutral lateral view was somewhat rotated, and therefore not all that helpful.

She reports that her symptoms are about the same; and her examination is also about the same. She has trace left L5 myotomal weakness, and slight hypalgesia in the left L5 dermatome.

Because she has L4-5 instability, in addition to her synovial cyst, my recommendation would be that her surgical treatment include not only decompression and removal of the cyst, but also L4-5 fusion. I think that pedicle screws and rods, combined with a posterolateral arthrodesis at L4-5 would be adequate, in this regard. Although an interbody fusion is possible, it would require considerably more bony removal (bilateral facetectomies), and more operative time and blood loss, and probably not add all that much to the probability of solid fusion.

Either way, she will need to be immobilized for about three months in a TLSO. I've discussed this with her in detail. She would like to wait about another 8 to 10 weeks before proceeding with surgery. Next week she is going to St. Louis for a second opinion with a neurosurgeon there. I've scheduled a follow up appointment here with her in four to six weeks.

I'll keep you informed.

Sincerely,

Patrick T. Tracy, M.D.
Assistant Professor of Neurosurgery
PTT:jmp

BLOOMINGTON OFFICE
Eastland Medical Plaza
1505 Eastland Drive
Bloomington, IL 61701
(309) 827-7863

PERU OFFICE:
2011 Rock St.
Suite D2
Peru, IL 61354
(815) 223-7861

GALESBURG OFFICE:
Cottage Hospital
695 N. Kellogg St.
Galesburg, IL 61401
(309) 345-4202

KEWANEE OFFICE:
716 Elliott St.
Kewanee, IL 61443
(309) 854-0523

MACOMB OFFICE:
McDonough District Hospital
525 E. Grant Street
Macomb, IL 61455
(309) 833-4181

*Scanned.*