ORIGINAL

# THE DEPOSITION OF
# BARBARA ELIZABETH JOHANNSEN KENDELL

## TAKEN ON MARCH 4, 2005

### IN THE MATTER OF:

**BARBARA J. KENDELL**
vs.
**AMERICAN INCOME LIFE OF CHICAGO and AMERICAN INCOME LIFE INSURANCE COMPANY**

Case No.: 04-1140

*MILES REPORTING COMPANY*
*Certified in Illinois and Missouri*
*1339 North 17th Street, Suite 102*
*Belleville, Illinois 62226*
*(618) 235-2633*
*FAX (618) 235-2641*

*Reported by:* Darlene Niemeyer, CSR, RPR, CCR
Illinois CSR License No.: 084-003677
Missouri CCR License No.: 866

EXHIBIT 1

**Page 425**

1 afford it.
2 Q. And that is because you didn't have COBRA at
3 that time; is that correct?
4 A. Yeah. I just couldn't afford it.
5 Q. Okay. So how long were you on the Prozac?
6 A. A year. I don't know. You would have to get
7 the records. I don't remember.
8 Q. Okay. You are not sure?
9 A. But I know -- I also know that I didn't -- there
10 was a lot of stuff I was supposed to be on that I
11 didn't go on that I have done damage to my body because
12 I couldn't afford it without health insurance.
13 Q. Okay, Barb. As far as the emotional stress --
14 A. Ouch.
15 Q. -- have you told me pretty much everything --
16 A. Oh, gosh, I hope so.
17 Q. -- you have on issue? Okay. One other thing,
18 besides when Worley was sick and dying and you were
19 diagnosed with depression and you were taking Prozac,
20 at any other point in your life have you ever been
21 diagnosed with depression --
22 A. No.
23 Q. -- or emotional distress or anything along those
24 lines?

**Page 426**

1 A. No, not as far as I know, no.
2 Q. Okay.
3 A. I don't know what somebody might have said
4 without telling me (the deponent laughing). But, no,
5 to my knowledge...
6 Q. Did you go to any other doctors for the
7 emotional --
8 A. Wait a minute. It is the up and the down.
9 Okay. Did I go to any other doctors besides Kenny?
10 Q. No, besides Meister for any type of emotional
11 issues?
12 A. Well, yeah, Kenny. You asked me about him
13 that -- you asked me about him earlier this afternoon.
14 Q. Okay. And so you went to Meister and you went
15 to Kenny for -- this is after the contract termination.
16 A. Oh, after the contract -- no, I just went to
17 Kenny -- or I just went to Meister.
18 Q. Okay. That's what I thought.
19 A. Well, I also talked it over with Joe Couri, but
20 Meister did the actual ordering.
21 Q. So Couri didn't want to put you on anything
22 else?
23 A. I didn't ask him to.
24 Q. Okay. But did he treat you for emotional

**Page 427**

1 issues?
2 A. He treated me, yeah, but it was physical.
3 Q. So I'm asking about emotional.
4 A. The emotional brought on an exacerbation of the
5 fibromyalgia, and I had to get an awful lot more shots.
6 Q. And he was treating you for the fibromyalgia?
7 A. Correct.
8 Q. Okay. But nothing with your emotions?
9 A. No.
10 Q. That's Meister?
11 A. Yes.
12 Q. Okay.
13 A. Stress just aggravates fibromyalgia.
14 Q. Do you have fibromyalgia right now?
15 A. Yeah.
16 Q. I mean, flaring up right now from stress?
17 A. Yes.
18 Q. From me?
19 A. No, from the sitting (the deponent laughing).
20 Q. Okay. If your -- if he's -- if you are okay,
21 you can stand.
22 A. No, it's just -- the muscles go into spasm.
23 Q. Okay.
24 A. And sometimes you get one where the sun doesn't

**Page 428**

1 shine, and that just...
2 Q. Okay, Barb. You received unemployment
3 compensation after your contract was terminated,
4 correct?
5 A. Yeah, after I fought it all the way through,
6 correct.
7 Q. And what happened? Was there a final
8 determination, a review by the board that you were not
9 an employee but were an independent contractor?
10 A. The way it was explained to me, and I did
11 contact an attorney over that. In fact, I think it was
12 one down in the Belleville area I finally talked to and
13 I don't remember who. I might have a note on
14 something.
15 Q. Okay.
16 A. Because I was really worried if that was going
17 to affect my EEOC ruling or anything.
18 Q. But what ultimately happened, just a simple
19 answer to that one?
20 A. They said that was only to make sure that
21 American Income didn't have to reimburse IDES for the
22 money that they had given me. Don't ask. That is the
23 way it was explained to me.
24 Q. Well, what was their ultimate determination?

```
 1  Were you -- did they determine or consider that you
 2  were an employee or an independent contractor?
 3  A.  The ultimate after the fact was that I was an
 4  independent contractor.
 5  Q.  Okay.  How much money did you receive from
 6  unemployment compensation?
 7  A.  I never ever added it all up.
 8  Q.  Okay.
 9  A.  It would be on my tax return.
10  Q.  Okay.  Do you remember how much you got per
11  week?
12  A.  No.
13  Q.  Again, on your tax return?
14  A.  Yeah.
15  Q.  Okay.
16  A.  Whatever the maximum was.
17  Q.  Okay.  And, too, in order to obtain unemployment
18  compensation, you have to apply for various jobs?
19  A.  Yes.
20  Q.  And so is it so many jobs per week or per month?
21  A.  I don't remember how many there are that you
22  have to -- I don't think there is a limit.  I don't
23  know.  You just had to show that you were actively
24  applying.
                        429
 1  Q.  Okay.  And, Barb, now, you had to prepare a log
 2  and maintain a log for them, didn't you?
 3  A.  I had to maintain a log and give it to them if
 4  they asked.
 5  Q.  Okay, correct.  The log that you maintained --
 6  so you maintained this at home, correct?
 7  A.  Yeah.
 8  Q.  This log that you maintained, did you complete
 9  this -- or provide truthful and accurate information --
10  A.  Yes.
11  Q.  -- on the log?
12  A.  Yeah.
13  Q.  Okay.  Besides unemployment compensation did you
14  receive any other type of compensation since your AIL
15  contract was terminated?
16  A.  Well, yeah, I sold policies.
17  Q.  Okay.  Do you have any idea of the amounts of
18  those policies?
19  A.  There again, it is on my tax forms.
20  Q.  Okay.
21  A.  Each individual policy, no.  The aggregate is
22  there on the Schedule C.
23  Q.  Okay.
24          THE DEPONENT:  I shouldn't wiggle, should I.
                        430
 1          THE VIDEOGRAPHER:  That's fine.
 2          THE DEPONENT:  I'm sorry.  I sat in on a lot
 3  of depositions with Worley.  Are we on the record?  Oh,
 4  never mind.  Never like this.
 5  Q.  (By Ms. Hansell) Barb, on the doctors' notes
 6  that you gave to Terry Brennan, we discussed one.  I
 7  think it is Dr. Couri's note.  It would be Defendant's
 8  Exhibit Number 5.  We determined that you discussed --
 9  this is about your surgery; is that right?
10  A.  Uh-huh, yes.
11  Q.  Was there another doctor's note that you gave to
12  Terry Brennan?
13  A.  Dr. Grubb.
14  Q.  And do you recall, was that before or after?
15  A.  He was the second opinion and he was going to
16  approach the surgery a little differently.
17  Q.  Okay.  Do you recall, did you ever inform Scott
18  Smith about these doctors' reports?
19  A.  Terry said he would.
20  Q.  But you never did it personally; is that
21  correct?
22  A.  I don't remember if I ever gave Scott a copy on
23  that when we had the meeting.  I don't remember.  I
24  know he knew that I had to have it.  I know his wife
                        431
 1  knew about it, because we talked about it when -- I
 2  don't remember when we all went up to Chicago for a
 3  meeting, and I -- and they were asking me about it.
 4  So, yeah, they knew.
 5  Q.  You said they were asking me.  Who was asking
 6  you?
 7  A.  Some of the other agents from the Chicago area.
 8  Scott's wife was.
 9  Q.  They were asking you about --
10  A.  Watch it, watch it, watch it, watch it.
11  Q.  Oh, thank you.  They were asking you about what?
12  A.  The surgery I was going to have.  Annette, his
13  wife, asked me if I had decided to have it, Scott's
14  wife.
15  Q.  Okay, Barb, real quick what we are going to do
16  now, hopefully this will be quick, I'm going to hand
17  you some documents.  I may have a few questions.  I'm
18  going to hand you some documents and just ask for you
19  to generally identify what they are, tell me, you know,
20  is it your handwriting, have you seen these documents
21  before?
22  A.  I hope there is no more porn (the deponent
23  laughing).
24  Q.  I hope not either, Barb.
                        432
```

```
STATE OF ILLINOIS   )
                    ) SS
COUNTY OF MONTGOMERY)
```

C E R T I F I C A T E

I, DARLENE M. NIEMEYER, a Notary Public in and for the County of Montgomery, State of Illinois, DO HEREBY CERTIFY that pursuant to agreement there appeared before me on the 4th of March A.D., 2005, at 103 W. Vandalia Street, Suite 300, Edwardsville, Illinois, BARBARA ELIZABETH JOHANNSEN KENDELL, who was first duly sworn by me to testify the whole truth of her knowledge touching upon the matter in controversy aforesaid so far as she should be examined, and her examination was taken by me in shorthand and afterwards transcribed (her signature having been not waived) and said deposition is herewith returned.

IN WITNESS WHEREOF I have hereunto set my hand and affixed my Notarial Seal this 21st day of March A.D., 2005.

*OFFICIAL SEAL*
*DARLENE M. NIEMEYER*
*NOTARY PUBLIC, STATE OF ILLINOIS*
*MY COMMISSION EXPIRES 3-3-2007*

*Darlene Niemeyer*
Notary Public and Certified
Shorthand Reporter

Illinois CSR License No.: 084-003677
My Notary Commission Expires: 03-03-2007